**UNITED STATES DISTRICT**
**DISTRICT OF MASSACHUSETTS**


**JOHN L. McCULLOUGH, III,**          )
          **Plaintiff,**                )
          **vs**                        )     No. 1:22-CV-10177-RGS
**OFFICER SCOTT ROBY**                  )
**(personal capacity) and OFFICER**     )
**FRANK WOODS (personal capacity),**    )
          **Defendant.**                )


BEFORE THE HONORABLE RICHARD J. STEARNS
UNITED STATES DISTRICT JUDGE
JURY TRIAL DAY 1


John Joseph Moakley United States Courthouse
Courtroom No. 21
One Courthouse Way
Boston, Massachusetts  02210


MONDAY, FEBRUARY 26, 2024
9:15 A.M.


Catherine L. Zelinski, RPR, CRC
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 7205
Boston, Massachusetts  02210
Email: CAL.Zelinski.Steno@gmail.com


Mechanical Steno - Computer-Aided Transcript

**APPEARANCES:**

Joshua O'Neill
The Boston Defender
100 Cambridge Street, 14th Floor
Boston, MA  02114
Tel: 617.356.7784
Email:  Josh@bostondefender.com
for Plaintiff.


Edward F. Whitesell, Jr.
Senior Assistant Corporation Counsel
-and-
Bridget I. Davidson
Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA  02201
Tel: 617.635.4045 (Whitesell)
     617.635.3238 (Davidson)
Email: Edward.whitesell@boston.gov
       bridget.davidson@boston.gov
for Defendants.

**P R O C E E D I N G S**

1   THE CLERK:  All rise.

2   (The Honorable Court Entered.)

3   THE CLERK:  Court is in session.  You may be

4   seated.

5   THE COURT:  Good morning, counsel.  This should be

6   quick.  We should have jurors at quarter of ten, and

7   fortunately we're first.  And, in fact, we're the only session

8   empaneling which is good for us.

9   I appreciate the effort that parties put in working

10  out the exhibit list.  That looks perfectly fine to me and will

11  eliminate any potential disputes.  My sense is that we can

12  probably finish the evidence tomorrow with arguments and charge

13  on Wednesday.  Does that sound realistic if we go all day today

14  and then as long as it takes on Tuesday?

15  MR. O'NEILL:  I think that's realistic, yes, Judge.

16  MR. WHITESELL:  I agree.

17  THE COURT:  Just going over what we've got.  But in

18  terms of what -- and we'll let the evidence speak for itself as

19  we develop the jury instructions, but I think after reviewing

20  the complaint and the pleadings as thoroughly as I could, I

21  think what I'm going to tell the jury, at least for the time

22  being, the claims that are going to be tried to them are the

23  excessive force claim, the resisting arrest claim, disorderly

24  conduct claim, the excessive use of force claim, the seizure

**P R O C E E D I N G S**

1  THE CLERK:  All rise.

2  (The Honorable Court Entered.)

3  THE CLERK:  Court is in session.  You may be

4  seated.

5  THE COURT:  Good morning, counsel.  This should be

6  quick.  We should have jurors at quarter of ten, and

7  fortunately we're first.  And, in fact, we're the only session

8  empaneling which is good for us.

9  I appreciate the effort that parties put in working

10  out the exhibit list.  That looks perfectly fine to me and will

11  eliminate any potential disputes.  My sense is that we can

12  probably finish the evidence tomorrow with arguments and charge

13  on Wednesday.  Does that sound realistic if we go all day today

14  and then as long as it takes on Tuesday?

15  MR. O'NEILL:  I think that's realistic, yes, Judge.

16  MR. WHITESELL:  I agree.

17  THE COURT:  Just going over what we've got.  But in

18  terms of what -- and we'll let the evidence speak for itself as

19  we develop the jury instructions, but I think after reviewing

20  the complaint and the pleadings as thoroughly as I could, I

21  think what I'm going to tell the jury, at least for the time

22  being, the claims that are going to be tried to them are the

23  excessive force claim, the resisting arrest claim, disorderly

24  conduct claim, the excessive use of force claim, the seizure

1 claim, and the interference with the right to free speech.

2        Mr. O'Neill, I'm going to allude to false arrest.  I

3 don't understand why you'd do false arrest and then draw in a

4 more difficult concept like malicious prosecution.  You should

5 take a basic straightforward Civil Rights and that would

6 introduce the concept of malice, which is almost impossible to

7 prove.  So I would think about that.

8        In terms of the conspiracy case as I'm not convinced I

9 was right.  There's nothing in the complaint that refers to an

10 agreement.  So I don't think there's any basis to put

11 conspiracy, and I don't think it really is appropriate anyway

12 to the jury.

13        I don't mind throwing in the Mass. Civil Rights Act

14 claims, but do you really want to complicate a straightforward

15 claim with concepts of intimidation?  You know, the state

16 statute is a little more complex and confusing.  But think

17 about it.  But right now I'm just saying that there will be

18 state and federal claims involved in the case.  But it just

19 occurred to me, if I were trying the case, I'm not sure I'd

20 want to throw in strange concepts when the Civil Rights Act

21 federally is so straightforward.  But you're the lawyer, not

22 me.  I just work here.  Okay?

23        So any last things we need to take up before the

24 jurors come in?

25        MR. WHITESELL:  Yeah, a couple of housekeeping

1  matters.

2      One, our paralegal is here to assist us with

3  electronics, the video.  I want to ask the Court's permission

4  in advance that she'd be able to come in front of the bar to

5  help us with the electronics.

6      THE COURT:  She actually will be more valuable than

7  any of you.

8      MR. WHITESELL:  Yes, your Honor.

9      THE COURT:  Yes, of course.

10     MR. WHITESELL:  The second thing is that, in both --

11  there's two things that relate to the video that has been

12  redacted for the portion involving the knee.  The first is the

13  way that this has been redacted, we didn't want to remove time

14  and have the jury question it, so it has been blacked out for

15  that nine-second period.  And we were wondering if your Honor

16  would be willing to give an instruction that the jury is not to

17  infer anything one way or the other about what had occurred?

18     THE COURT:  Yeah, just warn me when that is about to

19  happen.

20     MR. WHITESELL:  And finally, your Honor, on that

21  issue, I think we left it kind of open on Friday.  Counsel

22  suggested that he might want to have his client testify

23  regarding the knee or to use it in his opening, and I thought

24  your Honor's order was very clear that the knee was out of the

25  case because Officer Turner is not a defendant, and I just

1    wanted to see if --

2         MR. O'NEILL:  I won't.

3         MR. WHITESELL:  I just wanted to clarify that.

4         MR. O'NEILL:  And just so the record's clear, Judge, I

5    went back and looked at Mr. Whitesell's motion in limine and

6    your Honor's order and it was clear that we're not to get into

7    anything about that.

8         THE COURT:  Okay.

9         MR. O'NEILL:  So I do want to note that the video

10   still has Mr. McCullough saying he can't breathe.

11        THE COURT:  We've said that was --

12        MR. O'NEILL:  But, and Mr. McCullough and I have had

13   conversations that if he talks about that, he's not to mention

14   any knee or anything of that.  I wanted everybody to be aware

15   of that we won't talk about the knee.

16        THE COURT:  Okay.

17        Be ready in about 20 minutes and we'll be underway.

18   Rebecca and Chase, will handle the preemptory challenges.  That

19   should go quick since there are only three on each side.

20        Do you have the instruction sheet?

21        THE CLERK:  I did.  I gave it to them.

22        THE COURT:  Okay.  So everybody is clear, then, on how

23   we proceed?

24        Okay, see you in 20 minutes.

25        THE CLERK:  All rise.

1    (The Honorable Court Exited.)

2    (The Court Stood in Recess).

3    THE CLERK:  All rise.

4    (The Honorable Court and Potential Jurors Entered.)

5    THE CLERK:  All persons having business before the

6  Honorable Richard G. Stearns, United States District Judge, now

7  sitting at Boston, within and for the District of

8  Massachusetts, may draw near, give their attendance, and they

9  shall be heard.

10    God save the United States of America and this

11  Honorable Court.  Court is open.  You may be seated.

12    This is civil action No. 22-10177, _McCullough v. Roby_

13  _and Woods_.

14    Could I please ask the prospective jurors to stand

15  again?

16    Please raise your right hand.

17    (Venire Sworn.)

18    THE CLERK:  Thank you.  You may be seated.

19    Would counsel please identify themselves for the

20  record?

21    MR. O'NEILL:  Good morning, everyone.  My name is Josh

22  O'Neill.  I represent John McCullough.  Good morning.

23    MR. WHITESELL:  Good morning, everyone.  My name is

24  Edward Whitesell with the City of Boston Law Department.  With

25  me is Bridget Davidson also a lawyer with the City of Boston

 1  Law Department, and my paralegal -- our paralegal Emily

 2  Summersby.  And my clients are Scott Roby and Frank Woods.

 3          MS. DAVIDSON:  Good morning, everybody.

 4          THE COURT:  Good morning, counsel.  Good morning,

 5  Mr. McCullough.  Good morning, jurors.  It's a pleasure to see

 6  you here.

 7          As you heard, you may remember, my name is Richard

 8  Stearns.  This is probably evident, I'm a judge of the district

 9  court.  This is a sitting of the civil session of the court.

10  That is, the case that will be decided is a civil case, not a

11  criminal case.  Most of you are not going to be chosen, which I

12  regret, because we only have room for eight jurors for this

13  case.

14          Now, why are you here?  Because you're absolutely

15  essential to the functioning of the justice system.  Under our

16  Constitution, while as a judge I may have a great deal of

17  authority over matters of law, I have no authority over finding

18  of fact unless I'm called as you are, as a juror.  And, in

19  fact, I was just called in January to Dedham Superior Court

20  which was kind of nostalgic for me, because as a Superior Court

21  judge, I used to sit there as a judge.  So being called back to

22  familiar territory.  It turns out now that there's no lawyers'

23  ever interested in having me on a jury.  I've never -- I've

24  come close, but I never really had the pleasure of doing

25  anything but presiding over jury cases.

As the Constitution as framed, in any civil trial of any consequence, and by consequence, the framer is met any time more than $20 was at stake. That was a lot of money in 1789. Well, it still is a lot of money today, but it is a very low threshold for a jury demand. And, again, in any criminal case of any significance, that is, any case involves imprisonment for more than six months potentially, if either side wishes, only a jury can make the factual resolutions of the case. So as you'll gather from that brief introduction, without you there would be no justice system. We couldn't function without jurors. And I think of all the offices that we're called to, this may be the most democratic in a way and the most important. I think voting obviously is very important. But here as it was conceived and as it's worked out over centuries, ordinary citizens, you and me, are given a great deal of power to make very important decisions involving disputes that obviously matter a great deal to the parties involved as is the case here. It's a solemn obligation. As a citizen you don't really have to vote. You should. You don't have to vote. And I think jury service is the only thing that we compel. When I was younger, military service was compelled at least of men, but that no longer is the case either. So of our call to civic duty, this is one of the few that is absolutely firm. But also I think the most rewarding and most important in many respects of what will happen to a citizen in his or her public role.

1            Let me explain that -- I'm going to introduce the

2    parties in the case.  I want to explain a little bit about the

3    case to you so you can answer just a few short questions I have

4    that are intended to determine eligibility to sit on this case.

5    If you have an affirmative response, the answer is "Yes" to a

6    question I ask, if you just raise your hand in the jury box.

7            If you're in the audience, I'll need you to stand and

8    give me the jury number on the back of your -- I think it's on

9    the back of the card.  Now, I only ask that because it's hard

10   for me to keep track of people from this distance.  I can do it

11   from here but not quite back there.

12           And finally saying, this may be the hardest part of

13   jury service.  And I say that because I read a study once that

14   identified the most common phobia we share as Americans is

15   having to stand and speak in front of a room of strangers.

16   According to the study, we fear that more than we do death,

17   which if you think about it just because of concepts -- I don't

18   mean to put any stress on you.  All you have to do is give me

19   your juror number.  No more information.  You only need to

20   answer once.  The reason I'll need to know who you are is if,

21   for whatever reason, I need someone in the audience to take

22   your place of someone who is already a prospectively a juror,

23   I'll want to see you at sidebar so I can hear what you have to

24   say about why you answered the question as you did.

25           In a civil case we turn the person who brings a

1    lawsuit, the plaintiff.  The person or persons sued, we term

2    the defendant or defendants.  There's nothing pejorative about

3    either label.  We borrow the word "Defendant" from the criminal

4    law, but it has no criminal connotation in a civil case.

5    Lawyers just like Latin words, so we chose "Plaintiffs" and

6    "Defendants" to make it easier, at least for lawyers to tell

7    the parties apart.

8            A civil case is brought by way of what is called a

9    complaint.  The complaint is a short statement of facts

10   identifying the legal claims that a person believes that he or

11   she has that entitled him or her to some relief.  That's

12   usually sought, as is here, as in terms of money damages and

13   compensation.

14           The plaintiff in this case, as you heard, as we began

15   the case, is John McCullough.  Mr. McCullough lives in the

16   Mattapan section of Boston.

17           Mr. McCullough, could you stand so people can see you.

18           Is any prospective juror related to Mr. McCullough by

19   blood or by marriage or does any prospective juror know

20   Mr. McCullough?

21           (No Response.)

22           THE COURT:  All right.  Earlier you met

23   Mr. McCullough's lawyer, Joshua O'Neill.  He has offices here

24   in Boston.

25           Is any prospective juror related to Mr. O'Neill by

1  blood or by marriage or does any prospective juror know

2  Mr. O'Neill?

3       (No Response.)

4       THE COURT:  The defendants in this case are Scott Roby

5  and Frank Woods seated at counsel table.  Mr. Roby and

6  Mr. Woods are Boston Police patrol officers.

7       Is any prospective juror related to Officer Roby or

8  Officer Woods by blood or by marriage?  Or does any prospective

9  juror know either or both of the defendants?

10      (No Response.)

11      THE COURT:  Again -- thank you.  They introduced

12  themselves before, but the defendants' attorneys are Edward

13  Whitesell and Bridget Davidson who are attorneys with the law

14  office with the City of Boston.

15      Is any prospective juror related to Mr. Whitesell or

16  Ms. Davidson by blood or by marriage?  Or does any prospective

17  juror know one or both of the attorneys?

18      (No Response.)

19      THE COURT:  This, you're going to find, is a very

20  short trial as you'll now understand, because in addition to

21  the parties, the only other witnesses we may hear from are

22  Thomas Brooks and Saequan Sparks-Clancy.  They're both also

23  Boston Police officers.

24      Does any prospective juror know Mr. Brooks or

25  Mr. Sparks-Clancy?  Or are you related by any way, blood or by

1  marriage to either of these potential witnesses?

2          (No Response.)

3          THE COURT:  All right.  I explained what a complaint

4  is.  Here in this case let me just briefly describe what is

5  alleged.  And then my next questions will make, I think, more

6  sense to you.

7          According to the complaint, the plaintiff in the case,

8  Mr. McCullough, alleges that on April 25, 2020, while he was on

9  Blue Hill Avenue in Mattapan, he began filming on his cellphone

10  a civilian traffic stop conducted by the two Boston Police

11  officer defendants who are present here today.  There was a

12  third officer, I think, involved but not a defendant in this

13  case, but who will be one of the witnesses potentially,

14  Mr. Brooks, as I identified earlier.

15          When the stop concluded, Mr. McCullough attempted to

16  interview the driver who had been stopped by the police.

17  Officer Roby then asked him to desist.  Confrontation ensued

18  which resulted in Mr. McCullough's arrest.  Mr. McCullough

19  contends that the officers used excessive force while taking

20  him into custody and falsely charged him with assault and

21  battery, resisting arrest, and disorderly conduct.  Not

22  disputed, these are charges of which eventually he was

23  acquitted in a trial in the state district court.

24          The claims, which I'll explain in more detail very

25  soon, because the trial is going to end very soon, but right

now rather than give you legal definitions, let me just tell

you that you're going to be hearing claims of false arrest,

excessive use of official force, unlawful seizure, and

interference with the right to free speech.

The defendant officers for their part maintain that

they acted properly and within the constitutional limits.  But,

anyway, this is the dispute that the jury will have to resolve.

With this brief description of the case in mind, let

me just ask the following general and I'll get -- questions and

then I'll get more specific.

Does any prospective juror have a personal interest in

the outcome of the case?

(No Response.)

THE COURT:  Has any prospective juror formed or

expressed an opinion about this case?

(No Response.)

THE COURT:  Is any prospective juror aware of any

bias, prejudice or other reason that would make it difficult

for you to act impartially on the case as I described it?

(No Response.)

THE COURT:  Does any prospective juror have any

difficulty hearing?  A difficult question to answer if you do.

But if everyone can hear me, I think the acoustics are quite

good and we have a pretty good sound system so I don't think

that will be an issue for anyone in the trial.

1          (No Response.)

2          THE COURT:  Does any prospective juror have difficulty

3     understanding the English language?

4          (No Response.)

5          THE COURT:  Do any of you have a physical condition

6     that might affect your ability to sit comfortably and

7     concentrate during a trial?

8          THE CLERK:  What's your number?

9          PROSPECTIVE JUROR:  33.

10         THE COURT:  Anyone else have a response?

11         THE CLERK:  You can sit.

12         THE COURT:  Okay.

13         There's nothing disqualifying about this.  This is

14    just a question that we're interested in.

15         Is any prospective juror employed in a law enforcement

16    capacity or is any member of your immediate family so employed?

17         Juror No. 1.

18         Okay, did I miss anyone?

19         Well, as you gathered, again, by the introduction --

20         THE CLERK:  Your number?

21         THE COURT:  I'm sorry.

22         PROSPECTIVE JUROR:  I'm sorry.  1023 --

23         THE CLERK:  No, the two digit number.

24         PROSPECTIVE JUROR:  Two digit number.  40.

25         THE COURT:  40.  Okay.  Lucky number.

1          All right.  As you'll gather, a number of the

2    witnesses that we're going to hear from are Boston Police

3    officers.  Well, number is probably an exaggeration.  You'll

4    hear from four at most.

5          Would any prospective juror be inclined to consider

6    the testimony of a law enforcement officer to be more or less

7    credible based solely on the fact of his or her law enforcement

8    employment?

9          (No Response.)

10    THE COURT:  As you'll observe, the plaintiff,

11    Mr. McCullough, is a Black American.  Is any juror aware of any

12    bias or prejudice that you might have on the subject of race

13    that might in any way impede your ability to act impartially as

14    a juror in a case in which a Black American is suing white

15    police officers?

16          (No Response.)

17    THE COURT:  Has any prospective juror or a close

18    family member been involved as a party, victim, or witness in a

19    lawsuit that sounds similar to this one?

20          (No Response.)

21    THE COURT:  Okay.  This -- I'm not going to ask

22    anything about deliberations or verdicts, but this is my --

23    just out of my curiosity.  Have any of you served previously as

24    jurors?

25          One person.  Two.

1          Civil cases or criminal cases?  I assume this is in

2     the state court.

3          PROSPECTIVE JUROR:  State or federal?

4          THE COURT:  State or federal?

5          PROSPECTIVE JUROR:  Civil.

6          PROSPECTIVE JUROR:  Civil.

7          THE COURT:  Civil.  Okay, but not that many.

8          Has anyone served on a grand jury?  Has anyone served

9     on a grand jury?

10         (No Response.)

11         THE COURT:  I say that -- years ago I was a

12    prosecutor.  My first introduction to real life was in a grand

13    jury settings.  I think that's an interesting duty, too.

14         Well, again, this is a good sign as I see it that a

15    few of you actually have served to this point.  When I began as

16    a trial lawyer many years ago in the state system, we had a

17    much different way of selecting jurors.  It was called a

18    Key-Man system and it was manned to basically -- ran the system

19    as it existed.  But, again, in that time jurors didn't come

20    from one trial and then go off three years theoretically for

21    the next summons to jury service.  You actually served a term

22    of office.  I don't remember now, it was either three or six

23    months, and you had the option of reenlisting if you chose.

24    Where the jury pool came from, this is where the expression

25    "Key-Man" arose, there would be an official in each county who

1    would designate the person who in each town would pick the

2    potential jurors would be sent to the county jury pool.  Well,

3    what happened over time is that people who did serve,

4    particularly over six months or three months, whatever the

5    service was, sat through long trials and they came to like the

6    work so much that they started to reenlist constantly, and over

7    time we ended up with a very professional court of jurors.

8    They were very, very good.

9          The best training I got as a young lawyer was after I

10   lost a case, which happened more often than I cared to admit.

11   If the jurors felt particularly sorry for me, they would invite

12   me for coffee and tell me everything I done wrong over the

13   course of the trial.  In those days jurors could talk --

14   lawyers could talk to the jurors then.  Now the discovery rule

15   has changed.  Only if the juror volunteers themself, can the

16   lawyer actually speak to a juror after a trial.  We abolished

17   that system, and we went to, again, the one trial, no exemption

18   system here.  People are always surprised that the one reason I

19   brought that up in the beginning, as a judge, I'm not exempt

20   either.  I get called on the same basis as you do and have the

21   same chance of actually sitting as a juror.  It's a much better

22   system.  It's much more democratic.  It gets more people access

23   to the system.  I think it gives us a much more representative

24   pool of jurors.  So I think it's working very, very well.

25          As I said, this case is going to be a short one.  It

1    doesn't mean that it's not as important as any other case.

2    It's just that the issues are very focussed in this case.  We

3    anticipate, and I met with the lawyers last week and again this

4    morning, that we will finish -- we'll sit today, and we should

5    finish the evidence tomorrow.  Probably not much later than

6    lunch.  Wednesday morning we'll hear the arguments of charge

7    and begin the deliberations which will probably be Wednesday as

8    an obligation for you.  But I don't expect a full day on

9    Tuesday, but we'll -- at the end of the day today as we see how

10   we're progressing, I can give you an accurate forecast on what

11   would remain to be done on Tuesday.

12          So with this schedule in mind, would any prospective

13   juror face some insurmountable difficulty siting as a juror for

14   this short period of time?  By "insurmountable," I do not mean

15   holiday or business travel could be postponed.  I mean

16   something on the order of the son or a daughter's wedding, your

17   own wedding, non-elective surgery of an infant or sick child or

18   parent at home under your personal care or the dream vacation

19   packaged to Hawaii in which fully one half of your

20   nonrefundable life savings are invested in.

21          With those caveats does any juror have an

22   insurmountable conflict that would make service impossible?

23          Is that No. 3?

24          THE CLERK:  Your number, sir?

25          PROSPECTIVE JUROR NO. 10:  10.

```
 1              THE CLERK:  Anyone else?  Number?

 2              PROSPECTIVE JUROR NO. 24:  24.

 3              PROSPECTIVE JUROR NO. 8:  8.

 4              THE COURT:  Okay, those are the questions -- don't

 5    mean to cut you off.  Just have to be aggressive.  No. 8.

 6              Okay, for those who do and have responded

 7    affirmatively, I want to meet with you with the lawyers and the

 8    parties at sidebar here so we can get a little bit more private

 9    circumstances, pursue the reasons why you raised your hand.

10              Counsel, if I can get you up here?

11    (The following proceedings were conducted at sidebar.)

12              THE CLERK:  Juror No. 1.

13              THE COURT:  You said a family member in law

14    enforcement?

15              PROSPECTIVE JUROR NO. 1:  I'm a military police

16    officer.

17              THE COURT:  Congratulations.  In which branch?

18              PROSPECTIVE JUROR NO. 1:  Army National Guard.

19              THE COURT:  Anything about your personal experience

20    that would doubt your ability to be impartial?

21              PROSPECTIVE JUROR NO. 1:  No.

22              THE COURT:  Okay.  Have a seat, No. 1.

23              THE CLERK:  Juror No. 3, Judge.

24              THE COURT:  This is Ms. L?

25              PROSPECTIVE JUROR NO. 3:  Yes.
```

1        THE COURT:  And you said scheduling conflict?

2        PROSPECTIVE JUROR NO. 3:  One of my children was in

3   the Emergency Room until two o'clock this morning.

4        THE COURT:  What are you doing here?

5        PROSPECTIVE JUROR NO. 3:  I'm a stay-at-home parent.

6   He's doing okay, and I'm a stay-at-home parent and he's not

7   able to do to his usual --

8        THE COURT:  You should have stayed home.

9        PROSPECTIVE JUROR NO. 3:  He's okay.  Given the time

10  frame --

11       THE COURT:  Let's not take any risk.

12       PROSPECTIVE JUROR NO. 3:  Thank you, I appreciate it.

13       THE CLERK:  Bring this back to the second floor where

14  you checked in this morning.

15       Juror No. 8.

16       MR. O'NEILL:  I just want to note when you're asking

17  about whether anybody had trouble hearing, she appeared to

18  partially raise her hand.

19       THE COURT:  She'll bring it up.

20       THE CLERK:  Juror No. 8.

21       THE COURT:  No. 8, this is Mrs. C?

22       PROSPECTIVE JUROR NO. 8:  Yes.  I'm in the dental

23  healthcare field and I have patients for the next three days.

24       THE COURT:  You're a dental hygienist?

25       PROSPECTIVE JUROR NO. 8:  Dental hygienist, and I have

1   to call to have them cancel my patients.

2         THE COURT:  Okay.  The bad news and good news.  The

3   bad news is under law, I can't excuse under economic hardship.

4   The good news is since I have so many willing jurors here,

5   unless counsel object, I don't see any reason to have you miss

6   your patients.  Okay?

7         THE CLERK:  Bring this to the second floor.

8   (End Sidebar.)

9         THE CLERK:  Juror No. 9, you're going to sit right

10   here.  And juror No. 10 you come with me.

11   **(The following proceedings were conducted at sidebar.)**

12         THE CLERK:  Juror No. 10 scheduling, I believe.

13         THE COURT:  Mr. S, you have a scheduling conflict?

14         PROSPECTIVE JUROR NO. 10:  So my wife is pregnant with

15   our first child.  Her due date is early next week.  It's -- I

16   wasn't able to get clarity beforehand if she were to go into

17   labor if I was here, if I was able to go.

18         THE COURT:  I'm afraid there's no science that can

19   tell you --

20         PROSPECTIVE JUROR NO. 10:  Sure.

21         THE COURT:  All right, let's let you go then.

22         THE CLERK:  Okay, I have 9 in seat 3 and 11 in seat 8.

23         THE COURT:  Okay.

24   (End Sidebar.)

25         THE COURT:  We do have a full complement of eight

eligible jurors.  At this point we exercise what are called

preemptory challenges.  When I say "We," each side has a

limited number of challenges they can make to a juror for any

reason that they choose without explanation.  If you are

challenged, do not take it personally.  I was a trial lawyer

when I was younger.  I used to challenge jurors all the time.

Had no clue what I was doing.  The other lawyers are doing it,

I thought I'd look unprofessional if I didn't do it, too.  So

chances are we could ask, it wouldn't be much of an

explanation.  My law clerks, Rebecca and Chase will receive the

exercise of the peremptories.  And there are very few of them,

so this is not going to take very long.

We do have, as you heard, entertainment.  This is Guy

Fishman who's the cellist with the Handel and Haydn Society.

He has been doing some Bach recitals here.  The reason I

mention this is that to get permission to use this music at the

qualis that I mentioned for every juror, it's the oldest

performing musical orchestra group in the United States.  It

dates back to the early 19th century, and I do recommend it to

you if you ever have the chance to attend one of the concerts.

All right, counsel, when you're ready would you see

if --

(Peremptory Challenges Held off the Record.)

THE CLERK:  I want to check everyone in the box; 12,

2, 9, 4, 5, 6, 13, 11.

1       THE COURT:  All right.  Congratulations.  The eight of

2  you seated will be the jury who will hear this case.

3       I think I'm wrong.  I think that was Vivaldi that

4  Fishman was playing.  But maybe somebody with more musical

5  knowledge than perhaps I have.

6       All right, will everyone stand, please, while the

7  jurors are sworn.

8       THE CLERK:  The jurors in the box please raise their

9  right hand.

10                    **(Venire Sworn.)**

11       THE CLERK:  Thank you.  You may be seated.

12       THE COURT:  All right.

13       Those who were not chosen, I'm sorry you weren't.  But

14  if you report downstairs, hopefully there's another judge

15  looking for jurors for a trial today.  But those not chosen for

16  this case are now excused to return to the jury assembly room,

17  again, with my thanks.

18       (Remaining Venire Excused.)

19       THE COURT:  All right, jurors, I know it's been a --

20  so far a long, hopefully not a challenging or daunting morning.

21  But we do have refreshments for you upstairs.  Becca, my senior

22  law clerk, is going to show you the jury room that will be at

23  your disposal during the course of the trial.  We'll explain to

24  you a little bit how to come in the morning and how to get your

25  cellphone if you want your cellphone with you during the day

1  into the courthouse which normally they restrict.  We'll make

2  special arrangements for you.  And we'll come back in 25

3  minutes and we'll hear the opening statements and go right into

4  the trial.  We have the provision to give you lunch today.  So

5  you don't have to worry about looking for lunch.  We'll break

6  around one o'clock for lunch.

7       All right, the jurors are excused.  Report to the jury

8  assembly room.  Actually, the deliberation room and we'll be

9  back, counsel, at five of eleven.

10       (The Honorable Court and Jury Exited).

11       (The Court Stood in Recess).

12       THE CLERK:  All rise for the jury.

13       (The Honorable Court and Jury Entered.)

14       THE CLERK:  We are resuming on the record in civil

15  case 22-10177, _McCullough v. Roby, et al._

16       Thank you.  You may be seated.

17       THE COURT:  All right, jurors, congratulations again.

18  I know this is, for most of you, one exception is probably a

19  new experience.  So let me just give you a few words by way of

20  orientation and then we'll go right to the opening statements

21  of the lawyers.

22       The duty of the jury is to find the facts of the case

23  from the evidence that is presented at the trial.  As I

24  explained during the empanelment, you and you alone are the

25  judges of the facts.  You will then have to apply to the facts,

1    as you find them, the law as I will explain it to you.  You

2    must follow the law as I described it whether you personally

3    agree with the wisdom of the law or not.

4           Now, evidence will consist of basically testimony of

5    witnesses, but we'll also see documents, and in this case some

6    film that will be admitted for your consideration in reaching a

7    verdict.

8           From time to time the lawyers may refer to Answers to

9    Interrogatories.  I'm not sure that will be the case here.  But

10   an Interrogatory in a civil case is a written question asked by

11   each side of the other, and the answers to those

12   Interrogatories become finding of a party giving the answer.

13   Certain things are not evidence and should not factor into your

14   verdict:  Statements, arguments, and questions by the lawyers

15   are not evidence.  What the lawyers have to say will be helpful

16   in setting the context for the evidence you hear.  But the real

17   evidence are the exhibits and the witness testimony as you

18   assess them.

19          Objections to questions are not evidence.  Essentially

20   an objection, which you'll hear lawyers from time to time make,

21   is an obligation they have to their client when they believe

22   that evidence being offered is improper under our rules of

23   evidence.  You should not be influenced by the fact that an

24   objection is made or by the way I rule on it.  If I sustain an

25   objection, ignore the lawyer's previous question and any

1    assertion of fact the question might have contained.  If I

2    sustain the objection, then -- well, as I said, if I sustain

3    the objection, then you'll know what to do.  If I basically

4    overrule the objection, you'll treat the witness's answer as

5    you would any other.  Testimony that I may exclude or instruct

6    you to disregard as not evidence and should not factor into

7    your judgment in reaching a verdict.

8           Anything that you see or hear outside of the courtroom

9    during the course of the trial is not evidence and it should be

10   disregarded.  You must decide the case based solely on the

11   evidence here in open court.

12          There are two types of evidence in a trial:  There is

13   direct evidence and then there is so-called circumstantial

14   evidence.  A term that all of you have heard, but may not have

15   a ready definition for.

16          Direct evidence is direct proof of the fact usually

17   presented through the testimony of a person who claims to have

18   been an eyewitness to an event or a participant in a

19   conversation.  When you evaluate the direct testimony, your

20   decision is straightforward.  Do you believe what the witness

21   has told you is accurate?  Circumstantial evidence on the other

22   hand, is the proof of a chain of circumstances or set of facts

23   for which you can infer, conclude, that another fact is true

24   even though you have no direct evidence of that fact.

25          Assume, for example, when Tim the court clerk arrived

1  this morning, he did not find me in my office, but he found

2  lights on, my coat hanging in the closet, work I had taken home

3  for the weekend spread out on my desk with a copy of this

4  morning's newspaper, and a cup of steaming hot coffee.  This

5  set of facts, even though he had not seen me, he can properly

6  conclude and infer that I arrived for work, but I'm simply

7  somewhere else in the courthouse.  That despite what the

8  television courtroom drama likes to teach, the law draws no

9  distinction between these two types of evidence.  It does not

10  consider one type inferior or superior to the other.  You may

11  consider both direct and circumstantial evidence in reaching

12  your verdict and that evidence will be worth whatever you

13  decide to assign it.

14        Two questions that have come up for the jurors who I

15  always speak with after trial which I'll answer now.  Will we

16  have transcripts of witness testimony during deliberations?

17  The answer is no, and not because we wouldn't give them to you

18  if we could, we just don't have the technology as yet that can

19  produce the transcripts in time for a jury's deliberations.

20        That day will come, but it just hasn't come yet.

21        Well, if we won't have transcripts, can we keep notes?

22  To give you a good example of circumstantial evidence, because

23  you've all been given a notebook and a pen, of course you can.

24  You don't have to if you don't want to.  Some jurors find,

25  particularly in a short trial, note taking distracting.  I find

1    it helpful at least on key points on what I think the evidence

2    shows.  So you'll see me keeping notes, and I suspect the

3    lawyers will as well.  But that's a decision for you to make

4    personally.  If you do keep notes, what I promise you is that

5    no one will ever look at what you've written in the notebook

6    unless you choose to share it with your fellow jurors at the

7    conclusion of the trial during deliberations.  When the trial

8    is over, you get to take that notebook home with you or Tim

9    will shred the contents of anything that you've written if you

10   do leave a notebook behind.

11        Now, this case is a civil case.  So it is governed by

12   a standard of proof we call preponderance of the evidence.

13   This is a much lower standard than proof beyond a reasonable

14   doubt, the standard we apply in a criminal trial.  Essentially

15   proof by preponderance of the evidence is proof that you could

16   determine when you weigh the two competing opinions in

17   determining is more likely true than not.  It's almost assigned

18   mathematical quantity if you chose to.  If it's 51 percent

19   persuasive, then of course you've met the burden, or the party

20   has, of the preponderance of the evidence.  If it's 50/50, it's

21   clear that burden hasn't been met.  But essentially that's all

22   we mean by preponderance of the evidence, is it more likely

23   than not that what you've heard from what you have to judge is

24   true.

25        The way that we proceed is that the first Plaintiff

1    will present his case, which will come very soon.  As I think

2    he'll be the only witness, Mr. O'Neill, for the plaintiff.

3    Then followed by the defendant's case.  Again, this is mostly

4    by way of testimony admitting some exhibits for you to examine

5    as well.  When the evidence is concluded, counsel will have an

6    opportunity then to argue to you, the inferences that they

7    believe you should draw from the evidence that will be as been

8    presented during the trial.  I will then give you the

9    instructions on the law that will guide your deliberations.

10   And my practice is to write these out verbatim so you each have

11   a copy of the legal instructions for use in the jury room which

12   I suspect will be Wednesday morning.

13           One or two special instructions.  First, I ask that

14   you not discuss the case prematurely during the trial.  It

15   doesn't mean that you aren't to comments on things you see in

16   the courthouse and during the trial, but refrain from

17   expressing any ultimate opinion about any significant fact in

18   the case until you've heard all of the evidence and have had

19   the opportunity to hear what your fellow jurors have to say

20   what their opinion is and you have a full chance to discuss it.

21   I also ask that you not attempt to do any independent research

22   on the case on your own.  During this time of the Internet and

23   Google, it's very tempting to want to go and be your own

24   private investigator, but it's important that we decide the

25   case based on the same fund of information which is what we

1    will learn over the course of the trial.  Now as most of you

2    know, an American jury usually consists of twelve persons.  In

3    the federal court in a civil case actually only six jurors are

4    required to render a binding verdict.  I seat eight in the

5    unlikely event that for some emergency someone will not be able

6    to serve the two or three days involved.  But unlike the state

7    court, there are no alternate jurors in the federal court.

8    Because you're in seat seven and eight, doesn't mean that

9    you're an alternate juror.  You're all going to be fully

10   deliberating jurors at the end of the case, again, as I said,

11   because we do not have alternates in federal civil trials.

12          The schedule we will keep, which will be a very brief

13   one, is we'll reconvene at nine o'clock tomorrow morning.  I

14   realize that it's difficult even at nine o'clock to necessarily

15   be here, but it's important that you all be here because we

16   can't start without you.  And I can have the same obstacles

17   that many of you may face.  I lived in Milton so I had the Red

18   Line which caught on fire pretty regularly.  And now I moved to

19   Brookline wherein the Green Line isn't running at all.  So I

20   have to improvise as well in the sense of getting here.  To

21   make it easy for you, we will have a light breakfast set out

22   for you tomorrow morning at eight o'clock.  So you can save

23   some time getting here and get something to eat before we start

24   again tomorrow at nine.

25          As I indicated, we are going to have lunch for today.

1 And depending on the length and how far we go tomorrow, lunch

2 again tomorrow. So we won't waste any time looking for a place

3 to eat. If you want to bring a bottle of water to the jury

4 box, that's fine. But water is what you can have in the

5 courtroom. The only liquid permitted to have.

6 I do hope in the two or three days you also look at

7 the courthouse itself. This is actually considered one of the

8 most beautiful and functional modern federal courthouses. I

9 happen to agree with that as I sat on the committee that

10 basically supervised all construction and renovation of the

11 federal courthouses in the U.S. and I've seen a lot of them.

12 And of the newer courthouses I have to agree, I think this is

13 just a stunning architectural achievement. The building opened

14 in 1998. Federal court actually didn't begin -- well, it did

15 begin in Boston for a year. But we are one of the oldest

16 courts in the country. We go back to 1789. We're not the

17 first. I think New York was probably the first or

18 Philadelphia. But we were certainly the third court to be

19 created, again, by an act of Congress. The first court did not

20 sit in anything quite as magnificent as this surrounding. I

21 think the first courthouse was actually a tavern. It was the

22 old a Bunch-of-Grapes, which as best I can tell, was about

23 where Congress and State Street intersect in downtown Boston.

24 Judge Lowell who was the first, and for actually a century we

25 only had one federal judge in this district. Came to the

conclusion that wasn't terribly dignified to be holding federal
court sessions in a pub. So he moved courthouse to Salem,
Massachusetts. The reason for moving to Salem is that Salem at
the time was the richest seaport in the world. And the funding
of the United States government depended upon customs, tariffs
for 95 percent of its income. So most of the early business
the court did was having business of maritime business,
customs, and excise and it made more sense for the court to
actually be on scene in Salem.

Judge Lowell unfortunately died two years after he
became the first judge, but the next judge who succeeded him,
Judge Dodge, left -- actually fled, let's say when the British
invaded in the War of 1812, in fear of being captured. The
court then moved back temporarily to Boston but then stayed.
And the reason the court stayed was because of the Erie Canal.
Salem's great advantage as a seaport was that it was a day
closer to Europe than New York or Boston. It's not a terribly
a good port, frankly, in the sense of it being deep. So it can
only handle so much traffic at a time. But, again, a day's
advantage will save everybody a lot of money in transporting
goods. So when the court moved here, suddenly you had a day
closer if you used Boston or used New York and it became New
York because the Erie Canal as I remember opened in 1818. And
that became the easiest way to transport manufactured goods
from Europe into the central part of the U.S.

1       The court that when I joined it was at Post Office

2  Square.  Still is the Federal Court, but mostly bankruptcy

3  matters that are considered there now.  Here as I said, we

4  opened in 1998.  The court was designed by I.M. Pei Associates,

5  Henry Cobb being the principal architect.  I.M. Pei, you would

6  note because of the imprint the firm's had on Boston Christian

7  Science Center, the Kennedy Library.  Further afield, the Rock

8  and Roll Hall of Fame in Cleveland.  If you've been to Paris,

9  the last entry to the Louvre is an I.M. Pei work.  In putting

10  the design for the court together, Mr. Cobb actually studied

11  courthouses around New England and tried to incorporate a lot

12  of traditional motifs into the courtrooms themselves.  His idea

13  was that half of the design would be attributed to the old

14  colonial design, the other half, which is expressed by the

15  atrium and the conduit glass wall, is a homage to the modern

16  City of Boston.  So one side of the courthouse is a very modest

17  brick-facing exterior, the other is a spectus, as I said,

18  iconic wall which is the largest of its kind ever successfully

19  constructed.

20       The stenciling comes, again, I think from the new

21  famed courthouse in Vermont.  The beehive of brickwork frames

22  the door as you came into this room, is from a -- the

23  courthouse in Wiscasset, Maine.  Mr. Cobb admired the design.

24  It turned out that there was only one mason left who remembered

25  how to do that particular kind of work.  He was retired

significantly enough in Maine.  He decided to come not to build
the entrances, but to train a whole group of young masons on
how to do the work.  So we got not only the benefit of the
design, but also was able to save the craft itself.

The benches are Shaker-style, the ones that you sat on
waiting to be impanelled.  In true Shaker tradition, they're
meant to be very uncomfortable and to keep your attention on
what's going on in the room.  I apologize for that.  But we do
get the design in return.

The other interesting feature of the courthouse is
that in federal -- when we federal construction for a public
building, you're required to put aside a small percentage of
the construction costs for art.  And that was the case here.
The part here was chosen by Justice Breyer and by Judge
Woodlock who is one of my colleagues who sort of sat as the
court's representative in the design, overseeing the design of
the building.  What they chose are the abstract panels that you
see in the rotunda and at the end of each hallway.  They're
done by Ellsworth Kelly.  He was the founder of what is called
the Hardage or minimalist school.  It's a Paris School of Art
where he was trained.  Its motifs are basically geometric
shapes and had a passion for vivid colors.  Now, I will confess
when I first saw the Kelly installations, I was fully convinced
they were not art because I had this idea that I could have
done the same thing and therefore it can't be art.  And then as

1    I thought about it over the years, I couldn't have done the

2    same thing because I wouldn't have had the imagination.  I

3    would have gone out and bought some stale oil paintings of

4    ships that nobody would be interested in after a week.  Where

5    these always catch my imagination, as Kelly said they would.

6    Kind of understand what significance I can assign to them.  But

7    I leave that judgment to you.

8         I'll give you one last thing to go look at.  At the

9    elevator at the very bottom when you come up to the courtrooms,

10   there's a large plaque on the wall with a thousand names on it.

11   Those are the names of every worker who participated in the

12   construction of this building.  I would not be surprised during

13   the next couple of days, you'll have to see someone down there

14   with their grandchildren or children pointing out their name on

15   the wall because they're very proud of the building as it

16   stands.

17        All right, let's build it by way of introduction.

18   Let's begin now with opening statements.  The plaintiff will go

19   first followed by the defendant.

20        Mr. O'Neill, this is your opportunity to address the

21   jury.

22   **OPENING STATEMENT ON BEHALF OF THE PLAINTIFF**

23        MR. O'NEILL:  Thank you very much, your Honor.

24        No one deserves to be treated the way Mr. McCullough

25   was treated on April 25, 2020.  No one deserves to be treated

the way Mr. McCullough was treated in the lead-up to April 25th

of 2020, and then also what followed after that.  That's what

this case is about, Members of the Jury.  How Mr. McCullough

was treated up to April 25, 2020, on that day, and then

afterwards by Officers Scott Roby and Frank Woods.

Good morning, again, Members of the Jury, my name is

Josh O'Neill.  I represent Mr. McCullough.  It's my honor and

privilege to do so.  I want to talk to you a little bit about

what we expect or what I expect or what Mr. McCullough expects

that the evidence in this case will show.

First, let's talk about the lead-up into April 25,

2020.  You're going to hear testimony and also see a video, at

least one, of interaction between Mr. McCullough and Officer

Roby.  It happened in approximately in the six to eight weeks

leading up to April 25, 2020.  And you'll see an exchange of

words between the two of them.  And you'll also see at Mr. --

excuse me, Officer Roby says a street address to

Mr. McCullough.  This is an address that he associated with

where Mr. McCullough lives.  You'll also hear Officer Roby talk

about how Mr. McCullough was in the street at the time of their

interaction, and that if Mr. McCullough didn't leave the

street, that Officer Roby intended to lock him up.  Intended to

arrest him.  They parted ways.  There weren't any -- there

wasn't really any events that occurred after this interaction

before April 25, 2020, but they had some interactions just

1  before that that you won't see a video of.  And then also in

2  the weeks after that, a short exchange of words.  Another

3  mention by Officer Roby of Mr. McCullough's address.  And then

4  we'll come to the date at issue in this case, April 25, 2020.

5        Just to orient everybody, it's about -- not far after

6  the COVID-19 pandemic started in full force.  You'll see video,

7  multiple videos of the events, the interactions between

8  Mr. McCullough and Officers Roby and Woods on that day.  It's

9  in the early morning hours of Saturday, April 25th.  Another

10  way to think about it is the evening of Friday, April 24, 2020.

11  And what you'll see is that Mr. McCullough was out on Blue Hill

12  Avenue in Mattapan, and he was filming a traffic stop that was

13  being conducted by Officer Roby.  Officer Roby had stopped a

14  car on Blue Hill Avenue.  Officer Woods responded to assist

15  partially through when the traffic stop was -- had proceeded.

16  And what you'll see is that -- you'll see the orientation of

17  the lanes on Blue Hill Avenue.  So you'll see that there's

18  buildings.  You'll see that there's a sidewalk for pedestrians.

19  You'll see that there's a parking lane cut out where cars are

20  parked at the time.  You'll see that there's a biking lane, and

21  you'll see that there are two driving lanes and a median.

22        And the car is stopped near a corner and is

23  essentially into -- partially in the biking lane and partially

24  into that first driving lane closest to the sidewalk.  You'll

25  see Mr. McCullough filming the traffic stop.  You'll see

1     Officer Roby, Officer Woods near the car.  You'll see Officer

2     Roby's perspective of his interaction with the individuals in

3     the car.  And initially there's no interaction between anyone

4     at all.  Mr. McCullough is silently there filming.  You'll see

5     he has a device with what is his Smartphone, his phone filming.

6     And then after the traffic stop concludes and Officer Roby and

7     Officer Woods go back to their vehicles, you'll see that

8     Mr. McCullough walks around the front of the car to go speak

9     with the driver and a few other individuals in the car.  After

10     he's doing this, you'll see the exchange between them.  Officer

11     Roby sees him in the street.  And you'll see that Officer Roby

12     and Officer Woods, they were both in their full uniforms,

13     badges visible in marked cruisers with their emergency lights

14     on.  You'll see Officer Roby get out of his vehicle, go speak

15     to Mr. McCullough, and tell him to get out of the street.  He

16     approaches Mr. McCullough, walks towards the car.

17     Mr. McCullough does so.  Goes back around the car and back onto

18     the sidewalk, and Officer Roby then has a brief exchange with

19     the individuals in the car, begins walking back towards his

20     cruiser.  As that's happening the car drives away.  There's

21     really no interaction or no relevance of the car as it relates

22     to Officer Roby and Mr. McCullough.

23         As Officer Roby's walking back towards his vehicle,

24     you'll see Mr. McCullough walking, essentially mirroring him.

25     Slightly behind him but walking almost parallel with him as

1  Mr. -- excuse me, as Officer Roby is walking back to his

2  vehicle.  You'll hear Mr. McCullough ask for Officer Roby's

3  badge number.  And you'll see the moment when Officer Roby

4  decides he's going to arrest Mr. McCullough.  You can see he's

5  walking towards his cruiser and all of a sudden he turns, faces

6  Mr. McCullough, walks towards him and takes out his handcuffs.

7  And the reason that he says that he does that, what the

8  evidence will show is that Mr. McCullough had stepped back off

9  of the sidewalk into the parking lane.  And Officer Roby took

10  that to mean that he was in the street again.  He already told

11  him to get out of the street, and so he arrested him for it.

12  So from there starts a physical interaction between them.

13  Officer Roby grabs Mr. McCullough's clothing, they circle each

14  other.  Officer Woods at the same time is -- sees what's going

15  on and responds.  So he had walked back towards his vehicle, he

16  begins walking, jogging back towards Officer Roby and

17  Mr. McCullough.  You'll see Mr. McCullough push back and

18  slammed into a yellow clothing bin where you can put donations

19  in.  You'll see that in the video.  You'll see him arrested.

20  You'll see Officer Roby and Officer Woods put the handcuffs on

21  him.  You'll hear as that's happening that Mr. McCullough says

22  something to the effect of "What did you spray me with?"  And

23  during the course of the arrest pepper spray or OC spray is

24  deployed and affects both Officer Roby and Mr. McCullough.

25  Eventually after a relatively short period of time, we're

1  talking about a matter of 30 seconds or so, Mr. McCullough's

2  handcuffed, taken back to Officer Roby's cruiser.  There's a

3  short period of time where Officer Roby and Officer Woods are

4  waiting.  Officer Roby, because of the pepper spray has to call

5  his supervisor to respond.  That's Lieutenant Thomas Brooks.

6  He responds -- at the time was Sergeant Thomas Brooks, now it's

7  Lieutenant Thomas Brooks.  He responds, has a brief

8  conversation with Mr. McCullough.  Officer Roby gets into his

9  vehicle where Mr. McCullough is in the back seat and they drive

10  back to the B3 police station, which is 1165 Blue Hill Avenue,

11  Mattapan area, City of Boston.

12        Officer Woods gets back in his vehicle drives back to

13  the station as well.  His involvement essentially ends at that

14  point.

15        The drive to the station is very short.  Talk about a

16  matter of a few blocks from where this arrest, this interaction

17  happened.  And what you'll see is that when Officer Roby and

18  Mr. McCullough get back to B3 station, Mr. -- excuse me,

19  Officer Roby takes Mr. McCullough out of the vehicle and

20  Mr. McCullough starts screaming.  Screaming for help.  Saying

21  that he's being killed.  His property is being taken.  Because

22  he's terrified.  You'll see Officer Roby has -- basically has

23  the back of -- has Mr. McCullough's hands cuffed.  He has his

24  hands cuffed behind his back.  Some other officers respond to

25  assist.  They bring him in to, they bring him in to the booking

1   area of the B3 station.  On the way, Mr. McCullough's body hits

2   the garage door that Officer Roby and Mr. McCullough have to

3   walk through to get to the booking area.  And then you'll see

4   Mr. McCullough brought to the booking area, falls to the floor,

5   and is searched and processed by a number of officers who

6   respond.  During this interaction you'll see that, and you'll

7   hear about -- that Mr. McCullough -- Mr. Roby put

8   Mr. McCullough's hood over his head.  His mask was falling down

9   he felt that as Mr. McCullough was yelling he was spitting.

10   When Mr. McCullough's on the floor of the booking area, you'll

11   hear him talk about how he can't breathe.  He's having trouble

12   breathing, asking for the hood to be removed.  And then that's

13   essentially the end of the interaction on April 25, 2020.

14        You'll hear a little bit more about how Mr. McCullough

15   spoke with then Sergeant Brooks.  Sergeant Brooks took pictures

16   of Mr. McCullough and Mr. Roby.  And you'll hear Mr. McCullough

17   was held at B3 station in the jail cell for 36 hours.

18   Essentially again, Friday night but technically Saturday

19   morning at around one a.m. and wasn't released until Sunday,

20   midday.

21        Then begins what happened after April 25, 2020.  And

22   that's when Officer Roby, as a result of the interaction with

23   Mr. McCullough, brings a number of charges against him.

24   Mr. McCullough has to appear in court approximately four times

25   for, for these charges, to answer for these charges.  He has a

1    lawyer appointed to represent him.  He ends up taking it to
2    trial and all charges are dismissed against him at trial.  No
3    one deserves to be treated the way Mr. McCullough was treated
4    by Officer Roby and Officer Woods.
5         Mr. McCullough and I have a burden that Judge Stearns
6    talked to you about a few minutes ago.  As a plaintiff in this
7    case, we have to prove the claims by a preponderance of the
8    evidence.  Now Judge Stearns, Judge Stearns' role, one of them,
9    is to instruct you all on the law.  So you should listen to him
10   as he gives those instructions.  He gave them a few moments
11   ago, and he'll also, as he mentioned, give them to you at the
12   end of the case.
13        But I want to talk a little bit about the burden that
14   Mr. McCullough and I have in the claims that we're bringing as
15   a result of this interaction between Mr. McCullough and
16   Officers Roby and Woods.  And I want to talk about why the
17   story that we just heard, what I just discussed with you, why
18   that story will meet the elements of all of these claims by a
19   preponderance of the evidence.
20        So the first thing I want to talk about is false
21   arrest.  There are seven claims.  Now Judge Stearns mentioned
22   preponderance of the evidence, it's more likely than not,
23   essentially it's a tip of the scales Mr. McCullough and I do to
24   prove each of the elements of these claims.  The first one is
25   false arrest.  Really what this is about is were Officers Roby

1   and Woods functioning as on-duty police officers at the time

2   these events happened?  And did they act reasonably in

3   arresting Mr. McCullough?  And what the evidence will show is

4   that by a preponderance of the evidence they didn't.  There's

5   really no dispute.  You'll see from the evidence, that Officers

6   Roby and Woods were acting as on-duty police officers at the

7   time of these events.  You'll hear that as an element as a

8   number of these claims.  So I likely won't address it again.

9   Because, again, you'll see they were in uniform, they were on

10  duty, they had badges, they were in their assigned cruisers.

11  So really the key for the false arrest claim is that they acted

12  unreasonably in arresting Mr. McCullough.  And specifically

13  Mr. Roby.  And, again, as I mentioned earlier, you'll see the

14  exact moment on video.  It's actually the video that

15  Mr. McCullough filmed.  You can see Officer Roby walking and

16  you can see him make the decision that I'm now going to arrest

17  Mr. McCullough.  And there's -- the evidence will show there's

18  no basis for that arrest.  There's no basis for it whatsoever.

19  He was not obstructing traffic.  He was actually, at least

20  listening to, complying with Officer Roby's commands.  And in

21  any event, when Officer Roby makes a decision to arrest him,

22  you'll see he's standing in a parking lane.  Something that

23  people in Boston do perhaps thousands of times a day, standing

24  in a parking lane in the street.

25          The next claim's excessive force.  Again, the key is

1    were Officers Roby and Woods acting as police officers?  They

2    were.  And the second piece similar, false arrest, was the use

3    of force on officer -- excuse me, on Mr. McCullough reasonable?

4    And again, the evidence will show by a preponderance of the

5    evidence that it was not.  You'll see that Officer Roby had

6    grabbed Mr. McCullough's clothing, pushing him, pushed him back

7    into the metal clothing bin.  That they -- that the OC spray or

8    pepper spray was deployed while Mr. McCullough was being

9    arrested.  You'll see him jostled both at that initial traffic

10   stop area as he's getting into the cruiser, and then as he's

11   being taken into -- from Officer Roby's vehicle into the

12   booking area and then into the booking area.  You'll see all

13   the force used on him.  And you'll be able to see that it's not

14   reasonable.

15          The third is that there was an illegal search and

16   seizure of Mr. McCullough.  Again, the first key there -- the

17   first part there is whether the Officers Roby and Woods were on

18   duty.  They were.  And then, again, it's whether that the

19   search and seizure of Mr. McCullough was reasonable or not, and

20   it was not for essentially the same reasons that we've

21   discussed already.  There wasn't any reason to arrest him, no

22   reason to sees him and there really was no reason to search him

23   as a result of that.  And the evidence will show that we've met

24   that by a preponderance of the evidence.

25          Four more.  The next is violation of Civil Rights Act.

1    The Massachusetts Civil Rights Act, excuse me.  For that, it's

2    two parts.  Just that Officers Roby and Woods violated

3    Mr. McCullough's rights as they're guaranteed under either the

4    U.S. Constitution of Massachusetts Civil Rights Act, and they

5    did that using intimidation, threats, or coercion.  And you'll

6    see the intimidation that was used by Officer Roby in

7    particular, and you'll see the coercion as well used by both

8    Officers Roby and Woods.  How they interact with Mr. McCullough

9    both verbally and physically over the lead-up to April 25,

10   2020, and then on that day.

11        The next is excessive force for failure to intervene.

12   That's specifically against Officer Woods.  Really what that's

13   about is Officer Woods had the ability to prevent Officer Roby

14   from using excessive force on Mr. McCullough.  He saw it.  He

15   was physically able to prevent it.  He had the time to prevent

16   it and he chose not to.  And the evidence will show that by a

17   preponderance of the evidence.  You'll see that Officer Woods

18   assisted in the arrest of Mr. McCullough, had an opportunity to

19   prevent any force -- or excessive force being used against

20   Mr. McCullough.  Didn't do so.

21        Second to the last one, malicious prosecution.  What

22   that's about is that Officer Roby started a criminal case

23   against Mr. McCullough, he certainly did so.  He maintained

24   that case against him.  And you'll hear that he testified at

25   the trial that Mr. McCullough was present at and that the

1    charges were dismissed, and you'll hear about that from

2    Mr. McCullough himself.  And that there's, that the case was

3    brought as a result of actual malice, the probable cause.  And

4    you'll see in the lead up to -- the lead up to April 25, 2020,

5    and on that day in particular, you'll see the dynamic between

6    Officer Roby and Mr. McCullough and you'll see that it was --

7    the case was brought against Mr. McCullough to send a message.

8    That's what the evidence will show.

9         And then finally, First Amendment retaliation.  Now,

10   you'll -- really what started this whole event was

11   Mr. McCullough filming the traffic stop and then speaking.

12   Both acts that are protected by the First Amendment.  And

13   that's what the evidence will show that that's what he was

14   doing.  You'll also hear that -- or the next part of that

15   whether him doing that was a reason or part of the reason for

16   why he was ultimately arrested and charged.  And was.  You'll

17   hear evidence that every, every officer involved but

18   specifically Officers Roby and Woods knew of Mr. McCullough,

19   knew that he filmed the police officer interactions, had filmed

20   police officer interactions in the past, knew who he was.  And

21   that the evidence will show by a preponderance of the evidence

22   that they, his arrest and his charges were used to chill that,

23   that behavior.

24        And then finally, that there was no basis for the

25   arrest in the charges against him.  And you'll see that -- as

1  I've mentioned, you'll see that the exact mode when the arrest

2  decision was made, there was no reason to arrest him.  And then

3  you'll hear about the fact that the basis for the rest of the

4  charges are -- there's no basis for those as well and that

5  those charges were ultimately dismissed.

6      At the conclusion of all of that, Members of the Jury,

7  is that Mr. McCullough -- the evidence will show that Mr.

8  McCullough and I have met our burden.  We would have met -- we

9  would have tipped the scales.  We would have shown by the

10  preponderance of the evidence, that all seven claims -- the

11  elements of all seven claims have been met.  And, again, what

12  it boils down to is that the way Mr. McCullough was treated was

13  unfair.  It was improper.  It's not how anybody should have

14  been treated in his position.  I'll have an opportunity to

15  speak to you again at the end of the trial, and at that point

16  and for that reason, to how he was treated unfairly, he

17  shouldn't have been treated that way, I'll ask you to find

18  Officers Roby and Woods liable for all the claims that I

19  discussed with you.

20      Thank you.

21      THE COURT:  Thank you, Mr. O'Neill.  Is it going to be

22  Mr. Whitesell or Ms. Davidson.

23      MS. DAVIDSON:  It's going to be me, your Honor.

24      May I proceed your Honor?

25      THE COURT:  You may, of course.

**OPENING STATEMENT ON BEHALF OF THE DEFENDANTS**

MS. DAVIDSON: Good morning, ladies and gentlemen. In this case, you are not only going to hear about the incident that are heard by both sides but you will also see both sides. You are going to see a video recorded by Plaintiff on a cellphone that he later posted to his YouTube channel named The Resistance. Plaintiff's side displays a show that he puts on only when the cameras are rolling. You are also going to be see video from the officers' body-worn cameras. The officers' videos are going to show you that they were just doing their jobs in the middle of the Coronavirus pandemic. Before we get too far ahead, I would like to introduce myself and my clients. My name is it Bridget Davidson, and along with my co-counsel Ted Whitesell, we have the pleasure of representing Boston Police Officer Scott Roby and Boston Police Officer Frank Woods.

I would like to give you a small introduction to the parties in this case. Plaintiff, Mr. John McCullough, is a self-proclaimed First Amendment auditor that runs a YouTube channel called The Resistance. Mr. McCullough prides himself on being a cop watcher by recording various public officials to ensure that they are doing their jobs. Mr. McCullough's primary concern is recording content for his YouTube page. The officers in this case, Officer Roby and Woods are both sworn Boston Police officers. Officer Roby has been on the force for

1    about 29 years, and Officer Woods for just about six.  Officer

2    Roby grew up in the City of Boston and has two grown sons that

3    he raised in the city.  Officer Woods grew up outside of the

4    City of Boston and before becoming a police officer had a

5    career dedicated to public service.  Officer Woods is married

6    and has two children of his own.

7          But back to why we are here today.  On April 25, 2020,

8    during the height of the global Coronavirus pandemic, Officer

9    Roby was working the midnight shift.  Around 12:30 a.m.,

10    Officer Roby was conducting a simple traffic stop at the

11    intersection of Blue Hill Avenue and Ansel Street in the

12    Dorchester neighborhood in the City of Boston.  As is common

13    practice, Officer Woods came to assist Officer Roby while he

14    conducted the traffic stop.  I would like to make clear that

15    the traffic stop that Officer Roby was conducting was a

16    completely separate incident that Mr. McCullough interjected

17    himself into.  As the traffic stop was wrapping up,

18    Mr. McCullough appears and records the stop.  Once the traffic

19    stop is complete, both Officer Roby and Officer Woods each walk

20    back to their separate cruisers and get in them.  As the

21    officers are walking back to their cruiser, you will see from

22    Mr. McCullough's own video that he antagonizes Officer Roby by

23    asking if he is done here.  Nonetheless, the evidence will show

24    you that Officer Roby gets fully back into his cruiser and puts

25    his cruiser in gear to continue on duty for the rest of the

night when he notices that Mr. McCullough is now talking to the
people in the car that were involved in the traffic stop.

Officer Roby gets out of his cruiser and tells
Mr. McCullough to step out of the street.  You will see that
Mr. McCullough is standing in the middle of the right lane in a
two-lane inbound portion of Blue Hill Ave.  He is not only
standing in the middle of the lane preventing the car and the
two cruisers from leaving the scene, but he is also recording
his conversation with the people in the car that were involved
in the traffic stop.  You will see and hear from
Mr. McCullough's own cellphone video that he is promoting his
YouTube page and talking about how he knows Officer Roby.  As
Mr. McCullough is recording this interaction, Officer Roby
tells him a second time to step out of the street.
Mr. McCullough responds back that he is not obstructing
traffic.

Officer Woods notices that Officer Roby and
Mr. McCullough begin engaging with each other, so he activates
his body-worn camera and exits his cruiser to assist Officer
Roby.  Officer Roby then tells Mr. McCullough a third time to
step out of the street.  Mr. McCullough repeats himself that he
is not obstructing traffic as he moves towards the front end of
the car that was pulled over from the traffic stop all the
while still recording and not allowing the car from the traffic
stop to leave the scene.  Officer Roby tells him a fourth time

to step out of the street or else he is going to lock him up.

The evidence will show that Officer Roby begins walking back to

his cruiser as Mr. McCullough is moving parallel with him

yelling for his name and badge number from the sidewalk.

Officer Roby releases the car involved in the traffic stop and

almost makes it back to his cruiser when Mr. McCullough takes a

step off the sidewalk back into the street.  It is at this

point that Officer Roby decides to arrest Mr. McCullough for

disorderly conduct.  It is also at this point that Officer Roby

places his OC spray, commonly known as pepper spray, in his

hand.  You will hear from Officer Roby that he took his pepper

spray out as a precaution because he knew that given the name

of Mr. McCullough's YouTube page, he may resist arrest.  As

Officer Roby moves toward Mr. McCullough to arrest him, he

tells him a final time to step out of the street and then asks

for Mr. McCullough's hands.

The videos will show that Mr. McCullough pulls away

from Officer Roby.  Officer Woods hears the engagement between

the two and turns back around, because he was on his way to his

cruiser, and walks over to assist with the arrest.  You will

see and hear that Officer Roby makes several requests for

Mr. McCullough to put his hands behind his back, while Mr.

McCullough continuously pulls away and positions the two of

them between a yellow metal donation bin and a wall.  The

evidence will show that it was a struggle for both Officer Roby

1    and Woods to handcuff Mr. McCullough because he was resisting

2    arrest.

3         And you will also hear Mr. McCullough admit himself

4    that he was resisting arrest.  As Officer Woods approaches the

5    two positioned against the wall and the metal donation bin,

6    Officer Woods takes a black video holder out of

7    Mr. McCullough's hands.  Mr. McCullough had been holding this

8    video holder above his head while he was pulling away from

9    Officer Roby.  Officer Woods will testify that he dropped the

10   black video holder to the ground because it could have been

11   used as a weapon.  You will hear on the videos that during the

12   encounter both officers tell Mr. McCullough to stop resisting.

13   As Mr. McCullough's getting handcuffed, the smell of pepper

14   spray appears in the air.  The evidence will show that Officer

15   Roby accidently set off his pepper spray that he had in his

16   hand while he was trying to make the arrest.  Once the

17   handcuffs are finally on Mr. McCullough, you will both see and

18   hear that he calms down but is worried about exactly where his

19   phone is.

20        You will hear from Officer Roby and Mr. McCullough

21   that Mr. McCullough snatched his phone from Officer Roby as the

22   officers were putting Mr. McCullough into the cruiser.

23   Mr. McCullough then starts screaming for help and that his

24   property is being taken because he now has his phone and he

25   thinks that it could be rolling.

1        After Mr. McCullough is in the cruiser, Officer Roby

2   calls for a supervisor over the radio.  Lieutenant Thomas

3   Brooks who was a sergeant at the time and the patrol supervisor

4   that night, arrives on scene within a minute.  As Lieutenant

5   Brooks arrives on scene, he checks in with Officer Roby and he

6   checks on Mr. McCullough in the back of the cruiser.  Given the

7   B3 station is less than a minute from the scene, Officer Roby

8   drives both himself and Mr. McCullough back to the B3 station

9   to book Mr. McCullough.  During this quick car ride, the

10  evidence will show you that Mr. McCullough is no longer

11  screaming and that is because the camera is no longer rolling.

12        Upon arriving at the station, Officer Roby takes

13  Mr. McCullough out of the back of the cruiser.  You will see

14  and hear that as Mr. McCullough is taken out the cruiser, he

15  immediately starts pulling away and screaming that Officer Roby

16  is trying to kill him.  Officer Roby radios for assistance with

17  Mr. McCullough and brings him through the wagon bay of the B3

18  station.  Several officers show up to assist with bringing him

19  to the station for booking including Officer Woods.  The

20  evidence will show that at some point during interaction with

21  Officer Roby outside the station Mr. McCullough begins

22  spitting.  I would like to remind you that this incident

23  incurred in April of 2020 which is still at the very beginning

24  of the Coronavirus pandemic when very little was known about

25  the virus.  You will hear Officer Roby tell Mr. McCullough to

stop spitting.  As they enter the B3 station, Officer Woods

opens the door to the booking area.  The evidence will show you

that this is the last of Officer Woods' interactions with

Mr. McCullough that night.  Officer Roby and another officer

walk Mr. McCullough through the door to the booking area.  As

the officers do so, Mr. McCullough flails himself to the ground

and begins crying out.  You will hear from Officer

Sparks-Clancy that during the booking process Mr. McCullough

states that he cannot breathe and to take the hood off of his

head.  Officer Sparks-Clancy listens to the request and removes

his hoody that was pulled over his head to prevent him from

spitting at the officers, especially during the heightened time

of the Coronavirus pandemic.

      The evidence will show that during the booking process

of Mr. McCullough, Lieutenant Brooks took pictures of him and

asked him if he was hurt.  Mr. McCullough replied that he had

no injuries and did not need medical attention at that time

because the cameras were done rolling.  You will see pictures

and hear from Lieutenant Brooks that Mr. McCullough was not

sprayed with the pepper spray.  It was actually Officer Roby

that was affected by the pepper spray by getting it one of his

eyes.

      I urge you to pay attention to each side very

carefully because the evidence will show you that there is

Plaintiff's side, which is a show when the cameras are rolling,

1   and there's the side of the officers that are doing -- the side

2   of the officers that are doing their jobs during the height of

3   a global -- the global Coronavirus pandemic.

4           From watching the videos from both sides in this case,

5   the evidence will show you that Mr. McCullough was not arrested

6   for filming in public.  He was arrested for disorderly conduct.

7   At the end of the evidence, Judge Stearns will instruct you on

8   the law, and my co-counsel Ted Whitesell will have a final

9   opportunity to speak with you and summarize what you had both

10  heard and seen for yourselves.  Mr. Whitesell is going to ask

11  that you return a verdict consistent with the evidence, and

12  that means returning a verdict in favor of Officer Roby and

13  Officer Woods.

14          Thank you all very much.

15          THE COURT:  Thank you, Ms. Davidson.

16          Mr. O'Neill, your first witness?

17          MR. O'NEILL:  Thank you very much, your Honor.

18          The plaintiffs call Mr. McCullough to the stand.

19                      **JOHN McCULLOUGH,**

20                          Sworn.

21          THE CLERK:  Please introduce yourself to the jury and

22  spelling your last name for the record.

23          THE WITNESS:  Yes.  Good morning, my name is John

24  McCullough, M-c-C-U-L-L-O-U-G-H.

25  **DIRECT EXAMINATION BY MR. O'NEILL:**

```
 1   Q.   Good morning, Mr. McCullough.

 2   A.   Good morning.

 3   Q.   Where in the city do you live?

 4   A.   In Mattapan section.

 5   Q.   How long have you lived there?

 6   A.   Five years.

 7   Q.   How do you support yourself?

 8   A.   I'm single father so I'm receiving assistance from the

 9   state.

10        THE COURT:  Mr. McCullough, you might bring the

11   microphone a little closer so we can hear you.

12   Q.   I'm going to ask that last question again because it was a

13   little quiet.

14        How do you support yourself?

15   A.   Yes, I'm a single father.  I receive benefits from the

16   state.

17   Q.   Are you familiar with a Boston Police officer named Scott

18   Roby?

19   A.   Yes.

20   Q.   And how are you familiar with him?

21   A.   I've had interactions with him on several occasions while

22   recording, while recording him in his official capacity.

23   Q.   When, if you remember, was the first interaction you had

24   with him?

25   A.   So the first interaction I can't tell you the exact date.
```

 1    It was in the Dudley section of Boston.  He was illegally

 2    parked on the sidewalk with no indicators, no emergency lights

 3    on or anything, and I took issue with that and asked him to

 4    turn his lights on and he basically ignored me and walked off.

 5    Q.   So you said that Dudley Square -- Dudley triangle section

 6    of the city?

 7    A.   Yes.

 8    Q.   Is that, that's Roxbury, right?

 9    A.   Yes.

10    Q.   And can you approximate how far this interaction was from

11    Nubian Square Station?

12    A.   Yeah, it was a few paces.  Maybe like a hundred yards

13    from, right around the corner from there.  It was on Washington

14    Street.

15    Q.   Did you know -- at the time of this interaction, did you

16    know who he was?

17    A.   No, I just knew that he was a Boston Police officer.

18    Q.   This was the first time you ever interacted with him?

19    A.   Yes.

20    Q.   Did you happen to interact with him again after that?

21    A.   I did.

22    Q.   And talk to us about that.

23    A.   That was maybe about a half hour, 35 minutes later, I was

24    recording maybe a few blocks from where I first interacted with

25    him at and he was going to the scene where I was recording at.

1   Q.   Okay.

2           While I'm getting this set up, can you -- can you

3   approximate when, when this happened?  When this -- these two

4   interactions with Officer Roby were?

5   A.   You're asking like a date?

6   Q.   Right, yes.

7   A.   I would say it happened in March, early March.

8   Q.   Of what year?

9   A.   Of 2020.  Sorry.

10  Q.   That's okay.

11          THE CLERK:  The jurors in the back row, in that box

12  you can open up next to you, flip that all the way back from

13  the front.  And there are screens you can pull up.  You can

14  flip the armrest down if you want.

15  Q.   Mr. McCullough, can you see an image on the screen in

16  front of you?

17  A.   Yes.

18  Q.   I'm going to play just a few seconds of this video, and

19  I'll ask you some questions about it.

20          (Played Video.)

21  Q.   So do you recognize this video?

22  A.   I do.

23  Q.   How do you recognize it?

24  A.   Because I'm the one behind the camera recording.

25  Q.   Okay.

1          And what is this a video of?

2     A.   This was a video of me basically recording a public

3     parking lot.

4     Q.   And later in the video, is there -- what will we see later

5     in the video?

6     A.   So later in this video you will see that Boston Police

7     were called at that location because I was recording the public

8     parking lot.  And Officer Roby shows up, and we had an

9     interaction.  I wasn't happy with last interaction we had when

10    he was illegally parked on the sidewalk and didn't turn any,

11    like, emergency lights on or anything.  And when I asked him

12    for his name and his badge, he just kept walking.  So when he

13    came up the second time to the second location, I told him roll

14    his windows up, I believe, when he pulled up.

15    Q.   Okay.  Let me stop you right there for a second.

16          Just so we're clear, so this video is of you -- later

17    in this video you have an interaction with Officer Roby you

18    said?

19    A.   Yes.

20    Q.   And there was an interaction with him about approximately

21    30 minutes before this video?

22    A.   Yes.

23    Q.   Okay.

24          And that's the, that previous interaction was the one

25    where you were concerned about how he was parked?

1  A.   Yes.

2  Q.   I'm going to scroll through this video.  And this is

3  Exhibit 2.  And I'm going to start playing it 14 minutes 37

4  seconds into the video.

5          So this person with -- I've stopped it at 14:40.

6  This person with the sunglasses on and the grey hoody with the

7  black stripes that's facing the camera, do you know who this

8  person is?

9  A.   He claimed to be the owner of the parking lot.

10  Q.   Okay.

11          And then the person that we see in the middle left

12  with their back to the camera with what looks like a baseball

13  cap on and a black jacket with a hood, do you know who that

14  person is?

15  A.   That was an undercover police officer.

16  Q.   Okay.

17          Boston Police Officer?

18  A.   Yes.

19  Q.   And starting at 14:40.

20          (Played Video.)

21  Q.   Okay.

22          Now there's -- I stopped at 14:52.  There's a Boston

23  Police cruiser that looks like it's approaching you.  And is

24  that correct?

25  A.   Correct.

1   Q.   And just to be abundantly clear here, the video that we're

2   seeing, this is video you're filming?

3   A.   Yes.

4   Q.   And how are you filming it?

5   A.   I'm filming it with my cellphone.

6        MR. O'NEILL:  I'll start playing 14 minutes, 52

7   seconds.

8        (Played Video.)

9   Q.   So we just heard you say -- is that you who said are you

10  ready to identify yourself now?

11  A.   Yes, that was me.

12  Q.   And I paused at 15 minutes exactly.  Why did you say that?

13  A.   Because he did not identify himself 30 minutes earlier

14  when he was illegally parked on the sidewalk.

15  Q.   And who is he?

16  A.   Officer Roby.

17  Q.   Okay.

18        (Played Video.)

19        MR. O'NEILL:  Paused at 15 minutes, three seconds.

20  Q.   We just saw somebody roll up a window to this cruiser.

21  And it looks like.  It looks like two people in this cruiser,

22  correct?

23  A.   Yeah.

24  Q.   And do you know, do you know who the people are in the

25  cruiser?

1  A.   I know that's Officer Roby driving, and that was the first

2  time I met his partner at the time.

3  Q.   Okay.

4         Do you know who that is?

5  A.   No, I know of him.  I've seen him before and I've seen him

6  after.

7  Q.   Okay.

8  A.   But I don't know his name.

9  Q.   Okay.

10        (Played Video.)

11  Q.   That was you -- I stopped at 15:10.  That was you calling

12  Officer Roby the goon squad?

13  A.   Yes.

14  Q.   And his partner as well?

15  A.   Yes.

16  Q.   Why were you doing that?

17  A.   Because 30 minutes earlier they gave me a smug look when I

18  asked them to move their car from off the sidewalk or at least

19  put emergency lights on and just walked away from me even after

20  I asked them for their name and badges.

21        MR. O'NEILL:  Start playing 15:10.

22        (Played Video.)

23  Q.   That was -- again, that was you yelling at the vehicle?  I

24  paused at 15:33 --

25  A.   Yes.

1   Q.   -- that they're impeding traffic?

2   A.   Yes.

3   Q.   Why were you saying that?

4   A.   Right now, I can't tell you exactly what was going on.  I

5   believe there was a car in front of them trying to back up out

6   of the parking spot.  I'm not sure.  I really can't say

7   exactly.  Or they were too far out into the street whereas cars

8   had to go around.  And as you can see, they have no lights on

9   or anything to indicate that they're at an emergency call or,

10  you know, a call period.

11  Q.   Okay.

12       (Played Video.)

13  Q.   And that was you saying clown towards the car as well?

14  A.   Yes.

15  Q.   Why did you say that?

16  A.   Because just the whole professionalism that the way they

17  were acting and it was just, like, unbelievable that they could

18  show up to a call with me just recording in public, but they

19  couldn't turn any lights on or move their vehicle from the

20  sidewalk 30 minutes earlier.

21       MR. O'NEILL:  It's at 15:40.

22       (Played Video.)

23  Q.   So we stopped at 15:49.  What happened between you saying

24  clown and this where we stopped the video at 15:49, what were

25  you doing?

1    A.   So I believe that Officer Roby pulled off for whatever

2    reason.  I told him that he was impeding traffic, and I just

3    panned my camera around to these four gentlemen as they were

4    speaking.

5              MR. O'NEILL:  Playing at 15:49.

6              (Played Video.)

7    Q.   So I paused at 16 minutes, one second.

8              That, again, that was you saying -- instructing

9    Officer Roby to roll his window up, to "roll it the fuck up,"

10   right?

11   A.   Right.

12   Q.   Why did you say that to him?

13   A.   He's the one I identify who he was 30 minutes ago, and I

14   had a slight attitude that he would show up to this call.  I

15   mean, I'm understanding that he was dispatched but to show up

16   to a call where nobody was committing a crime, I didn't see

17   where his involvement was needed.

18             MR. O'NEILL:  Starting at 16:01.

19             (Played Video.)

20   Q.   So I want to just back up here for a second.  So I backed

21   up to 15 minutes and 59 seconds.  I want to play again.

22             (Played Video.)

23   Q.   I stopped at 15 minutes and nine seconds.

24             As Officer Roby is getting out of the vehicle, what

25   is he saying to you?

1    A.   He's telling me if I don't step out of the street, he's

2    gonna lock me up.

3           MR. O'NEILL:  And playing 16:09.

4           (Played Video.)

5    Q.   So stopped at 16:32.  You were asking Officer Roby for his

6    name and badge number?

7    A.   Yes.

8    Q.   And what did he, how did he respond to that?

9    A.   He didn't say anything.  I happened to see his badge

10   number on his badge.  But I didn't get his name.  But he didn't

11   respond when I asked him for his name and badge.

12          (Played Video.)

13   Q.   So I stopped here at 16 minutes, 44 seconds.  Can you

14   describe what's going on or what has been going on in the last,

15   like, five seconds or so?

16   A.   After this point I'm being intimidated.  If you can see

17   this officer very close up to me.  I never walk up close to

18   them.  They walked up close to me and you'll see me pan my

19   camera over to Roby, and he's up close to me as well.  In my

20   opinion it was an intimidation tactic trying to get a rise out

21   of me, hoping that some type of contact was initiated.  But

22   because I stayed, you know, composed and just stood there

23   recording, fortunately nothing happened.

24          MR. O'NEILL:  Playing at 16:44.

25          (Played Video.)

1    Q.    Okay.

2           I stopped at 17 minutes, three seconds.  So you just

3    said pass the name around to every police officer, right?

4    A.    Yes.

5    Q.    Why did you say that?

6    A.    To let them know that I'm going to be holding the whole

7    City of Boston, which is Boston Police Department, accountable

8    by recording them.  So pass my name along.  Because they would

9    always try to get ID from me, but I wouldn't give them my ID.

10   So somehow they had knew my name because I got arrested through

11   the state police.  From a case from the state police I got

12   arrested for recording, and that's how they found out my name.

13   So, they would say my name, circulate my name throughout the

14   department.

15   Q.    Okay.

16          And we just heard -- well, did you hear Officer Roby

17   say anything as he was getting into his vehicle?

18   A.    Uhm, you have to play it again.  I'm not sure.

19   Q.    Sure.  I'll back it up.

20          MR. O'NEILL:  So now playing at 16 minutes, 53

21   seconds.

22          (Played Video.)

23   Q.    So paused at 17 minutes, three seconds.  Did Officer Roby

24   say anything?

25   A.    Yes, he exposed my address.  He exposed where I live, and

1  he said, Going back to Deering Road.

2  Q.   What's the significance of Deering Road?

3  A.   Well, that's where I live.  I live in that area.

4  Q.   Okay.

5       And so when he said that, what did you, what did you

6  take that to mean?

7  A.   That he was intimidating me.  That, you know, at any

8  time -- any given time I could, I could run into some trouble

9  from the Boston Police Department by them knowing where I live

10 at.

11      MR. O'NEILL:  Playing 17 minutes, three seconds.

12      (Played Video.)

13 Q.   Pause at 17 minutes, 14 seconds.

14      That was you calling officer a tyrant, right?

15 A.   Yes.

16 Q.   Why did you do that?

17 A.   Just because of their whole professionalism.  The way he

18 acted from 30 minutes before all the way up until now,

19 intimidation tactics.  Walking up close to me, not giving me a

20 name -- well, Officer Roby not getting me his name.  I got his

21 badge number from his badge.  But just the whole

22 professionalism period.  He acted like a tyrant.

23 Q.   You said Roby didn't give you his name and badge number

24 just now, right?

25 A.   Right.  He didn't give me his name or badge.  I got his

1    badge number from his shield that he was wearing.

2    Q.   Did anybody else give you their name?

3    A.   His partner.  His partner had just gave it to me.

4    Q.   Do you recall after Officer Roby gets into his car here,

5    was there any other interaction between the two of you after?

6    A.   I can't remember.

7    Q.   Okay.

8         So playing 17 --

9    A.   I don't think so, though.

10   Q.   Okay.

11        MR. O'NEILL:  Playing 17 minutes, 15 seconds.

12        (Played Video.)

13   Q.   So that's you saying he's going to lock me up for

14   disorderly, right?

15   A.   Yes.

16   Q.   Why did you say that?

17   A.   I was just -- well, I was commentating for the video,

18   which I rarely did in those days, but I was just repeating what

19   he said.  What he was gonna lock me up for.  I stepped off the

20   curb, and he said he will lock me up for disorderly conduct for

21   being in the street.

22        MR. O'NEILL:  Playing 17 minutes, 30 seconds.

23        (Played Video.)

24   Q.   So you just told the gentleman we talked about earlier

25   that he's doing the walk of shame.  What does that -- what did

1  you mean by that?

2  A.   Well, that's basically, he called, he called resources on

3  me which wasn't needed.  It wasn't no crime committed.  And I

4  mean, he was expecting, I guess at the very least, to see me

5  admonished by the police or as much as me getting arrested,

6  which none happened.  And he walked away with none of those

7  results.  So that's the walk of shame.  That's what we call the

8  wake of shame when people call police on other people for not

9  committing a crime and nothing happening to that person once

10  the police show up.

11          MR. O'NEILL:  Playing 17 minutes, 36 seconds.

12          (Played Video.)

13  Q.   So you just said to the two officers in the vehicle,

14  including Officer Roby, it doesn't matter if you know my name,

15  right?

16  A.   Yeah.

17  Q.   Why did you say that?

18  A.   Because it won't stop me from holding police accountable.

19  Q.   And how did you know that they knew your name?

20  A.   I believe I heard them say my name.

21          MR. O'NEILL:  Playing 18 minutes, two seconds?

22          (Video Played.)

23  Q.   So you mentioned intimidation tactics a couple times

24  recently in the video.

25  A.   Uh-huh.

```
 1   Q.    Correct?

 2   A.    Yes.

 3   Q.    And what did you mean by that?

 4   A.    Well -- I'm sorry, I say doxing.  It's like an internet

 5   term of putting your address out.  Because he knew I was going

 6   to publish this, this video.  So I believe, my opinion, he

 7   purposely put it out there just so other people could hear it

 8   and just so he could, just so he could let me know that he knew

 9   where I lived at along with other police officers in the

10   department.

11               MR. O'NEILL:  Playing 18 minutes, 18 seconds.

12               (Played Video.)

13   Q.    What did you mean when you said you know what you're

14   doing?

15   A.    Well, by them, by Roby exposing my address, by him being

16   yelling out go back to Deering Road, that's intimidation

17   tactic.  That's a way of trying to chill my rights.  For me to

18   not -- deter me from recording in the future.  Hopefully, you

19   know, that would keep me away from recording Roby in the future

20   and other police officers.

21               MR. O'NEILL:  So playing 18 minutes, 33 seconds.

22               (Played Video.)

23   Q.    You just said your mother to somebody.  Why did you say

24   that?

25   A.    He drove passed and called me an asshole.
```

1  Q.   And that's the car -- I stopped at 19 minutes, nine

2  seconds.  That's the car that's in the middle of the screen

3  there driving down the street?

4  A.   Correct.

5  Q.   Okay.

6        (Played Video.)

7  Q.   So pause at 19 minutes, 34 seconds.  What you're

8  describing, what you described just before I paused, that was

9  the interaction that happened 30 minutes previously, right?

10  A.   Yes, correct.

11        (Played Video.)

12  Q.   So that was the end of that video, correct?

13  A.   I'm sorry, I didn't hear you.

14  Q.   I'm sorry.  That was the end of that video, correct?

15  A.   Yes.

16  Q.   You didn't, did you interact with Officer Roby any further

17  that day?

18  A.   No.

19  Q.   Did you interact with him again before April 25, 2020?

20  A.   Yes.

21  Q.   And what was the -- tell us about that.

22  A.   I would say it was maybe a few weeks after this video and

23  it was probably about twelve or one o'clock at night.  I was

24  just out recording holding the police accountable for

25  transparency.  And I was in the Jamaica Plain section.  And

1    there was a bridge that was closed off.  There was like a storm
2    earlier that day, and I think some branches had fell and there
3    were city workers out there cleaning that up.  And Officer Roby
4    was going the detail.  And I didn't notice him when I
5    approached the scene, but he yelled -- he yelled at me, yelled
6    my name out and said, Is that John McCullough from Deering
7    Road?  And I asked him, I said, Well, what's your name?  Once
8    again he didn't give me his name.  I told him, I said one day
9    I'm going to find out your name.

10           I quickly left that area because it was just me and
11   him out there.  Like I said, there were city workers but they
12   were, like, up the street attending to the details of cleaning
13   up the branches or whatever.  And I just remember how he acted
14   in the video that you just showed, I figured, you know,
15   probably not a good idea for me to continue to record him.  I
16   felt like as though my rights were chilled at that time.
17   Because it was late at night, it was just he and I, and he
18   could have made any kind of moves to arrest me or anything
19   worse.  So I decided just to keep it moving and continue on.
20   Q.   Okay.
21           And you said this, this interaction happened a few
22   weeks after the video that we just watched which is Exhibit 2?
23   A.   Yes.
24   Q.   And so remind me one more time, I apologize, approximately
25   when did the video in Exhibit 2 happen?

1  A.   I would say early March.  I really, just -- that was four
2  years ago, so I can't really give you an accurate --
3  Q.   Sure.
4  A.   -- time, when it happened.  But I would like to say it
5  happened early March.
6  Q.   Okay.
7       So that early March was when that video in Exhibit 2
8  was taken?
9  A.   Yes.
10  Q.   Okay.
11       So then this, this third interaction you're talking
12  about that was off camera happened approximately two weeks
13  after that?
14  A.   Two or three weeks later.
15  Q.   Okay.
16       I want to turn your attention to April 25, 2020.
17  A.   Okay.
18  Q.   Do you remember what you were doing or just past midnight
19  on that date?
20  A.   Yes.
21  Q.   What were you doing?
22  A.   I was out recording police officers.
23  Q.   Why, why were you doing that?
24  A.   For accountability and transparency.
25  Q.   And where, where were you recording?

1  A.   Wherever I could find police officers.

2  Q.   Okay.

3           At that time, and this is just past midnight on April

4  25, 2020, where were you filming?

5  A.   I was on Blue Hill, the cross street with Ansel I believe,

6  and I had noticed that there was a police cruiser maybe a block

7  away as I was approaching.  That there was a police cruiser, so

8  I kept walking, and as I approached the scene, I started

9  recording.

10 Q.   Okay.

11          Can you see the still on your screen?

12 A.   It's all black.  Yeah, I see it now.

13 Q.   Okay.

14          Do you -- well, I'm going to play you a couple of

15 seconds of this video.  This is Exhibit 1.  And I'll ask you if

16 you recognize it.

17          (Played Video.)

18 Q.   So I've stopped it at 11 seconds.  I've stopped it at 11

19 seconds.  Do you recognize this video?

20 A.   I do.

21 Q.   And how do you recognize it?

22 A.   I'm the author of it.

23 Q.   And what is it, what is it showing?

24 A.   It's showing me recording a traffic stop.

25 Q.   And is that the same traffic stop that we were just

1    discussing?

2    A.    Yes.

3    Q.    Okay.

4          So this is, this is the traffic stop on -- at around

5    or just past midnight on April 25, 2020?

6    A.    Correct.

7    Q.    And the street that we're looking at, what street is that?

8    A.    That's Blue Hill.

9    Q.    Blue Hill Avenue?

10   A.    Sorry, yes, Blue Hill Avenue.

11   Q.    And where, what area or what section of Blue Hill Avenue?

12   A.    That's the Dorchester section.

13   Q.    I'm going to rewind back to the beginning.  And so this is

14   just at the very beginning of the video and there's a still.

15   Can you describe what we see right now?  This is at zero.  I'm

16   at zero seconds of Exhibit 1.

17   A.    Yes.  We see Officer Roby conducting a traffic stop.  And

18   we see Officer Woods assisting him with that traffic stop.

19   Q.    Okay.

20         And which of the people is Officer Roby?

21   A.    Officer Roby is on the far side of the vehicle in the

22   street with the mask on.  The white mask.

23   Q.    Okay.

24         And who is that individual towards the right-hand

25   side of the screen?

1    A.    That's Officer Woods.

2    Q.    Okay.

3          And can you describe where, where the vehicle is

4    located in the street?

5    A.    So right now it's mostly in the bike lane, but as you can

6    see, you can see the rear wheel, part of it is in the traffic

7    lane.

8    Q.    So I'm going to play again about ten seconds.

9          (Played Video.)

10   Q.    I've stopped it at five seconds.  There's no -- we can't

11   hear anything going on, right?

12   A.    No, not at this time.

13   Q.    Why is that?

14   A.    I would simply say because my phone couldn't pick up the

15   audio at that time.

16   Q.    But you weren't talking while this is --

17   A.    No, I wasn't saying anything.

18   Q.    And neither were Officer -- was it Officer Roby --

19   A.    I would say no, they weren't speaking at that time.

20   Q.    Okay.

21          MR. O'NEILL:  Start playing at five seconds.

22          (Played Video.)

23   Q.    All right.  I've stopped it here at 11 seconds.

24          So can you describe where Officer Woods is standing?

25   A.    Yes, he's standing in a parking lane.

1   Q.   And there's -- can you describe where, there's a red car

2   in the upper left-hand corner.  Where is that red car in

3   relation to the street?

4   A.   I see a red car and what looks like a white car behind it,

5   but the red car is parked in the parking lane.

6   Q.   And then we see -- what do we see in the middle of the, of

7   the screen that's just behind, it looks like it's behind

8   Officer Woods as we're looking at this?

9   A.   I see Officer Roby's vehicle jutted out into the street a

10  little more further out into the traffic lane then the vehicle

11  he had pulled over.

12  Q.   How do you know that's Officer Roby's vehicle?

13  A.   At the time I didn't.  Right at that time I didn't.  But I

14  eventually found out because he walked to the cruiser and got

15  in it.

16  Q.   Okay.

17       And then is there another cruiser behind his?

18  A.   Yes, that's Officer Woods.  And it looks like it's

19  parallel to Officer Roby's parking.

20       MR. O'NEILL:  All right, so I'm going to start playing

21  at 11 seconds.

22       (Played Video.)

23  Q.   So I stopped it at a minute and 14 seconds.  Can you

24  describe the level of traffic, if any, around this time?

25  A.   Very low.  Low traffic at that time.  Occasionally, I

1    don't know, maybe a few cars will pass after a minute or so.

2    Q.   And you're talking about vehicle traffic, right?

3    A.   Yes.

4    Q.   And what about pedestrian foot traffic?

5    A.   That was even lower than the vehicle traffic, maybe one or

6    two people I seen when I was out there.

7    Q.   All right.

8         MR. O'NEILL:  I'm starting to play at one minute, 14

9    seconds.

10        (Played Video.)

11   Q.   So I stopped at one minute and 44 seconds.  This is

12   Exhibit 1.  Is that you saying, "Are you done"?

13   A.   Yes.

14   Q.   Why did you say that?

15   A.   Because I wanted to speak to the driver and I didn't want

16   to interject or interrupt the stop so I was trying to find out

17   if the police officer was done with the stop.

18        MR. O'NEILL:  I'll start playing at one minute and 44

19   seconds.

20        (Played Video.)

21   Q.   So what was your goal in speaking with the people in the

22   vehicle?

23   A.   Well, I know how I've been treated by Officer Roby in the

24   past and I was just curious to see how he treated them.  And I

25   was kind of, you know, sure that he wasn't treating them too

nicely.  And it was confirmed by her response.

Q.   And at this point you had had the three previous

interactions with him that we discussed, right?

A.   Yes.

Q.   And did you know, did you know his name at this point?

A.   No.

        MR. O'NEILL:  I'll start playing at one minute, 50

seconds.

        (Played Video.)

Q.   Stopped at one minute, 56 seconds.

        You called Officer Roby an asshole, right?

A.   Yes.

Q.   Why did you do that?

A.   Because of my past experiences with him.

Q.   Okay.

        MR. O'NEILL:  Start playing, one minute 56.

Q.   All right.

        So I stopped at two minutes, three seconds.  So you

asked the people in the car to check you out on YouTube, right?

A.   Yes.

Q.   Why did you do that?

A.   So that they can see the education that I offered on my

channel as far as knowing your rights when it comes to police.

Q.   And you said something about The Resistance, right?

A.   Yes.

1  Q.   What is that?

2  A.   That's the name of my channel.

3  Q.   Okay.

4       And why did you, you named it -- the channel, The

5  Resistance?

6  A.   I named it The Resistance, yes.

7  Q.   What does that refer to?

8  A.   Resistance means to resist against tyranny and corruption.

9  Q.   Okay.

10      I'm going to back it up.  One minute and 53 seconds.

11      (Played Video.)

12 Q.   So, I stopped at two minutes, four seconds.  What's going

13 on?  What was going on right before I stopped it?

14 A.   So as I concluded my conversation with the driver, Officer

15 Roby got back out of his car to tell me to step out the street.

16 I responded with, I'm not obstructing traffic.  I'm just

17 having -- basically just having a conversation.  I knew I was

18 protected.  Well, let me say this, I knew that I wasn't

19 impeding any traffic because I was protected by the two

20 vehicles.  I believe it's policy that when they stop cars, they

21 have to have their cars jutted out a little further, which his

22 vehicle was -- his cruiser is jutted out a little further to

23 the street.  And Officer Woods' vehicle is also jutted out even

24 further than Officer Roby.  So I knew that I was protected by

25 their vehicles and I knew that I wasn't impeding traffic.

1   Q.   Do you recall any point of a car passing by you as you're

2   speaking with the people in the vehicle?

3   A.   I believe a car did pass by me.  I'm not totally sure just

4   from off memory.  Maybe if I see it, but I think a car did pass

5   me.

6         MR. O'NEILL:  Let's start playing two minutes and four

7   seconds.

8         (Played Video.)

9   Q.   So I stopped at two minutes, 11 seconds.

10          Talk to us about what just happened in those seven

11   seconds.

12   A.   So he told me to step out of the street.  I wasn't

13   willingly able to comply because he used his body as force.

14   Meaning that he was intimidating by walking up on me.  As you

15   can see, I'm pretty much recording his chest because that's how

16   close he was to me.  So he basically backed me out to the

17   street.  So I was able to react and comply myself.  He just

18   walked me down.  And I was in fear -- right at that time I was

19   if fear because I felt as though he was trying to initiate

20   contact.  So I backed away from him all the way to the

21   sidewalk.  So we -- so no contact would be initiated.  I knew

22   that if it would, I probably would be slammed to the ground.

23         MR. O'NEILL:  I'm going to start playing at two

24   minutes 11 seconds.

25         (Played Video.)

1    Q.   So I've stopped it at two minutes, 18 seconds.

2         So what happened between the last stop and now?

3    A.   So now I'm on the sidewalk and I'm mirroring him.  I'm

4    mirroring him the way he's walking, but on the sidewalk.  I'm

5    asking him for his name and badge.  I'm very upset right now.

6    He threatened me with arrest.  I didn't commit a crime.  And

7    I'm intent to get his name and badge so I can put the complaint

8    on him, and he wouldn't give it to me.  So I step off the curb,

9    I ask him for his name and badge again, and then he turns

10   around and he proceeds to arrest me.

11   Q.   Okay.

12        You said you stepped off the curb?

13   A.   Uh-huh.

14   Q.   And where did you step into when you did that?

15   A.   I stepped off the curb into the parking lane.  So I was in

16   front of that red car that you had showed a few minutes ago.

17   Probably about 30 or 40 feet in front of that.

18        MR. O'NEILL:  I'll start playing at two minutes, 18

19   seconds.

20        (Played Video.)

21   Q.   So stopped at two minutes, 31 seconds.

22        What's happening now?

23   A.   So once I stepped into the parking lane, that's when he

24   made the decision to arrest me.  I backed back onto the curb --

25   I mean onto the sidewalk, and he pulled his handcuffs out,

1    grabbed me arm, and he was pulling on me and then shortly after

2    Officer Woods came to assist him and started pulling on my left

3    arm.  So I had two officers pulling me in two different

4    directions and grabbing my clothing and pushing me up against

5    the metal clothes container as well as the wall.

6              MR. O'NEILL:  So back it up to two minutes and 21

7    seconds.

8              (Played Video.)

9    Q.   So, the person we saw that -- just the left of the screen

10   there with the white mask on, that's Officer Roby, right?

11   A.   Yes.

12             MR. O'NEILL:  I'll play again at 2:24.

13             (Played Video.)

14   Q.   So I've stopped at two minutes and 30 seconds.  There's a

15   grainy picture of an individual and they're right in the middle

16   of the screen.  Who is that?

17   A.   That's Officer Woods.

18             MR. O'NEILL:  I'll start playing at two minutes, 30

19   seconds.

20             (Played Video.)

21   Q.   So two minutes and 37 seconds, did you hear anything just

22   before I paused?

23   A.   Yes.

24   Q.   What, what did you hear?

25   A.   That's my back slamming into the metal clothes container.

1    Q.    Okay.

2          MR. O'NEILL:  I'm going to back up two minutes, to two

3    minutes and 27 seconds.

4          (Played Video.)

5    Q.    So I paused at 2:32.  Is that -- there's an item in the

6    middle of the screen.  What is that?

7    A.    That's the metal clothes container for donations.

8    Q.    And that, that's the one that you just talked about

9    running into?

10   A.    Yes.

11   Q.    All right.

12          Did you do that on your own, run into the clothes

13   container?

14   A.    No, I was pushed into -- I was pushed violently into the

15   clothes container.

16   Q.    By who?

17   A.    By Officer Roby.

18          MR. O'NEILL:  So playing two minutes, 32 seconds.

19          (Played Video.)

20   Q.    So what -- talk to us about what we just watched.  I

21   paused it at two minutes, 55 seconds.

22   A.    So they were pushing me against the metal clothes

23   container, grabbing my arms.  They also were using pain

24   compliance techniques by, you know, poking their thumbs into my

25   wrists.  And I would say maybe about ten seconds after that, I

1    felt like a mist on the side of my face, on the right side of

2    my face.  And also after I felt the mist I smelt pepper spray.

3    So it was kind of -- it was surprising because it came out of

4    nowhere.  So I just asked him what did he spray me with?  And

5    he said he didn't spray me with anything.

6    Q.   So I want to back up.  You mentioned something about pain

7    compliance techniques?

8    A.   Yes.

9    Q.   What's that?

10   A.   So as they were grabbing my arms, I believe Officer Woods

11   was poking his thumbs into my wrist which was very painful.

12   Officer Roby, he was twisting my wrists and trying to put the

13   handcuffs on at the same time.  They were doing things like

14   applying pain to get me to, I guess submit to their unlawful

15   arrest.

16   Q.   Okay.

17        MR. O'NEILL:  I'm going is to start playing at two

18   minutes, 55 seconds?

19        (Played Video.)

20   Q.   So I stopped at three minutes and two seconds.  We just

21   heard a statement.  What was that statement?

22   A.   I asked him what did he spray me with.

23   Q.   So that was you asking that?

24   A.   Yes.

25   Q.   And what -- again, explain why you, why you asked that.

1   A.   Because I felt a mist of some type of spray on the side of

2   my face, and then it began burning.  And not only did I feel it

3   for a few seconds, later I smelled it.

4   Q.   Did it affect you in any other way if at all?

5   A.   I think my vision was blurry in my right eye and it was

6   burning on the side.  That's it.

7   Q.   And we've paused here at Exhibit 1, two minutes and three

8   seconds.  Can you describe what we're looking at here?

9   A.   That's my camera obviously on the ground.  I think it was

10  knocked out of my hand by Officer Woods.

11          MR. O'NEILL:  Start playing three minutes and two

12  seconds.

13          (Played Video.)

14  Q.   So, what did we just see right there?  I paused at three

15  minutes and 23 seconds.

16  A.   We see Officer Roby picking my camera up, my phone up.

17          (Played Video.)

18  Q.   So we just heard the end of the video there.  You were

19  saying give me my phone, right?

20  A.   Yes.

21  Q.   And why were you doing that?

22  A.   I was very concerned about the footage that was on the

23  phone.  The footage that I just recorded.  I didn't want it to

24  get deleted.

25  Q.   Why not?

1  A.   Because it showed the -- it showed two objections to what

2  just happened with me being violated and my rights being

3  violated and being unlawfully arrested.

4  Q.   And after that video ends, was there any further video

5  recorded from your phone of the interaction?

6  A.   No, that was it.

7  Q.   So I want to play another video for you.  Just a moment.

8  I'm going to play a couple seconds of this for you.

9         (Played Video.)

10 Q.   I paused it here at 17 seconds.  This is Exhibit 3.  Do

11 you recognize this video?

12 A.   Yes.

13 Q.   What is it?

14 A.   That's Officer Woods' body cam.

15 Q.   Okay.

16        How do you know that?

17 A.   Because he was the assisting officer on scene.

18 Q.   And can you describe what we see in the -- towards the

19 middle bottom of the screen?

20 A.   Yes.  That's me on the sidewalk.

21 Q.   Okay.

22        And then, and then anything else that -- can you

23 describe the rest of the scene that we see there?

24 A.   I see a white line.  I see a cutout of the pavement, the

25 white line establishing the parking lane, and I can see the

1  vehicles mostly in the bike lane, just only a small amount of

2  the left side of their vehicles into the traffic lane.

3  Q.   Okay.

4       Is there any -- were there any other people that you

5  see?

6  A.   Not at this time.

7  Q.   Okay.

8       MR. O'NEILL:  I'm going to play it at 17 seconds.

9       (Played Video.)

10      MR. O'NEILL:  So back up to 10 seconds.

11      (Played Video.)

12      MR. O'NEILL:  Pause at 17 seconds again.

13  Q.   So you said you're on the sidewalk?

14  A.   Yes.

15  Q.   Okay.

16       So you're in the bottom middle of the screen here?

17  A.   Yes.

18  Q.   Okay.

19       And it, can you describe what you're wearing?

20  A.   I'm wearing my black chut-pants at the time.  I'm wearing

21  a gray jacket.  I have a mask on, and I have a hat on.

22  Q.   Okay.

23       And do you see, do you see another Boston Police

24  officer?  I paused at 19 seconds.

25  A.   I see Officer Roby on the other side of the vehicle.

1    Q.    Okay.

2    A.    In the street.

3    Q.    Okay.

4          MR. O'NEILL:  I'm playing at 19 seconds.

5          (Played Video.)

6    Q.    Okay.

7          I paused at 32 seconds.  What do we, what are we

8    seeing right here at this point?

9    A.    We're seeing Officer Roby approaching me, he tries to

10   arrest me for stepping off the pavement into the parking lane.

11   By the time -- what we're seeing right now is Officer Woods'

12   body cam showing that I'm backing into -- backing up into the

13   pavement and Officer Roby trying to arrest me, grabbing my

14   arms, grabbing my clothing, and kind of, like, basically using

15   his body to force me back towards the metal clothes container.

16   Q.    Okay.

17         MR. O'NEILL:  Playing at 32 seconds.

18         (Played Video.)

19   Q.    So I stopped at 35 seconds.

20         What do you have in your -- if anything in your right

21   hand?

22   A.    So that's my camera holder.  And I'm able to affix my

23   camera on to that.  And it's basically a stabilizer so the

24   video won't be -- just basically stabilizing so you have a

25   clearer view of the video.

1    Q.   And when you say your camera, what, what device is it

2    film -- filming in the stabilizer?

3    A.   My phone.

4         MR. O'NEILL:  So I'm going to play again 35 seconds.

5         (Played Video.)

6    Q.   So I paused at 41 seconds.

7         Did you hear any of the commands that Officer Roby

8    was giving you?

9    A.   At that time?

10   Q.   Right.

11   A.   I'm not sure.  I was kind of traumatized by the fact that

12   he was putting his hands on me and trying to arrest me and

13   pushing me back.  So I don't think what he was saying was being

14   processed by me because I was just, I was appalled, I was

15   scared, I was traumatized, and, you know, I was in fear.  I

16   didn't know what was going to happen next.

17        MR. O'NEILL:  I'm going rewind at 31 seconds and we'll

18   play it.

19        (Played Video.)

20   Q.   So can you talk to us a little -- now we have this

21   different camera view, can you talk to us a little bit about

22   what's going on?

23   A.   He was telling me to put my hands behind my back.  Like I

24   said, I was scared.  I was in fear.  It was just a natural

25   reaction so I could defend myself.

1    Q.   Do you hear that, hear people saying stop resisting?

2    A.   Yes.

3    Q.   Do you know who specifically was saying that?

4    A.   Officer Roby.

5    Q.   Okay.

6         Anybody else?

7    A.   I think I heard Officer Woods say it once I believe, you

8    know, at least for the camera.  Because like I said, if they

9    want to call it resisting, I call it I was scared.  I was in

10   fear.  I tensed up, and I was just -- it was just a natural

11   reaction to protect and defend myself.

12   Q.   Okay.

13        So you, you just said that they were calling what you

14   were doing resisting, is that what I heard?

15   A.   (Witness nods head).

16   Q.   Is that a "Yes"?

17   A.   Yes.

18   Q.   And so you said you were -- what were you doing that they

19   were calling resisting?

20   A.   Well, I was recording with one hand.  I had the camera

21   holder in one hand.  And I had my arm straight down to my side

22   because I didn't want to raise any alarm, make them think I was

23   trying to put my hands on them or anything.  And they were

24   grabbing my arms and my arms was just stiff because the trauma

25   that I was going through at the time and the fear that I was

1  experiencing.

2        THE COURT:  Mr. O'Neill, we're told that lunch has

3  arrived for the jurors, but I don't want to interrupt.  Find a

4  good place to stop.

5        MR. O'NEILL:  I have a little bit more to go, your

6  Honor, so this might be a good place to stop.

7        THE COURT:  All right.

8        All right, Jurors, lunch has arrived for you upstairs.

9  Let's plan on 45 minutes.  We'll check if you want more time,

10  we'll make more time.  But I think there's a meal there that

11  should be okay.  We'll see how everybody feels.

12        Counsel, 45 minutes for lunch all right?

13        MR. O'NEILL:  Thank you.

14        THE CLERK:  All rise.

15        (The Honorable Court and Jury Exited.)

16        (Court Recessed for Lunch.)

17              *  *  *  *  *

18

19

20

21

22

23

24

25

1    **A F T E R N O O N   S E S S I O N**

2           THE CLERK:  All rise for the jury.

3           (The Honorable Court and Jury Entered.)

4           THE CLERK:  Resuming on the record civil action No.

5    22-10177, _McCullough V. Roby and Woods._

6           Thank you.  You may be seated.

7           THE COURT:  All right, welcome back, Jurors.

8           Mr. O'Neill, you may.

9           MR. O'NEILL:  Good morning, your Honor -- good

10   afternoon, your Honor.  Sorry.  Thank you.

11   **DIRECT EXAMINATION BY MR. O'NEILL:   (Resumed)**

12   Q.   Mr. McCullough, I'm going to play, this is Exhibit 3.  And

13   I'm starting at a minute.  I'm just going to play this and ask

14   you just to watch it.

15           (Played Video.)

16   Q.   Pausing at a minute and eight seconds.  I'm going to back

17   up a little bit here.  Okay, so we're, we're at 38 seconds.

18   And can you just briefly describe what we see in the still here

19   at 38 seconds of Exhibit C.

20   A.   Yes, Officer Roby grabbing my clothing and me holding my

21   camera with my camera holder.

22   Q.   Okay.

23           MR. O'NEILL:  I'm going to play at 38 seconds.

24           (Played Video.)

25   Q.   Before the break we talked about how this is, you said

1  that this is Officer Woods' body-worn camera video, connect?

2  A.    Yes.

3  Q.    So I've stopped it at 45 seconds.

4         Can you describe what you're -- what the last few

5  seconds that you saw and what we see here on the still?

6  A.    Well, I see at the time I felt, but right now I see

7  Officer Woods pulling my arm back kind of like twisting it, and

8  Officer Roby is kind of, like, pressing me against the wall

9  caddy-corner to the wall and the metal clothes container.  And

10 I'm kind of, like, pinned in that area while they're trying to

11 get -- I guess, the handcuffs on my wrist.

12 Q.    Okay.

13         MR. O'NEILL:  Play at 45 seconds.

14         (Played Video.)

15 Q.    So, now I've stopped at 53 seconds.  Walk us through the

16 last eight seconds what we just saw.

17 A.    That was them grabbing -- continue to grab on me, pulling

18 my arms and once again press me against the metal clothes

19 container.  And during that time that's when I was feeling the

20 OC spray burning my face as well.

21 Q.    Okay.

22         So it was at this point that you felt it in the

23 interaction?

24 A.    Yes.  If this is after that happened, this whole time I'm

25 feeling the effects of the OC spray on the side of my face.

1  Q.   Okay.

2        MR. O'NEILL:  Playing at 53 seconds.

3        (Played Video.)

4  Q.   This is right at a minute.  So that was you who said,

5  "What did you spray me with, bro?"

6  A.   Right.

7  Q.   And so, were you feeling the effects of the spray before

8  that?

9  A.   A few seconds before I was feeling, feeling the effects of

10 the spray.  That's the reason why I said what did you spray me

11 with.

12 Q.   Okay.

13       And I'm going to back up just a few seconds and I

14 want you to just -- well, let's start playing at 54 here.

15       (Played Video.)

16 Q.   And I stopped it at 58 seconds.  What, the last four

17 seconds what did we see?  What did you see?

18 A.   I didn't see much.  I just felt a lot.  I felt them

19 putting handcuffs on my wrists.

20 Q.   But in Exhibit C that we're playing, what are we watching

21 Officer Woods do, if anything?

22 A.   He's grabbing on to my arms and pulling on to my arms and

23 twisting and trying to assist Officer Roby with getting the

24 cuffs on my wrist.

25 Q.   Okay.

 1          MR. O'NEILL:  Put it back to 54 seconds.  Play it

 2     again.

 3               (Played Video.)

 4     Q.    So that object there -- I stopped at 58.  What's that?

 5     A.    That's my camera holder.

 6     Q.    And so --

 7     A.    And he's trying to take that away from -- from the grasp

 8     of my hand.

 9     Q.    Okay.

10               (Played Video.)

11     Q.    So I stopped at a 1:25.  That was you saying "Can I get my

12     camera?"  Right?

13     A.    Yes.

14     Q.    And why were you asking about your camera?

15     A.    Because I was in fear that, that footage was gonna get

16     destroyed.  I just wanted my camera and my phone -- my phone

17     camera in my possession so that nothing would happen to the

18     footage.  I, I been through enough.  I knew I was going through

19     a lot at the time and, you know, it just needed to be seen

20     outside of all three of us.

21     Q.    Okay.

22               (Played Video.)

23     Q.    So I've stopped it at a 1:58 seconds.  That was you

24     screaming "help me", right?

25     A.    Yes.

1  Q.   Why were you screaming like that?

2  A.   At that point in my belief I did not commit a crime.  And

3  I had -- they shouldn't have had their hands on me.  They

4  shouldn't have been pulling on me.  They shouldn't have been

5  grabbing on me like they did.  I felt like I was being

6  kidnapped.  I had no idea what was gonna happen after that.  I

7  knew I was in their custody by force and I was afraid.  So it

8  was a cry out just for people -- I mean, I record, I put videos

9  out for people to see tyranny and description, so I'm crying

10 out to whoever can hear.  Maybe somebody looking out their

11 window, anything, to see what's going on and for them to help

12 me.  And realistically, they're the police, nobody outside of

13 that is gonna help me, but I felt as though I needed to cry

14 out.

15          MR. O'NEILL:  I'm going to play at a 1:58.

16          (Played Video.)

17 Q.   I'm going to fast forward it through here.  Bear with me

18 one moment.  I'm going to start playing at two minutes and 55

19 seconds.

20          (Played Video.)

21 Q.   So, I pause at three minutes, nine seconds.

22           What did you see happen a few seconds before I paused

23 it?

24          MR. WHITESELL:  Objection, your Honor.

25          THE COURT:  I'm sorry, I don't understand the

1  objection.

2          MR. WHITESELL:  Your Honor, at this time

3  Mr. McCullough is in the back of the car.  He didn't see

4  anything.  You asked him to describe the video.

5          MR. O'NEILL:  Yes.

6          THE COURT:  That's fair enough.  Let's just watch the

7  video for our own minds.

8          MR. O'NEILL:  Okay.

9          (Played Video.)

10  Q.   So pause at three minutes, 29 seconds.  The two people

11  that we see here, do you know who those people are?

12  A.   I only know one, which is Officer Roby.

13  Q.   Okay.

14          You don't know the other person?

15  A.   Not at that time.

16  Q.   Okay.

17          Do you now know who that is?

18  A.   Yes, I do.

19  Q.   And who IS that?

20  A.   Lieutenant Brooks.  Used to be Sergeant Brooks during that

21  time.

22  Q.   Okay.

23          The still that we just saw, at that point where were

24  you?

25  A.   I was in the back of the cruiser that Officer Roby and

1    Woods placed me in.

2           MR. O'NEILL:  Can we make it so that only

3    Mr. McCullough can be on camera?

4           THE CLERK:  Yes.

5           MR. O'NEILL:  All set?

6           THE CLERK:  Is it video, though?

7           MR. O'NEILL:  It is, yes.

8           THE CLERK:  The audio will play.

9           MR. O'NEILL:  I'll take the audio out.

10   Q.   So, Mr. McCullough I'm going to show you a video.  Can you

11   still see my computer screen?

12   A.   Yes.

13   Q.   Okay, now you see a video play?

14   A.   Yes.

15   Q.   Okay.

16           So I'm going to let that play.  And I'll ask you a

17   few questions in a moment.

18           (Played Video, No Audio.)

19   Q.   I'm fast forwarding through it a little bit here.

20           So I paused it at two minutes and 36 seconds.  Do you

21   see a person in the middle of the screen?

22   A.   Yes, that's me.

23   Q.   That's you?

24   A.   Yes.

25   Q.   Okay.

1          And based on that, based on what you've seen so far,
2   do you recognize this video?
3   A.   Yes.
4   Q.   And what do you recognize it to be a video of?
5   A.   Officer Roby's body cam.
6   Q.   Okay.
7          And was it at -- the video that's depicted in this --
8   the footage that's depicted in this video, is that a fair and
9   accurate representation of the events you went through on April
10  25, 2020?
11  A.   Yes.
12         MR. O'NEILL:  At this time, your Honor, I move to
13  admit Exhibit C into evidence.
14         THE COURT:  I think we agreed on it.
15         MR. WHITESELL:  No objection from the City's
16  perspective.
17         THE CLERK:  Exhibit 6.
18         (Exhibit 6 Admitted).
19         MR. O'NEILL:  Is that published?
20         THE CLERK:  Yes.
21         MR. O'NEILL:  Thank you.
22  Q.   I'm going to back up a little bit here, Mr. McCullough, so
23  this is two minutes and 26 seconds.
24         (Playing Video.)
25  Q.   So this is at two minutes and 36 seconds, this is the

1    image that you testified that's you in the middle of the

2    screen, right?

3    A.    Yes.

4    Q.    And what are you doing there?  Can you describe that?

5    A.    Yeah.  I'm trying to communicate with the people in the

6    car and the driver that I'm just out there recording them.

7    It's kind of hard to convey that message to them, but I was

8    just trying to keep them at ease, keep them at peace, because I

9    understand how people who are not educated about recording in

10   public understand how they can feel.  So it's just kind of

11   like, you know, motioning hey, everything's cool, I'm just

12   recording.

13   Q.    Okay.

14         MR. O'NEILL:  Start playing two minutes and 36

15   seconds.

16         (Played Video.)

17   Q.    So paused at 2:56 and just fast forward a little bit here.

18   Okay, so now at three minutes and 45 seconds.

19         (Played Video.)

20   Q.    Sorry.  Let me rewind ten seconds.

21         (Played Video.)

22   Q.    Okay.

23         So I paused at 4:24.  What are we seeing right here

24   where were you stopped?

25   A.    That's me concluding my conversation with the driver and

1   basically backing up very slowly as I'm watching Officer Roby
2   approach me.
3   Q.   Okay.
4         A few seconds before that, what happened that you
5   saw?  I can rewind.  Let me do this.  Give me one second.  Four
6   minutes and nine seconds.
7         (Played Video.)
8   Q.   So just I paused it at 4:22.
9   A.   Uh-huh.
10  Q.   What just happened, that two to three second clip?
11  A.   A vehicle went passed me in the left traffic lane.
12  Actually, that's a three lane street, because there's a third
13  lane that's a turn-in lane, so I would say that's the second
14  lane that the vehicle passed me in.
15  Q.   Okay.
16        So --
17  A.   Right there in that section is a three-way street -- I
18  mean a three-lane street in that section right there.  I'm
19  standing in the first traffic lane.  The vehicle was in the
20  second traffic lane and then there's a third traffic lane for
21  turning only.
22  Q.   Okay.
23        MR. O'NEILL:  I'm going to start playing at four
24  minutes 22 seconds?
25        (Played Video.)

```
1    Q.   So I paused at 4:39.  I'm going to back it up to 4:33.
2    Just watch that again.
3              (Played Video.)
4    Q.   So at 4:38 just before there's a -- you can see you
5    walking, where are you walking in relation to the street?
6    A.   It looked like I stepped into the parking lane.
7    Q.   Okay.
8    A.   It looked like I stepped into the parking lane.
9              (Played Video.)
10   Q.   I'll pause at six minutes and 31 seconds and fast forward
11   here.  This is at seven minutes, 41.
12             (Played Video.)
13   Q.   Sorry.  Let's back up.  Let's pause at 7:45 and go to
14   7:25.
15             (Played Video.)
16   Q.   So pause at 7:34 there.
17             Did you -- you heard a person speaking, right?  In
18   just that in the video before I paused it?
19   A.   When I was in the back seat of the cruiser?
20   Q.   In the video itself.
21   A.   Yes.
22   Q.   Okay.
23             And do you recognize that voice?
24   A.   I do.
25   Q.   And whose voice is that?
```

```
 1   A.    Sergeant Brooks.

 2   Q.    Okay.

 3              And then --

 4   A.    I also recognize Officer Roby's voice as well.

 5   Q.    Okay.

 6              What did he say just before the video was paused?

 7   A.    Could you rewind it again, please?

 8   Q.    Of course.

 9              (Played Video.)

10   Q.    Okay, so I paused at 7:36.  I'm going to rewind.

11              (Played Video.)

12   Q.    So seven minutes and 33 seconds.  What was just said right

13   then?

14   A.    I heard Officer Roby say "I had a traffic stop, I had to

15   lock up John, the video guy."

16   Q.    Play at seven minutes, 33.

17              (Played Video.)

18   Q.    So I paused at eight minutes and 33 seconds.  At this

19   point where are you?

20   A.    I'm in the back seat of the cruiser.

21   Q.    Okay.

22              And what's happening just as I paused it in the

23   time -- like, as you're sitting in the back of the cruiser,

24   what's happening?

25   A.    Well, I'm feeling the sensation of the OC spray and
```

1   Officer Brooks opens the door to ask me a question.

2   Q.   Okay.

3          MR. O'NEILL:   I'm going to play eight minutes, 33

4   seconds.

5          (Played Video.)

6   Q.   So pause at 8:38.  Is that you saying I need medical

7   attention?

8   A.   Yes.

9   Q.   And who were you saying that to?

10  A.   To Officer Brooks -- Sergeant Brooks at the time.

11         (Played Video.)

12  Q.   So I paused at 8:58.  You and Officer Roby are talking to

13  each other, correct?

14  A.   Yes.

15  Q.   And what are you talking about?

16  A.   I'm asking him what is he charging me with, because at

17  that point I have no idea why I'm being taken into the custody

18  unlawfully.

19         (Played Video.)

20  Q.   So I paused at nine minutes, 48 seconds.  That was just

21  you talking, right?

22  A.   Yes.

23  Q.   Why did you say what you said there?

24  A.   Because when Officer Roby grabbed me and took me out the

25  car, he twisted the handcuffs very violently right in the

1  middle and I hurt my wrist, both wrists at the same time.  So I

2  asked him that question, "Why you grabbing my shit like that?"

3  'Cause he didn't -- in my opinion he didn't have to do that.  I

4  was already coming out the car I wasn't resisting or anything.

5  Q.   So this is at nine minutes and 48 seconds?

6       (Played Video.)

7  Q.   So we'll pause again, briefly nine minutes, 59 seconds.

8  You said, Why are you grabbing me like that?

9  A.   Uh-huh.

10 Q.   For the same reason?

11 A.   It was continuous, he never stopped.  It was, he had twist

12 the cuffs.

13      (Played Video.)

14 Q.   All right, so pause it at 9:56.

15      That's you screaming, right?

16 A.   Yes.

17 Q.   And you're screaming help me?

18 A.   Yes.

19 Q.   Why were you doing that?

20 A.   Because at that point once he twisted the cuffs and he

21 kept that pressure on both of my wrists, now I know he has ill

22 will towards me.  So I'm very scared right now.  I don't

23 understand what the reason he's doing it for, but I know I

24 don't deserve it.  So I'm crying out, hopefully somebody hears

25 me.

1          (Played Video.)

2    Q.   So it's at ten minutes and one second.  You screamed a

3    couple times in a row "He's trying to kill me," right?

4    A.   Yes.

5    Q.   Why were you screaming that?

6    A.   Would somebody intervene hopefully one of his coworkers,

7    hopefully somebody in the street sees what's going on.  I'm

8    receiving this for no reason and, you know, I am at that point

9    in time I didn't -- I actually didn't know what was gonna

10   happen once they put me in that station.  So I was just looking

11   for somebody to intervene with the unlawfulness that was going

12   on.

13   Q.   But he hadn't done anything other than the twisting of the

14   cuffs you mentioned that you were concerned about, right?

15   A.   Yeah, at that time?

16   Q.   Right.  At that time.

17   A.   No, it was just the twisting of the cuffs that put extreme

18   pressure on both of my wrists.

19          (Played Video.)

20   Q.   So I stopped at 10:22.  So, you're still screaming "He's

21   trying to kill me," right?

22   A.   Yes.

23   Q.   He's been doing it for -- about how long would you say you

24   had been yelling?

25   A.   Probably a good ten seconds.

1    Q.   Okay.

2              And why did you continue doing that?

3    A.   So in addition to him applying pressure by twisting the

4    handcuffs and that pressure being applied to both of my wrists,

5    he now, he had bent me over.  I believe at this point he had

6    bent me over and he put the hood over my head on my jacket.

7    And I couldn't see anything after that.  I was extremely

8    scared, and it started to affect my breathing at that time

9    because the hood came all the way down over my nose.

10   Q.   Okay.

11             So we'll play it at 10 minutes, 22 seconds.

12             (Played Video.)

13   Q.   So I paused at 10:32.  Right before I paused you made a

14   couple of statements.  What were those?

15   A.   I said He's taking my property.  And I said Stop punching

16   me.

17   Q.   Why did you say that?

18   A.   Because he was punching me.  He had bent me over and prior

19   to him punching me, which maybe was a second or two seconds

20   before, he ran my head into the wall of wherever they was

21   taking me to.  So my head, my head hit the wall and then I

22   started, I felt a series of punches on the side of my face.

23   Q.   Okay.

24             MR. O'NEILL:  Playing at ten minutes, 32 seconds.

25             (Played Video.)

1    Q.   So I paused 10:36.  Just before I paused we heard somebody

2    say something.  What was said just then?

3    A.   I believe I heard Officer Roby say Stop spitting.

4    Q.   Okay.

5         Do you know, what was your understanding of why he

6    said that?

7              MR. WHITESELL:  Objection, your Honor.

8              THE COURT:  When you say why -- sustained.

9    Q.   Were you spitting on anybody?

10   A.   Intentionally, no.

11   Q.   Okay.  Explain that.

12   A.   But I was very -- there was a lot of adrenaline pumping at

13   the time.  I was scared.  I was in fear.  I was trying to

14   convey to anyone who would hear to help me.  So I'm pretty sure

15   when I was speaking, maybe a little spittle came out.

16   Intentionally?  No, I was in too much fear to be trying to spit

17   in somebody's face.  And at that point I had the hood on over

18   my face as well.

19   Q.   Okay.

20             MR. O'NEILL:  So ten minutes and 36 seconds.

21             (Played Video.)

22   Q.   So pause at ten minutes and 53 seconds.  So can you walk

23   us through generally where you're travelling from the time you

24   exit the vehicle until now?

25   A.   So I know from the time that I left the vehicle, I was

1  going into the rear of B3 police station.  That's where I was

2  going towards.  At some point as I got close to the wall, I was

3  bent over and the hood was pulled over my head.  So from that

4  point on, I can't tell you exactly what or where I walked

5  through.  I know I was in B3 police station, but I can't tell

6  you if I went through two rooms or, you know, the details of

7  that because I was bent over.  And the only thing I could see

8  was the ground.

9  Q.   Okay.

10  A.   And my sneakers.

11  Q.   Okay.

12       MR. O'NEILL:  Playing at ten minutes, 53 seconds.

13       (Played Video.)

14  Q.   So pause at 11 minutes and four seconds.  That was you

15  making those statements, correct?

16  A.   Yes.

17  Q.   Why were you doing that?

18  A.   Because I was feeling more pressure on my wrists.  I could

19  not see anything.  It was completely dark.  And I was having

20  shallow breaths at the time.  Beginning to have shallow

21  breaths.

22  Q.   Okay.

23       Can you explain what you mean by shallow breaths in a

24  little more detail?

25  A.   Well, I had the hood kind of like pinned, pulled over my

1     nose like right to here (indicating).  Right where my mustache

2     is.

3     Q.   Okay.

4     A.   And it was pulled tightly and I wasn't able to get enough

5     air in through my nose.  And I was talking at the same time, so

6     there wasn't much air going through my mouth.  So it was

7     shallow breaths.  I was getting very little air as I was

8     speaking and trying to plead to them for them to stop doing

9     what they were doing to me.

10              MR. O'NEILL:  So playing at 11 minutes.

11              (Playing Video.)

12    Q.   All right.  So I paused at 11 minutes and 33 seconds.  Can

13    you talk about what happened just from your memory over the

14    last five seconds or so?

15    A.   Yeah, I can feel, I can feel myself being dragged across

16    the floor and I'm being pulled by the handcuffs as they're

17    continually being twisted.  And I'm just telling them, like,

18    you guys don't have to do this to me.  I'm walking with y'all,

19    you know, I'm not being dead weight.  I'm saying you guys don't

20    have to do this to me.  You can just casually walk me to where

21    you need to walk me through.  But they decided to, you know, I

22    guess be violent about it and drag me across the ground and

23    twist the handcuffs.  And the whole time I still had the hood

24    over my face.

25    Q.   So playing at --

1   A.   So it wasn't -- I'm sorry.

2   Q.   Go ahead.

3   A.   About the hood being over my face at this time, it wasn't

4   as constricted as it was when they were bringing me in.  It

5   kind of loosened up because I guess Roby took his hand off the

6   hood.  It was still covering my face, but I couldn't see who

7   was around me.  I was just feeling, you know, my wrists being

8   twisted and my legs being pinned.

9           MR. O'NEILL:  So play at 11 minutes, 33 seconds.

10          (Played Video.)

11  Q.   So, paused at 11 minutes, 45 seconds.

12          At this point do you know where your phone is?

13  A.   No, I don't.

14  Q.   Playing at 11:45.

15          (Played Video.)

16  Q.   So paused at 11 minutes, 58 seconds.

17          Is that your leg that we see right there?

18  A.   Yes.

19  Q.   Okay.

20          And so can you describe just how your body is

21  oriented in relation to the floor from what we can't see?

22  A.   Yeah, I'm kind of, like, contorted.  I had my leg -- my

23  leg is up one way, I'm kind of bent over, and I'm handcuffed.

24  I'm still handcuffed.  And I think I'm being held by the

25  handcuffs as well.  And I'm being -- there's massive weight on

1   top of me as Officer Roby or whoever was on the upper area of

2   my body, I was being pinned down.

3   Q.   Okay.

4          MR. O'NEILL:  So play at 11 minutes, 58 seconds.

5          (Played Video.)

6   Q.   Okay.  So paused at 12 minutes, 36 seconds.

7          So that was you saying you couldn't breathe, right?

8   A.   Right.

9   Q.   And can you explain what -- just the seconds up to that

10   and then what happened right then as I paused the video?

11   A.   Yeah.  Well, they continued to pin their weight on me on

12   my back and my shoulder.

13          MR. WHITESELL:  Your Honor, I would object and move to

14   strike the answers regarding the weight on the back.

15          THE COURT:  Sustained.

16          The jury will disregard that testimony.

17   Q.   So without, without describing that, just talk about what

18   the -- again, the lead-up to just before I paused the video.

19   A.   So the hood was around my nose and it was, I was having

20   shallow breaths and it was hard for me to breathe and I was

21   pleading to them that I couldn't breathe and please take the

22   hood off my head.

23          MR. O'NEILL:  Playing at 12:36.

24          (Playing Video.)

25   Q.   Okay.  So pause at 13 minutes and 11 seconds.

```
 1            So, at this point walk us through what happens right
 2    after we pause the video.  Right after we last saw you on the
 3    floor.
 4    A.   So I think I remained in that room on the floor for the
 5    next few minutes, and after the next few minutes they picked me
 6    up and they take me to another room.  And that was the
 7    processing room for me to get booked and processed.  And I
 8    stood there with the officer while the lady took my picture,
 9    while they fingerprinted me, and until that process was over
10    until I was placed into a cell.
11    Q.   Did you receive -- well, after, after you were booked, do
12    you recall speaking with anybody in the B3 station?
13    A.   Yeah, the lady who was processing me, the officer who was
14    processing me and Officer Brooks.
15    Q.   Okay.
16            And without saying exactly what was said, what was
17    the substance of the conversation with Sergeant Brooks?
18    A.   He took pictures.  He asked if it was okay for them to
19    take some pictures real quick.  And he asked me if I needed
20    medical attention.
21    Q.   Okay.
22            And what did -- how did you respond to that?
23    A.   I told him, I said no, I'm fine now.  Because at the time
24    I didn't feel the pain anymore.  I don't know if that was due
25    to the whole adrenaline rush of everything that I been through
```

1    for the past, let's say, ten minutes or whatever. But by that

2    time, like I said, like I explained earlier, there was a mist

3    of pepper spray that I felt on the side of my face, and I did

4    initially say that I wanted medical attention, but by the time

5    I was on the ground and I went through all I went through the

6    handcuff twisting and everything, that was the least of my

7    problems. I wasn't really concerned about spray as far as what

8    it was feeling like, I just know that I didn't feel too much

9    pain at the time. And I didn't want to waste resources when I

10   knew I wasn't in pain anymore.

11   Q.   Okay.

12         Did you have any -- did you experience any pain after

13   April 25, 2020?

14   A.   Yes, I do.

15   Q.   And talk about that.

16   A.   I experienced minor back pain. The bruises and my wrists

17   lasted I would say about two weeks. There was slight pain for

18   a few hours in the, like, the pain didn't completely subside

19   from the OC spray at the time when I told them that I didn't

20   want medical attention. But while I was in the cell, I felt a

21   little irritated on the side of my face. Put a little water on

22   it, and it eventually subsided for good. But that was the pain

23   that I went through.

24   Q.   Did you ever seek medical care for --

25   A.   No.

1   Q.   Why not?

2   A.   Because there wasn't no long-term pain that I received to

3   go to a hospital to seek any medical care.

4   Q.   Did you ever do anything to document the bruises on your

5   wrists?

6   A.   No, I didn't.

7   Q.   Can you explain why you didn't?

8   A.   Well, I -- at the time I wasn't really concerned about

9   documentation of bruises because of what I had on video.  I

10   felt, I felt as though, and I still feel that the video is the

11   strongest piece of this case, because it's the

12   self-explanatory.

13   Q.   How long approximately were you at B3 station after you

14   were arrested?

15   A.   I believe about between 30, 40, 36 hours.

16   Q.   Do you recall when, again, approximately when you were

17   released the day and time?

18   A.   Yeah, I believe it was afternoon.  Around like -- between

19   eleven and twelve, Sunday afternoon.

20   Q.   Okay.  Sunday, April 26th?

21   A.   Yes.

22   Q.   At any point up until this time, up until you were

23   released from custody in B3 station, did Officer Roby ever

24   provide his name and badge number to you?

25   A.   No.

1   Q.   After you were released, what were, what were the next

2   steps I guess in your interactions with Officer Roby?

3   A.   I'm sorry, could you be a little more detailed?

4   Q.   Sure.

5          Was there any -- were there any -- did you have to go

6   to court after this interaction with Officer Roby?

7   A.   Well, well when I was released, I received a bail receipt

8   for my bond and I was -- it was stated on the bail receipt to

9   not return to B3 police station unless it was for emergency

10  purposes only.

11  Q.   Okay.

12  A.   That struck me as odd and unconstitutional, so I had to --

13  it was during COVID, so a lot of things were being backed up.

14  So I think the first court date that I made was the following

15  August or September I believe.

16  Q.   Okay.

17         Of 2020?

18  A.   Of 2020, yes.

19  Q.   And can you approximate how many times you appeared in

20  court?

21  A.   I would say about four to five times.

22  Q.   Okay.

23         Is that -- the case ultimately went to trial,

24  correct?

25  A.   Yes.

```
 1   Q.   And do you recall what you were charged with?
 2   A.   Assault and battery on a police officer.  Disorderly
 3   conduct.  I can't remember the other one.  It escapes me right
 4   now.
 5   Q.   Okay.
 6              But there was a third charge?
 7   A.   There was a third charge.  There was actually a fourth
 8   charge as well, but it ended up being dropped.
 9              MR. WHITESELL:  Your Honor, I think your Honor's order
10   limited testimony to specific items related to the criminal
11   case.
12              THE COURT:  I agree.  But I think I already told the
13   jury that resisting arrest is the third as I recall.
14              MR. WHITESELL:  Yeah, okay.
15   A.   So I'm sorry, it was assault and battery on a cop,
16   disorderly conduct and resisting arrest.
17   Q.   Okay.
18              Do you, what do you recall about -- well, let me
19   rephrase.
20              When, when did the trial -- did you go to trial in
21   that case?
22   A.   I did go to trial.
23   Q.   Okay.
24              When was that?
25   A.   That was in October 2022.
```

1   Q.   Okay.

2        And what happened over the course of that trial?

3        MR. WHITESELL:  Objection, your Honor.

4        THE COURT:  No, what happened at the conclusion of the

5   trial is what we want to know.

6        MR. O'NEILL:  Sure.

7   Q.   What happened at the -- as a result of that trial?

8   A.   Oh, all charges were dropped on my behalf.

9   Q.   Did anybody testify for the Commonwealth?

10   A.   Yes.

11   Q.   Who?

12   A.   Officer Roby.

13   Q.   Did anybody else testify?

14   A.   No.

15        MR. O'NEILL:  If I may have just one moment, your

16   Honor?

17        THE COURT:  Of course.

18   Q.   What, if anything, happened to your phone?

19   A.   It was destroyed.  I was only able to salvage the footage

20   because the SD card was still in the phone but the phone was

21   completely smashed and destroyed.

22   Q.   When did you receive it back?

23   A.   Upon me being released from B3 police station.

24        MR. O'NEILL:  Nothing further for me, Judge.

25        THE COURT:  How long do you think you'll be, more than

1    an hour?

2              MR. WHITESELL:  Yes.  About that.

3              THE COURT:  About that?

4              All right, Jurors, why don't we take a ten-minute

5    break.  We've been going for more than an hour.  We'll get you

6    out of here well before four o'clock, and then tomorrow we'll

7    hear from the defendants in the case, all right?  Thank you.

8    Ten-minute recess.

9              THE CLERK:  All rise.

10             (The Honorable Court and Jury Exited.)

11             (Court Stood in Recess.)

12             THE CLERK:  All rise for the jury.

13             (The Jury Entered.)

14             (The Honorable Court Entered.)

15             THE CLERK:  Resuming on the record civil action No.

16   22-10177, _McCullough versus Roby and Woods_.

17             Thank you.  You may be seated.

18             THE COURT:  All right, Mr. Whitesell, the floor is

19   yours.

20             MR. WHITESELL:  Thank you, your Honor.

21   **CROSS-EXAMINATION BY MR. WHITESELL:**

22   Q.   Mr. McCullough, I'd like to address a few things that came

23   up during your direct examination.  Do you recall when you

24   testified about how Officer Roby said go back to Deering Road?

25   A.   Yes.

1  Q.   And you referred to it as doxing?

2  A.   Yes.

3  Q.   It was you that put it on the Internet, though, right?

4  A.   I did publish it, yes.

5  Q.   So you were the person who published it on the Internet

6  for your subscribers to see, correct?

7  A.   To show the professionality of the officer, Roby.

8  Q.   But Officer Roby didn't broadcast your video on the

9  Internet to anybody, did he?

10 A.   I didn't say he broadcasted anything on the Internet.

11 Q.   You referred to it as doxing and put it out there for

12 everybody.  But you were the one that put it on the internet,

13 weren't you?

14 A.   Well, doxing would be the wrong terminology that I use.

15 He exposed my address in public.

16 Q.   All right.

17       And you testified on direct that you had been

18 arrested previously by the state police, correct?

19 A.   Yes.

20 Q.   And it just happened a matter of weeks or months before?

21 A.   Months before, yes.

22 Q.   So you know what happens when you get arrested, correct?

23 A.   As far as what?

24 Q.   Well, you were taken into custody on that example,

25 correct?

1    A.    Yes.

2    Q.    Were you put in the back of the police vehicle?

3    A.    What arrest are you speaking of?

4    Q.    The state police arrest.

5    A.    Yes.

6    Q.    So you were familiar with some of the things that happened

7    here during this arrest?

8    A.    Yes.

9    Q.    Did you resist arrest with the state police?

10   A.    That was one of the charges I believe.

11   Q.    Yeah, but did you resist arrest?  Did you --

12   A.    Yeah, because it was one of the -- I was charged with it.

13   Q.    Okay.

14         And let's be very clear, you resisted arrest in this

15   case, correct?

16   A.    Yes.

17   Q.    In fact, you've testified to that fact that you've

18   resisted arrest, correct?

19   A.    Yes.

20   Q.    You didn't want them to put the handcuffs on you, did you?

21   A.    No, I didn't.

22   Q.    I think you testified about a Jamaica Plain encounter that

23   occurred at a bridge?

24   A.    Yes.

25   Q.    And I think you said that there was a storm that day and

1  they were doing some work?

2  A.   I believe it was a storm earlier, because a tree, parts of

3  the tree fell into the street on a bridge.

4  Q.   And the reason you didn't want that conversation with the

5  officer recorded because he had told you you didn't want to go

6  up that road because there was a power lines down, correct?

7  A.   No.

8  Q.   And you testified that you were too afraid of Officer Roby

9  to go up to him and record that day, you just took off,

10  correct?

11  A.   From him chilling my rights before, yes.

12  Q.   All right.

13         But a couple weeks later you approached him at this

14  intersection at Ansel and Blue Hill Avenue and started filming

15  him then?

16  A.   Yes, I did.  I didn't recognize him in the beginning.

17  Q.   But you recognized him eventually?

18  A.   I did.

19  Q.   And you were yelling at him, you were yelling at him, "Are

20  you done with this stop?  Are you done with this stop?"

21  A.   I raised my voice so he could hear me.  I didn't yell at

22  him.  I was just trying to confirm if he was done with the

23  stop.

24  Q.   And you weren't afraid now, in this case, the incident at

25  Ansel Street?

1    A.   Well, at the point he was engaged -- in my thinking he was

2    engaged with a traffic stop.  I figured that the traffic stop

3    was more important than me filming, so I -- and I've also

4    committed myself for at least about four minutes of recording

5    so I continued to stay, yes.

6    Q.   All right.

7         So, you say you didn't know what was going to happen

8    when Officer Roby was bringing you to the back of the station,

9    correct?

10   A.   Yeah.  After I was kidnapped, yes.

11   Q.   And you thought you were being kidnapped you said, I

12   think --

13   A.   I was being kidnapped.

14   Q.   All right.

15        And you thought he was trying to kill you?

16   A.   I would say -- no, I would say that it was a cry for help.

17   It was a cry for maybe for one of his fellow officers to

18   intervene or for somebody just to hear, just to see the

19   unjustness that was going on.

20   Q.   But you saw the videos today, correct?

21   A.   Of course.

22   Q.   Right after he put you in the back of the car the first

23   thing he does is tap on his radio and call for his supervisor,

24   correct?

25   A.   Right.

1  Q.  And when you're at the station and, you know, he's trying

2  to bring you in the station and you guys are struggling, first

3  thing he does is tap on his radio and ask for help in the back

4  to come and get you into the station?

5  A.  I don't remember seeing that.  But I'm not saying it's not

6  true.

7  Q.  It's on the video.

8  A.  Okay, I don't remember seeing it.

9  Q.  Now, you said at some point as you were going into the

10  booking area, where we saw that caged door, that you had your

11  hood over your face and you were having trouble breathing at

12  that time.  And you said -- is that a yes, sir?

13  A.  That's a yes.

14  Q.  And you said that you, that the problem was exacerbated

15  because you were talking at the time, correct?

16  A.  I said that my breath was shallow because I was talking at

17  the time.

18  Q.  But you never asked the officers to take the hood off at

19  that time, did you?

20  A.  There was a lot going on.  I had my wrists being twisted.

21  They had me bent over.  They had the hood over my head.  I

22  couldn't see everything at once.  There was a lot going on.

23  Q.  But 15, 20 seconds later in the video you asked to have

24  the hood taken off, correct?

25  A.  That's when the breathing got worse, yes.

1    Q.   And they immediately took the hood off, didn't they?

2    A.   Yeah, they -- I was just laying on the ground.  The other

3    time they was trying to get me in the station so they could

4    care less about the hood being over my head.

5    Q.   But they didn't know were you having trouble breathing at

6    that time, you hadn't said anything at that point?

7    A.   That's not --

8    Q.   You were just yelling?

9    A.   No, it's not my responsibility to convey to them that

10   they're, they're messing with my breathing.  They should

11   already know.  He should be a reasonable officer.

12   Q.   But you're communicating at that point in time.  You're

13   crying out for help.  You're screaming.  But you don't have the

14   ability to tell them to please take the hood off?

15   A.   Well, like I said when I was placed on the room on the

16   floor, that's when the breathing got worse and increasingly I

17   wasn't able to breathe.  The breaths got shallow.  So I spoke

18   at that time about taking the hood off.

19   Q.   And they immediately took the hood off?

20   A.   Yeah.  The officer who wasn't involved with the situation

21   until I got into the police station, he was new to the

22   situation.

23   Q.   All right.

24   A.   And I actually thank that officer as well, because if he

25   didn't intervene, it could have gotten worse.

```
 1   Q.   Sir, sir --

 2   A.   I'm just saying.

 3   Q.   There's no question pending now.  There's no question

 4   pending.

 5            You were out that night looking to record content for

 6   your YouTube channel, correct?

 7   A.   I was looking -- I was out there holding police

 8   accountable.

 9   Q.   Yeah, so the primary targets of your recordings are police

10   officers, correct?

11   A.   At that time, it was, yes, because it was -- they were the

12   only city officials that were out at that time.

13   Q.   All right.

14            And you, you testified that your YouTube's channel's

15   called The Resistance, correct?

16   A.   Yes.

17   Q.   And on your YouTube page it states that the Resistance

18   channel is a call to action resist against tyranny and

19   corruption.  We are the resistance, stand resistant, be

20   resistant, correct?

21   A.   Correct.

22   Q.   And is The Resistance also a handle that you use on

23   Facebook for posting your video comment or did at the time?

24   A.   Yes.

25   Q.   But your primary page for posting content is your
```

1  Resistance page at YouTube, right?

2  A.   Yes.

3  Q.   And do you solicit donations for your videos?

4  A.   I ask for donations, yes.

5  Q.   You maintain a PayPal account with the handle Eyes on Blue

6  Bloods; is that correct?

7  A.   I have, yes.

8  Q.   And you have a Go Fund Me page -- or had a Go Fund Me Page

9  with the same handle?

10  A.   I have, yes.

11  Q.   And these handles were linked to the Resistance YouTube

12  page?

13  A.   Yes.

14  Q.   And you started The Resistance page a few months before

15  this arrest, correct?

16  A.   Yes.

17  Q.   Why we're here?

18  A.   Correct.

19  Q.   And you refer to some of what you do as auditing, First

20  Amendment auditing, correct?

21  A.   Yes.

22  Q.   And you believe you're holding government officials

23  accountable while exercising your own free speech; is that

24  correct?

25  A.   And recording them as well.

1  Q.   So on some occasions you're auditing and on some occasions

2  you're recording; is that correct?

3  A.   Yes.

4  Q.   And you instigate the public officials when you're

5  recording them, don't you?

6  A.   What do you mean "instigate," I don't understand.

7  Q.   Well, you try to get them fired up and mad at you?

8  A.   No, I don't.

9  Q.   Oh.

10         Are you sometimes aggressive with them?

11  A.   Aggressive how?

12  Q.   Well, for example, you often call people on your videos

13  that are working for the government crude names, correct?

14  A.   I have.

15  Q.   You've called police officers pieces of shift; is that

16  correct?

17  A.   Yes.

18  Q.   And that includes PPD officers, correct?

19  A.   Yes.

20  Q.   And in fact you have a video on your website of you

21  calling Providence police officers pieces of shit and fuck them

22  for over 13 minutes; is that correct?

23         MR. O'NEILL:  Objection, Judge.

24         THE COURT:  Overruled.

25  Q.   Is that correct?

1  A.    Yes, that's correct.

2  Q.    And you were arrested for disorderly in that video, too,

3  correct?

4  A.    Unlawfully --

5        MR. O'NEILL:  Objection, Judge.

6  A.    Unlawfully.

7        THE COURT:  Sustained.  We're already down to one

8  count.

9        MR. O'NEILL:  Judge, I just move to strike that

10  answer.

11        THE COURT:  Well, it never really quite got out.

12  Q.    And part of the reason you recorded these public officials

13  to determine whether or not they know you can record them,

14  correct?

15  A.    Well, the first reason why I record them is to show the

16  level of professionality that they display.

17  Q.    And you've said that one of the things you want to see is

18  whether or not they know that you're allowed to record them,

19  correct?

20  A.    I may have said that.

21  Q.    In your experience the majority of BPD officers that

22  you've encountered know that you can record them don't they?

23  A.    Not in the beginning.  Now they do after almost a thousand

24  videos that I put out.  They know now.

25  Q.    And you reported -- I think you said you record other

1  public officials, correct?

2  A.   Yes.

3  Q.   And you record a private businesses, correct?

4  A.   Yes.

5  Q.   Recorded at hospitals?

6  A.   Yes.

7  Q.   And you've posted or have posted at this time 981 videos

8  on The Resistance.  Does that sound about correct?

9  A.   That's about correct.

10  Q.   And of those videos, three or four hundred of them are

11  original content that you created?

12  A.   Correct.

13  Q.   And you'd agree that roughly 200 of them are you filming

14  Boston Police officers or other representatives of BPD,

15  correct?

16  A.   Yes.

17  Q.   And you have over 23,000 subscribers The Resistance

18  channel, correct?

19  A.   Correct.

20  Q.   And close to three million views of your videos?

21  A.   If that's what it states on YouTube.  I haven't checked it

22  in a while.

23  Q.   You want people to view your videos, correct?

24  A.   Of course.

25  Q.   And there was a period of time when you were monetizing

1  your videos, correct?

2  A.   Yes.

3  Q.   But that monetization got shut down by YouTube and

4  Facebook, didn't it?

5  A.   Yes.

6  Q.   And that was because some of the content you were posting,

7  correct?

8  A.   Yes, some of the content that the police officers display.

9  Q.   Also there were copyright issues, correct?

10  A.   I don't know.

11  Q.   So was there a period -- there was a period of time when

12  you stopped actively recording government officials, correct?

13  A.   Yes.

14  Q.   And that was because you didn't want it to interfere with

15  the lawsuit you were maintaining against Officers Roby and

16  Woods?

17  A.   Not just that, it was just time for a break, and being as

18  though I did put the lawsuit in, it was time to put in that

19  break.

20  Q.   And you said that you stopped actively auditing because

21  you didn't want to do anything that would cause police contact

22  while this case was going on, correct?

23  A.   If I said that, I believe I said that to you in a

24  deposition, yes.  Of course.

25  Q.   And that you intended to resume your auditing and

1    recording for The Resistance when the lawsuit was over,

2    correct?

3    A.   Possibly.  I'm not sure.  I know I said that to you, but

4    you know, my thoughts change on that.

5    Q.   So as you sit here today, you don't intend to continue to

6    record?

7    A.   I'm not sure.  I'm not sure.  From the experience that I

8    received from Officer Roby, I'm not sure.  Sometimes I feel as

9    though I want to, sometimes I feel as though I won't.

10   Q.   That's not actually true, is it?

11   A.   That's what I just stated to you.

12   Q.   For example, on February 9, 2024, you were auditing state

13   officials running the migrant shelter at Melnea Cass

14   Recreational Center, correct?

15          MR. O'NEILL:  Objection.

16   A.   That's migration.

17          THE COURT:  Overruled.

18   Q.   And you recorded your encounter there, didn't you?

19   A.   I did.

20   Q.   And eventually that encounter involved BPD officers?

21   A.   Eventually it did.  I wasn't expecting it to.

22   Q.   All right.

23          And the state police were involved?

24   A.   Something else I wasn't expecting.

25   Q.   And you just posted that video to The Resistance last

1  week, didn't you?

2  A.   I did.

3  Q.   And a few days after that you engaged with two officers on

4  Blue Hill Avenue who were speaking with a citizen about joining

5  BPD, correct?

6         MR. O'NEILL:  Objection, Judge.

7         THE COURT:  You know, I think we're getting a little

8  off topic here.

9         MR. WHITESELL:  Your Honor, I think he said that he

10  wasn't --

11         THE COURT:  Well, you've made --

12         MR. WHITESELL:  -- he wasn't videoing actively.

13         THE COURT:  Well, I think you've made the point that

14  he --

15         MR. WHITESELL:  Okay, your Honor.

16         THE WITNESS:  I'm sorry, can I say something?

17  A.   When you asked me about videoing, I thought you meant

18  after this was over with, and I haven't made that decision if

19  I'm going to go into that full time like I did before.  That's

20  what I mean when I say I'm not sure.  This is every once in a

21  while.  Lately it has been frequent, but only about two or

22  three times.  I've been on a long sabbatical for 18 months now

23  from not recording police officers.

24  Q.   But you're back now.  You've done it twice in the last two

25  weeks, correct?

1    A.   I have.

2    Q.   Including another incident with BPD, correct?

3    A.   I have.  But I thought you was specifically talking about

4    Officer Roby.  I don't think I'll ever record him again.

5    Q.   No.

6         My question was whether you intended to resume

7    recording when this lawsuit was over?

8    A.   Okay, well I misunderstood you, I'm sorry.

9    Q.   All right.

10        Do you intend to resume recording when this lawsuit

11   is over?

12   A.   Yes, I do.  I do.

13   Q.   And I think we've seen from the videos this was not your

14   first encounter with Officer Roby, was it?

15   A.   No, it wasn't.

16   Q.   And that had happened about a month or two earlier I think

17   you testified?

18   A.   Yes.

19   Q.   All right.

20        And you said that you stopped to question Officer

21   Roby and his partner outside of the public schools' Bolling

22   Building; is that correct?

23   A.   Correct.

24   Q.   And in that instance they just ignored you and kept

25   walking, right?

```
1    A.    They did.  As they were illegally parked on the pavement.

2    Q.    But they didn't do anything to you, right?

3    A.    They weren't following policy and they weren't following

4    law.  They were actually illegally parked --

5    Q.    They didn't speak to you?

6    A.    -- on the pavement.  They didn't have to for me to say

7    something to them.

8    Q.    They didn't respond to you?

9    A.    No.

10   Q.    And you didn't get that encounter on video, did you?

11   A.    No, I didn't.  But I told the truth that they didn't

12   respond to me and they kept going.

13   Q.    And they didn't arrest you?

14   A.    No, not at all.

15   Q.    And Officer Roby was with his partner that day, correct?

16   A.    Correct.

17   Q.    And you're well familiar with Officer Roby's partner,

18   correct?

19   A.    Only seen him twice.

20   Q.    Officer Harris, does that ring a bell?

21   A.    That does ring a bell.

22   Q.    And you would later call him a piece of shit in a separate

23   traffic incident, wouldn't you?

24   A.    I did.

25   Q.    Following this encounter at the Bolling Building, you were
```

1  intending to go to the post office at Nubian Square, correct?

2  A.   Yes.

3  Q.   And you were going to do some auditing then?

4  A.   I was going to do some recording.

5  Q.   Okay.

6        But you stopped and started recording the parking lot

7  across the street; is that correct?

8  A.   Yes.

9  Q.   And so you started talking to an individual there who said

10 he was the owner, I believe you testified?

11 A.   Yes.

12 Q.   And he told you to stop recording, correct?

13 A.   I believe so, yeah.

14 Q.   But you refused, correct?

15 A.   He has no right to tell me to stop recording in public.

16 Q.   All right.

17        And he called the police, correct?

18 A.   Yes.

19 Q.   And after about ten minutes BPD arrived at the scene,

20 correct?

21 A.   Yes.

22 Q.   And Officers Roby and Harris weren't the first ones on the

23 scene, were they?

24 A.   No.

25 Q.   We saw those plain clothes officers that came in.  Were

they the first ones there?

A.   Yes.

Q.   And you testified Officer Roby and Officer Harris were right around the corner at the Bolling Building just 20 minutes before, correct?

A.   30 minutes, yes.

Q.   And they were among the other officers that responded to the scene at the parking lot?

A.   Yes.

Q.   And you weren't arrested in this instance, were you?

A.   No, I didn't commit a crime.

Q.   And these officers all knew you could record on the street, correct?

A.   I have no idea what they knew.

Q.   Well, Officer Roby, in the video, you heard him say "Get out of the street.  Get back up on the sidewalk."  Correct?

A.   I did hear him say that.  But I don't know if he was knowledgeable if I could record.

Q.   But he never told you to stop recording, did he?

A.   No, he didn't.

Q.   Now, was this day the first day that you met Officer Roby?

A.   I believe so, yes, to my knowledge.

Q.   And as we've seen, you've videotaped this encounter, correct?

A.   Yes.

1    Q.   All right.

2              Your Honor, I'd like to play Exhibit 2, a portion of

3    it.

4              THE COURT:  Very well.

5              MR. WHITESELL:  It's published to the jury because

6    it's in evidence.  13:59.

7              Go ahead and play that.

8              (Played Video.)

9              MR. WHITESELL:  You can stop it.

10   Q.   And to be clear, no one arrested you that day, right?

11   A.   No.

12   Q.   And you were filming the police the whole time, correct?

13   A.   Yes.

14   Q.   And Officer Roby told you that the reason you were being

15   disorderly is because you were in the street, correct?

16   A.   No.  That's not why he told me that.  He stated that, but

17   that's not the reason he told me I was being disorderly.

18   Q.   He said you were being disorderly, correct?

19   A.   That's not the reason whey he told me --

20   Q.   When he got out of the car, did he say you were being

21   disorderly?

22   A.   He stated that, but that's not the reason why he said I

23   was being disorderly.  He said that because I explicitly told

24   him to roll his window up.  He was offended me by using my

25   First Amendment.

1   Q.   He told you that you were being disorderly, correct?

2   A.   He said --

3   Q.   You watched the video, right?  When he got out of the car,

4   he said you were being disorderly, correct?

5   A.   Let's rewind it again.  Can we watch it again?

6          MR. WHITESELL:  Go to the spot where they both come

7   out of the car.

8          (Played Video.)

9   Q.   So you heard him say you're being disorderly, correct?

10   A.   I heard him state that, yes.

11   Q.   All right.

12          And then you started yelling about free speech,

13   correct?

14   A.   What happened is, is that I told him to roll his window

15   the F up, and you see him made a facial, he made this -- he

16   smugged his face up, opened the door, he reacted, and said stop

17   being disorderly.

18   Q.   And you said something else about free speech, correct?

19   A.   And I said, I said --

20   Q.   Sir --

21   A.   -- I said you can't censor my speech.  And that's when he

22   said Stay out the street.

23   Q.   Yes.

24          So you were talking about two different things there;

25   is that correct?

1  A.   Well.

2  Q.   In other words, he wasn't censoring your speech, he was

3  telling you to get out of the street, wasn't he?

4  A.   Once he realized he couldn't censor my speech, that's when

5  he went to stay out the street.

6  Q.   Did he ever tell you to turn your camera off?

7  A.   No, he didn't.

8  Q.   Is there any indication in that video at all that he

9  thought that you weren't allowed to record?

10  A.   No.

11  Q.   And Officer Roby didn't arrest you in this incident?

12  A.   No.

13  Q.   But you recorded him, correct?

14  A.   Yes.

15  Q.   You demanded his name and badge, correct?

16  A.   I demanded his name and badge, and he didn't give it to

17  me.

18  Q.   And when you went down to the post office, did you have an

19  incident with BPD there later that day?

20  A.   I believe I did.  They were called by the staff at the

21  post office.

22  Q.   And different officers arrived?

23  A.   Yes.

24  Q.   It wasn't any of the officers that were at this scene?

25  A.   No.

1  Q.   All right.

2  A.   And I didn't get arrested.

3  Q.   So at this time you lived very close to B3?

4  A.   Yes.

5  Q.   It's about a block and a half I guess you said from the --

6  A.   Yes.

7  Q.   And a lot of your recordings happened at B3, correct?

8  A.   I would say maybe four or five of them.  Not a lot.

9  Q.   I think you said when you were recording regularly, you

10 went there two or three times a month.  Do you recall that?

11 A.   Two or three times a month for maybe a month or two.

12 Q.   Well, we were only a few months into your Resistance

13 website, correct?

14 A.   Yes.

15 Q.   You started The Resistance --

16 A.   Right, around March or April.

17 Q.   And you started it in January, right?

18 A.   Right.

19 Q.   And in that time you were going down to B3 two or three

20 times a month to record, correct?

21 A.   I may have misstated that I went there two or three times

22 a month because I only have about four videos at B3.

23 Q.   And you had a video involving a sergeant who is now Deputy

24 Superintendent Eddy Chrispin?

25 A.   Yes.

1  Q.  And he was on duty the day you went into the station?

2  A.  Yes.

3  Q.  And he explained to you you couldn't go into the police

4  parking lot, correct?

5  A.  He was explaining to me that -- yeah, he was explaining

6  that I wasn't able to go in the police parking lot.

7  Q.  My recollection is that you were going in that day because

8  you were auditing them for some gates that they put up near the

9  police parking lot, correct?

10 A.  Right.

11 Q.  And you went in and talked to Sergeant Chrispin about the

12 gates outside, correct?

13 A.  Right.

14 Q.  And he explained to you why you couldn't go into the

15 parking lot to film, correct?

16 A.  He tried to explain.

17 Q.  Right.

18       And you regularly tried to go into the B3 parking

19 area to film, correct?

20 A.  The public parking lot?

21 Q.  The parking lot at B3.

22 A.  The public parking lot at the public police station,

23 right?

24 Q.  Yeah, the parking lot at B3, correct?

25 A.  The public parking lot, yes.

1  Q.   Yes.

2  A.   The public parking lot.  The parking lot that's open to

3  the public.

4  Q.   And you understand, you testified at your deposition, that

5  certain places in public buildings are not public, correct?

6  A.   Without proper signage.  There has to be a state statute

7  backed.

8  Q.   Sergeant Chrispin explained to you there are places in the

9  police station that you couldn't film, correct?

10  A.   Sergeant Chrispin tried to explain to me that because

11  there was a gate up that it meant that I couldn't go into the

12  parking lot, which is untrue.

13  Q.   And he didn't tell you to turn your camera off while you

14  were in the station talking to him, did he?

15  A.   No, but he tried to deter me from recording in the parking

16  lot, the public parking lot.

17  Q.   I understand.  But he didn't stop you from recording

18  inside the police station, did he?

19  A.   No, he didn't.

20  Q.   In addition to Officer Roby, you've also had an issue with

21  Officer Roby's partner in the video that we saw in Exhibit 2,

22  correct?

23  A.   Yes.

24  Q.   You believed he was, quote, "conspireing with Roby to get

25  you locked up over the incident involving the parking lot."

1    Correct?

2    A.    Yeah.  Excuse me, yes.

3    Q.    You've never been arrested over that parking lot incident,

4    right?

5    A.    No.

6    Q.    Do you recall a video you posted of an encounter with BPD

7    officers including Officer Harris, a stopped woman in her car

8    that you recorded and posted, "Cops take a stroll when the

9    camera's rolling"?

10           MR. O'NEILL:  Objection, Judge.

11           THE COURT:  Overruled.

12    Q.    Do you recall that video?

13    A.    Yes.

14    Q.    All right.

15           No --

16           MR. WHITESELL:  I would like to play the video just

17    for the witness.  No sound.

18           (Played Video.)

19    Q.    Mr. McCullough, do you recognize this video?

20    A.    I would be able to recognize it more with sound.

21    Q.    I unfortunately can't play the sound for you with the jury

22    in the room.

23           MR. WHITESELL:  Go ahead and play it.

24           (Played Video.)

25    Q.    Do you recognize the woman in this video?

1 A. I do.

2 Q. Do you remember filming a traffic stop involving her?

3 A. Yes.

4 Q. And you recognize the officer in the plain clothes with

5 his hoody on?

6 A. I do.

7 Q. Okay.

8    Is that Officer -- is that Detective Ricard?

9 A. Yes.

10 Q. Do you remember filming this traffic stop?

11 A. I do.

12 Q. And was this an incident where you were out on your

13 scooter and you saw a police officer -- a police cruiser that

14 was driving what you called erratically?

15 A. Yes.

16 Q. And you followed them?

17 A. Yes.

18 Q. Then you followed them to this traffic stop?

19 A. Yes.

20 Q. So you decided to record the traffic stop that day, right?

21 A. I did.

22 Q. And this stop involved multiple police officers from BPD

23 including Officer Harris, correct?

24 A. Yes.

25 Q. And this was about two years after the stop at the parking

1  lot on Exhibit 2, correct?

2  A.   Yes.

3  Q.   And you remembered Officer Harris from that incident,

4  didn't you?

5  A.   I do.

6  Q.   You did on that day, didn't you?

7  A.   I did.

8  Q.   Yeah.

9       You even reference Officer Roby in this video, don't

10  you?

11  A.   I did.

12  Q.   Even though he wasn't present?

13  A.   Right.

14  Q.   And you ended up posting an edited version of your

15  recordings to The Resistance channel, correct?

16  A.   Yes.

17       MR. WHITESELL:  Your Honor, at this time I would like

18  to offer this video as the next exhibit and just play discrete

19  portions for the jury.

20       THE COURT:  Discrete portions, all right.

21       MR. O'NEILL:  Just note my objection, Judge.

22       THE COURT:  So noted.

23       (Exhibit E Admitted.)

24       THE CLERK:  What was the letter on that?

25       MR. WHITESELL:  I think we're up.  E.

1          Are you at the beginning?  Go ahead.

2          (Played Video.)

3          MR. WHITESELL:  Pause there.

4    Q.   Is that the introduction to the video that you put on The

5    Resistance website?

6    A.   Yes, yes.

7    Q.   And the beginning -- in the beginning those are excerpts

8    from the whole of the video, correct?

9    A.   From a collection of videos.

10   Q.   So you took some of the things from the rest of the video,

11   the body of the video and put them in an introduction, correct?

12   A.   Yes.

13   Q.   Including one scene where you ran around and you point at

14   several officers and called them John Doe 1, John Doe 2, and

15   John Doe 3?

16   A.   Yes.

17   Q.   And that's a reference to suing the officers?

18   A.   Yes.

19          MR. WHITESELL:  Can you go to 5:37.

20          (Played Video.)

21   Q.   So this is an encounter you had with Officer Harris,

22   correct?

23   A.   Yes.

24   Q.   And you told him "Did your boy Roby get the news yet?"

25   Correct?

1   A.   Yes.

2   Q.   And that news was the fact that you had filed a federal

3   lawsuit against him, correct?

4   A.   Yes.

5   Q.   All right.  9:45.

6           (Played Video.)

7   Q.   All right.

8           That was Officer Harris again, right?

9   A.   That is Officer Harris.

10  Q.   And you zoomed in on him?

11  A.   Yeah, I mean, look how he was looking.

12  Q.   And you said, "This guy here," right?

13  A.   Wasn't too friendly.

14  Q.   Did he do anything to you?

15  A.   Personally, no.

16  Q.   All right.

17          He's just sitting up against the wagon at that time,

18  right?

19  A.   Yeah.

20  Q.   And at this time you thought he was conspiring with Roby

21  to arrest you for the parking lot incident two years earlier,

22  right?

23  A.   At that time?

24  Q.   Yeah.

25  A.   No.

1   Q.   Why are you focussed on Officer Harris in this video and

2   not the other officers?

3   A.   Because Officer Harris was the officer that was with

4   Officer Roby when we had our interaction, and I remembered him

5   and I know he's a smug officer.

6        MR. WHITESELL:  Can you play 11:25 to 12:40, please.

7        (Played Video.)

8   Q.   You called Officer Harris "a piece of shit" several times

9   there, correct?

10  A.   Yes, I did.

11  Q.   You're trying to instigate him --

12  A.   I'm exercising my First Amendment.

13  Q.   You're trying to instigate him because the stop is over

14  and you didn't get anything good for your video, did you?

15  A.   No, sir.  What?  You didn't play the whole video.  I wish

16  you would so everybody could see the gist of the video.  But

17  you refuse to play it.  You only want to play some.

18  Q.   Sir, sir, I don't refuse to play anything.  I just moved

19  it into the evidence.  The jury will have the whole video.

20        And you -- you've testified you expect a professional

21  response from officers, correct, when you yell at them like

22  that?

23  A.   Yes.

24  Q.   And that's exactly what he gave you, correct?

25  A.   Yeah, he didn't give me anything other than a professional

1    response.  But I can also exercise my First Amendment as well.

2    Q.   And nobody stopped you from filming that -- this arrest,

3    right?

4    A.   No.

5    Q.   In fact, almost every officer gave you their name and

6    badge number right away?

7    A.   They did after two years of filming.  Remember, you said

8    this was two years later.  So after all the hard work I put in,

9    now they know.

10   Q.   And you went after Officer Harris at the end there because

11   you thought he was conspiring with Officer Roby, correct?

12   A.   No.  Two years later?  No.

13   Q.   Again, no one arrested you at the scene, correct?

14   A.   No.

15   Q.   And no one stopped you from recording at any point in

16   time, correct?

17   A.   No.

18   Q.   All right.

19        I want to talk about your arrest by Officer Roby in

20   this case.  On the day before your arrest with Officer Roby you

21   were recording officers in Randolph and Brockton, correct?

22   A.   Correct.

23   Q.   All right.

24        And around 9:00 or 9:30 that night you were recording

25   in the back of the parking lot in the back of B3, correct?

1    A.    Correct.  All under the guise of exercising my First

2    Amendment.

3    Q.    And you knew officers would be outside to film because

4    this was within the few months of the start of the pandemic,

5    correct?

6    A.    I'm sorry, repeat that question.

7    Q.    You knew officers would be outside at B3 because this was

8    within a few months of the pandemic, correct?

9    A.    No, I didn't know that for that reason.  No, I didn't know

10   that they were going to be out there or not.

11   Q.    You knew they were conducting activities outside because

12   of the fear everyone had about the global pandemic, correct?

13   A.    No, I didn't.

14   Q.    All right.

15          And at some point when you were filming that first

16   time at B3, you decided to go home, correct?

17   A.    Yes.

18   Q.    And you came back out around midnight to record, correct?

19   A.    Yes.

20   Q.    And you were aware that there was a curfew in place at

21   that time, correct?

22   A.    Unconstitutionally, yes.

23   Q.    But there was a curfew in place?

24   A.    Unconstitutionally.

25   Q.    All right.

```
1              And that curfew was nine p.m., correct?
2    A.   Unconstitutionally.
3    Q.   I understand your opinions on that, sir.
4              The curfew was nine p.m.?
5    A.   Yeah, it had no bearing on me.  It was unconstitutional.
6    Q.   And you were wearing a jacket with a hood on it, correct?
7    A.   And also that curfew was a suggestion by the Governor.
8    Q.   Nobody arrested --
9    A.   It was never a law.
10   Q.   Nobody arrested you for being out after curfew, did they?
11   A.   No, because it was unconstitutional.
12   Q.   Nobody in this arrest ever told you to go home, it's after
13   curfew?
14   A.   No.
15   Q.   All right.
16             But there was a curfew in place, correct?
17   A.   Unconstitutional.
18   Q.   Understood.
19             And you first realized it was Officer Roby when you
20   got to the corner and positioned yourself to record the stop,
21   correct?
22   A.   No, as I stated to my attorney, I didn't recognize him at
23   first.
24   Q.   You didn't recognize him at first?
25   A.   No.
```

1    Q.   But you certainly knew who he was when he got to the

2    window of the car, correct?

3    A.   By the time he approached me, I certainly knew who he was.

4    Q.   No, no, but by the time you got to the window of the car

5    to talk to the people of the traffic stop you knew who he was?

6    A.   Possibly.  I can't remember.

7    Q.   You actually said, "I know this guy, he's an asshole,"

8    didn't you?  To the people in the car?

9    A.   Correct, correct.

10   Q.   And then you advertised your Resistance website right

11   afterwards, correct?

12   A.   Yeah, so they could see the video.

13   Q.   And in that first encounter where you showed up on the

14   corner and Officer Roby's talking to people in the car, Officer

15   Roby didn't even acknowledge you, did he?

16   A.   No, he didn't.

17   Q.   All right.

18        And he got all the way back to his car and got in his

19   car to leave without saying anything to you at all, didn't he?

20   A.   Right.

21   Q.   But you were recording the whole time?

22   A.   Yes.

23   Q.   And Officer Woods didn't say anything to you as you passed

24   behind him on the sidewalk, correct?

25   A.   No.

1   Q.   He didn't stop you from filming?

2   A.   No, he didn't.

3   Q.   He knew you were there, though, correct?

4   A.   He knew I was there.

5   Q.   And when you got to the corner, you even gestured at the

6   phone and the apparatus that was holding it to the people in

7   the car to let them know you were recording, correct?

8   A.   Correct.

9   Q.   You wanted Officer Roby to know you were recording as

10  well, didn't you?

11  A.   I'm pretty sure he already knew I was recording.

12  Q.   And you were aware now that Officer Roby had his body-worn

13  camera on the whole time he was engaging with you that evening,

14  correct?

15  A.   Uhm, I don't know about the part -- well, when he engaged

16  with me, yes, correct.

17  Q.   So when you were involved with this traffic stop, Officer

18  Roby had his body-worn camera on at all times?

19  A.   I wasn't involved with the traffic stop.

20  Q.   Well, you put yourself involved in it by showing up to

21  record it, correct?

22  A.   I wasn't involved with the traffic stop.

23  Q.   You recorded it, didn't you, the end of it?

24  A.   I wasn't involved with the traffic stop.  Me recording it

25  doesn't involve me.  I'm just recording the traffic stop.

1    Q.   So let me rephrase my question so that it will be

2    accurate.

3              Did you record the end of the traffic stop?

4    A.   I recorded the end of the traffic stop.

5    Q.   And as Officer Roby walked back to his vehicle, you yelled

6    out to him "Is it over?"  Right?

7    A.   I said, "Are you done here?"

8    Q.   "Are you done here?"

9    A.   Yes.

10   Q.   And he didn't respond, correct?

11   A.   He didn't respond.

12   Q.   He continued to ignore you and go back to his car?

13   A.   Yes.

14   Q.   And he knew you were recording at that time, correct?

15   A.   I'm pretty sure he did.

16   Q.   All right.

17              You're pretty sure he heard you when you said you're

18   done here, correct?

19              MR. O'NEILL:  Objection, Judge.

20   A.   I don't know.

21              THE COURT:  Sustained.

22   A.   He didn't respond.

23              THE COURT:  We're starting to repeat ourselves.

24   Q.   And throughout this time when Officer Roby returned to the

25   vehicle, you stayed on the sidewalk the whole time, correct?

1    A.    I'm sorry, repeat that question?

2    Q.    As Officer Roby was walking back to his vehicle, you

3    stayed on the sidewalk until he got back to his car, correct?

4    A.    Yes.

5    Q.    It was only when he got back in his car that you stepped

6    off the sidewalk to come around and talk to the people in the

7    car, correct?

8    A.    Yes, to not interfere or interrupt.

9    Q.    So, when you get out of the car, shortly thereafter

10   Officer Roby leaves his vehicle and approaches you, correct?

11   A.    You mean when I approached the car?

12   Q.    Yeah.  After you spoke and said, that you knew this guy

13   and he's an asshole, talked about The Resistance, shortly

14   thereafter Officer Roby got out of his car and approached you,

15   correct?

16   A.    Right.

17   Q.    Told you to get out of the street, correct?

18   A.    Yes.

19   Q.    You were in fact in the street at that time, correct?

20   A.    Yes, blocked by his police cruiser.

21   Q.    Okay.

22          Would he had been able to leave where you were

23   standing?

24   A.    Sure.

25   Q.    Officer Roby's car was in the right-hand driving lane,

1 wasn't it?

2 A.   He was in the right-hand driving lane, yes.

3 Q.   Yes.

4        And you were standing in the middle of it, weren't

5 you?

6 A.   I wouldn't say I was standing in the middle of it.  I was

7 standing in the street, but the bottom line is Officer Roby was

8 able to pull off without me interfering, without me being an

9 interference which I wasn't.

10 Q.   Were you or were you not standing in the middle of the

11 lane where Officer Roby's car was at the time that he got in

12 his car to leave?

13 A.   I was standing at the driver's side of the lane.  I was

14 standing in the driver's side in the right hand of the lane and

15 not interfering with him being able to pull off.

16 Q.   And when you walked off the side of the sidewalk to go

17 talk to the individuals in the vehicle, you walked in front of

18 their car, didn't you?

19 A.   I did.

20 Q.   Right.

21 A.   Yeah.

22 Q.   So when you were walking in front of the car, they

23 couldn't pull off either, could they?

24 A.   Well, I walk in front of cars every day and they're able

25 to get to where they need to get to.  I was visible to the

1    driver.  So the driver seen me.  I wasn't causing a

2    disturbance.

3    Q.   But you understand at that at that point the traffic stop

4    was over, correct?

5    A.   Yes, it was over.

6    Q.   And all three of those vehicles were about to drive off,

7    correct?

8    A.   No, they weren't.  They were sitting there.  I didn't see

9    any gesture of her shifting any gears or going down towards to

10   shift a gear or her grabbing a steering wheel to pull off.

11   That's why I stepped out in front.

12   Q.   All three vehicles were done with the traffic stop and

13   ready to leave, correct?

14   A.   I wouldn't say that they were ready to leave.

15   Q.   Okay.

16   A.   I can't say that.  I can't say that they were ready to

17   leave.

18   Q.   That's because you were standing in the middle of the lane

19   that they were in, correct?

20           MR. O'NEILL:  Objection, Judge.

21   A.   No.

22           THE COURT:  Sustained.

23   A.   That's not the reason why he couldn't pull off.  Officer

24   Roby --

25           THE COURT:  Mr. McCullough, no.  When I say

1    "Sustained," stop.

2              THE WITNESS:  Sorry.

3              THE COURT:  That's -- we don't want argument.

4    Q.   So as Officer Roby approached, he told you to get out of

5    the street multiple times, you backed away from him, correct?

6    A.   I backed away from him the second time.  He said get out

7    the street as he was approaching me.

8    Q.   And you continued to back all the way around the front of

9    the car that was stopped, correct?

10   A.   As he was intimidating me with his body and using physical

11   force to back me out, yes.

12   Q.   And then he backed you all the way up onto the sidewalk,

13   right?

14   A.   Yes.

15   Q.   And he immediately turned around and went back to his

16   vehicle, correct?

17   A.   I don't believe so.  I believe he stopped and spoke to the

18   driver.

19   Q.   Once he, once he knew you were back on the sidewalk and

20   not in the middle of the street, he stopped approaching you,

21   correct?

22   A.   Yes.

23   Q.   And he turned around and he let the car go because now the

24   car could go because you were on the sidewalk, correct?

25   A.   The car wasn't trying to leave when I first was talking to

1   him.

2   Q.   But when Officer --

3   A.   That wasn't a problem.  You're trying to make that an

4   issue.  That wasn't an issue that the car was trying to pull

5   off.

6   Q.   I'm just asking you a question.  When you were back on the

7   sidewalk, the car drove off when Officer Roby said they could

8   go, correct?

9   A.   Because they were directed by Officer Roby that they could

10  leave, and most people are going to listen to a police officer

11  when they say something to them.  But at the time the first

12  time I went to say something to him, no, I didn't -- it wasn't

13  an issue with me walking in front of the car and talking to him

14  because they weren't trying to pull off.

15  Q.   When they pulled off you were no longer in the street,

16  correct?

17  A.   No, I wasn't in the street.

18  Q.   You were on the sidewalk, correct?

19  A.   After Officer Roby told them to leave.

20  Q.   And Officer Roby didn't arrest you at this point, correct?

21  A.   No, I didn't commit a crime.

22  Q.   That's not what I asked you.  He didn't arrest you at this

23  point in time, correct?

24  A.   No.

25  Q.   So, after Officer Roby let the car go, he continued back

1  to his vehicle again, correct?

2  A.   Yes.

3  Q.   And you started to follow him parallel along the sidewalk,

4  correct?

5  A.   Yes.

6  Q.   And you were yelling out "name and badge, name and badge"?

7  A.   Yes.

8  Q.   And to be clear at this point in time you already knew who

9  he was?

10  A.   No.

11  Q.   You knew his badge number certainly because you were

12  showing it in that video that we watched previously, correct?

13  A.   Yeah.  But that badge number never stuck with me.  I

14  probably could have always went back and look at it.  I did

15  know the badge number, but I didn't know his name.

16  Q.   And you knew he was from that parking lot incident,

17  correct?

18  A.   I did.

19  Q.   And you knew him well enough to tell the driver he was an

20  asshole, correct?

21  A.   Yes.  From my experiences with him, yes.

22  Q.   And you never asked Officer Woods for his name and badge,

23  did you?

24  A.   No, I didn't.

25  Q.   You were just instigating Officer Roby at this point,

1  correct?

2  A.   No, I wasn't.  At what point, sir?

3  Q.   When you were engaging him at the traffic stop.

4  A.   Asking him for his name and badge?

5  Q.   Yeah.

6  A.   No.  The reason why I was asking for his name and badge

7  because he threatened to lock me up without me committing a

8  crime.  And of the past experiences that he and I had, so I

9  went -- I demanded his name and badge because I wanted to put a

10 complaint in on him.

11 Q.   But you didn't -- in every video we've seen you asked

12 every officer what their name and badge is no matter what

13 they're doing, correct?

14 A.   Most videos.

15 Q.   Yeah.

16      But in this one, on this night, the only person you

17 focussed on was Officer Roby, correct?

18 A.   Yes, because he threatened me for arrest without

19 committing a crime.

20 Q.   You were just trying to get content for The Resistance

21 channel, correct?

22 A.   No, I was recording the professionality of Boston Police

23 officers.

24 Q.   So, I think you testified on direct you stepped off the

25 curb and Officer Roby came towards you; is that accurate?

1    A.    Stepped off the curb and I maybe took another step after

2    that, remained in the parking lane, didn't approach the white

3    line and then he arrested me.

4    Q.    And that's near the front where his vehicle was at the

5    time, correct?

6    A.    Near the front?  On the right-hand side is where I was.

7    On his -- on the side of his vehicle.  I was on the right-hand

8    side of his vehicle.  Never went to the front of his vehicle.

9    That's on the video.

10   Q.    And it was at this point where he told you to put your

11   hands behind your back, correct?

12   A.    In the parking lane.  Me standing in the parking lane.

13   Q.    Is that a yes?

14   A.    Yes.

15   Q.    And it was at this point in time where you refused to

16   submit to arrest, correct?

17   A.    That's not true.  That's when I backed up as he we trying

18   to arrest me in the parking lane, he pulled out his handcuffs,

19   I backed into the pavement.

20   Q.    So we already established, you made clear that you admit

21   that you resisted arrest at this time?

22   A.    I didn't start resisting until he violently grabbed my

23   arms.  And that's basically me having a natural reaction of

24   tensing my arm to the side.

25   Q.    You understand that in order to put you in handcuffs he

1  had to grab your arm, correct?

2  A.   Yeah, but he was putting my arms in handcuffs unlawfully.

3  Q.   But if you don't cooperate and put your hands behind your

4  back, he has to grab your arm and handcuff you, doesn't he?

5  A.   Of course.

6  Q.   And you testified that you resisted arrest by stiffening

7  your body and actively trying to keep them from putting the

8  cuffs on you, correct?

9  A.   Yes.

10  Q.   And you pulled one of your arms away from the officers?

11  A.   I didn't see that in the video, and I don't remember that.

12  Q.   You don't remember pulling your arm away from the

13  officers?

14  A.   No, I just remember being tense, holding it stiff.

15  Q.   Do you remember holding the camera and the device that was

16  in it over head like (gesturing) this when they were trying to

17  put the cuffs on you?

18  A.   I remember recording while he was trying to put the cuffs

19  on me.

20  Q.   And you recorded from a position like this (gesturing),

21  correct?

22  A.   Like I always was.

23  Q.   And it wasn't just a camera that you had, it was a device

24  that was holding a camera, correct?

25  A.   Yeah, but I was recording that position since the onset of

1    the video.

2    Q.   Officer Woods had to rip that item out of your hand in

3    order to get you in handcuffs, correct?

4    A.   To unlawfully arrest me, yes, he ripped it out of my

5    hands.

6    Q.   All right.

7         And as we've seen in this video, your biggest concern

8    here was the way the telephone was, correct?

9    A.   Yes.

10   Q.   And Officer Roby went back and picked up your phone,

11   didn't he?

12   A.   He did.

13   Q.   And he had it in his hand as he escorted you to the

14   vehicle, correct?

15   A.   Yes.

16   Q.   And you grabbed it out of his hand as you were going into

17   the vehicle, didn't you?

18   A.   I did.

19   Q.   All right.

20        And you put it underneath your body, correct?

21   A.   Yeah, it was my property.  It didn't --

22   Q.   But Officer Roby made no attempt to take the phone back

23   from you at that time.  He left you in the car with it,

24   correct?

25   A.   Well, at the time I didn't know he was suffering from

1  being sprayed, self-inflicted, in his face with OC spray.

2  Q.   But he made no effort to take the phone back from you,

3  correct?

4  A.   Well, at the time he was suffering being sprayed in his

5  face.  He said it in the video.

6  Q.   Regardless of his physical condition, did he make any

7  effort to take the phone back when you grabbed it from him and

8  got in the car?

9  A.   No, because he was suffering from his physical condition.

10  Q.   You know Officer Roby's thinking on that?

11  A.   I seen it in the video.  He explained it in the video.  He

12  said he took his phone back and, you know, he was suffering

13  with the spray in his eye.

14  Q.   So I want to talk about the OC spray.  That went off while

15  you were facing the wall near the clothing bin, correct?

16  A.   Correct.

17  Q.   All right.

18        And your hands were behind your back at the time,

19  correct?

20  A.   Not quite sure, it could have been -- one arm could have

21  been to the side.  And I know definitely Roby had one arm

22  behind my back, but I don't know about two hands behind my

23  back.

24  Q.   So Officer Roby had at least had one of your arms behind

25  your back at this time?

1    A.    Yes.

2    Q.    And it went off when he was trying to put the cuffs on

3    you, correct?

4    A.    Yes.

5    Q.    Your contention is Officer Roby intentionally sprayed you?

6    A.    That's what I believe, yes.

7    Q.    All right.

8         And that somehow while he was putting the cuffs on,

9    put cuffs on your hands while you were resisting arrest he

10    somehow reached up around and tried to spray you in the face?

11    A.    Well, he already stated I was resisting and they were

12    having a hard time putting handcuffs on me.  So I believe he

13    used the pepper spray to subdue me to be able to put the

14    handcuffs on me.

15    Q.    So it's your belief that even though you're resisting

16    arrest and struggling to get the cuffs on, he was able to reach

17    around with one hand and try to spray you in the face with the

18    OC spray?

19    A.    It was my belief while I was resisting an unlawful arrest,

20    he tried to reach his hand around and sprayed me in the face.

21    Q.    That's not what you told Sergeant Brooks later that night

22    when he was photographing your injuries, was it?

23    A.    I don't think I explained to Sergeant Brooks at all about

24    Sergeant -- I mean, Officer Roby spraying me in the face.

25    Q.    You actually told him that you didn't get sprayed, didn't

1  you?

2  A.   No, I did not tell him that.

3  Q.   And you didn't have your phone at the time, right, it was

4  in the property bin?

5  A.   At that time when I was talking to Sergeant Brooks?

6  Q.   Yes.

7  A.   Yeah, they had the phone.

8  Q.   So you weren't recording at that time?

9  A.   No.

10 Q.   And that's when you told Sergeant Brooks you didn't

11 actually get sprayed by Officer Roby, correct?

12 A.   No, I didn't say that.

13 Q.   And Sergeant Brooks took photos of your face, correct?

14 A.   What's that?

15 Q.   Sergeant Brooks took photos of your face, correct?

16 A.   Definitely did.

17 Q.   And they offered you EMS, correct?

18 A.   They asked me a second time did I want EMS and I told them

19 I was fine.

20 Q.   And that time you said no?

21 A.   That's when I said no.  After everything that I

22 experienced from being sprayed to being slammed to the wall of

23 the metal clothes container, all the way up to being dragged in

24 B3 police station, by the time they asked again about the

25 pepper spray that pain had subsided, and I was just appalled

1    and in fear from what happened prior to that.

2    Q.   And you knew Sergeant Brooks from B3, correct?

3    A.   No.

4    Q.   You have had conversations with Sergeant Brooks before,

5    correct?

6    A.   Not prior.

7    Q.   Not prior?

8    A.   Not prior to that, no.

9    Q.   You actually contend that BPD altered the photographs that

10   were taken by Sergeant Brooks, correct?

11   A.   Yes, I do.

12   Q.   I think the word you used was that BPD doctored the photos

13   to conceal redness on your face from the OC spray, correct?

14   A.   Right.  And I have a reason for saying that, because they

15   took mines in black and white, and they made sure they took

16   Officer Roby's in color.  So they didn't want to display the

17   effects of what the pepper spray did to me.

18            MR. WHITESELL:  Just one second, your Honor.

19            Your Honor, I would like to publish to the jury as

20   what's been previously marked as Exhibit 4.

21            THE COURT:  This being?

22            MR. WHITESELL:  The photographs, your Honor.

23            THE COURT:  All right.

24            We'll stop at about five minutes.  I'm not trying to

25   cut you off, we can always resume in the morning.

```
 1          MR. WHITESELL:  Okay, your Honor.  I can wrap up after
 2    these photos.  Just a couple seconds more.
 3          THE COURT:  Okay.
 4    Q.   You see this photograph, Mr. McCullough?
 5    A.   That's not what I received.
 6          MR. WHITESELL:  Your Honor, these are --
 7    A.   Especially not from you.
 8    Q.   These are photos that have been marked in evidence and
 9    agreed to by your counsel, Mr. McCullough.
10    A.   You gave these to me in black and white.
11    Q.   Mr. McCullough, these are photos that your counsel agreed
12    to --
13    A.   I swear by God that you gave this to me in black and
14    white.
15          THE COURT:  Well, assuming if that's true, that's not
16    the issue, is it?
17          MR. WHITESELL:  Yes.
18    Q.   So these are the photos -- do you recognize these photos?
19    A.   I also recognize the swelling on the right side of my face
20    as well.
21    Q.   So do you recognize these photos?
22    A.   Yes.
23    Q.   All right.
24          And these are the photos that were taken by Sergeant
25    Brooks in the booking area that night, correct?
```

1    A.    Correct.

2    Q.    And they are in fact in color, correct?

3    A.    Right here they are, but not what you gave me in

4    discovery.

5    Q.    Okay.

6          MR. WHITESELL:  Your Honor, this is a good time to

7    stop.

8          THE COURT:  All right.  Do you have more?

9          MR. WHITESELL:  Not a lot, no.

10         THE COURT:  All right, Jurors, I want to get you on

11   the road before dark even though spring will come eventually,

12   but I think we're doing just fine.  I don't think we'll go to

13   the end of the day tomorrow.  We will have lunch for you and I

14   think we'll probably wind up.

15         Would you agree, counsel, probably a little after

16   lunch I think we'll finish the evidence?

17         MS. DAVIDSON:  Yes, your Honor.  I would agree with

18   that.

19         MR. O'NEILL:  Yes, your Honor.

20         THE COURT:  Okay, so a little earlier day tomorrow.

21   We will have breakfast for you in the morning, lunch, and then

22   we'll finish up and come back Wednesday for the arguments and

23   charge.

24         All right, the jury's excused until tomorrow morning

25   at nine.

1          THE CLERK:  All rise.

2              (The Jury and the Honorable Court Exited.)

3              (At 3:35 p.m., the Court Stood in Recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **I N D E X**

2         Opening Statement on Behalf of the Defendant

3                                              **Page** 1-36

4         Opening Statement on Behalf of the Plaintiff

5                                              **Page** 1-49

6

7    **Witness**                                **Page**

8    JOHN McCULLOUGH

9    Direct Examination by Mr. O'Neill          1-49

10   Cross-Examination by Mr. Whitesell         1-121

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**E X H I B I T S**

| NO. | | ADMIT |
|-----|-----|-------|
| 6 | .......................... | 1-101 |
| E | .......................... | 1-148 |

**C E R T I F I C A T E**


**UNITED STATES DISTRICT COURT )**

**DISTRICT OF MASSACHUSETTS    )**



         I, Catherine L. Zelinski, certify that the foregoing

is a correct transcript from the record of proceedings taken

Monday, February 26, 2024 in the above-entitled matter to the

best of, my skill and ability.



     /s/ Catherine L. Zelinski          March 18, 2024

     Catherine L. Zelinski, RPR, CRC        Date
     Official Court Reporter