**UNITED STATES DISTRICT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JOHN L. McCULLOUGH, III, | ) |
|     Plaintiff, | ) |
|     vs | )  No. 1:22-CV-10177-RGS |
| OFFICER SCOTT ROBY | ) |
| (personal capacity) and OFFICER | ) |
| FRANK WOODS (personal capacity), | ) |
|     Defendant. | ) |

BEFORE THE HONORABLE RICHARD J. STEARNS
UNITED STATES DISTRICT JUDGE
JURY TRIAL DAY 3

John Joseph Moakley United States Courthouse
Courtroom No. 21
One Courthouse Way
Boston, Massachusetts  02210

WEDNESDAY, FEBRUARY 28, 2024
8:45 A.M.

Catherine L. Zelinski, RPR, CRC
Official Court Reporter
John Joseph Moakley United States Courthouse
One Courthouse Way, Room 7205
Boston, Massachusetts  02210
Email: CAL.Zelinski.Steno@gmail.com

Mechanical Steno - Computer-Aided Transcript

**APPEARANCES:**

Joshua O'Neill
The Boston Defender
100 Cambridge Street, 14th Floor
Boston, MA  02114
Tel: 617.356.7784
Email:  Josh@bostondefender.com
for Plaintiff.


Edward F. Whitesell, Jr.
Senior Assistant Corporation Counsel
-and-
Bridget I. Davidson
Assistant Corporation Counsel
City of Boston Law Department
City Hall, Room 615
Boston, MA  02201
Tel: 617.635.4045 (Whitesell)
     617.635.3238 (Davidson)
Email: Edward.whitesell@boston.gov
       bridget.davidson@boston.gov
for Defendants.

1          **P R O C E E D I N G S**

2          THE CLERK:  All rise.

3          (The Honorable Court Entered.)

4          THE COURT:  All right, good morning, counsel.  And

5    thank you for the constructive suggestions on the instructions

6    and the verdict slip.  I've adopted actually all but one.  Let

7    me quickly explain what I've done.

8          The verdict slip is easiest.  I'm basically am puzzled

9    that the plaintiff wants to press claims under a higher burden

10   than the federal statute requires, but nonetheless, it's in

11   there with the appropriate instruction about intimidation and

12   coercion and threats.

13         To protect the defendants I've also added in the

14   damages sections, you'll see the cross onto the jury that on

15   those counts where you have constitutional violations under the

16   mixed federal and state claims, they should take care not to

17   award duplicate damages for the same constitutional violations.

18   So I think that provides the right protection for the

19   defendants and gives the plaintiff what he's asking for in

20   terms of the claims themselves.

21         You'll see that I've added in as Mr. O'Neill requested

22   as threats, intimidation, and coercion at the appropriate place

23   in the instructions.

24         There is, Mr. O'Neill, actually a stipulation, if you

25   think about, which I refer to at the beginning, which was the

1   agreement of the authenticity of the videotapes that we saw

2   would not be contested. So I'm treating that as a stipulation,

3   and it also gives me a chance to mention the video as actual

4   evidence in the case. Everything else, except for the typos

5   that you pointed out, I think has been corrected. If you see

6   something else, I guess it's too late now, but let us know and

7   we'll do our best if we can to correct them.

8         The one area where I disagree with is on the punitive

9   damages, as I've indicated all along, is the First Circuit

10   cautioned in _McKinnon versus Kwong Wah Restaurant_. Punitive

11   damages in this Circuit are not favored and are allowed only

12   with caution. And then Mr. O'Neill points to the right case,

13   Smith versus Wade, but only to the part of it that then

14   provides the alternative that punitive damages are appropriate

15   when you have evidence of evil motive or intent or reckless or

16   callus indifference to the federally protected rights of

17   others. However, the opinion tends to go on in _Kolstad versus_

18   _American Dental Association_, which actually is more important

19   of the two cases. That's 527, U.S. 526, the Supreme Court

20   makes it clear this is a subjective test, not an objective one.

21   And in this case there's absolutely no evidence of any

22   subjective sense on the part of either officer. Principally

23   that we're talking about Officer Roby, that he believed that

24   what he was doing was deliberately violating Mr. McCullough's

25   constitutional rights. If anything, the evidence is to the

1   contrary.  He testified that he believed, as I think Mr. Woods

2   did as well, he was acting at all times within his authority of

3   a police officer, and he was taking care not to violate any

4   perceived constitutional right of Mr. McCullough.  I think

5   probably is best evidenced by the fact that he did not do

6   anything to try to seize the videotape from Mr. McCullough or

7   otherwise try to intimidate his ability to post whatever he

8   chose to post on his YouTube page.

9         But I will, Mr. O'Neill, again as I've said, even

10  though I've already preserved that right, at the close of

11  instructions to give you another opportunity to preserve the

12  right by framing an objection at the close of the instructions.

13         I understand we have all but one juror here now.  So I

14  think we will be able to start right at nine o'clock.  Remember

15  forty-five minutes -- who will give the closing for the

16  defendant?

17         MR. WHITESELL:  I will, your Honor.

18         THE COURT:  All right.

19         And I can find a deductive line, I can believe it's

20  Mr. O'Neill who will give the closing for the plaintiff.

21         MR. O'NEILL:  That's correct, Judge.

22         THE COURT:  All right, after 45 minutes I think that

23  might take us to the break.  If we finish earlier, I'll go

24  right into the instructions.  As I said, I would have verbatim

25  copies of the instructions and the verdict slips for each of

1   the jurors in the case.

2       It's been a short trial but a fun trial.  Fun in the

3   sense that it raises a lot of interesting issues.  We'll see

4   what the jury thinks of them.

5       MR. WHITESELL:  Your Honor, if I may, again, Officer

6   Woods is not present today.  He's at surgery for his father.  I

7   was just wondering if maybe an instruction to the jury in some

8   sense that either not to read anything into the fact that he's

9   not here one way or the other --

10       THE COURT:  Well, to balance it out why don't I -- if

11   the lawyers agree -- are in agreement, let me mention that

12   Officer Woods is dealing with a medical emergency in his family

13   and that Mr. McCullough may have to be absent himself from time

14   to time because of his diabetes.

15       MR. O'NEILL:  I don't think it's been actually an

16   issue, Judge, but if you don't mind, that would be great.

17   Thank you.

18       THE COURT:  That way I don't think the jury should be

19   speculating about, you know, as we know, you don't even have to

20   show up at your own civil trial.  It's an odd rule, but that's

21   the way it goes.

22       All right, nine o'clock we'll reconvene.

23       THE CLERK:  All rise.

24       MS. DAVIDSON:  Thank you, your Honor.

25       (The Honorable Court Exited.)

```
1                (Court Stood in Recess at 8:53 a.m.)

2                THE CLERK:  All rise for the jury.

3                (The Jury and Honorable Court Entered.)

4                THE CLERK:  All persons having business before the

5      Honorable Richard G. Stearns, United States District Judge, now

6      sitting at Boston, within and for the District of

7      Massachusetts, may draw near, give their attendance, and they

8      shall be heard.

9                God save the United States of America and this

10     Honorable Court.  Court is open.  You may be seated.

11               This is civil action No. 22-10177, McCullough versus

12     Roby and Woods.  Thank you.

13               THE COURT:  Good morning, counsel.  Good morning,

14     Mr. McCullough, and good morning, Jurors.  Thank you for being

15     so prompt.

16               We're going now to proceed to the closing statements

17     of the parties.  Let me just -- two notes.  Officer Woods is

18     not with us today because his father's undergoing surgery.  So

19     his appearance has been excused.

20               Mr. McCullough is diabetic.  So he may have to from

21     time to time excuse himself.  But neither mean any disrespect

22     to you or to the Court because of necessary absences.

23               All right, each side has been allotted up to 45

24     minutes.  The defendant will proceed first followed with the

25     closing of the plaintiff, Mr. O'Neill.  This is the opportunity
```

1    lawyers have -- they like I think more than in the point of the

2    trial, the opportunity to argue the inferences they believe you

3    should draw from the evidence presented during the case.  When

4    they finish, as I indicated just before we came in, we'll

5    either take a quick break, again, depending on the timing, and

6    then I'll give the final instructions for you.

7           As I said, those have been reduced verbatim in writing

8    so you'll each have a copy as I go through them.  They're not

9    that long, but they are legal and consequentially less dramatic

10   than the lawyers' statements.

11          All right, I understand, Mr. Whitesell, you'll be

12   giving the closing for the defendants.

13   **CLOSING STATEMENT ON BEHALF OF THE DEFENDANT**

14          MR. WHITESELL:  Thank you, your Honor.

15          There is one crucial point that cannot be overlooked

16   in considering the facts of this case.  Throughout the entire

17   encounter with Mr. McCullough, Officer Roby kept his body-worn

18   camera on.  This included an area of B3 where the BPD policy

19   required him to take it off.  The booking area.  Mr. McCullough

20   posits a wild theory of BPD coverup, including intentionally

21   destroyed phone and doctored photographs.  He has no answer for

22   one simple question:  If Officer Roby was trying to coverup

23   excessive force and false arrest, why did he keep his body-worn

24   camera on the whole time?  Why didn't he just push the button

25   and turn the camera off when the traffic stop was over?  There

1    is common sense answers to these questions:  There was no cover

2    up.  The truth is that Officer Roby wanted his body-worn camera

3    on that night because he knew about John McCullough and he knew

4    of his YouTube channel The Resistance, and he wanted whatever

5    happened next to be on a camera not controlled by

6    Mr. McCullough.

7            Ladies and gentlemen of the jury, my name is Ted

8    Whitesell, along with my colleague Bridget Davidson.  I

9    represent Officer Scott Roby and Officer Frank Woods.  I get

10   the opportunity to review the evidence with you and offer some

11   conclusions as to what occurred that night of Mr. McCullough's

12   arrest.

13           The judge will instruct you that Mr. McCullough has

14   the burden of proof in this case.  What that means is that

15   Mr. McCullough must present evidence communicating to you that

16   Officers Roby and Woods did something the night of

17   Mr. McCullough's arrest that violated his constitutional rights

18   and caused him harm.  I submit to you that Mr. McCullough has

19   failed to meet that burden.

20           In this case there are two versions of the events that

21   occurred that night during the arrest of Mr. McCullough:

22           The truth and a show that was put on by Mr. McCullough

23   that he thought was for the benefit of his 23,000 YouTube

24   subscribers.  The truth is that had Mr. McCullough simply

25   stayed out on the sidewalk and out of the street, none of this

would have happened.  Mr. McCullough was not arrested for

filming or agitating Boston Police officers.  As you saw in the

videos and heard in Mr. McCullough's testimony, when that is

all he does, he does not end up in handcuffs.  This night he

ended up in handcuffs because he was in the street blocking the

flow of traffic immediately following a traffic stop, refusing

to follow lawful orders to get out of the street and stay on

the sidewalk.  That is all.  And what happened after that was

the use of reasonable force to place a noncompliant arrestee,

one that admitted that he was resisting arrest, in handcuffs to

transport him back to the station for booking.

        The flip side is the show that Mr. McCullough put on

for the camera that he believed was rolling throughout the

entire incident.  Mr. McCullough's only concern that evening

was the location of his phone on which he believed he was

recording the arrest.  You hear him repeatedly ask for his

phone.  As he is placed in handcuffs, he repeatedly asks if he

can get his camera off the ground.  At several points you'll

hear him yell that officers were stealing his property, which

he admitted was a reference to his phone.  And when he knew the

phone was with him or he knew that it was near him, he put on a

show.  He freely admits that he resisted arrest refusing to

allow officers to handcuff him.  The Resistance lived up to his

name.  When he grabbed the phone out of Officer Roby's hand as

he's being placed in the cruiser, he suddenly screams multiple

1 times "Help me." The moment he is removed from the cruiser at
2 B3, he complains "Why are you grabbing my shit like that?",
3 another reference to the phone. And when shortly thereafter he
4 again tries to grab the phone away from Officer Roby on the
5 video in Exhibit 6 at 9:48, Officer Roby says, "Release the
6 camera."

7        Mr. McCullough immediately and repeatedly starts
8 screaming "Help me," and "He's trying to kill me." While in
9 the words of Officer Sparks-Clancy, he was violently pulling
10 away towards Blue Hill Avenue. This was a show. Before I go
11 any further I'd like to set the stage with the evidence
12 regarding Mr. McCullough and his YouTube channel, The
13 Resistance.

14        Just months before the arrest that gives rise to this
15 lawsuit, Mr. McCullough created an online identity, The
16 Resistance, and decided he would start filming police officers
17 and other government officials to do what he called "hold them
18 accountable." In truth all he does is verbally abuse his
19 targets in the hopes they will act in a negative manner.
20 Mr. McCullough particularly liked to goad police officers to
21 give him product for his Resistance page by swearing at them
22 and calling them pieces of shit. He admitted that he did this
23 and told Providence Police officers to fuck off for a period of
24 13 minutes, and then he proudly posted that video on The
25 Resistance channel for his viewers to see. Again, The

1    Resistance lived up to its name.

2           Though his insults are usually out of the blue and

3    unwarranted and designed to agitate the officers, he still

4    expects that the officers will maintain appropriate levels of

5    decorum, yet he films them while he agitates them in the hopes

6    they do not.  As we saw in the videos, police officers usually

7    ignore his behavior.  What they don't do is arrest

8    Mr. McCullough for no reason or simply because he is filming

9    the encounter.  Mr. McCullough attempted to monetize his

10   YouTube channel Resistance and a similar page he had on

11   Facebook, but he was eventually shut down by both websites as a

12   result of his content.  He solicits donations through PayPal

13   and Go Fund Me accounts with the handles Eyes on Blue Bloods.

14   Mr. McCullough is desperate for page views while Lieutenant

15   Brooks referred to as likes.  His 981 videos on The Resistance

16   channel of which 200 or so are original content involving the

17   Boston Police Department, have 23,000 subscribers, and almost

18   three million views.  Mr. McCullough's behavior is nothing more

19   than marketing.  You hear that in his own video of the traffic

20   stop, when after he calls Officer Roby an asshole, he

21   approaches the stopped vehicle and says, quote, "But y'all

22   check me out on YouTube.  Boston audits, Boston audits, The

23   Resistance."  That's Mr. McCullough putting on a show.

24          You have in evidence a typical video from The

25   Resistance channel post-editing involving the Boston Police

1  Department. That would be Exhibit 7 Entitled, "Cops take a

2  stroll once the camera's roll."

3       Again, the title reveals for McCullough is all about

4  his camera and not the traffic stop that BPD is conducting in

5  that video. Mr. McCullough admitted that he had no idea why

6  officers had made that stop. Yet he continues to film seeking

7  to engage officers about imagined Fourth Amendment violations

8  without any understanding as to why that's not been heard. He

9  puts his camera in the faces of multiple officers demanding

10 name and badge, and to a man they comply without any reaction.

11 He rattles off fictitious names for the officers, John Doe 1,

12 John Doe 2, John Doe 3 as a threat of a lawsuit against the

13 officers. And the added production of the video reveals his

14 true intent. He calls it a Cop-Watch Production and loads up

15 the introduction with stock video of Philadelphia Police and

16 individuals fighting as The Resistance pops up onto the screen.

17 Despite all of this, no officer tells Mr. McCullough to stop

18 recording that day or places him under arrest.

19       What is most revealing about Exhibit 7, however, is

20 the way that Mr. McCullough treats Officer Sean Harris, the

21 individual that was Officer Roby's partner on the day of the

22 prior incident in front of the Bolling Building and

23 subsequently at the parking lot when the owner called for the

24 police. We saw the latter half of the parking lot encounter in

25 Exhibit 2. Although Mr. McCullough is filming the entire time,

1    he is never told to stop filming nor is he arrested at that

2    time.  Officer Roby told him that he needed to step out of the

3    street.  A street that Mr. McCullough accused Officer Roby of

4    blocking traffic with his vehicle or he will be arrested for

5    disorderly conduct.  On this occasion Mr. McCullough complied

6    and he stayed out of the street.  A few weeks later, he would

7    fail to do so.

8         Getting back to Mr. McCullough's subsequent encounter

9    with Officer Harris on Exhibit 7, you can see Mr. McCullough's

10   obsessed with these two officers.  As he goes down the line of

11   officers demanding name and badge and receiving both, he stops

12   on Officer Harris.  You'll see this in Exhibit 7 starting at

13   5:37.  When he gets to Officer Harris, he says, quote, "Your

14   boy Roby, did he get the news yet?"  Mr. McCullough admitted he

15   was talking about this lawsuit.

16        He also testified that he thought there was a

17   conspiracy between Officers Harris and Roby to have him

18   arrested for the parking lot incident.  There was never an

19   arrest for the parking lot incident.

20        Returning to Exhibit 7, you can see just prior to the

21   ten-minute mark Mr. McCullough, again, then focuses on Harris

22   zooming in and saying "This guy" despite the fact that Officer

23   Roby testified that Harris was not his regular partner.  The

24   highlight of this video, however, is the end.  Starting at

25   approximately 9:45 McCullough shadows the detective in charge

1   of the stop and somehow ends up focusing on Officer Harris at

2   12 minutes repeatedly calling him a piece of shit.  When

3   Mr. McCullough continues this verbal abuse, Officer Harris

4   calmly responded.  And Mr. McCullough moved on yelling about

5   how he didn't need to get mad, all he, quote, "Needed to do was

6   put in the paper trail on y'all."

7           To set the scene for the arrest on April 25, 2020, is

8   important to remember that all of the witnesses emphasized that

9   this was the absolute apex of the global COVID-19 pandemic.

10  You can see that in the masks worn not only by the police

11  officers but Mr. McCullough himself.  There was a state and

12  citywide curfew at nine p.m.  People were uncertain and had no

13  idea what to expect from this new Coronavirus.  The Boston

14  Police Department, one of the few entities still up and running

15  at this time, had to put in special protocols; staggering

16  shifts, holding roll calls outside just to ensure that people

17  remained six feet apart to protect themselves from the unknown.

18  It was in this environment that Officer Roby pulled over a

19  vehicle that was driving erratically.  Officer Roby stopped the

20  vehicle, approached to collect the driver's license and the

21  registration for the car.  He testified that he thought that he

22  had already turned on his body-worn camera, but when he looked

23  down before approaching the vehicle a second time, he realized

24  it was off.  So he immediately pressed the button turning it

25  from green to red indicating that it was recording.  This was

1  before Mr. McCullough arrived on the scene.

2       I want to focus for a moment on Officer Roby's

3  probable cause to make an arrest.  It was shortly after Mr.

4  McCullough arrived on the scene that Officer Roby had probable

5  cause.  Following the traffic stop with Mr. McCullough filming

6  from the sidewalk, Officer Roby returned directly to his

7  vehicle ignoring Mr. McCullough.  Officer Roby entered his

8  cruiser, he turned off his emergency lights, he put his cruiser

9  into gear, and he prepared to drive away from the scene.  He

10 had no intention of locking up Mr. McCullough until he left the

11 sidewalk.  It was only then he looked up and saw Mr. McCullough

12 blocking his lane, standing in the middle of the street next to

13 the stopped vehicle.  It was then that he first had probable

14 cause to make an arrest, but he didn't.  Instead Officer Roby

15 elected to move Mr. McCullough back on to the sidewalk so that

16 traffic could flow.  He gave Mr. McCullough a chance.  Once he

17 had done so, the stopped vehicle was cleared to leave.

18       As Officer Roby exited his vehicle the first time to

19 tell Mr. McCullough to get out of the street.  You can see on

20 his body-worn camera a car speeds by Mr. McCullough at very

21 short range.  It is not the last car to do so.  Protected or

22 not, Mr. McCullough was in the road and impacting traffic in

23 the lane where cars were passing by.  Officer Roby testified

24 that those cars passed no more than five feet from Mr.

25 McCullough.  You can see it on the video.  Regardless,

1    Mr. McCullough was certainly impeding traffic right in front of

2    him in the right-hand lane that was trying to leave after the

3    traffic stop.  He walked in front of the stopped vehicle and

4    stood by their window in the middle of the right-hand lane.  He

5    prevented Officer Woods and Roby from leaving the scene after

6    the traffic stop was over.  Despite these facts, Officer Roby

7    ordered Mr. McCullough multiple chances -- offered Mr.

8    McCullough multiple chances to return and remain recording on

9    the sidewalk.  And initially he did so.  But as we see in all

10   of these videos, Mr. McCullough cannot leave well enough alone

11   when the traffic stop was over.  He followed Officer Roby, with

12   whom he was well acquainted, shouting "Name and badge."  When

13   Mr. McCullough stepped off the sidewalk a second time with a

14   clear intention of approaching Officer Roby's vehicle as he

15   prepared to drive away, Officer Roby decided to place him under

16   arrest.

17          You can look at the video of the prior encounter,

18   Exhibit 2, to foreshadow what would have occurred if Officer

19   Roby had returned to his vehicle a second time that night.  In

20   that video marked as Exhibit 2, Mr. McCullough entered the

21   street on several occasions going right up to the driver's side

22   window telling Officer Roby "To roll the window the fuck up."

23   Calling him a clown, and stepping behind the vehicle to record

24   the number and the license plate.  There's little doubt that

25   Mr. McCullough entered the street on the night of his arrest

1 the second time to repeat those expletives for his YouTube
2 subscribers.

3 Officer Roby did not arrest Mr. McCullough for
4 recording the police or exercising his First Amendment rights.
5 He arrested him for obstructing traffic.  In other words,
6 disorderly conduct.  And the rest of what occurred that night
7 was an ordinary arrest combined with a show put on by Mr.
8 McCullough.

9 You will hear Judge Stearns instruct you that there
10 only needs to be probable cause for one of the charges to
11 defeat a claim for false arrest.  Here is the example evidence
12 that there was sufficient probable cause for at least two of
13 the charges.  And as noted, the evidence is clear that Mr.
14 McCullough was obstructing the stopped vehicle and the police
15 vehicles from leaving the traffic stop.  He was approximately
16 five feet away from getting hit by passing cars in the second
17 driving lane.  Furthermore, Mr. McCullough admits that he
18 resisted arrest.

19 As Judge Stearns will instruct you that an officer may
20 have locked probable cause to make an arrest, does not justify
21 to arrest these attempts to resist the exercise of his official
22 authority.  Indeed that is what The Resistance does.  He
23 admitted that he pulled away, stiffened, and had the camera
24 apparatus up over his head while Officer Roby was trying to put
25 him in handcuffs.  Officer Woods had to yank the apparatus out

1  of his hand to get the cuffs on him.  Mr. McCullough

2  emphatically insisted on several occasions that the underlying

3  arrest for disorderly conduct was unlawful.  However, as you

4  will be instructed, quote, "under Massachusetts law, there is

5  no right of a citizen to resist an arrest, even one that the

6  citizen believes to be illegal, unless the arresting officer

7  using excessive force."  There was no such excessive force

8  here.

9       Additionally, you will be instructed that the fact

10  that the criminal case was ultimately decided on a required

11  finding of not guilty by the state criminal trial judge, has no

12  bearing on this case whatsoever.  As the jury instructions will

13  inform you, quote, "The fact that a person may not in fact be

14  guilty of a crime does not invalidate an officer's judgment

15  that he has grounds to make an arrest."  The standards are

16  different.  In the words of the jury instructions, quote, "The

17  quantum of evidence necessary to establish probable cause

18  involves a far lesser standard of proof than proof beyond a

19  reasonable doubt.  The standard that determines whether or not

20  a person is guilty of a crime, or the many discretionary

21  factors that the court or the prosecutor may bring to bear in

22  deciding to proceed with the trial of the case."  In other

23  words, that a judge entered a required finding of not guilty in

24  the criminal case against Mr. McCullough simply has no bearing

25  on your decision as to whether he had probable cause to arrest

1 | Mr. McCullough in this case.

2 | The next issue in this case is whether Officer Roby

3 | used objectively reasonable force in effectuating the arrest of

4 | Mr. McCullough.  As you will be instructed shortly, police

5 | officers are, quote, "Privileged to use whatever force is

6 | reasonably necessary to effect an arrest, even if it causes

7 | injury, so long as that force is not excessive under the

8 | circumstances."  The circumstances here are clear, Mr.

9 | McCullough did not want to be arrested, and he was willing to

10 | do anything to resist it.  And in such circumstances officers

11 | are allowed to use reasonable force to make an arrest,

12 | including going hands on and to put the arrestee in handcuffs.

13 | Here Officer Roby was allowed to use the force he implemented

14 | to get Mr. McCullough in handcuffs.  To some extent the videos

15 | speak for themselves in this regard, especially by the

16 | body-worn camera of Officer Woods who recorded the incident

17 | between Mr. McCullough and Officer Roby from a slight distance.

18 | I urge you to look at that section of Officer Woods' body-worn

19 | camera footage in determining whether Officer Roby used

20 | reasonable force.

21 | Mr. McCullough testified that Officer Roby pushed or

22 | shoved him on a few occasions over the course of this arrest.

23 | I would submit to you that when you watch the videos, that's

24 | actually not the case.  But even if it had been, you will be

25 | instructed that not every push or shove by a police officer,

1  even if it may seem unnecessary in the peace and quiet of this

2  courtroom, constitutes excessive force.  Even if you were to

3  concede that Officer Roby pushed Mr. McCullough that evening,

4  the assertion that's believed by the videos, that not even a

5  push is sufficient to prove excessive force.  Officer Roby

6  testified that he used the clothing bin and the wall to confine

7  Mr. McCullough while he tried to get the handcuffs on him.  At

8  the time he did not know whether Officer Woods had seen the

9  second encounter or whether he was arriving to resist.

10  Together, when Officer Woods arrived, they used the wall in the

11  bin to gain leverage in their attempts to get him handcuffed.

12  It is a technique that officers use to get a noncompliant and

13  resisting arrestee into handcuffs.  You often hear sports

14  announcers speak of the out of bounds lines as an extra

15  defender.  That's what the wall and the bin were here, a way to

16  corner Mr. McCullough so that Officers Woods and Roby could get

17  him to comply and get him in handcuffs.

18          Now, I want to talk to the accidental discharge of the

19  OC spray that evening.  Mr. McCullough was never sprayed with

20  the OC spray that night.  He presents a wild theory that

21  Officer Roby, while trying to get handcuffs on his wrists,

22  reached around his body and face and attempted to spray Mr.

23  McCullough in the eyes and missed instead of hitting him on the

24  side of the face and spraying Officer Roby in his eye.  The

25  actual version of events is the one told by Officer Roby.  As

1    he approached someone, he expected to resist arrest, someone

2    who posts videos of these encounters on a website called The

3    Resistance, he removed his OC spray and had it in his hand in

4    case he needed it.  It was still in his hand as he was

5    struggling to get the cuffs on Mr. McCullough's wrists behind

6    Mr. McCullough's back.  During this struggle Officer Roby

7    accidently discharged the spray and got it on his jacket which

8    he wiped near his eyes following the arrest.  You can see the

9    OC spray cannister was already on the ground in Officer Woods'

10   body camera footage at 1:02 as the handcuffs are finally placed

11   on Mr. McCullough.

12         At worst Officer Roby unsafely handled the OC spray

13   while he was handcuffing Mr. McCullough discharging the spray

14   in close proximity to himself and others.  But we know that it

15   was not intentional and that Mr. McCullough was not actually

16   affected by the accidental discharge.

17         You will be instructed that Mr. McCullough bears the

18   burden of proof of the third element of these claims by a

19   preponderance of the evidence, that Officers Woods and Roby

20   acted intentionally.  As it relates to the accidental discharge

21   of OC spray here, there is no evidence of intent on the part of

22   Officer Roby.  Like, many things he accused Officer Roby of

23   that evening, however, Mr. McCullough took advantage of the

24   snarled and accidental discharge of OC spray for the benefit of

25   his Resistance channel viewers.  We know Mr. McCullough didn't

get sprayed.  Based on what you can see in the body-worn video, we know Officer Roby's hands were trying to handcuff Mr. McCullough when the OC discharged.  You know when the OC discharged, because you can hear Mr. McCullough, who can smell it, say "What did you spray me with?"  Once everything was over and he was being photographed by Lieutenant Brooks, however, Mr. McCullough admitted that he didn't get sprayed.  He knew his story about the OC spray was being documented.  And the photos would show that he had no injuries.  So he came clean off camera to Sergeant Brooks.  You have the photos -- now, Lieutenant Brooks.  You have the photos taken by Lieutenant Brooks, which show you that while Officer Roby clearly got OC spray near his eyes, Mr. McCullough did not.  Officer Roby's eyes are red and bloodshot in the photos.  Mr. McCullough's eyes are not.

There was a line of questioning for each officer that testified about whether they were aware of accidental discharges of OC spray in the past.  Lieutenant Brooks testified that he was in fact aware of such instances, though he had luckily never been involved in one.  Accidental discharges happen.  Officer Roby sheepishly admitted that he got OC spray in his eyes when he was showing Mr. McCullough's attorney his cannister of OC spray during a deposition in this case.  Finally, there is no evidence that the force used in the booking area was excessive.  Mr. McCullough admitted that when

he entered the booking area, he dropped to the floor and became

dead weight.  Mr. McCullough was pushing his foot against the

evidence locker trying to gain purchase so that he could

continue to resist arrest.  On the video that Officer Roby had

from his body-worn camera, we see Officer Roby at the bottom

half of Mr. McCullough's body doing nothing to harm him.  While

Mr. McCullough complained he could not breathe because of the

hood pulled over his face while he was spitting on officers.

Officer Sparks-Clancy testified that he immediately reached

down and he removed the hood from Mr. McCullough's head.  You

can see that interaction on the body-worn camera of Officer

Roby.

Mr. McCullough also asserts a claim of interference

for his First Amendment right to free speech.  There are no

facts to support this claim.  Moreover, the evidence is quite

the opposite.  Every single officer testified that they would

not arrest an individual for filming police officers, including

Officer Woods and Officer Roby.  Mr. McCullough conceded that

he was not arrested on those occasions when he was filming

police officers.  There simply is no claim for interference

with Mr. McCullough's right to speak or record Officer Woods

and Officer Roby the evening of his arrest.  In fact, we still

have the video of that recording.

Now, you heard Mr. McCullough say he turned off his

phone when he was placed in the back of the cruiser.  In truth

that's likely when his phone broke, as immediately after he
grabbed his phone he sat on it. That's also the moment when
Mr. McCullough's video feed cuts out. Mr. McCullough would
have you believe that Officer Roby intentionally smashed the
phone after the arrest in an attempt to destroy the video.
This, despite the fact that he didn't delete the video or
remove the SD card on which it was stored. This, despite the
fact that Officer Roby had his body-worn camera on and left it
on through the entire encounter with Mr. McCullough.

The theory that Officer Roby smashed the phone is as
far fetched as most of Mr. McCullough's story. Like the idea
that BPD intentionally doctored booking photos to hide injuries
to his face, or that counsel provided Mr. McCullough with
doctored photos in discovery. You can see those photos
yourself. They are consistent with what Mr. McCullough told
Sergeant Brooks, he didn't get sprayed.

I want to speak very briefly on the issue of damages
because Mr. McCullough doesn't have any. He claims he was
physically harmed in the encounter with Officers Roby and
Woods, but he declined medical treatment at the station and he
did not see a doctor after the incident. He even admitted that
he wasn't sprayed with the OC spray, which is verified by the
photographs taken by Lieutenant Brooks. He also claims he
suffers emotional harm and distress, but he never received
treatment for either. In just one week following this

1   supposedly traumatic incident, Mr. McCullough was back on the

2   street instigating police.  Mr. McCullough didn't stop

3   recording police officers until he was afraid it would

4   jeopardize his chances to recover in this lawsuit, and even

5   then he could not help himself.  You heard him admit that two

6   weeks before this case was set to start trial, he was then

7   recording officials, including BPD officers, at the migrant

8   shelter at the Melnea Cass Recreational Complex.  And just days

9   later he was challenging BPD officers seeking to recruit new

10  officers at an intersection not far from B3.

11          There is no evidence in this case to show that

12  Officers Roby and Woods did anything other than their jobs that

13  night.  Officer Roby gave Mr. McCullough multiple chances to

14  stay out of the street and out of the way of people leaving the

15  traffic stop.  When he would not comply, Officer Roby arrested

16  him.  Officer Woods simply assisted in that arrest.  Even if

17  you -- even to the extent that you were to find Officer Roby

18  did anything to constitute excessive force, which I submit that

19  he did not, Officer Woods simply had no opportunity to

20  intervene.  The only truly eventful thing that occurred that

21  night was Officer Roby's OC spray that accidently discharged

22  behind Mr. McCullough's back while he was being handcuffed.

23  The rest of his antics, the screaming, the claiming that

24  officers were trying to kill him was a show put on by Mr.

25  McCullough, a show contradicted by the video evidence in this

1  case.  Mr. McCullough simply failed to meet his burden of proof

2  on his claims.

3         As a result, I'd ask you to carefully consider the

4  evidence during your deliberations:  What you've seen and what

5  you've heard, and return a verdict in favor of Officers Roby

6  and Woods.

7         Thank you.

8         THE COURT:  Thank you, Mr. Whitesell.

9         Mr. O'Neill, this is your opportunity to address the

10  jury.

11  **CLOSING STATEMENT ON BEHALF OF THE PLAINTIFF**

12         MR. O'NEILL:  Thank you very much, your Honor.

13         Good morning, Members of the Jury.

14         No one deserves to be treated how Mr. McCullough was

15  treated on April 25, 2020.  That's what we talked about at the

16  beginning of this trial.  It's part of Officer Roby's job,

17  maybe even the main part, to treat the people he interacts

18  with, the citizens and civilians he interacts with, with

19  courtesy and respect.  That's his duty.  And we know he can do

20  it, we saw it.  We saw it in the traffic stop shortly before he

21  interacted with Mr. McCullough.  We saw him speak with the

22  driver of the car and the occupant inside the car, and he was

23  kind.  He was respectful.  He gave them a break.  Right?  He

24  mentioned that he -- they were subject to arrest for what they

25  did, that he could have instituted -- they would have been

 1    subject to fines, but instead he gave them a warning.

 2         I want you to compare that to how Officer Roby treated

 3    Mr. McCullough.  What did he do?  We saw multiple times he

 4    threatened -- or heard multiple times that he threatened

 5    Mr. McCullough with Mr. McCullough's address.  Saying I know

 6    where you live.  We saw it on camera in Exhibit 2 in their

 7    first interaction together.  And then I want to play a section

 8    of Exhibit 6 for you.  This is Officer Roby's body-worn camera.

 9         (Played Video.)

10         MR. O'NEILL:  Walks by an officer and the officer

11    says, "That's awesome," referring to what's going on with

12    Mr. McCullough.  How does Officer Roby respond?  "I'm tired of

13    his ass.  He's always making things difficult."

14         Does that sound respectful?  Does that sound like it's

15    kind to Mr. McCullough?  It's not.  Mr. McCullough didn't

16    deserve to be treated that way.

17         Now, I'm not going to rehash all of the events that

18    led up to April 25, 2020, all of them during, and even the ones

19    after.  We've all seen multiple videos of the same event.  But

20    I do want to talk about some highlights and I do want to talk

21    about the burden that Mr. McCullough has here.

22         Now, again, Judge Stearns is going to give you

23    instructions on that burden, but it's a preponderance of the

24    evidence, right?  More likely than not.  Mr. McCullough just

25    has to tip the scales as to each of his claims.

1        And I'm not going to go through all the claims

2   individually either, fun as that may be.  But I do want to talk

3   about just three key points of both the evidence that came in

4   and then how that evidence relates to Mr. McCullough's claims.

5        So the first, first point we'll address.  That there

6   was no probable cause to arrest Mr. McCullough for any crime

7   when he was arrested by Officer Roby.  That's No. 1.

8        No. 2, that Mr. McCullough's Civil Rights were

9   violated.

10       And then 3, how the violation of his Civil Rights

11   affected him.

12       So the probable cause, the Civil Rights violations and

13   then how he was affected.  So first let's talk about probable

14   cause.

15       Judge Stearns is going to instruct you that there were

16   three charges brought against Mr. McCullough as a result of his

17   interaction with Officer Roby on April 25, 2020.

18       First, his assault and battery.

19       The second is resisting arrest.

20       And the third is disorderly conduct.

21       Now, it sounds like Defendants aren't even concerned

22   about assault and battery, but we'll talk about it anyway.  In

23   order for their to be an assault and battery, there needs to be

24   a harmful or an offensive contact.  Intentional contact.  So

25   somebody coming up and grabbing me, for example.  We heard

1    testimony, you can view the exhibits; the body-worn camera, the

2    video.  Mr. McCullough's video, at no point does Mr. McCullough

3    ever strike anybody, punch anybody, kick anybody.  We heard

4    Officer Woods talk about that.  And you can see it, you can see

5    it in the video?  Most of the time during the arrest he simply

6    has his arms out to the side or next to him, never strikes

7    Officer Woods or Officer Roby.  So there's no probable cause to

8    arrest him for that.  So the first of the three charges is out.

9        Next, resisting arrest.  We've heard a lot about

10   resisting arrest.  We heard a lot about resisting arrest from

11   Mr. McCullough.  We heard a lot about resisting arrest from

12   Officers Woods and Roby.  But the actual crime of resisting

13   arrest isn't just simply a simple definition of resisting, it

14   has a specific definition.  Judge Stearns is going to give it

15   to you, but I'll give you portions of it now as well.

16       Resisting arrest means using or threatening to use

17   physical force or violence or using any other means of avoiding

18   arrest that creates a substantial risk of causing bodily

19   injury.  So let's break that down.

20       Right, so the first one's using or threatening to use

21   physical force or violence.  So in order for there to be

22   probable cause to arrest Mr. McCullough under that portion,

23   there would have to be some evidence that he threatened to use

24   or used physical force or violence against Officers Roby and

25   Woods.  Didn't happen.  You can look at it in the video.  You

1  heard the testimony of Officers Roby and Woods.  Mr. McCullough
2  never threatens them.  He says a lot of other things, but he
3  never threatens Officers Roby or Woods.  And he never, again,
4  similar to assault and battery, he never punches them, strikes
5  them, kicks them, nothing.  No physical force was used by
6  Mr. McCullough against Officers Roby and Woods.  So that's out.

7          Then the next part, using any means of avoiding arrest
8  which creates a substantial risk of bodily injury to Officers
9  Roby and Woods.  So Mr. McCullough would have had to try to
10 avoid getting arrested somehow that would have substantially
11 risked Officers Roby and Woods being injured, having bodily
12 injury.  Now we know that there was no bodily injury to either
13 Officer Roby or Officer Woods.  No evidence of that whatsoever.
14 And Mr. McCullough did nothing during the course of the arrest
15 other than pin his hands next to his body.  He didn't swing his
16 camera holder or his camera phone at anybody.  He didn't have
17 Officer Roby -- and Officers Roby and Woods chase him into a
18 place that posed danger to them.  Nothing.  So that's it.
19 That's resisting arrest right there.  No probable cause for
20 under either of those two definitions to arrest Mr. McCullough
21 for resisting arrest.  He simply didn't do it.  There's no
22 evidence of it.

23         The other point is that Mr. McCullough obviously
24 didn't avoid being arrested.  He didn't attempt to avoid being
25 arrested, but the officers obviously didn't avoid being

1    arrested because he was arrested.

2          So finally we'll turn to disorderly conduct.  Now
3    we've heard just as much or more about disorderly conduct as
4    we've heard about resisting arrest.  And just as with resisting
5    arrest, disorderly conduct has a very specific definition.
6    Again, Judge Stearns will give that to you.  But essentially it
7    involves fighting, threatening or tumultuous behavior which
8    affects the public.  No evidence that Mr. McCullough did that.
9    Didn't fight anybody.  Didn't threaten anybody.  Wasn't messing
10   around with anybody in a public space.  Wasn't engaged with a
11   crowd or anything of that sort.  There's just no evidence of it
12   whatsoever.  There's no, nothing to support the probable cause
13   that Officer Roby would have needed to arrest him.

14          But let's even take the definition that Defendants
15   use, which, again, that's not the correct -- the definition
16   they use of disorderly conduct is not the correct definition
17   under the law.  But let's even take their definition, right,
18   that Mr. McCullough was standing in the street obstructing
19   traffic.  What they're saying is if a person goes into the
20   street intentionally, right, not by accident, and is in the way
21   of a vehicle, any vehicle that could possibly travel in that
22   lane, that person can be arrested for disorderly conduct.
23   There's probable cause to arrest that person.  If that's the
24   case, then everybody that ever is in the City of Boston can be
25   arrested.  If that's the case, then Officer Roby himself could

1    have been arrested for probable -- excuse me, for disorderly

2    conduct.  You'll see multiple times as he's conducting this

3    traffic stop, cars go by him.

4         (Played Video.)

5         MR. O'NEILL:  Right there.  Police car goes by Officer

6    Roby as he's standing by the driver's side window of the car he

7    stopped.  Exactly what Mr. McCullough did.  And granted,

8    Officer Roby's a police officer.  He's functioning as a police

9    officer at that time.  He's conducting a traffic stop.  He's

10   performing his official duties so he shouldn't be arrested for

11   standing in the street.  But he couldn't be -- even if he

12   wasn't a police officer, he couldn't be arrested for doing

13   that.  It just doesn't make any sense.  If somebody is stopped

14   on the side of the street, walks in front of their vehicle and

15   goes to open their driver's side door to get in the car and a

16   car is driving by them, does it make sense that they're subject

17   to arrest for disorderly conduct?  No.

18        If there's -- if somebody has a friend stopped on the

19   side of the street or even in a lane with their flashers on and

20   they walk around the front of the vehicle and talk to the

21   person at the driver's side window and there's cars going

22   around them, does it make sense that they should be arrested

23   for disorderly conduct?  No.  It makes no sense.

24        Again, if that was the case, police officers -- Boston

25   Police officers could be arresting thousands -- tens of

1  thousands of citizens around Boston every single day.

2  Everybody would be subject to arrest for disorderly conduct.

3          So there was no probable cause to arrest

4  Mr. McCullough for disorderly -- for disorderly conduct even

5  under Defendant's own definition.  And, again, just to

6  reemphasize, that's not the definition of disorderly conduct.

7  It requires threatening, fighting, tumultuous behavior

8  affecting the public, not simply standing and speaking with

9  somebody in a car.  Or, even walking around the front of a car

10 or being in the front of a car.  The motorist who was stopped

11 wasn't trying to drive away when Mr. McCullough walked in

12 front.  Officer Roby initially put his car in drive and could

13 have driven right around Mr. McCullough in the second lane.  We

14 saw a car go by Mr. McCullough in the video.  Just go.  Drives

15 right around him.  Not affected at all.  That's not disorderly

16 conduct.  It's not close to disorderly conduct.  There's simply

17 no probable cause.

18         So that's it.  We've addressed all three charges

19 against Mr. McCullough that, that could have resulted in a

20 lawful arrest.

21         There wasn't -- there's not probable cause for any of

22 them.  It's just not close.  There's no evidence to support

23 probable cause for any of them.

24         So we have two topics left.  We've got the Civil

25 Rights violations and then how those Civil Rights violations

1    affected Mr. McCullough.  So let's talk about the Civil Rights

2    violations.  Let's talk about the excessive use of force.  And

3    then after that I'll get to Mr. McCullough's First Amendment

4    rights, his filming of police officers while they're conducting

5    their official duties and then his free speech rights.

6          So first, the excessive force.  The evidence shows by

7    a preponderance of the evidence that Officer Roby used

8    excessive force against Mr. McCullough and then Officer Woods

9    had the ability to prevent that excessive force.  Now, I want

10   to start that conversation by talking about how Mr. McCullough

11   was behaving at the time of his arrest on April 25, 2020.

12   Initially we saw, he's silently filming, right?  Standing near

13   the traffic stop, quiet.  Not saying anything.  He motions at

14   one point to either the drivers or Officers Roby or Woods, but

15   otherwise really isn't moving even, but certainly standing

16   there silently.  When he walks around the front of the car to

17   go speak with the drivers and the people in the car, Officer

18   Roby comes out of his vehicle, orders him out of the street.

19   "You're in the street, get out of the street."  And walks

20   towards him.  You can see Officer Roby's body-worn camera

21   approaching Mr. McCullough and then you see the reverse angle

22   from Mr. McCullough's camera.  And what does Mr. McCullough do

23   in response to that?  Initially he says, I'm not obstructing

24   traffic.  But eventually he moves around the car parked as

25   instructed and as Officer Roby is physically indicating he

1    should do.  He complies with his order.  Then the exchange

2    happens where Mr. McCullough's asking for Officer Roby's name

3    and badge number.

4         As -- and as Mr. McCullough is walking slightly back

5    but parallel to Officer Roby, you saw he steps into the parking

6    lane, right?  Not in the street.  There's a parking lane, bike

7    lane, and then two lanes of traffic -- actually three.  There's

8    a turn lane as well.  But he's in the parking lane, right?  So

9    there's not -- no traffic there.  And there's parked cars.  We

10   saw the parked cars parked just a way back, a red car and a

11   white car.  Steps into the parking lane, and then Officer Roby

12   says, All right, get out of the street, you're under arrest.

13   And what does Mr. McCullough do when Officer Roby says that and

14   approaches him again?  He backs up.  He backs onto the

15   sidewalk.  And Officer Roby comes towards him.  And what does

16   Officer Roby do?  Pulls out his handcuffs and pepper spray.  He

17   grabs Mr. McCullough by the front of the jacket saw that in the

18   video, and pushes him.  He testified -- Officer Roby testified

19   directly.  I used a six or seven level of force and pushed him

20   backwards.  Pushed him backwards into the metal clothing bin.

21   You can hear the sound, the crash of Mr. McCullough's body

22   hitting the metal clothing bin.  Now, again, Mr. McCullough

23   isn't threatening anybody.  He's not threatening Officer Roby.

24   When Officer Woods comes up, he doesn't threaten Officer Woods.

25   He's not hitting anyone.  Not swinging his arms at Officer

Roby. Kneeing, kicking. None of that. He doesn't try to run away from either of them. So he gets slammed into the container, turned around, and then as he's getting handcuffed, pepper spray. Now, we heard -- we talked a lot about the pepper spray. You can hear, you heard Mr. McCullough in the video say, "What'd you spray me with?" Right? You heard Officer Woods talk about being able to smell the pepper spray. And then we even heard from Officer Sparks-Clancy, who wasn't at the scene, right, he doesn't interact with Mr. McCullough until they get back to B3, and then really isn't, isn't near him until they're in the booking area. He's standing up by his head. And what does he smell? He smells pepper spray. He was even unsure when Mr. McCullough was sprayed based on what he smelled.

We heard Officer Woods say I've never accidently deployed my pepper spray. Other than Officer Roby, never heard of anybody doing it. We heard Officer Sparks-Clancy, same thing. Lieutenant Brooks: I've heard about it, not sure who, but I've heard about it, but I've never witnessed it or done it myself. And then we heard about the actual pepper spray can cannister itself. It has a flip top on the top, designed -- it's designed to prevent the very thing that Officer Roby is saying happened, it accidently discharged. Does that make sense that with those officers talking about their knowledge of accidental discharges, and then the flip top on the top, the

1    way the cannister is designed, does that make sense that that

2    was -- it just happened?  It was an accidental discharge?  No,

3    it doesn't.  It was intentional and it causes pain.  We heard

4    about that.  Causes pain.  Causes difficulty breathing.  We

5    heard about Mr. McCullough having difficulty breathing later

6    on.  It irritates.  It burns.  It hurts.  What else hurts is

7    the pain compliance techniques that Officer Roby said he used.

8    The pressure points on Mr. McCullough's arms and wrists.  He's

9    intentionally causing him pain to try and put the handcuffs on

10   him.

11         Now, you'll hear Judge Stearns say when you're

12   considering whether excessive force was used, what you actually

13   need to do is put a reasonable officer in Officer Roby's

14   position.  So, we're not considering what Officer Roby himself

15   knew, how he felt, those sort of things, we're concerned with

16   what a reasonable officer in his position would have done, the

17   force they would have thought was reasonably necessary and the

18   force that they used.

19         So I ask you would a reasonable officer in Officer

20   Roby's position have done what Officer Roby did?  Why not try

21   to talk to Mr. McCullough?  Just calm the situation down.

22   Right?  We know Officer Roby knew about Mr. McCullough's

23   YouTube videos and how he had interacted with the police

24   before.  So if we can transfer that knowledge and information

25   to a reasonable officer, why not try and just calm him down

1    first?  See if he'll just willingly put the handcuffs on,

2    instead of using force right away, right out of the gate --

3    getting pepper sprayed right out of the gate.  And for all that

4    was made about Mr. McCullough's behavior, how he agitates

5    police, curses at them -- and he does, right?  We saw it.  But

6    we also saw that there were times that he's respectful.  You

7    saw him on the stand.  You heard from Lieutenant Brooks who

8    said, I got along with him.  I respect what he does.  When he

9    spoke with Mr. McCullough after the arrest, he was calm and

10   polite.  We saw in the video, Exhibit 2, the interaction in

11   Roxbury, Mr. McCullough asked one of the plain clothes officers

12   for his name and badge number.  He says something to the effect

13   of Officer Hooley and gave his badge number.  What does

14   Mr. McCullough do?  He walks away.  He doesn't say anything

15   else to him.  Doesn't get in his face.  Isn't cursing at him.

16   All that is to say when he's treated respectfully and when the

17   officers he's engaging with do what they're required to do with

18   the rules and what their jobs require them to do, he leaves

19   them alone.  He listens to them.  He's respectful to them.

20        So a reasonable officer in Officer Roby's position

21   would at least try that.  Maybe just have a conversation with

22   him.  I know you disagree with this arrest, but I have probable

23   cause, I'm going to put the handcuffs on you.  I want to do it

24   peacefully.  I'll let you know what the charges are.  I'll tell

25   you my name and badge number.  We'll get all of that sorted,

1  but I need to put the handcuffs on you.  I'm not going to hurt

2  you.  I'm not going to try to hurt you.  I don't want to hurt

3  you, but we have to -- I have to do this and we can go back to

4  the station and figure this out.  That's what a reasonable

5  officer would have done.  Try to use force as a last resort.

6  That's not what Officer Roby did.  And that's the excessive use

7  of force.

8        And we saw in the video, at least after or Officer

9  Roby initially grabs Mr. McCullough.  Officer Woods is a good

10 distance away.  There's nothing he can do there.  He can't, you

11 know, transport himself in a split second over to the

12 interaction between Officer Roby and Mr. McCullough and stop

13 everything from happening.  But he does eventually get there.

14 You see it in his body-worn camera.  He's right there, grabbing

15 on to Mr. McCullough.  He has the ability to try and calm the

16 situation down, prevent the use of the pain compliance methods,

17 try and just calm things down, and he doesn't do that.

18        Now, let's talk about some of the other force that was

19 used after the arrest, right?  You heard Officer Roby himself

20 talking about Mr. McCullough running into the brick wall near

21 the wagon bay door.  He did that himself, right?  That's what

22 Officer Roby said.  Does that make sense?  Does that make sense

23 that somebody would run themselves into a brick wall?  No, it

24 doesn't.  He was pushed into it.

25        You heard about the twisting of the handcuffs.  That

1    as Mr. McCullough's hands are handcuffed behind his back,

2    Officer Roby is grabbing them and he's twisting them, causing

3    him pain.  You heard about Officer Roby hitting Mr. McCullough

4    in the face, right, as they're waiting by the wagon bay door to

5    open.  Mr. McCullough says Officer Roby is punching him in the

6    face and pulling his hood over his head.

7         How about asking if -- how about Officer Roby asking

8    if he could just take a second to adjust Mr. McCullough's mask.

9    Right?  His hands are handcuffed behind his back.  He can't do

10   anything.  He had a mask on earlier on in the interaction.  You

11   saw it when we first seen him by the traffic stop.  Rather than

12   just trying to calm the situation down again, saying hey, give

13   me a second, I can pull your mask up or I can get you --

14   another one for you.  Give me a second.  He never does that.

15   Never does that.

16        And then Mr. McCullough falling to the floor in the

17   booking area.  And we -- you all know of your common sense what

18   it's like to physically lean on someone, right?  But what if a

19   person's leaning on another person and the person supporting

20   the leaner suddenly steps back, goes away?  What happens to

21   that, the person leaning on them?  They fall.  Whose fault is

22   that?  Is that the person who was leaning or the person who was

23   supporting?  The person who was supporting.  Sometimes -- you

24   may have heard this phrase, pulling the chair.  Somebody's

25   expecting support, expecting something to catch them and it's

1   taken away intentionally.  Lucy pulling the football away,

2   Peanuts.  Same idea.  So Mr. McCullough is leaning on others,

3   and then all of a sudden that support is gone.  He falls, falls

4   to the floor.  A reasonable officer would have tried to ease

5   him down, right?  A reasonable officer doesn't want

6   Mr. McCullough to get hurt.  Just try and say, Whoa, whoa,

7   whoa, careful.  It feels as like I'm about to lose you.  Let me

8   ease you down.  Or if it's an accident, if it truly is an

9   accident, Hey, are you okay?  That was kind of our fault.

10   Sorry about that.  What can I do to help you?  Didn't hear

11   that.  So for all of those reasons Mr. McCullough has shown by

12   the preponderance of the evidence that excessive force was used

13   against him.  He's tipped the scales there.

14         So we're still on the Civil Rights violations.  The

15   first was the excessive force.  Now, let's talk about the

16   violations of Mr. McCullough's First Amendment rights to film

17   officers while they're exercising -- while they're performing

18   their official duties and his right to free speech.

19         Now, we've -- for an interaction or an arrest that had

20   nothing to do with Mr. McCullough's rights to free speech and

21   his right to film officers, we have heard a lot about his

22   YouTube channel and a lot about the things that he says to

23   police officers.  Mr. Whitesell's closing was almost entirely

24   about Mr. McCullough's YouTube channel, his videos, and what he

25   says to officers.  Does it make sense that that much attention

1   is paid to Mr. McCullough filming and saying things, but then
2   the arrest had nothing to do with it whatsoever?  No connection
3   at all.  Even when we knew, we all know that Officer Roby knew
4   about the videos.  He -- before April 25, 2020.  He watched the
5   video of the first encounter between Mr. McCullough and him and
6   didn't want to give him the views.  Right?  Didn't like that
7   Mr. McCullough was filming him and filming other police
8   officers.  Every police officer who testified knew about
9   Mr. McCullough's videos.  Knew -- at least knew of them and
10  likely saw them, right?  And some of them said they saw them.
11  Now, no officer is going to say when they're arresting
12  somebody, Hey, I'm arresting you because you're filming me and
13  saying things to me.  I'm intentionally -- right now I'm
14  arresting you to violate your First Amendment rights.  Of
15  course not.  Nobody is going to say that.  But we know, again,
16  what we just talked about, we know what everybody knew about
17  Mr. McCullough.  We know they were all aware of him.  We know
18  that they were all aware that he was filming.  We know that
19  they were all aware that he was saying things to officers, that
20  he would try to agitate officers.  And we know that Officer
21  Roby didn't like it when Mr. McCullough challenged him, right?
22  Verbally.
23          This is Exhibit 2 -- not this.  One moment.
24          (Played Video.)
25          MR. O'NEILL:  Bear with me.

1          (Played Video.)

2          MR. O'NEILL:  Right there.  "Roll the window up.  Roll

3     it the fuck up."  In response to it, what did Officer Roby do?

4     He gets out of his vehicle and then does this.

5          (Played Video.)

6          MR. O'NEILL:  "You're being disorderly.  I'm gonna

7     lock you up.  Stay out of the street."  Does that sound

8     familiar?  It's the same thing that happened on April 25, 2020.

9     Almost the exact same interaction.  And what was it in response

10    to?  It was in response to Mr. McCullough saying something to

11    Officer Roby and filming it.

12         (Played Video.)

13         MR. O'NEILL:  So Mr. McCullough has already been in

14    the street.  He's already done the thing that defendants say is

15    probable cause for arrest for disorderly conduct.  It's not.

16    But Officer Roby doesn't arrest him at that point, right?  He's

17    clearly standing in the street.

18         (Played Video.)

19         MR. O'NEILL:  "Name and badge."  Says something to

20    him.  Right?  Filming him and says something to him.  And

21    officer -- you saw him turn, I'm arresting him now in response

22    to a statement.  That's why he was arrested.  We heard at the

23    end of Officer Roby's body-worn camera video.  "I'm tired of

24    this guy.  Tired of his ass."  That's why he was arrested.  It

25    wasn't because he was standing in the street.  That's not

disorderly conduct.  We talked about that.  It's because of
what he said.  Because of what he said weeks earlier, and it's
because it happened again.  He was challenging him, asking him
for his name and badge number, filming him, and he didn't like
it.  That's why he was arrested.  Violation of his First
Amendment rights.  He has a First Amendment right to the free
speech.  He has a First Amendment right to film officers when
they're conducting their official duties.

Almost done.

All right, so we've talked about probable cause.
We've talked about the Civil Rights violations.  And now we're
going to talk about how all of this affected Mr. McCullough,
the damages.  So let's go through it.  Let's talk about
everything that affected Mr. McCullough or how all of this
affected Mr. McCullough.

Let's talk about the pain he endured, right?  Officer
Roby discussed the level, the six or seven level of force on a
scale of one to ten that he used on him.  Pushing him.
Slamming him into the metal clothes bin.  Using that same level
of force, the six or seven level on a scale of one to ten, on
his arms, on his wrists.  The pain compliance methods, right?
Using -- intentionally causing pain on Mr. McCullough to get
the handcuffs on him.  The burning and the pain from the pepper
spray affecting his ability to breathe.  That's stressful.
That can cause anxiety.  It's scary.  The twisting of his arms

and shoulders.  The twisting of the handcuffs.  Hands are
handcuffed behind his back.  Twisting of the handcuffs into his
wrists.  Hitting the brick wall by the wagon bay.  Falling to
the ground in the booking area.  You heard about how all of
that resulted in a sore back, sore shoulders, sore wrists.  And
no, he didn't get medical treatment for that.  He didn't.  But
really in a common sense, from a common sense perspective,
what's likely going to happen is someone is going to tell him
to take some pain medication and he'll get better.  Right?  He
didn't have any significant -- severe injuries, right?  He
didn't have any broken bones or torn ligaments or anything like
that.  But he still was affected by that physically.  He still
endured the pain.  He still felt what happened to him.

Then how about the mental and emotional pain?
Discomfort.  The indignity, the fear of the anxiety,
humiliation that he went through.  The fear of being arrested.
He honestly believed that he didn't do anything wrong.  And he
didn't.  But even if you disagree with that, he honestly
believed that he didn't do anything wrong.  Being arrested for
that is stressful.  It's scary.  It's humiliating.  Having
excessive force used against you not knowing what's going to
happen next.  When is this going to stop?  Is it going to
happen again?  Fear.  Anxiety.  Sitting in a cell in the B3
station for 36 hours.  Sure, he was eventually bailed out,
Mr. McCullough, but he had to wait until somebody did that.

1  You heard him talk about he didn't have the phone numbers for

2  people.  They were on his phone, which he didn't have access

3  to.  It had been essentially destroyed in any event.  He didn't

4  know who was coming or when.  That's scary, right?  I don't

5  know how long I'm going to be here.  I don't like being here to

6  begin with, and I don't know how long this is going to last.

7  He couldn't live his life for those 36 hours.  Couldn't go see

8  family or friends.  Couldn't sleep in his own bed.  Couldn't be

9  in his own living space, go to his favorite restaurant, or

10  whatever it is that he wanted to do.  He couldn't do any of

11  those things.  His freedom in the true sense was taken away

12  from him for a long time, and he's sitting in a cell.  And,

13  again, all of this happened when he did nothing wrong.  He

14  committed no crime.  And when the charges were eventually

15  dismissed against him, he'll never get that time back.  He'll

16  never get that freedom back.  He'll never get the time back of

17  having to go to court for his criminal case, the four

18  appearances that you heard him talk about.  The two-day trial.

19  Not knowing what's going to happen as a result of that trial.

20  Again, he, he didn't do anything wrong here.  He didn't commit

21  a crime, but he might get convicted of one or all of them.  He

22  might have to serve jail time, possibility, right?  Who knows?

23  Imagine having to worry about that.  I didn't do this.  I know

24  I didn't do this, what they're saying I did, but I might have

25  to arrange my affairs so that if I need to go to jail for a

1  period of time.  Or I might -- whatever the punishment might be

2  having to deal with that.  That's scary.  That's anxiety

3  inducing, right?

4        No one should have to go through that.  No one should

5  have to be treated like that.  And that's why you should find

6  Officers Roby and Woods liable for the claims against them.

7        Thank you.

8        THE COURT:  Thank you, Mr. O'Neill.

9        Jurors, why don't we take a 10- or 15-minute break.

10  There's coffee while we round up a copy of the instructions and

11  the verdict slip for you.  We'll come back.  I think I'll be

12  about 30, 35 minutes and then it's yours.  All right?

13  15-minute recess.

14        THE CLERK:  All rise.

15        (The Honorable Court and Jury Exited.)

16        (Court Stood in Recess.)

17        THE CLERK:  All rise.

18        (The Honorable Court Entered.)

19        THE COURT:  Mr. Whitesell, you had something you

20  wanted to address to the Court?

21        MR. WHITESELL:  Yes, your Honor, the description of

22  how disorderly conduct and the elements of claim were read to

23  the jury, triggered something for me from one of my prior

24  briefs.  And I would refer the Court to *Commonwealth v Bosk*,

25  which is 29F Court 904 pinpoint says 906.  It's a 1990 case out

1    the Mass. Appellate Courts.  It involved a defendant who was

2    pulled over for a traffic stop.  He got out of the car after

3    the stop was completed.  He was in the street.  Or the road,

4    and he was told several times to get back in the vehicle.  He

5    did not comply.  And he was arrested and charged with

6    disorderly conduct.  The Court upheld the conviction and said

7    that -- one of the things he said during this was that he was

8    in the street and yelling at the trooper after the stop was

9    completed, and that just being in the street was risking his

10    own safety and the safety of others.  So I just wanted to

11    express my concern.  And I guess I don't know if it had

12    anything to do with the closing, it just raised the issue

13    during the closing that maybe we need to flesh out the

14    disorderly as it relates to the specific facts of this case.

15    And I, I'm -- I just want to raise it for the Court.  And I

16    would suggest that maybe something on this issue could be added

17    to the first paragraph on page 15 at the end of where we

18    discuss what the definition of disorderly conduct is.

19         THE COURT:  Well, I think that risks pushing the

20    jurors' focus where it shouldn't be.  We made it clear, my

21    instructions matter, not how Mr. O'Neill describes the law.  I

22    don't think that's your strongest suit anyway.  I think the

23    resisting arrest claim is actually the one that the jurors

24    would be more inclined to go to.  But as I'm going to explain

25    to the jury, even if he's mistaken, as long as he's in good

1  faith believes he has probable cause, that's sufficient under

2  the law.  So I don't think that we want to confuse things

3  further.

4        All right, let's bring the jury in.

5        MR. WHITESELL:  Thank you, your Honor.

6        THE CLERK:  All rise for the jury.

7        (The Jury Entered.)

8        THE CLERK:  Resuming on the record civil action

9  22-10177, _McCullough versus Roby and Woods_.

10       Thank you, you may be seated.

11       THE COURT:  All right, Members of the Jury, now that

12 the closing arguments of the lawyers have been presented, it's

13 time for me to instruct you on the law.

14       My instructions will be in four parts:

15       First, some instructions on the general rules that

16 define and control the duties of a jury in a civil case;

17       Second, some instructions that you may find of use in

18 evaluating the evidence that has been presented;

19       Third, I will explain the rules of law that you must

20 apply to the facts as you find them,

21       And, finally, I have some brief guidelines that will

22 govern the conduct of your deliberations.

23       In defining the duties of the jury, let me first give

24 you the general rules:

25       It is your duty to find the facts from all the

evidence in the case.  To the facts as you find them you must
apply the law as I will explain it to you.  And you must follow
the law as I describe it, whether you personally agree with the
wisdom of the law or not.  You must do your duty as jurors
regardless of any personal likes or dislikes, opinions,
prejudices, or sympathy.  That means you must decide the case
solely on the evidence before you and according to the law.

In following my instructions, you must follow all of
them and not single out some and ignore others; they are all
equally important.  And you must not read into the
instructions, or into anything that I may have said or done
during the trial, any suggestions from me as to the verdict you
should return.  Whatever opinion I might have as to what your
verdict should be is utterly irrelevant.  The verdict is yours,
and yours alone, as the finders of fact, to render.  While I
intend to be as helpful as I can in providing you with the
knowledge of the law, you are required to render an intelligent
verdict, you will, when I'm finished, be surprised -- even
astonished -- at the extent to which the law commits this case
to your sole determination as the judges of the facts.

Plaintiff, you will recall, is the name we give the
person who brings the lawsuit.  We refer to the person or
persons sued as the defendants.  In a civil trial, a plaintiff
bears the burden of proving his case by a preponderance of the
evidence.  This means that the plaintiff must produce evidence

1  which, when considered in the light of all the evidence in the

2  case, leads you to believe that his claims are more likely true

3  than not.  If he fails to meet this burden, your verdict must

4  be for Defendants.

5          Now, let me briefly review with you what is and is not

6  evidence in a civil case.  The evidence is typically presented

7  at a trial in one of three ways:

8          First, through the sworn testimony of witnesses both

9  on direct and cross-examination.

10          Second, through physical objects, like documents and

11  photographs, which are identified by a witness, and admitted as

12  exhibits during the trial.

13          Third, by stipulation, or agreement between the

14  parties that certain facts are true and need not be

15  independently proven as such at trial as was the case with the

16  agreed authenticity of the videotapes that have been received

17  in evidence.

18          Certain things are not evidence and should have no

19  influence on your verdict.

20          Arguments and statements by lawyers, as I have

21  cautioned several times, are not evidence.  What the lawyers

22  have said over the course of the trial you may find helpful,

23  even persuasive, in reaching your judgment, but the facts are

24  to be determined from your own evaluation of the testimony of

25  the witnesses, the exhibits, and any reasonable inferences that

1  you choose to draw from the facts as you find them.

2        Questions to the witnesses are not evidence.  They can

3  only be considered in the sense that they give context or

4  meaning to a witness's answer.

5        Objections to questions are not evidence.  Attorneys,

6  as I explained, have the duty to their clients to object when

7  they believe that a question is improper under the rules of

8  evidence.  You should not be influenced by the fact that an

9  objection was made or by the way I ruled on it.  If I sustained

10  the objection, you should ignore the lawyer's question and any

11  assertion of fact that it might have contained.  If I overruled

12  the objection, you should treat the witness's answer like any

13  other.

14        Testimony that I excluded, struck, or that I

15  instructed you to disregard is not evidence.  You should also,

16  as I have cautioned, ignore editorial comments made by the

17  attorneys during their presentations, particularly those

18  intended to characterize the testimony of witnesses.  Whether

19  or not a witness's testimony was believable on any particular

20  point is a determination that only you can make.

21        Notes, if you have kept them, and most of you have,

22  are not evidence.  They are a personal memory aid to be used to

23  refresh your recollection of the evidence during the

24  deliberations.

25        Finally, anything you may have seen or heard outside

1  of the courtroom during the course of the trial is not

2  evidence.  You must decide the case based solely on the

3  evidence offered and received during the trial.

4       Regardless of the way in which evidence is presented,

5  it comes in one of two forms, as either direct or

6  circumstantial evidence.  Direct evidence is direct proof of

7  the fact, usually presented through the testimony of a person

8  who claims to have been an eyewitness to an event or a

9  participant in a conversation.  When you evaluate direct

10 testimony your decision is fairly straightforward.  Do you

11 believe that what the witness has told you is accurate?

12 Circumstantial evidence, on the other hand, is the proof of a

13 chain of circumstances, or a set of facts, from which you could

14 infer or conclude that another fact is true, even though you

15 have no direct evidence of that fact.

16       For instance, I have a seasonal interpretation for you

17 here.  It kind of fits the weather this week.  If you were to

18 awake in the morning, and even though the day was bright and

19 clear, see puddles of water on the street, you might draw the

20 inference that it had rained during the night even though your

21 sleep had been uninterrupted.  In other words, the fact of rain

22 is an inference that could be drawn from the presence of water

23 on the street.  An inference may be drawn, however, only if it

24 is reasonable and logical, and not if it is speculative or

25 based upon conjecture.  If for example, you observed puddles on

water on your street, but not on any other street in your
neighborhood, other facts, like a broken water main, or if you
live in the suburbs, a neighbor's malfunctioning sprinkler
system, might explain the presence of water.

In deciding whether to draw an inference, you must
look at and consider all of the facts in the case in the light
of reason, common sense, and your own life experience.

Neither type of evidence, direct or circumstantial, is
considered superior or inferior to the other.  Either or both
types of evidence may be considered in reaching your verdict
and may be given whatever weight you as the finders of fact
deem the evidence to be worth.

Most evidence received at trial is offered through the
testimony of witnesses.  As the jury, you are the sole judges
of the credibility of these witnesses.  If there are
inconsistencies in the testimony, it is your function to
resolve any conflicts, and decide where the truth lies.

You may choose to believe everything that a witness
said, only part of it, or none of it.  If you do not believe
the witness's testimony that something happened, that of course
is not evidence that it did not happen.  It simply means that
you must put aside that testimony and look elsewhere for
credible evidence before deciding where the truth lies.

Often it may not be so much what the witness says, but
how he says it that might give you a clue whether or not to

accept his version of an event as believable.  You may consider
the witness's character, his appearance and demeanor on the
witness stand, his frankness or lack of frankness in
testifying, whether the witness was contradicted by anything
that he said prior to the trial, and whether his testimony is
reasonable or unreasonable, probable or improbable in light of
all the other evidence in the case.  You may consider how good
an opportunity the witness had to observe the facts about which
he testifies, the degree of intelligence the witness shows, and
whether his memory seems accurate.  You may also consider the
witness's motive for testifying, whether he displays any bias
in doing so, and whether he has any interest in the outcome of
the case.  Now simply because a witness has an interest in the
outcome of the case does not mean the witness is not trying to
tell you the truth as he recalls it or believes it to have
been.  But a witness's interest in the case is a factor that
you may consider along with everything else.  You may also
consider the fact that a witness may be perfectly sincere in
his account of an event and simply be mistaken as the truth.

The weight of the evidence does not depend on the
number of witnesses testifying for one side or the other.  You
must determine the credibility of each witness who testified,
and then reach a verdict based on all the believable evidence
in the case.

In deciding whether to believe a witness, keep in mind

1   that people sometimes forget things or get confused or remember

2   an event differently.  Memory is not always reliable, and when

3   someone recounts a story twice, it will seldom be identical in

4   every detail, unless it is a memorized lie, or the witness is

5   possessed of extraordinary perception and recall.  It is for

6   you to decide whether any contradictions in a witness's

7   testimony are lapses of memory or intentional falsehoods.  That

8   may depend on whether important facts or small details are at

9   issue, and how important the facts might have appeared to the

10  witness at the time they were perceived.  Let me now turn to

11  the legal standards that apply to the facts as you find them.

12          Mr. McCullough has alleged violations of his Civil

13  Rights under both federal and stay law.  The Massachusetts

14  Civil Rights Act differs in some respects from its federal

15  counterpart, principally in imposing an additional element that

16  a violation of rights come about because of the threats,

17  intimidation, or coercion.  For purposes of the state Civil

18  Rights Act, a threat involves the intentional exertion of

19  pressure to make another fearful or apprehensive of injury or

20  harm.  "Intimidation" means putting another in fear for the

21  purposes of compelling or deterring conduct.  Coercion is

22  defined as the application to another of such force, either

23  physical or moral, as to constrain him to do against his will

24  something he would not otherwise have done.  In all due

25  respects, the elements of the federal and state acts are

1    identical insofar as Mr. McCullough's excessive force,

2    unreasonable seizure, false arrest, and free speech claims are

3    concerned.  The malicious prosecution and First Amendment

4    retaliation claims, on the other hand, are brought solely under

5    federal law.  Consequently, I will instruct you in terms of the

6    federal law, but with the understanding that the substance of

7    the instructions covers the companion claims under the state

8    law as well, again except for the threats, intimidation, and

9    coercion element.

10           The Federal Civil Rights Act is codified at 42 U.S.C.

11   Code 1983.  It states in relevant part -- and this is somewhat

12   ancient language.  This is a long, existing statute under our

13   law.

14           Every person who, under color of any statute,

15   ordinance, regulation, custom, or usage, of any State or

16   Territory, subjects, or causes to be subjected, any citizen of

17   the United States or other person within the jurisdiction

18   thereof, to the deprivation rights, privileges, or immunities

19   secured by the Constitution and laws, shall be liable to the

20   party injured.

21           To establish a claim under Section 1983, a plaintiff

22   must prove by a preponderance of the evidence four things:

23           That a defendant acted under color of state law;

24           That a defendant's conduct deprived the plaintiff of

25   personal rights secured by the Constitution or laws of the

United States;

        That a defendant's acts were intentional; and

        That the defendant's acts were a proximate cause of injury to the plaintiff.

        Acting under color of law means acting or purporting to act in the performance of official duties.  There is no dispute that Officers Roby and Woods were at all relevant times acting as sworn police officers empowered to make arrests and enforce the laws of the Commonwealth of Massachusetts.  In other words, the first statutory requirement is not a matter of dispute.

        Mr. McCullough must next prove that the actions of one or more of the defendants deprived him of a right secured by the Constitution or laws of the United States.  Mr. McCullough alleges four such deprivations:  That the defendants violated his Fourth Amendment rights to be free from the excessive use of official force; to be free from arbitrary arrest and unreasonable seizure; his right be free from malicious prosecution; and finally to be free from interference with the First Amendment right to the free exercise of speech.

        Force involves the harmful touching of another by physical means or by means of an instrumentality such as pepper spray.  As a general matter, an officer is privileged to use whatever force is reasonably necessary to effect an arrest -- even if it causes injury -- so long as that force is not

excessive under the circumstances.  In deciding whether the
force a defendant is alleged to have used was excessive, you
must first determine whether he in fact did the things that he
is alleged to have done.  Next you must determine whether the
amount of any force that was used in fact exceeded the amount
of force that a reasonable officer would have used in similar
circumstances.

Let me stress the word reasonable.  Whether a police
officer has used excessive force in making an arrest is gauged
by objective standard of reasonableness.  An officer's motives
or subjective purpose has no bearing on the reasonableness of
his use of force.  You are instead to look to the objective
facts and circumstances of the case, including the severity of
the alleged offenses for which the arrest was made, the extent
of the injuries suffered by the plaintiff, whether the
plaintiff was reasonably perceived as posing a threat to the
officer's safety or the safety of the public, and whether the
plaintiff actively attempted to resist or evade arrest.  That
an officer may have lacked probable cause to make an arrest
does not justify an arrestee's attempts to resist his exercise
of official authority.  On the other hand, that an officer has
probable cause to arrest does not justify any excessive use of
force against an arrestee.

Not every push or shove by a police officer, even if
it may seem unnecessary in the peace and quiet of this

courtroom, constitutes excessive force.  The reasonableness of
the use of force must be judged from the perspective of a
reasonable officer on the scene rather than with the 20/20
vision of hindsight.  The concept of reasonableness makes
allowance for the fact that police officers are forced to make
split-second judgments in circumstances that are sometimes
tense, uncertain, and rapidly evolving, about the amount of
force that is necessarily in the particular situation.

Even where an officer is not involved in the physical
apprehension of a person, he or she may be held vicariously
liable for the excessive use of force if he or she fails to
protect the victim from another officer's use of excessive
force.  The failure to intervene rule, however, applies only
where an officer has a realistic opportunity, measured in both
time and proximity, to intercede.

In his second claim, Mr. McCullough alleges that
Officer Roby violated his right under the Fourth Amendment to
be free from arbitrary arrest and seizure.  The Fourth
Amendment to the Constitution guarantees "the right of the
people to be secure in their persons...against reasonable
searches and seizures...."  A seizure occurs when a person
submits to an officer's show of authority or when his freedom
of movement is physically restrained, however briefly.  An
arrest is an unreasonable seizure when it is made without
probable cause.

1            Now let me explain what is meant by the term of

2    "probable cause."  A police officer is permitted to make an

3    arrest only if he or she has probable cause.  Probable cause is

4    permitted to make an arrest only if he or she has probable

5    cause.  Probable cause means reasonable cause, something more

6    than a hunch or a mere suspicion, but something much less

7    exacting than proof beyond a reasonable doubt, the standard we

8    apply in determining whether someone is guilty of a crime, or

9    even proof by a preponderance of the evidence.  Probable cause

10   rather is concerned with probabilities.  Thus, the fact that a

11   person may not in fact be guilty of a crime does not invalidate

12   an officer's judgment that he has grounds to make an arrest.

13   You must ask whether the facts available to Officer Roby, at

14   the time he arrested Mr. McCullough, would have warranted an

15   officer of reasonable caution in the belief that Mr. McCullough

16   had committed one or more of the crimes of assault and battery,

17   resisting arrest, and disorderly conduct.  If they would, the

18   arrest was proper.  If they would not, the arrest was unlawful.

19            Now, it may be helpful in this regard if I briefly

20   explain the elements of each of the offenses for which

21   Mr. McCullough was arrested.  Assault and battery is the

22   unlawful application of harmful or offensive force to the

23   person of another.  The crime of resisting arrest involves the

24   use or threatened use of physical force or violence against the

25   person of the arresting officer or another, or the use of any

other means of avoiding arrest that creates a substantial risk

of causing bodily injury to the arresting officer or another.

Under Massachusetts law, there is no right of a citizen to

resist an arrest, even the one that citizen sincerely believes

to be illegal, unless the arresting officer is using excessive

force.  Disorderly conduct is intentional conduct that is

intended to disturb the public tranquility or alarm and provoke

others.  It includes fighting, threatening or tumultuous

behavior.  It does not include mere agitated behavior or verbal

protests of police conduct.

In assessing probable cause, the focus must be on what

the defendant officer knew at the time of the arrest and not on

subsequent events for which he had no control.  For example,

the fact that the charges against Mr. McCullough were

ultimately dismissed is not a factor in your determination

whether defendants had probable cause to arrest Mr. McCullough

for one or more of the cited offenses on April 25, 2020.  As I

explained earlier, this is because the quantum of evidence

necessary to establish probable cause involves a far lesser

standard of proof than proof beyond a reasonable doubt, the

standard that determines whether a person is guilty of a crime,

or the many discretionary factors that a court or a prosecutor

might bring to bear in deciding whether to proceed with the

trial in the case.  Again, as in the case of use of force, the

test to be applied is an objective one -- we are concerned with

1  what a reasonable police officer in Officer Roby's position,

2  knowing what he knew in April 25, 2020, would have done.

3  Again, a defendant's subjective state of mind or possible

4  motive has no bearing on an assessment of the existence of

5  probable cause.

6        Malicious prosecution under federal law means

7  instituting wrongfully maintaining a criminal prosecution

8  against an arrested person despite knowing that there is no

9  probable cause to do so.  To prevail, a plaintiff must also

10  show that he suffered a deprivation of liberty because of legal

11  proceeding, and that the criminal prosecution was resolved in

12  his favor.  These last two elements are not in dispute.  As I

13  explained in introducing the case to you, the charges against

14  McCullough were dismissed after a trial in the state district

15  court.  The focus rather is on the issue of probable cause.

16  The dismissal of the charges in the state court has no

17  conclusive bearing on this issue because of the difference

18  between proof beyond a reasonable doubt required for a criminal

19  conviction and the significantly lesser burden of probable

20  cause required for an arrest.  As I explained, probable cause

21  means "reasonable cause," something less exacting than proof by

22  preponderance of the evidence or proof beyond a reasonable

23  doubt.

24        Mr. McCullough's fourth claim is a claim of official

25  interference with the exercise of his First Amendment rights.

1   I instruct you as a matter of law, that the Supreme Court of

2   the United States and the Court of Appeals for this Circuit

3   have held that the First Amendment protections extend to

4   civilian videotaping of encounters with police so long as the

5   filming itself is not disruptive or conducted in such a manner

6   so as to interfere or potentially interfere with an officer's

7   discharge or his official duties.

8           The third element that Mr. McCullough must prove by

9   the preponderance of the evidence is that the defendant acted

10  intentionally.  The act is intentional if it is done knowingly,

11  that is, if it is done voluntarily and deliberately, and not

12  because of mistake, accident, negligence, or other innocent

13  reason.  Stated another way, a person acts intentionally when

14  he acts with a conscious objective to engage in a particular

15  conduct.  A plaintiff is not required to show that a defendant

16  intended to inflict the harm that resulted, only that he

17  intentionally did the act that caused the harm.

18          Now, let me discuss damages.  In discussing the law of

19  damages, I am not attempting to suggest what your verdict

20  should be on this or any other disputed issues.  It is simply

21  easier that I instruct you now on the law of damages, rather

22  than interrupt your deliberations later with additional

23  instructions should they become necessary.

24          If you return a verdict for Mr. McCullough on his

25  Civil Rights claims, you should award him a sum of money that

you believe will fairly and justly compensate him for any

injury you believe that he sustained as a direct result of the

defendant's conduct.  Compensatory damages are intended to

compensate an injured party for the losses that he suffers

because of another's wrongs.  The object of the law, as best as

money can accomplish it, is to restore the injured person to

the position he would have been in had the wrong not occurred.

Mr. McCullough's specific claim is for a sum of money

to compensate him for any emotional distress or pain and

suffering he may have experienced because of any wrongful

treatments by the defendants.  Emotional distress includes

mental pain, discomfort, indignity, depression, fear, anxiety,

or humiliation suffered as a result of the defendant's conduct.

It does not, however, include any award for the stress related

to the experience of litigation in the courts.

Although uncertainty in the amount of damages not bar

recovery and mathematical precision is not required, you must

not speculate, conjecture, or guess in making an award.  It is

your duty to calculate a sum that you find fair and just.  In

this regard, you may consider the intensity and duration of the

plaintiff's feelings, the extent and egregiousness of the

defendants' conduct, in deciding the sum that you best think

will make Mr. McCullough whole.

There is no special formula for assessing these kinds

of damages.  You must use your wisdom and common sense in

1 translating into dollars and cents an amount that will fairly

2 and reasonably compensate the plaintiff for any injuries he has

3 suffered.  Bear in mind that a party asking for damages has the

4 burden of proving his injury by a fair preponderance of the

5 evidence.  If you do award damages on the mixed-law federal and

6 state Civil Rights claims 1, 2, and 3, you should take care not

7 to award duplicate damages for the same

8 constitutional violation under the mostly identical laws.  You

9 should also know that any compensatory award you make is free

10 of state and federal taxes.  Consequently, you should not

11 attempt to factor tax consequences into your verdict.

12 Interest, too, is a factor calculated by the Court.

13         If you find that Mr. McCullough has not suffered any

14 actual damages but was nonetheless deprived of a constitutional

15 right because of a defendant's conduct, you may award nominal

16 damages.  Nominal damages are token damages, assessed at one

17 dollar, which are meant to signify that a plaintiff's rights

18 were technically violated even though he suffered no

19 compensable loss or injury.

20         Finally, let me say a few words about deliberations.

21 Each of you must decide the case for yourself, but you should

22 do so only after considering all of the evidence, after

23 discussing it fully with other jurors, and after listening to

24 the views of your fellow jurors.  Do not be afraid to change

25 your opinion if, after hearing the opinions of your fellow

1   jurors, you are convinced that your initial conclusion was

2   wrong.  But do not come to a decision simply because other

3   jurors insist that it is right, nor surrender an honest belief

4   about the weight and effect of the evidence simply to reach a

5   verdict.

6          Although the trial has been very short, this case has

7   taken significant time and effort on the part of the court and

8   the attorneys involved.  There is no reason to think that this

9   case could have been better tried or that another jury would

10  have been better qualified than you to decide it.  It is

11  important therefore that you reach a verdict if you can do so

12  conscientiously.  Your verdict must be unanimous as to each of

13  the specific questions I am going to ask you to answer.  Your

14  answers will be recorded on the verdict slip by the juror I

15  appoint as the foreperson.

16         But before I appoint the foreperson, let's take a

17  quick look at the verdict slip, with the understanding that the

18  questions as posed have no metaphysical significance.  I'm not

19  trying to convey any message to you.  I'm just trying to give

20  you an agenda that I think will make your deliberations

21  sensible and help you to proceed in order.  It doesn't make no

22  sense to go argue about damages for two hours and then decide

23  there was no liability in the case.  So I'm trying to give you

24  what I think is a logical way to proceed with the issues in the

25  case.

1          So the question 1 asks you about the excessive force

2     claim under state and federal law.

3          Question 2 is whether Officer Woods failed to

4     intervene or interject the plaintiff under the federal or state

5     law.

6          Question 3 is the question that goes to Officer Roby's

7     arrest of Mr. McCullough.

8          Question 4 is the malicious prosecution claim.

9          Question 5 is the First Amendment interference claim.

10    And, again, only if the answer to one or more of those

11    questions is Yes, will you proceed to the damages issue.  And,

12    again, that's a very straightforward question, what sum of

13    money would fairly and reasonably compensate Mr. McCullough for

14    the violation of his Civil Rights.

15         I recognize that the law does not give you a lot of

16    guidance in this area, but that's what the law intends.  The

17    law, as I've said over and over again, commits almost every

18    important decision in the case to you as the jurors, and that

19    includes what you using your own life experience will conclude

20    is a fair award if you do reach the issue of damages.

21         Again, I cautioned you earlier not to make duplicative

22    awards under the federal and state Civil Rights claims.  And if

23    you do return damages against both Officer Roby and Officer

24    Woods, I ask that you apportion them as see fit.  And that's

25    part of the question 7.

```
 1          Now, this is the time, one of the times, a few times
 2     that the law requires me to actually have a sidebar conference
 3     with the attorneys for the purposes simply to make sure I did
 4     not omit something from the instructions or I did not misspeak
 5     at some point relating the instructions to you.  This shouldn't
 6     take more than three or four minutes.  I'll then appoint the
 7     Foreperson and -- what time is lunch coming, Tim?
 8          THE CLERK:  12:45.
 9          THE COURT:  And you'll have lunch so you can continue
10     your deliberations through lunch if you choose.
11          All right, counsel.
12     (The Following Proceedings Were Conducted at Sidebar.)
13          THE COURT:  You'll preserve the punitive damages?
14          MR. O'NEILL:  Yes, just note my objection.  I
15     requested that the punitive damage instructions should have
16     been included.  It wasn't, so I would object to that.
17          THE COURT:  I gave my reasons for that.
18          MR. WHITESELL:  And I don't have any objection other
19     than the one I made while the jury was out earlier.
20          THE COURT:  Okay, that will be on the record.
21          You've all done a really good job.  I'm just guessing
22     that you're younger than Mr. Whitesell?
23          MS. DAVIDSON:  Yes, I am.  Yeah.
24          MR. WHITESELL:  I turned 51 yesterday, your Honor, so
25     I'm getting up there.
```

1          THE COURT:  Congratulations.

2          It's nice to see more younger people in the court.

3   You're pretty young, too?

4          MR. O'NEILL:  35.

5          THE COURT:  Okay.  In my mind that's young.

6          MS. DAVIDSON:  I won't say how young I am.

7          THE COURT:  I know danger when I see it.

8   (End Sidebar.)

9          THE COURT:  All right, apparently there were no major

10  mishaps as far as the lawyers were able to discern.

11         Mr. G, by custom the juror who fights his way to seat

12  No. 1 to serve as foreperson.  If you're willing to assume that

13  duty, I'd like to appoint you.  Do you accept?

14         JUROR NO. 1:  No. (Not audible).

15         THE COURT:  If you're elected, we'll just go to the

16  next juror.  Yes or no?

17         JUROR NO. 1:  No.

18         THE COURT:  No?  Okay.

19         All right, Mr. M., all right, you'll be the

20  foreperson.  I think you have had jury experience before.  Yes,

21  so this will not be unfamiliar to you.

22         All right, as the foreperson, you'll have the same

23  voice and obviously the same vote as other deliberating jurors.

24  You will act as moderator of the discussion and serve as the

25  jury's spokesperson.  Your most important obligation is to

1   ensure that any juror who wishes to be heard on any material
2   issue has a full and fair opportunity to be heard by his or her
3   fellow jurors.  When the jury has reached a verdict, you will
4   fill in the appropriate answers, sign and date the verdict
5   slip, and inform the court officer that the jury is ready to
6   return to the courtroom.
7           If it becomes necessary during the deliberations to
8   communicate with me, you may do so but only by means of a
9   written note signed by the foreperson and then passed through
10  the court officer.  And whatever issue you raise, I'll do my
11  best at that point to answer, but hopefully things will be
12  pretty clear to you.
13          This is the official book, Mr. M.  This has the
14  official verdict slip in the back of the book, the one that
15  you'll fill out and sign.  I'll leave the book for you.
16          The attorneys will take a few minutes to verify that
17  the exhibits are all in order and then Tim will bring those up.
18  Although I think you'll have electronic access.
19          THE CLERK:  They should be up there.  I'll explain it
20  to them.
21          THE COURT:  He'll explain to you how you can
22  electronically access any of the evidence that you want to
23  review for whatever reason.
24          All right, then, Counsel, if you'll stay in touch with
25  the court so if there are any questions or a verdict, we can

1  get you here quickly.

2  All right, the jury may -- thank you.

3  THE CLERK:  All rise.

4  (The Honorable Court and Jury Exited.)

5  THE CLERK:  Can I have you guys state on the record

6  that you're all set with the exhibits?

7  MR. O'NEILL:  I, Josh O'Neill, on behalf of Mr.

8  McCullough, I'm all set.

9  MR. WHITESELL:  The defendants are all set.

10  THE CLERK:  Thank you.

11  (At 11:05 a.m., the Court Stood in Recess.)

12  THE CLERK:  All rise for the jury.

13  (The Jury and Honorable Court Entered.)

14  THE CLERK:  Resuming on the record civil action No.

15  22-10177, _McCullough versus Roby and Woods_.

16  Thank you.  You may be seated.

17  THE COURT:  Mr. Foreman, I understand the jury has

18  reached a unanimous verdict in the case?

19  JURY FOREPERSON:  Yes.

20  THE COURT:  All right.  Hand it to the clerk to be

21  recorded.  Thank you.

22  (The Foreperson Hands Verdict Slip to The Clerk.)

23  THE COURT:  All right, the verdict is in order.  It

24  has been signed and dated appropriately by the Foreperson.  It

25  may be recorded by the clerk.

1          THE CLERK:  Members of the Jury, please stand.

2          Mr. Foreperson, Members of the Jury, harken to your

3    verdict as the Court will record it.  You, upon oath, do say as

4    follows:

5          Question 1, do you find by a preponderance of the

6    evidence that Officer Scott Roby used unreasonable and

7    excessive force in effecting the arrest of John McCullough on

8    April 25, 2020, in violation of federal and state law?

9          Answer 1, no.

10          Question 2, do you find by a preponderance of the

11    evidence that Officer Frank Woods failed to protect John

12    McCullough from being subjected to unreasonable and excessive

13    force during his arrest on April 25, 2020, in violation of

14    state and federal law?

15          Answer 2, no.

16          Question 3, do you find by a preponderance of the

17    evidence that Officer Scott Roby arrested John McCullough

18    without probable cause on April 25, 2020, in violation of

19    federal and state law.

20          Answer 3, no.

21          Question 4, do you find by a preponderance of the

22    evidence that Officer Scott Roby instituted a malicious

23    prosecution of John McCullough without probable cause following

24    his arrest on April 25, 2020, in violation of federal law?

25          Answer 4, yes.

1          Question 5, do you find by a preponderance of the

2     evidence that Officer Scott Roby interfered with John

3     McCullough's protected rights under the First Amendment on

4     April 25, 2020, in violation of federal law?

5          Answer 5, no.

6          Question 6, what sum of money will fairly and

7     reasonably compensate John McCullough for the violation of his

8     Civil Rights?

9          Answer 6, $5,000.

10          Question 7, if damages are awarded in question 6,

11     please indicate the amount the jury awards against.

12          Officer Scott Roby, $5,000.  Officer Frank Woods, zero

13     dollars.

14          So say you, Mr. Foreperson?

15          JURY FOREPERSON:  I do.

16          THE CLERK:  So say you all members of the jury.

17          THE JURY:  (All answer in the affirmative.)

18          THE CLERK:  Thank you, you may be seated.

19          THE COURT:  All right, jurors, this ends your service

20     with the thanks of the Court.  I have no power to tell you to

21     do anything now.  I would, if you don't mind taking a couple of

22     minutes in the jury room, I would like to come up and at least

23     meet all of you personally before you go on your way.  I know

24     you worked very hard on this.  You were very attentive and I

25     know it was appreciated, the work you did as a juror.  So the

1  jurors may now be excused to leave if you wish, but I'll be up

2  in about a minute to see those of you who wish to stay.

3              THE CLERK:  All rise.

4              (The Jury Exited.)

5              THE COURT:  And I'll repeat my thanks to the counsel

6  as everything to look forward to in the case.  And,

7  Mr. McCullough, good luck.  Stop filming.

8              But, I think it turned out just about right, because

9  -- as best as I can tell, but it's the jury that makes the

10  decision.  So welcome any of you back in the future.  Good luck

11  to you, too, Mr. McCullough.

12             MR. O'NEILL:  Thank you, your Honor.

13             MR. WHITESELL:  Thank you, your Honor.

14             MS. DAVIDSON:  Thank you, your Honor.

15             (At 4:02 p.m., Court Adjourned.)

16

17

18

19

20

21

22

23

24

25

I N D E X

                                                Page

1

2

3    Closing Statement on Behalf of Plaintiff    3-8

4    Closing Statement on Behalf of Defendant   3-27

5

6    Closing Instructions for the Jury          3-50

7

8    Verdict                                    3-73

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                       **C E R T I F I C A T E**

2

3

4               **UNITED STATES DISTRICT COURT )**

5               **DISTRICT OF MASSACHUSETTS      )**

6

7

8

9        I, Catherine L. Zelinski, certify that the foregoing is a

10       correct transcript from the record of proceedings taken

11    Wednesday, February 28, 2024, in the above-entitled matter to

12                 the best of, my skill and ability.

13

14

15       /s/ Catherine L. Zelinski            _March 18, 2024_

16       Catherine L. Zelinski, RPR, CRC          Date
         Official Court Reporter
17

18

19

20

21

22

23

24

25