1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                    )
4    McCullough,                    )
                                    )
5            Plaintiff,             )
                                    )    Civil Action
6    v.                             )    No. 1:22-cv-10177
                                    )    Pages 1 to 165
7    Robey et al,                   )
                                    )
8            Defendant.             )
                                    )
9

10

11        BEFORE THE HONORABLE RICHARD G. STEARNS
                UNITED STATES DISTRICT JUDGE
12

13                        JURY TRIAL
                           (Day 2)
14

15
                     February 27, 2024
16                        9:00 a.m.

17

            John J. Moakley United States Courthouse
18                    Courtroom No. 21
                     One Courthouse Way
19              Boston, Massachusetts 02210

20

21

22

                   Jessica M. Leonard, CSR, FCRR
23                    Official Court Reporter
           John J. Moakley United States Courthouse
24                    One Courthouse Way
                 Boston, Massachusetts 02210
25              JessicaMichaelLeonard@gmail.com

1
APPEARANCES:
2
On Behalf of the Plaintiff:
3
     BOSTON DEFENDER LLC
4    By: Joshua O'Neill
     100 Cambridge St
5    14th Floor
     Boston, MA 02114
6    617-356-7784
     Josh@bostondefender.com
7

8    On Behalf of the Defendant:

9    CITY OF BOSTON LAW DEPARTMENT
     By: Edward F. Whitesell, Jr.
10   One City Hall Plaza
     Room 615
11   Boston, MA 02201
     617-635-4045
12   Edward.whitesell@boston.gov

13
     On Behalf of the Defendant:
14
     CITY OF BOSTON LAW DEPARTMENT
15   By: Bridget Davidson
     One City Hall Square
16   Room 615
     Boston, MA 02201
17   617-635-3238
     Bridget.davidson@boston.gov
18

19

20

21

22

23

24
                    Proceedings reported and produced
25                    by computer-aided stenography.

I N D E X

EXAMINATIONS                                          PAGE
  CONTINUED CROSS-EXAMINATION                          4
  BY MR. WHITESELL
  REDIRECT EXAMINATION                                15
  BY MR. O'NEILL
  RECROSS-EXAMINATION                                 18
  BY MR. WHITESELL
            SCOTT ROBEY                        19
  DIRECT EXAMINATION                                  19
  BY MR. WHITESELL
  CROSS-EXAMINATION                                   78
  BY MR. O'NEILL
  REDIRECT EXAMINATION                                87
  BY MR. WHITESELL
            THOMAS BROOKS                      88
  DIRECT EXAMINATION                                  88
  BY MS. DAVIDSON
  CROSS-EXAMINATION                                  111
  BY MR. O'NEILL
            SAEQUAN SPARKS-CLANCY              122
  DIRECT EXAMINATION                                 122
  BY MR. WHITESELL
  CROSS-EXAMINATION                                  131
  BY MR. O'NEILL
            FRANCIS WOODS                      134
  DIRECT EXAMINATION                                 134
  BY MS. DAVIDSON
  CROSS-EXAMINATION                                  157
  BY MR. O'NEILL

1                    P R O C E E D I N G S

2            THE CLERK:  Resuming on the record civil action

3    22-cv-10177 *McCullough v. Robey et al*.

4            THE COURT:  Good morning, Counsel, good morning,

5    Mr. McCullough.  People say they can set their watches by our

6    session so we can try to be on time.  Are we going to go to

7    redirect or do we have a few more questions?

8            MR. WHITESELL:  I have a few more questions.

9            THE CLERK:  Please remember you're still under oath,

10   sir.

11                   CONTINUED CROSS-EXAMINATION

12   BY MR. WHITESELL:

13   Q.   Good morning, Mr. McCullough.

14   A.   Good morning.

15   Q.   At all times at the arrest during Ansel and Blue Hill

16   Ave., you were in a standing position, correct?

17   A.   Yes, that's correct.

18   Q.   You never went to the ground at that intersection,

19   correct?

20   A.   That's correct.

21   Q.   And at all times prior to getting into the car with the

22   officers, you were in a standing position, correct?

23   A.   Correct.

24   Q.   And Officers Woods and Robey escorted you to your vehicle,

25   correct?

1   A.   Yes.

2   Q.   And Officer Robey had his phone in your hand as he

3   escorted you to the cruiser, correct?

4   A.   Yes.

5   Q.   And as he approached the vehicle, you approached the

6   vehicle and they went to put you in the cruiser, you grabbed

7   the phone out of his hands, didn't you?

8   A.   Well, I actually felt the phone as he was holding the

9   handcuffs.  He was holding the handcuffs which were attached to

10  my wrist and he also had the phone in his hand as well, and as

11  he was escorting me to the police cruiser, I felt the phone and

12  I used my fingers to retrieve it back.

13  Q.   And it was at that precise moment that you started yelling

14  for help and that people were trying to kill you as you were

15  getting into the cruiser?

16  A.   Yes, as I was getting into the cruiser, yes, which was not

17  recorded by my phone.

18  Q.   And when you got back to B-3 and Officer Robey took you

19  from the cruiser, you tried to pull away from him, correct?

20  A.   No, I didn't.  He pulled my handcuffs -- well, he pulled

21  the handcuffs that were attached to my wrist as I was trying --

22  Q.   You pulled --

23  A.   Excuse me, let me finish.  As I was trying to get out of

24  the car.

25  Q.   Sorry, I didn't realize you weren't done.

1  A.   He told me to get out of the car, I was motioning out of

2  the car and he pulled my handcuffs.  So that's a no.

3  Q.   So you were screaming and yelling, "He's trying to take my

4  property," correct?

5  A.   Yes, I did.

6  Q.   You were pulling towards Blue Hill Avenue, correct?

7  A.   I wasn't pulling.  He was pulling me.

8  Q.   And when you talk about your property, again, you're

9  talking about your phone, correct?

10 A.   Correct.  Pretty much a cry for help just to bring

11 attention to the unlawfulness that was happening.

12 Q.   The focus of that whole night was on your phone?

13 A.   The focus was trying to make objective record of recording

14 two police officers at a traffic stop.

15 Q.   And there were other officers in the B-3 parking lot when

16 you guys got out of the vehicle, correct?

17 A.   I assume so.

18 Q.   You assume so or you know there were?

19 A.   I assume because a few came shortly after I got out of the

20 car.

21 Q.   And as you entered the booking area, Officer Robey pulled

22 your hood from your jacket over your head, correct?

23 A.   As we were entering B-3 police station, he bent me over

24 and put the hood over my head.  We were still outside when the

25 hood was over my head.

1  Q.   And he yelled "stop spitting" at that time, didn't he?

2  A.   He did yell, "stop spitting."

3  Q.   And when you went to the booking area, you fell limp to

4  the floor, correct?

5  A.   I was released.  There was a continuous grapple -- there

6  was a continuous hold on me from outside of the police station

7  all the way into the police station by multiple police

8  officers.  I was bent over, I was walking unbalanced, and when

9  they let go, I fell.

10 Q.   You fell to the floor on your own accord?

11 A.   Off balance, yeah.  I was bent over and everything when

12 they released their hands from me.

13 Q.   And you admit you were upset and erratic when this was all

14 going on, correct?

15 A.   I don't remember that.

16 Q.   Do you remember having your deposition taken in this case?

17 A.   I do, and you can refresh me if you like.  I'm pretty sure

18 that I would remember saying that.

19      MR. WHITESELL:  This is just for the witness.

20 BY MR. WHITESELL:

21 Q.   Do you see this deposition transcript in front of you?  Do

22 you recall having your deposition taken?

23 A.   Yes.

24 Q.   And you met with your attorney, and we went to my office,

25 and I had some questions and you had some answers.  Do you

1    remember that?

2    A.    I definitely remember that.

3    Q.    At the top of 222, you see where it says -- I asked you if

4    you had spit on any of the officers.  Do you see that?

5         You said, "I could have because I was erratic so as I

6    was speaking, spit could have came out of my mouth."

7         I asked a question:  "When you say you were erratic,

8    what do you mean?"

9         You answered, "I was upset.  I was -- you know, I was

10   being locked up unlawfully.  I was being taken into custody for

11   not doing anything, so, yeah, I was redressing my grievances by

12   screaming and talking loudly, so possibly spit could have come

13   out of my mouth."

14        Do you see that?

15   A.    Correct.

16   Q.    So you were upset and erratic?

17   A.    From the whole ordeal of being arrested unlawfully and the

18   violence that I experienced, absolutely.  Absolutely.

19   Q.    And, again, this was the height of the COVID pandemic,

20   correct?

21   A.    Yes, it was.

22   Q.    But you were wearing a mask outside on the street while

23   you were filming, weren't you?

24   A.    I was.  But I also was handcuffed and lost control of that

25   mask through the ordeal that I went through by Officer Woods

1   and Officer Robey.  So you can understand how a mask can come

2   off while I'm being bent over, got a hood over my head.

3   Q.   You never saw Officer Woods in the booking area, did you?

4   A.   I didn't.

5   Q.   That's because he wasn't there, right?

6   A.   I believe he was not.

7   Q.   You didn't hear his voice during that time?

8   A.   No.

9   Q.   And Officer Robey was in the booking area for some period,

10  correct?

11  A.   Yes.  When he was -- he was one of the officers that had

12  their hands on me when I was on the floor.

13  Q.   So as -- at some point he left the booking area, though?

14  A.   Yes.

15  Q.   And that was the last time you saw him that evening,

16  correct?

17  A.   No.

18  Q.   He didn't book you, did he?

19  A.   No, he didn't.

20  Q.   And he took your phone with him, correct?

21  A.   I'm pretty sure he did, yes.

22  Q.   And we see in the video he threw it on the chair as he was

23  leaving the booking area, do you recall that?

24  A.   Yes.  Possibly already destroyed at that time.

25  Q.   And you didn't get your phone back until you left the

1    station that night, correct?

2    A.    I didn't leave that night.  I didn't leave until 34 to 36

3    hours later.

4    Q.    And that was because you didn't get bail, correct?  You

5    didn't get bailed out?

6    A.    Until 34 to 36 hours later.

7    Q.    But you could have been bailed out earlier, correct?

8    A.    I can't remember.

9    Q.    You were offered to make a phone call during the booking

10   process, correct?

11   A.    Sure, but I didn't remember any numbers because they

12   wouldn't allow me to get my phone, which was kind of mysterious

13   why they wouldn't let me get my phone.

14   Q.    So you were allowed to leave the jail cell once you were

15   able to make a call and get bailed out, correct?

16   A.    I'm sorry, repeat that.

17   Q.    You were allowed to leave B-3 once you made a phone call

18   and got bailed out, correct?

19   A.    Yes, which was on Sunday.

20   Q.    And that, again, you were offered to make a phone call at

21   the booking process, correct?

22   A.    Once again, no, I wasn't.  No.

23   Q.    You understand that --

24   A.    No.  They wanted to make sure that I was booked and

25   processed before I made a call.

1   Q.   Well, you understand that's the last step of the booking

2   process, is to ask you if you want to make a call, correct?

3   A.   Afterwards.  It's not always in that motion.  Most times,

4   they put you in the cell first and then they'll come back to

5   retrieve you for a phone call.

6   Q.   So you testified during your deposition that you believe

7   Officer Robey intentionally broke your phone while it was in

8   property, correct?

9   A.   Of course, yes.

10   Q.   Is that still your belief?

11   A.   Yes.

12   Q.   And you said that he did this to quote/unquote "cover his

13   tracks"?

14   A.   For it to be -- the video to not be seen.

15   Q.   The phone fell to the ground during your arrest, didn't

16   it?

17   A.   Yeah, through the scuffle that was going on that Officer

18   Woods and Officer Robey started.

19   Q.   And you had it underneath you in the car while you were in

20   the back of the cruiser, correct?

21   A.   Under my leg, yes.

22   Q.   And you got your phone back, didn't you?

23   A.   Destroyed, yes.

24   Q.   And the video was still on it, correct?

25   A.   Excuse me?

1   Q.   The video was still on it, wasn't it?

2   A.   Yes; that's because it was captured on an SD card.  They

3   forgot to take the SD card out.

4   Q.   No one deleted the video?

5   A.   He didn't destroy it properly.  He forgot to take the SD

6   card out.

7   Q.   He went through the process of destroying your phone but

8   didn't take the SD card out; is that your testimony?

9   A.   That's my testimony.

10   Q.   And he didn't delete it from your phone?

11   A.   No, because if he was able to get into it, he would have

12   to put a password in.

13   Q.   You need to put password in to take the SD card out?

14   A.   Actually, what happened is when I had the phone in the

15   cruiser, I cut it off myself.  I hit the side button under my

16   leg to ensure that the video would be safe so he couldn't do

17   nothing anyway but take the SD card out but I don't think he

18   was knowledgeable enough to do that.

19   Q.   During your booking, EMTs showed up, correct?

20   A.   I'm sorry?

21   Q.   The EMTs showed up during your booking, correct?

22   A.   They did.

23   Q.   And you denied medical attention, correct?

24   A.   Once again, after everything that I went through, the

25   whole adrenaline rush, by the time -- from my understanding, I

1    asked for EMTs to begin with so they should have came.  I

2    shouldn't have never been asked a second time.  That was my

3    right to receive it.  But they did ask me again and by the time

4    I went through that whole ordeal, all the violence, that pain

5    subsided.

6    Q.   You understand that the EMT eyes were present at the

7    station when you got back, right?

8    A.   I do understand that.

9    Q.   And that the Sergeant Brooks actually called them --

10   A.   I was trying -- I was asked again did I want to see -- did

11   I want the EMTs to come and I told them that I was fine.

12   Q.   So you asked Sergeant Brooks for the EMTs?

13   A.   I was asked.  Yes.

14   Q.   And he called them.  He called them and had them go to the

15   station?

16   A.   They arrived, and I didn't want to waste resources but I

17   already told them I was fine, but they came and -- they

18   arrived.

19   Q.   And when you asked Sergeant Brooks for medical attention,

20   you had already been through the scuffle and resisting arrest,

21   at the scene of the arrest, correct?

22   A.   Resisting an unlawful arrest, yes.

23   Q.   You testified very briefly about the injuries you

24   allegedly suffered as a result of this incident, correct?

25   A.   Yes.

1  Q.  But you've never seen a doctor for any physical injury?

2  A.  No, I didn't.

3  Q.  And you've never been treated for any emotional distress

4  or anything like that?

5  A.  No.

6  Q.  And despite any injuries or emotional distress you

7  suffered, you went right back out and engaged with police

8  officers the following week, correct?

9  A.  Yes.

10  Q.  Mr. McCullough, you've used aliases previously, correct?

11       MR. O'NEILL:  Objection, Judge.  Relevance.

12       THE COURT:  Sustained.

13  BY MR. WHITESELL:

14  Q.  On the night in question, Officer Robey never asked you to

15  turn off your camera, did he?

16  A.  No.

17  Q.  And Officer Woods never told you to turn off your camera,

18  did he?

19  A.  No.

20  Q.  And you freely admit that you were in the street in Blue

21  Hill Ave. that night, correct?

22  A.  I was in the street talking to the driver.

23  Q.  In the right-hand travel lane, correct?

24  A.  Not impeding traffic, correct.

25  Q.  And you freely admit that you resisted arrest when they

1   tried to arrest you, correct?

2   A.    I resisted an unlawful arrest, yes.

3   Q.    You resisted that arrest, correct?

4   A.    I resisted an unlawful arrest.

5   Q.    You ended up putting an edited video on your resistance

6   page, didn't you?

7   A.    No, I didn't.

8   Q.    You didn't put this video on The Resistance page?

9   A.    You said an "edited version."  I put it up there just how

10  I recorded it.

11  Q.    You put the raw version up there?

12  A.    Yes.

13  Q.    And you didn't put a version up with commentary on it?

14  A.    I put another version other than that original video, yes.

15  Q.    So you put two versions up, the raw video?

16  A.    I put a couple live versions up.  I had some live versions

17  to that video that I did on YouTube.

18  Q.    Do you know how many hits those videos got?

19  A.    Couldn't tell you.

20          MR. WHITESELL:  No further questions.

21          MR. O'NEILL:  Briefly Judge.

22                          REDIRECT EXAMINATION

23  BY MR. O'NEILL:

24  Q.   Mr. McCullough, you saw and spoke with Mr. Whitesell about

25  a YouTube video yesterday that was admitted as Exhibit 7,

1   correct?

2   A.   Yes.

3   Q.   And can you tell us what -- if you remember -- the title

4   of that video was?

5   A.   "Cops Take a Stroll Once the Cameras Roll."

6   Q.   Can you talk to us a little bit about what was going on in

7   that video generally and briefly?

8   A.   Sure.  I happened to see a Boston police cruiser driving

9   erratically in the street.  I was on the scooter and I just

10  happened to follow him, and maybe a little less than a mile,

11  they led me to a location where a young lady was who was pulled

12  from her vehicle.  She was stopped and pulled from her vehicle

13  and walked all the way around the corner with her vehicle alone

14  and an officer searching it.

15          I didn't know that at the time, but when I arrived, I

16  started recording and I asked her what happened.  She said she

17  didn't know what she did, she was just coming from a friend's

18  house and all of a sudden a whole bunch of cops pulled her

19  over.  The officer in question was Detective Picard -- started

20  searching her pocketbook, and all this was around the corner

21  from where her vehicle was.

22          They were searching her pocketbook and they had her

23  detained, and I was just explaining to her that if she didn't

24  do anything wrong, if there wasn't any probable cause for her

25  to be pulled over, that she could sue the police officers.  I

1 was explaining to her what the process was, and they eventually

2 let her go without question.

3 Q. Do you recall in the video, you pointing at a few officers

4 on the scene and calling them John Doe One, John Doe Two, John

5 Doe Three?

6 A. Correct.

7 Q. Why did you do that?

8 A. Well, that's just in case if she didn't get the

9 information -- basically their name and badges -- which was

10 eventually received in the video. But at the time, if she

11 didn't, or if she and I got separated where I couldn't give her

12 the information, she can list those officers on the lawsuit as

13 John Doe One, John Doe Two, John Doe Three until she's able to

14 identify them.

15 Q. Do you recall speaking with Officer Harris in that video?

16 A. Yes.

17 Q. Do you recall calling him a piece of shit a number of

18 times?

19 A. I do.

20 Q. Why did you do that?

21 A. Just reminding him of our first incident when, two years

22 prior with Officer Robey, just how -- telling him he was a

23 piece of shit by the intimidation tactics that he practiced on

24 me along with Officer Robey two years prior.

25 Q. So Exhibit 7, that video was recorded two years after the

1   video of the first encounter between you and Officer Robey and

2   Officer Harris?

3   A.   Yes, it was.

4        MR. O'NEILL:  No further questions, Your Honor.

5        THE COURT:  Anything further?

6                    RECROSS-EXAMINATION

7   BY MR. WHITESELL:

8   Q.   Just one question:  The woman in the video, she was

9   already pulled over when you arrived at the scene, correct?

10  A.   Yes, the car was already pulled over.  She was separated

11  from her vehicle.

12  Q.   So you had no idea why she was pulled over?

13  A.   She told me she didn't know.

14  Q.   She told you she didn't know?

15  A.   Yes.

16  Q.   But you don't know as you sit here today why the cops

17  pulled her over, do you?

18  A.   Well, I believe what she said.

19       MR. WHITESELL:  No further questions.

20       THE COURT:  Thank you, Mr. McCullough.  That concludes

21  your testimony.

22       MR. O'NEILL:  Nothing further for the plaintiff,

23  Judge.  The plaintiff rests.

24       THE COURT:  The plaintiff rests in this case.  Let's

25  all preserve your rights and I suggest we take this up after we

1    finish the evidence in the case.

2              MR. WHITESELL:  Understood, Your Honor.

3              THE COURT:  We'll now to the turn to the defense.

4              MR. O'NEILL:  Your Honor, the defense calls officer

5    Scott Robey to the stand.

6              (The witness was sworn.)

7              THE CLERK:  Could you please introduce yourself to the

8    jury, spelling your last name for the record.

9              THE WITNESS:  The name is Scott Robey, last name

10   spelled R-O-B-E-Y.

11                        SCOTT ROBEY,

12   having been duly sworn by the Clerk, was questioned and

13   testified as follows:

14                     DIRECT EXAMINATION

15   BY MR. WHITESELL:

16   Q.   Good morning, Officer Robey.

17   A.   Good morning.

18   Q.   Officer Robey, how old are you?

19   A.   I am 54.

20   Q.   What do you do for a living?

21   A.   I'm a Boston police officer.

22   Q.   Where are you employed?

23   A.   District E-5 in West Roxbury.

24   Q.   That's the Boston Police Department?

25   A.   Yes.

```
 1   Q.   How long have you been a police officer?

 2   A.   Just about 29 years.

 3   Q.   Are you from Boston?

 4   A.   Yes.

 5   Q.   Did you grow up here?

 6   A.   Yes.

 7   Q.   Did you graduate from high school?

 8   A.   Yes.

 9   Q.   Do you have a college degree?

10   A.   Yes.

11   Q.   What's that degree in?

12   A.   Criminal Justice.

13   Q.   Is that a bachelor's or an associate's?

14   A.   Associate's.

15   Q.   Where did you get that degree from?

16   A.   Curry College.

17   Q.   And when did you get that degree?

18   A.   2001/2002.

19   Q.   Did you get that while you were on the job?

20   A.   Yes.

21   Q.   Were you ever in the military?

22   A.   Yes.

23   Q.   What branch?

24   A.   United States Navy.

25   Q.   And when did you join the Navy?
```

```
 1   A.    I joined the Navy in 1989.

 2   Q.    Is that straight out of high school?

 3   A.    Yes.

 4   Q.    What did you do in the Navy?

 5   A.    I was an aviation fighter pilot.

 6   Q.    When did you leave the Navy?

 7   A.    I left the Navy in '91.

 8   Q.    Do you have any children?

 9   A.    Yes.

10   Q.    Do you have any law enforcement experience between the

11   Navy and joining BPD?

12   A.    Yes.

13   Q.    And what did you do?

14   A.    I worked at Boston City Hospital, hospital police.

15   Q.    And what did you do when you worked at the Boston City

16   Hospital?

17   A.    I worked Long Island and I worked Boston City Hospital in

18   the psych ward.

19   Q.    And was that a police job?

20   A.    Yes.

21   Q.    And how long did you work for Boston City Hospital?

22   A.    I worked there, I believe, just about a year and a half to

23   two years.

24   Q.    At some point, did you go to the academy for BPD?

25   A.    Yes.
```

```
 1    Q.    Do you know what year you joined the academy?

 2    A.    '95.

 3    Q.    Do you have to take an exam before you join the academy?

 4    A.    Yes.

 5    Q.    What kind of exam is that?

 6    A.    The state Civil Service Exam.

 7    Q.    Did your training at the academy include defensive

 8    tactics?

 9    A.    Yes.

10    Q.    And does that include BPD's rules on the use of force?

11    A.    Yes.

12    Q.    When did you graduate from the police academy?

13    A.    December, '95.

14    Q.    And after you graduated, did you start as a police officer

15    right away?

16    A.    Yes.

17    Q.    What was your rank?

18    A.    Patrolman.

19    Q.    And has that always been your rank?

20    A.    Yes.

21    Q.    And where were you first stationed?

22    A.    I was first stationed in D-4 in the South End.

23    Q.    And have you ever been in any specialized units?

24    A.    Yes.

25    Q.    What unit?
```

1   A.   I was in the gang unit a couple of times.

2   Q.   And when did you transfer to B-3?

3   A.   I transferred to B-3 -- 2006 maybe, 2007.

4   Q.   Where is B-3 located?

5   A.   It's located at 1165 Blue Hill Ave.

6   q.   And how long were you at B-3?

7   A.   Just about seven to eight years.

8   Q.   Did you go to B-3, leave, and come back at some point?

9   A.   No.

10  Q.   Were you assigned to B-3 at the time of the incident in

11  this case?

12  A.   Yes.

13  Q.   Where are you stationed now?

14  A.   District E-5 in West Roxbury.

15  Q.   But at the night of the arrest, you were in B-3?

16  A.   Yes.

17  Q.   Prior to the events of this evening that we've been

18  discussing here, did you know John McCullough?

19  A.   Yes.

20  Q.   And what did you know about him?

21  A.   Just that he videotaped around the station.

22  Q.   Were you familiar with his website?

23  A.   Yes.

24  Q.   Do you know what it was called?

25  A.   The Resistance.

1  Q.   And had you ever viewed it?

2  A.   Yes, on other officers' phones.

3  Q.   And did he show you a video from that website?

4  A.   Yes.

5  Q.   Do you recall what video that was?

6  A.   I believe it was the video from Dudley Station.

7  Q.   And is that the parking lot encounter that we've seen?

8  A.   Yes.

9  Q.   You've been in the courtroom during Mr. McCullough's

10 testimony, correct?

11 A.   Yes.

12 Q.   And so you had an encounter with him prior to the arrest

13 at Ansel Street, correct?

14 A.   Yes.

15 Q.   And what were the circumstances of that encounter?

16 A.   The first time, I believe, was right on Shawmut Ave. when

17 I pulled up next to the parking lot across from the post

18 office.

19 Q.   And what happened?

20 A.   We were basically assigned to assist another unit that was

21 off there.

22 Q.   And you saw Mr. McCullough there?

23 A.   Yes.

24 Q.   What did he do?

25 A.   He walked up to the car telling us to get out of the

1    street and swearing at us and recording us around the whole

2    car.

3    Q.    Did you arrest him at that time?

4    A.    No.

5    Q.    Did you ever tell him to stop recording?

6    A.    No.

7    Q.    Do you know Mr. McCullough's address?

8    A.    Yes.

9    Q.    Why?

10    A.    I believe we ran him that day when we were there at the

11    parking lot.

12    Q.    And this was outside the B-3 station?

13    A.    No, this was outside of the Shawmut Ave. address.

14    Q.    That's over in Nubian Square?

15    A.    Yes.

16    Q.    And when you say "ran him," what do you mean?

17    A.    We ran him on the computer.

18    Q.    Is that what is referred to commonly as running his BOP?

19    A.    Yes.

20    Q.    Do you ever do an FIO for him?

21    A.    Yes.

22    Q.    Can you explain what an FIO is?

23    A.    A Failed Investigative Observation report.

24    Q.    Were there any other occasions that you had encountered

25    Mr. McCullough prior to the night you arrested him at Ansel

1    Street?

2    A.    Yes.

3    Q.    Can you explain the next occasion you encountered him?

4    A.    I believe it was a couple of times.  Once outside of

5    District B-3 he was in the rear parking lot recording in the

6    parking lot the police officers' plates.

7    Q.    And did you have any interaction with him at that time?

8    A.    I do not.  Another officer did.  I was present.

9    Q.    So you saw Mr. McCullough?

10   A.    Yes.

11   Q.    Do you know whether Mr. McCullough saw you?

12   A.    Yes, I believe he did.  He looked right at me.

13   Q.    Did you say anything to him?

14   A.    No.

15   Q.    Did you tell him to stop recording?

16   A.    No.  Another officer was talking to him.

17   Q.    And do you know whether he was arrested that night?

18   A.    No, he was not.

19   Q.    And was there any other occasions?

20   A.    Yes, there was another occasion I was on overtime in

21   Jamaica Plain and I was blocking the road because there was a

22   tree down and some wires down on the sidewalk further up the

23   road, and he pulled up and I told him that he couldn't go up

24   there because there was wires down.  He was a good distance

25   away from me and he just looked at me and then I called out his

1  name so he knew who I was and to get his attention and he

2  turned and went the other way.

3  Q.   Mr. McCullough didn't record you that time, did he?

4  A.   No.

5  Q.   And are there any other occasions other than the parking

6  lot incident that you encountered Mr. McCullough prior to the

7  Ansel arrest?

8  A.   Not that I recall.

9  Q.   And you saw the video that was played of that parking lot

10  encounter, correct?

11  A.   Yes.

12  Q.   I want to show you what's been marked as Exhibit 2

13  starting at the 14:15 mark.

14       MR. WHITESELL:  This is in evidence.  We're not on the

15  screen yet.  Is that your end or our end?

16       THE CLERK:  Are you at HDMI one?

17       (The video was played.)

18  BY MR. WHITESELL:

19  Q.   You were here yesterday when Mr. McCullough talked about

20  an incident about 20, 30 minutes earlier near the Bolling

21  Building, correct?

22  A.   Yes.

23  Q.   Can you explain to the jury what happened during that

24  encounter?

25  A.   It wasn't really an encounter.  We were stopped over there

1    doing a Code 19 and then they called us to go into the Bolling

2    Building to escort somebody out.

3    Q.    Do you know who occupies the Bolling Building?

4    A.    The Boston School Department.

5    Q.    And what's a Code 19?

6    A.    It's a walk-and-talk around Dudley Square.

7    Q.    So your assignment that day was to be present in what's

8    now Nubian Square?

9    A.    Yes.

10   Q.    And you were in a cruiser that day?

11   A.    Yes.

12   Q.    And you were with a partner?

13   A.    Yes.

14   Q.    You see the vehicle on the screen.  Is that your vehicle?

15   A.    Yes.

16   Q.    The vehicle you were assigned that day?

17   A.    Yes.

18   Q.    And do you recall this incident?

19   A.    Yes.

20   Q.    And did you have a partner that day?

21   A.    Yes.

22   Q.    And what was his name?

23   A.    Sean Harris.

24   Q.    Was Sean Harris a regular partner at that time?

25   A.    No.

1                MR. WHITESELL:  Go ahead and play the video.

2                (The video was played.)

3    BY MR. WHITESELL:

4    Q.    Is that Sean Harris?

5    A.    Yes.

6    Q.    And we hear you telling him he cannot be in the street.

7    Is that disorderly conduct?

8    A.    Yes.

9    Q.    Is Mr. McCullough allowed to film his interactions with

10   the police?

11   A.    Yes.

12   Q.    Did you arrest Mr. McCullough during this encounter?

13   A.    No, I did not.

14   Q.    Does Mr. McCullough's presence at the scene impact your

15   ability to do police work?

16   A.    At some points, yes.

17   Q.    How so?

18   A.    He becomes confrontational and getting up in officers'

19   face while they're trying to pay attention to what's going on

20   around them.

21   Q.    Is that a threat to officer safety?

22   A.    Yes.

23   Q.    I want to talk to you about the evening of the arrest at

24   Ansel Street.  The night of the events in that case, what shift

25   were you working?

1   A.   I was working last half.

2   Q.   When you say "last half," what do you mean?

3   A.   It's usually 11:45 p.m. till 7:30 a.m., but because of the

4   change in shift, because of the pandemic --

5   Q.   How were the shifts changed because of the pandemic?

6   A.   They staggered officers' times of arrival to come in

7   somewhere at midnight.  Some were at 12:45.

8   Q.   Is that to not have a lot of people in the same place at

9   the same time?

10   A.   Yes.

11   Q.   Were there any other adjustments to the normal BPD routine

12   going on during this time period?

13   A.   Yes.  We were pretty much told to stay outside, outside

14   the station, and we would conduct our roll calls outside in the

15   parking lot.

16   Q.   Was there a curfew in place?

17   A.   Yes, there was.

18   Q.   And what time was it?

19   A.   9:00 p.m.

20   Q.   Have you ever arrested someone for being outside curfew?

21   A.   No.

22   Q.   Were you working out of B-3 that night?

23   A.   Yes.

24   Q.   And what was your assignment?

25   A.   I was a service -- I believe I was Charlie 425.

1    Q.    And Charlie is a word for "C"?

2    A.    Yes.

3    Q.    What's a service car?

4    A.    It's a basic call-to-service vehicle that you handle radio

5    calls for calls to service and, like, traffic, parking issues,

6    and you get paired up with another service car to go to rapid

7    response calls when there's no rapids available.

8    Q.    Is a traffic stop a rapid response?

9    A.    No.

10    Q.    And when you say "rapid," what are you referring to?

11    A.    A two-man car.

12    Q.    So you were in a one-man car that night?

13    A.    Yes.

14    Q.    You didn't have a partner?

15    A.    No.

16    Q.    At that time at B-3, was that a regular assignment for

17    you?

18    A.    Pretty much, yes.

19    Q.    And what were you wearing that evening?

20    A.    I believe I was wearing my department rain jacket as well

21    as my vest and a full duty uniform.

22    Q.    Including the belt?

23    A.    Yes.

24    Q.    And what things did you have on your belt?

25    A.    I had on my OC spray, I believe my handgun, my radio, my

1   handcuffs, my -- I believe my flashlight.

2   Q.   Can you explain to the jury what OC spray is?

3   A.   It's like a pepper spray mist that comes out of a canister

4   that we -- issued in the Boston Police Academy.

5   Q.   And that's given to you by BPD, correct?

6   A.   Yes.

7   Q.   Is it commonly referred to as pepper spray?

8   A.   Yes.

9   Q.   Is it what's known as an incapacitating agent?

10  A.   Yes.

11  Q.   Did you receive training on the use of OC spray at the

12  academy?

13  A.   Yes.

14  Q.   When are you allowed to use it?

15  A.   During active resistance or assaults on police officers as

16  well as to protect civilians and other people in the area when

17  there's protests and multiple assailants.

18  Q.   Have you ever been sprayed with pepper spray

19  intentionally?

20  A.   Yes.

21  Q.   When was that?

22  A.   At the Boston Police Academy and several times afterwards.

23  Q.   How does pepper spray impact you?

24  A.   Sometimes it causes redness on my face and around my eyes

25  but usually I don't have too much of an impact from it.

1  Q.   And getting sprayed at the academy, that was part of your

2  training?

3  A.   Yes.

4  Q.   Officer Robey, shortly after coming on duty that night,

5  did you make a traffic stop?

6  A.   Yes, I did.

7  Q.   Had you had any calls or arrests prior to that stop on

8  this shift?

9  A.   No.

10 Q.   Where did this traffic stop occur?

11 A.   It started at Blue Hill Ave. and Woodrow.

12 Q.   When you say "started," can you describe what happened

13 that caused you to effectuate a stop?

14 A.   I was in the center lane on Blue Hill Ave. heading inbound

15 towards the city when the vehicle on -- to the right of me had

16 its turn signal on to turn right on Woodrow.  And as the light

17 turned green they took a left and cut in front of me.

18 Q.   What did you do next?

19 A.   I activated my lights and siren and pulled them over like

20 a block up at Blue and Ansel.

21 Q.   And can you describe the position of the car you pulled

22 over when it came to a stop?

23 A.   It stopped in the right travel lane.

24 Q.   Was it partially in the bike lane?

25 A.   Yes.

1  Q.    And how did you position your vehicle?

2  A.    I positioned my vehicle with an index to the left to have

3  some cover from -- in case any encounters of hostile people.

4  Q.    Why exactly do you position your car out from the vehicle

5  that you stopped?

6  A.    It's basically to put the engine block in front of you so

7  you have some cover in case something happens during the

8  traffic stop as well as prevent cars from striking you when

9  you're up at the window of a traffic stop.

10  Q.    And is positioning your vehicle that way sometimes trained

11  at the academy?

12  A.    Yes, sometimes.

13  Q.    Is it a standard police practice for traffic stops?

14  A.    With some officers, yes.

15  Q.    Were there other vehicles on the road at that time?

16  A.    Yes, there was.

17  Q.    And could traffic still pass in the left-hand lane?

18  A.    Yes.

19  Q.    Did your lights remain on at this time?

20  A.    Yes, they were.

21  Q.    And at some point, did Officer Woods arrive to assist you

22  in the arrest?

23  A.    Yes, he did.

24  Q.    In the stop, I mean, I'm sorry.

25  A.    Yes.

1   Q.   And what did he do?  Did you see?

2   A.   I was at the window talking to the occupants and giving

3   them a copy of a warning citation that I had issued, and their

4   license and registration back, and I believe he came up on the

5   passenger's side on the sidewalk towards the rear of the

6   vehicle I had pulled over.

7   Q.   And did you notice Mr. McCullough right away?

8   A.   No, I did not.

9   Q.   Why not?

10  A.   I had my takedown lights on so they kind of shine when I

11  looked back, and I seen Officer Woods, I seen the other person

12  coming up behind him, but I assumed it was his partner because

13  he was a two-man car.

14  Q.   But he didn't have a partner at this point in time?

15  A.   No, he did not.

16  Q.   Do you know why that was?

17  A.   I didn't know at the time, but I know because of the

18  pandemic, the staggered shift.

19  Q.   So his partner on that shift had already gone off duty?

20  A.   Yes.

21  Q.   You say you had your Takedown lights on.  Can you explain

22  that, what a Takedown light is to the jury?

23  A.   They're bright white lights in the front of the cruiser

24  that face the vehicle to illuminate the inside of the vehicle

25  during traffic stops at night.

1  Q.   And when you're at the window of the vehicle you stop,

2  those lights are shining on you as well, correct?

3  A.   Yes.

4  Q.   Does that make it difficult to see in that direction?

5  A.   Yes.

6  Q.   Is that the purpose of the lights?

7  A.   Yes.

8  Q.   When you first noted the man that you initially thought

9  was Woods' partner, where was he located?

10 A.   Walking behind Officer Woods.

11 Q.   On the sidewalk?

12 A.   Yes.

13 Q.   Was there any other reason you had difficulty recognizing

14 Mr. McCullough that night?

15 A.   Yes.  I wasn't too fixed on him; I was more fixed on the

16 occupants of the vehicle.  That was, I believe, three occupants

17 inside -- three or four inside the vehicle.

18 Q.   Did you notice the individual who you initially thought

19 was Woods' partner wearing anything?

20 A.   Yes.  When he moved up to the front of the vehicle and

21 tried to get the occupants' attention.

22 Q.   And what did you see that he was wearing?

23 A.   I believe a gray jacket and he had some kind of black

24 rectangular device in his hand.

25 Q.   And was he wearing a mask?

1   A.   Yes.

2   Q.   When you first noticed Mr. McCullough holding the device,

3   did you think he was recording?

4   A.   At that time, yes.

5   Q.   Were you wearing a body-worn camera that night?

6   A.   Yes, I was.

7   Q.   At some point, did you turn it on?

8   A.   Yes.

9   Q.   What made you turn it on?

10  A.   Because I was conducting a traffic stop, and I assumed I

11  already had turned it on when I took their license and

12  registration, but you have to double click it.  The old

13  cameras, you had to double click them for them to activate, and

14  I didn't activate it right away.

15  Q.   So is it standard procedure to turn on your body camera

16  when you approach a traffic stop?

17  A.   Yes.

18  Q.   And, in this instance, you thought you had done that to

19  get the license and registration?

20  A.   Yes.

21  Q.   When you approached the car the second time, you realized

22  you didn't have it on?

23  A.   Yes.

24  Q.   Did you turn it on at that time?

25  A.   Actually, when I was in the vehicle, when I looked down

1   when I was writing the citation, I noticed that the light was

2   green and not red for recording, and that's when I hit it to

3   turn it on.

4   Q.   Can you explain what the green and red light indicates to

5   you as an officer?

6   A.   Green means it's ready to record, and red means it's

7   recording.

8   Q.   What does "ready to record" mean?

9   A.   Ready is just that it's on standby.

10   Q.   Have you reviewed the footage from the body-worn camera

11   that night since the incident?

12   A.   Yes.

13   Q.   I'm going to play for you --

14        MR. WHITESELL:  It's in evidence now, right?

15        MR. O'NEILL:  Yes.

16        MR. WHITESELL:  Your Honor, I'd like to play and

17   publish to the jury Exhibit 6, which is his body-worn camera

18   video.

19        THE COURT:  Exhibit 6, all right.

20        MR. WHITESELL:  Thank you, Your Honor.

21        (The video was played.)

22   BY MR. WHITESELL:

23   Q.   Now, while this is playing, Officer Robey, you can hear

24   there's no sound on this video, correct?

25   A.   Yes.

1  Q.    And is it your understanding that the first 30 seconds of

2  video for body-worn cameras doesn't have any sound?

3  A.    Yes.

4  Q.    Why is that?

5  A.    It's recording, but it doesn't -- it doesn't activate the

6  sound for some reason until after 30 seconds.

7  Q.    So you just saw your finger go up in front of the camera,

8  correct?

9  A.    Yes.

10 Q.    And you heard a beeping noise?

11 A.    Yes.

12 Q.    And the sound came on, correct?

13 A.    Yes.

14 Q.    Is that the point in time when you actually activated your

15 body camera?

16 A.    Yes.

17 Q.    And is it your understanding that 30 seconds of prior

18 footage is captured when you press the button?

19 A.    Yes.

20 Q.    So the body camera is capturing things that happened

21 before you decided to push the button, correct?

22 A.    Yes.

23          MR. WHITESELL:  Go ahead and play it.

24          (The video was played.)

25 BY MR. WHITESELL:

1  Q.   We see a police car go by in the left-hand lane, correct?

2  A.   Yes.

3  Q.   And you're standing in the right-hand lane at this time

4  speaking with the passengers of the vehicle, correct?

5  A.   Yes.

6  Q.   About how far away from you was that police vehicle when

7  it passed by?

8  A.   Probably about, like, five feet.

9  Q.   Did you see that vehicle when it came by?

10  A.   Yes.

11  Q.   And had its lights and sirens on?

12  A.   Had its lights on, yes.

13  Q.   Sorry, just the lights?

14  A.   Yes.

15        MR. WHITESELL:  Go ahead and play.

16        (The video was played.)

17  BY MR. WHITESELL:

18  Q.   Is that John McCullough?

19  A.   Yes.

20  Q.   Did you know that at the time?

21  A.   Not until this point.

22  Q.   So, at this point, you didn't realize that was him?

23  A.   No.

24  Q.   Where was your focus when this was happening?

25  A.   On the backseat passenger.

1  Q.   And why the backseat passenger?

2  A.   Because they -- I had them switch up because the operator

3  only had a learner's permit and just was getting her -- she

4  just signed off to get her license for the exam, and the person

5  who had a license that is supposed to be beside her was in the

6  back seat.

7  Q.   So you asked them to switch seats in the vehicle?

8  A.   Yes, so the person with the driver's license would be in

9  the front seat with the person with the learner's permit.

10  Q.   And did that occur?

11  A.   Yes.

12  Q.   And while that was happening, was Officer Woods on the

13  sidewalk on the passenger's side?

14  A.   Yes.

15  Q.   And you see John McCullough holding something in this

16  picture.  Is that the cage device that you've described?

17  A.   Yes.

18  Q.   And that was holding his phone?

19  A.   Yes.

20  Q.   You see him in the video, he gestures to that device.  Did

21  you notice that when you were at the scene?

22  A.   I did not.

23          MR. WHITESELL:  Play to 4:02.

24          (The video was played.)

25  BY MR. WHITESELL:

1  Q.   Just there you saw a truck go by, right?

2  A.   Yes.

3  Q.   How far would you estimate -- you're in the right-hand

4  lane still talking to them in the window?

5  A.   Yes.

6  Q.   How far would you estimate that truck was to you when you

7  went by?

8  A.   It was probably the same, probably about five feet away.

9         (The video was played.)

10  BY MR. WHITESELL:

11  Q.   So what was happening here with respect to the traffic

12  stop?

13  A.   I was explaining to them what the citation was for and

14  that it was a warning.  There was no civil violation.

15  Q.   So you elected to give them a warning rather than cite

16  them?

17  A.   Yes.

18  Q.   Does that still come with a piece of paper?

19  A.   Yes.

20  Q.   But does that go on their license?

21  A.   No, it does not.

22         MR. WHITESELL:  Go ahead.

23         (The video was played.)

24  BY MR. WHITESELL:

25  Q.   You saw an individual walking back parallel to you on the

1   sidewalk, correct?

2   A.    Yes.

3   Q.    And who was that?

4   A.    Officer Woods.

5   Q.    And you can see another vehicle behind your car at this

6   point in time.  Do you know whose vehicle that is?

7   A.    Officer Woods'.

8   Q.    And he has his lights on at this time?

9   A.    Yes.

10          MR. WHITESELL:  Go ahead.

11          (The video was played.)

12   BY MR. WHITESELL:

13   Q.    We see you make a gesture on the right-hand side of the

14   steering column.  What are you doing there?

15   A.    Putting the car in drive.

16   Q.    And you've completely closed the door at this point,

17   correct?

18   A.    Yes.

19   Q.    Did you turn your emergency lights off?

20   A.    Yes.

21   Q.    What was your intention at this point in time?

22   A.    To drive off behind the vehicle that I had pulled over.

23          (The video was played.)

24   BY MR. WHITESELL:

25   Q.    Can you describe what you observed when you stepped out of

1   the vehicle?

2   A.   I observed John McCullough in the travel lane directly in

3   front of me.

4   Q.   Directly in front of your vehicle?

5   A.   Yes.

6   Q.   Why did you want Mr. McCullough to step out of the street?

7   A.   Basically so the vehicle could pull off and we could pull

8   off as well.

9   Q.   When you're talking about "the vehicle,"  you're talking

10   about the stopped vehicle?

11   A.   Yes.

12   Q.   Did any other -- did you see any other vehicles come by

13   when Mr. McCullough was in the street?

14   A.   Yes.

15   Q.   Was the vehicle you had stopped free to leave at this

16   time?

17   A.   I didn't believe they were going to pull off with him in

18   the street.

19   Q.   And Mr. McCullough is in the lane that they have driven

20   off in, correct?

21   A.   Yes.

22   Q.   And Mr. McCullough was standing in the lane where your car

23   was as well?

24   A.   Yes.

25   Q.   And you had already put your car in gear when you decided

1   you were going to get out of the vehicle, correct?

2   A.   Yes.

3   Q.   So what did you do?

4   A.   I put it back into park and exited my vehicle to let him

5   know to get out of the street.

6   Q.   Is there anything you need to do to put your car in gear?

7   A.   Yes.  You have to press the button in the vehicle to

8   activate it.

9   Q.   Is that a safety measure?

10   A.   Yes.

11   Q.   And did you press that button when you put it in gear?

12   A.   Yes.  You hear the beep in the video.

13   Q.   That's what the beep is?

14   A.   Yes.

15   Q.   Did you have probable cause to arrest Mr. McCullough at

16   this time?

17   A.   Yes.

18   Q.   Is it illegal to be in the travel lane of a street?

19   A.   Yes, obstructing traffic.  Yes, it is.

20   Q.   And what's the charge?

21   A.   Disorderly conduct.

22   Q.   Why didn't you arrest him at this time?

23   A.   I just wanted him to go back on the sidewalk.  He could

24   have conducted his interview from the sidewalk if he wanted to

25   speak to them.  I just wanted him out of the street so I didn't

1   get hit and he didn't get hit and nobody else was in danger.

2   Q.    Did Mr. McCullough comply with your commands?

3   A.    He didn't at first.

4   Q.    Eventually did he?

5   A.    Yes.

6   Q.    And he stepped back up on the sidewalk?

7   A.    Yes.

8   Q.    And what did you decide to do once he was back up on the

9   sidewalk?

10  A.    I spoke to the driver, they said thank you and the person

11  in the backseat said, "Are we all set?"  And I said, "Yes, you

12  can go."

13  Q.    Sorry, I didn't hear that last part?

14  A.    I said, "Yes, you can go."

15  Q.    And did they drive off at that time?

16  A.    Yes.

17  Q.    And that's because Mr. McCullough was on the sidewalk?

18  A.    Yes.

19  Q.    After you let the vehicle go, what did you intend to do

20  next?

21  A.    I actually was going to proceed up Blue Hill Ave. There

22  was a call where the other vehicle had went by with the lights

23  on for a motor vehicle accident and you can also see the fire

24  was responding as well.

25  Q.    You saw that on your computer?

1  A.  No, I heard it on the radio.

2  Q.  Heard it over the radio.  When during this arrest did you

3  hear it over the radio?

4  A.  This was during the traffic stop.

5  Q.  So your intent, after Mr. McCullough got back onto the

6  sidewalk, your intent was to go to another call?

7  A.  Yes.

8  Q.  You hear Mr. McCullough say, "Name and badge, name and

9  badge."

10  A.  Yes.

11  Q.  Why didn't you give him your name and badge?

12  A.  I have given him my name and badge number several times

13  and it's on his videos, past videos that he's recorded.

14  Q.  And we saw one where he actually read your badge number

15  off to the camera, correct?

16  A.  Yes.

17  Q.  But your testimony is you've given him your name

18  previously?

19  A.  Yes.

20          (The video was played.)

21  BY MR. WHITESELL:

22  Q.  So what happens here as you return to your car?

23  A.  John McCullough continues up in the street beside me and

24  approaches towards the front of my vehicle.

25  Q.  Does he step back into the street?

1  A.   He was in the street, yes.

2  Q.   So we see you walking towards your vehicle and abruptly

3  turn and walk towards Mr. McCullough.  What happened that

4  caused you to do that?

5  A.   Because he continued to walk towards me, towards the front

6  of my vehicle.

7  Q.   And what was your concern with that?

8  A.   Again, I wouldn't be able to leave and he would be in the

9  street again.

10 Q.   At this point, did you decide to arrest him?

11 A.   Yes.

12 Q.   And why did you decide to arrest him at this point?

13 A.   Because he wasn't following any verbal commands for him to

14 stay on the sidewalk.

15 Q.   And what did you intend to charge him with at this stage?

16 A.   Disorderly conduct.

17        (The video was played.)

18 BY MR. WHITESELL:

19 Q.   So what did Mr. McCullough do when you told him to put his

20 hands behind his back?

21 A.   He pulled away from me and tried to back up towards the

22 wall on the sidewalk.

23 Q.   Did you have your OC spray out at this time?

24 A.   Yes, I believe I did.

25 Q.   And why?

1   A.   Just in case he did what he did:  resist arrest and try to

2   fight us.

3   Q.   Did you have a reason to believe he might resist arrest at

4   this time?

5   A.   Yes.

6   Q.   What was that?

7   A.   From his videos and his statements that "you won't do that

8   to me" and, just, the name of his video is The Resistance.

9   Q.   And did he resist in this case?

10   A.   Yes, he did.

11   Q.   Can you describe how he resisted specifically?

12   A.   Just stiffened up his body, pulled his hands back away

13   from me and wouldn't put his hands behind his back and wouldn't

14   listen to any verbal commands.

15   Q.   Were there any other reasons that you had your OC spray

16   out in particular?

17   A.   Sometimes it's a deterrent to prevent people from

18   assaulting you or resisting.

19   Q.   So an arrestee might be more compliant because you show

20   them the spray.

21   A.   Yes.

22   Q.   Approximately how big was Mr. McCullough at the time?

23   A.   I believe he 6'1", 6'2", I'm not sure.

24   Q.   What were you doing while he was resisting arrest?

25   A.   I was trying to get one of his hands that he had over his

1   head with the little control -- the video control thing in his

2   hand.

3   Q.   You're trying to get his hand behind his back?

4   A.   Yes.

5   Q.   Was he holding anything in the hand you were trying to

6   cuff?

7   A.   I believe he had his phone or his -- he had something in

8   his hand.  I'm not sure.  It might have been the phone holder

9   thing.

10   Q.   Do you know what happened to the phone holder during the

11   scuffle?

12   A.   Yes.  It hit the -- I believe the base of the yellow

13   collection box and went on the floor.

14   Q.   So it fell to the ground?

15   A.   Yes.

16   Q.   Did Officer Woods assist you in getting Mr. McCullough

17   handcuffed?

18   A.   Yes.

19   Q.   Is that him that we see in this shot?

20   A.   Yes.

21        (The video was played.)

22   BY MR. WHITESELL:

23   Q.   And you see the bin there.  Is that the clothes donation

24   bin that's been described in the testimony today?

25   A.   Yes.

1   Q.   And there's a wall there as well?

2   A.   Yes.

3   Q.   You were in the courtroom yesterday.  You heard

4   Mr. McCullough say you slammed him into the bin.  Did that

5   actually happen?

6   A.   No.

7   Q.   When you have a non-compliant or resisting arrestee, is it

8   a tactic police use to try to corner them up against a wall?

9   A.   Yes.

10   Q.   And what is the advantage to doing that?

11   A.   To limit the space and prevent from getting assaulted.

12   Q.   You hear Mr. McCullough say, "What did you spray me with?"

13   Did your OC spray OC spray go off?

14   A.   Yes.

15   Q.   Did you use it intentionally?

16   A.   No.

17   Q.   How did it go off?

18   A.   I'm not too sure, but when I was putting his hand behind

19   my back I had my cuffs in my hand and I dropped the OC spray at

20   that point and I believe I had spray on the left side of my

21   arm, on my jacket.

22   Q.   And at some point, did it get in or near your eyes?

23   A.   Yes.

24   Q.   Do you know how that happened?

25   A.   When I went up to move my hand up to my head, I believe I

1    was doing my mic or something and I rubbed it in my eye.

2    Q.   Where were your hands in relation to Mr. McCullough when

3    the OC spray went off?

4    A.   Down by his left side.

5    Q.   And you were in the process of trying to cuff him when

6    this happened?

7    A.   Yes.

8    Q.   Did you ever reach around Mr. McCullough and try to spray

9    him in the eyes?

10   A.   No, I did not.

11   Q.   You got it in your eyes, though, correct?

12   A.   Yes.

13   Q.   But that wasn't from spraying it, that was from

14   second-hand conduct?

15   A.   Yes.

16   Q.   Have you ever gotten OC spray in your eyes since that

17   night?

18   A.   Yes.

19   Q.   What were the circumstances that that happened?

20   A.   It was at the deposition.

21   Q.   And what happened?

22   A.   I put my hand on my belt to show my OC spray and the OC

23   went off, just a small bit.

24   Q.   And did you get it on your hands?

25   A.   Yes.

1   Q.   And how did you get it in your eye?

2   A.   I touched my face afterwards and -- not realizing that it

3   was on there.

4   Q.   As a police officer, are you allowed to use force in

5   effecting an arrest?

6   A.   Yes.  The only force necessary to -- the amount of force

7   necessary to effect the arrest.

8   Q.   So you can't use excessive force, correct?

9   A.   Correct.

10   Q.   Did you use force here to arrest Mr. McCullough?

11   A.   Yes.

12   Q.   What force did you use here to make the initial arrest?

13   A.   Just the amount of force necessary to effect the arrest to

14   get his hands behind his back and make him comply by putting

15   the handcuffs on him.

16   Q.   What was that specifically?

17   A.   I believe I had took control of his wrist and turned it

18   into a discomforting position so he would leave his hand to be

19   placed in handcuffs.

20   Q.   When you say "discomforting position," is that a tactic

21   that's taught at the academy?

22   A.   Yes.

23   Q.   And what is that called?

24   A.   It's a pressure point on his wrist.

25   Q.   And the idea is to get him to comply?

1   A.   Yes.

2   Q.   Was your use of force intended to cause pain?

3   A.   No.

4   Q.   Did you use what's known as -- I think Mr. McCullough

5   referred to it as pain compliance?

6   A.   I did not, no.

7   Q.   Is pain compliance something that's taught at the academy?

8   A.   Yes.

9   Q.   What circumstances would you use pain compliance?

10  A.   When somebody's actively resisting and they don't allow

11  you to take control of them when they're on the ground,

12  sometimes you use pain compliance on their legs or on their

13  arms or on their biceps.

14  Q.   What kind of things would be pain compliance?

15  A.   You would -- some instance they trained us to use our

16  baton to put into the back of their legs in order to get them

17  to -- if they're kicking, to stop kicking, and as well as on

18  their wrist, to put it on the pressure point on their wrist to

19  apply pressure to get them to -- I guess conform to what was

20  going on.

21  Q.   Did you have a baton that night?

22  A.   I didn't have my baton, no.

23  Q.   Do you regularly carry your baton?

24  A.   Not regularly, no.

25  Q.   Is there any reason you don't carry your baton?

1    A.    It's pretty bulky, and when you get in and out of the

2    cruiser, it jabs you in the back.

3    Q.    So on this night, you didn't have a baton, correct?

4    A.    It was in the car; I didn't have it on me.

5    Q.    But when you were outside on the street you didn't have

6    it?

7    A.    No.

8    Q.    And you didn't use any pain-compliance methods?

9    A.    Just the pressure point on his wrist, but it had no effect

10   because he had his jacket on.

11   Q.    Did -- is the pressure, the immobilization with the

12   pressure, is that considered pain compliance?

13   A.    Yes.

14   Q.    You said it had no effect.  What did you mean by that?

15   A.    John kept stiffening up his arm and pulling it away, so I

16   couldn't get it to properly affect him because he had his puffy

17   jacket on.

18   Q.    Is the use of OC spray force?

19   A.    Yes.

20          (The video was played.)

21   BY MR. WHITESELL:

22   Q.    I just asked you if the use of OC spray is force, and you

23   said yes, correct?

24   A.    Yes.

25   Q.    Is it a proper use of force when it's used properly?

1    A.    Yes.

2    Q.    So you've described circumstances in which you're allowed

3    to use OC spray, correct?

4    A.    Yes.

5    Q.    In this case, could you have used your OC spray if you

6    wanted to?

7    A.    Yes.

8    Q.    But you didn't do it intentionally, did you?

9    A.    No.

10   Q.    And you were able to get your handcuffs on by this point

11   in the video, correct?

12   A.    Yes.

13              (The video was played.)

14   BY MR. WHITESELL:

15   Q.    So you heard Mr. McCullough ask for his phone, correct?

16   A.    Yes.

17   Q.    And what did you tell him?

18   A.    That I got his phone.

19   Q.    And at some point you say, "You need to stop."  Why did

20   you say that?

21   A.    He was pulling away and trying to -- I believe trying to

22   take the phone out of my hand.

23              (The video was played.)

24   BY MR. WHITESELL:

25   Q.    During this portion of the video, what was Mr. McCullough

1    doing?

2    A.    Taking his phone back.

3    Q.    Was he resisting in any other way?

4    A.    Yes, he didn't want to get into the car until he had his

5    phone.

6    Q.    How were you holding him as you were escorting him to the

7    cruiser?

8    A.    I had one hand on his jacket and the other hand on his

9    handcuffs.

10   Q.    Where on his jacket were you holding?

11   A.    I believe on the sleeve.

12   Q.    At some point, he got his phone back?

13   A.    Yes.

14   Q.    How did that occur?

15   A.    He grabbed it out of my hand and snatched it back.

16   Q.    When he was able to recover his phone, what did he start

17   doing?

18   A.    He started yelling, "Help me, help me."

19   Q.    And did he have the phone with him when you placed him in

20   the cruiser?

21   A.    Yes.

22   Q.    Where did he put it?

23   A.    Underneath him.

24          (The video was played.)

25   BY MR. WHITESELL:

1  Q.   Is that you calling a supervisor?

2  A.   Yes.

3  Q.   And you did that immediately after you put John in the

4  car?

5  A.   Yes.

6  Q.   Why did you call for a supervisor immediately after his

7  arrest?

8  A.   Because the OC spray went off.

9  Q.   Any other reason?

10  A.   That was it.

11  Q.   Why did you need to notify a supervisor about the

12  discharge of OC spray?

13  A.   Just because the use of force -- OC spray or your baton --

14  you have to notify a supervisor.

15  Q.   Are OC spray and baton -- are those a particular type of

16  weapon?

17  A.   Yes.

18  Q.   What kind of force is that?

19  A.   Minimum use of force.

20  Q.   Also called non-lethal force?

21  A.   Non-lethal.

22  Q.   Did EMS come to the scene?

23  A.   No, they did not.

24  Q.   Do you know where EMS is located in relation to the

25  station?

1    A.   We were actually one block away from the EMS bay, which is

2    at the station.

3    Q.   Did you believe Mr. McCullough needed medical attention

4    because of the discharge?

5    A.   I did not, no.

6    Q.   If your OC spray had not gone off, would you have called

7    for a supervisor?

8    A.   No.

9    Q.   Why not?

10   A.   There was no need to.  It was just a routine arrest.

11            (The video was played.)

12   BY MR. WHITESELL:

13   Q.   Taking things one at a time, you hear Officer Woods say

14   you're rolling.  Do you know what he's asking you there?

15   A.   If my camera was rolling.

16   Q.   And you acknowledge that it was?

17   A.   Yes.

18   Q.   And he told you that he was rolling as well?

19   A.   Yes.

20   Q.   And you see him asking if you're good.  Do you know what

21   he's asking you there?

22   A.   The -- the effect of the OC spray, if I was all set.

23   Q.   And he had pointed to his eye and said, "a little bit."

24   Is that what he was talking about, the OC spray?

25   A.   Yes.

1          (The video was played.)

2     BY MR. WHITESELL:

3     Q.    Who's in the photo right here?

4     A.    Sergeant Brooks.

5     Q.    And you see a third cruiser behind Officer Woods?

6     A.    Yes.

7     Q.    This is Officer Woods' cruiser in the picture here?

8     A.    Yes.

9     Q.    And cruiser right behind there, whose cruiser is that?

10    A.    I believe that's Sergeant Brooks'.

11    Q.    And what was Sergeant Brooks' assignment that night?

12    A.    He was the patrol supervisor.  He would have been the one

13    that responded for the call for the use of force.

14          (The video was played.)

15    BY MR. WHITESELL:

16    Q.    You say there, "I had the OC spray in my hand and it

17    accidentally went off," correct?

18    A.    Yes.

19    Q.    And that is what occurred with the OC spray?

20    A.    Yes.

21          (The video was played.)

22    BY MR. WHITESELL:

23    Q.    You heard Officer Brooks asking if he got hit by the spray

24    at all?

25    A.    Yes.

 1   Q.   And asking if he needed medical attention?

 2   A.   Yes.

 3   Q.   And what did Mr. McCullough say?

 4   A.   I believe he said, Yeah, I need medical attention.

 5   Q.   Do you know what Sergeant Brooks did in response to that?

 6   A.   Yes, he notified EMS to meet us at the bay door.

 7   Q.   Who drove Mr. McCullough back to BPD?

 8   A.   I did.

 9   Q.   Were you good to drive?

10   A.   Yes.

11   BY MR. WHITESELL:

12   Q.   We heard in that previous video you referred to him as

13   "John the video guy," is that correct?

14   A.   Yes.

15   Q.   Why did you call him that?

16   A.   Because he's known around the station.

17   Q.   Did you expect that Sergeant Brooks was familiar with him?

18   A.   Yes.

19   Q.   Can you describe where you parked your cruiser when you

20   returned to the station?

21   A.   Right outside the wagon bay just beyond the wagon and the

22   ambulance.

23   Q.   Is there any reason you didn't pull your cruiser closer to

24   the station?

25   A.   There was no room to pull it anywhere.

1   Q.   You've heard the wagon bay referred to on several

2   occasions.  Do you know what the function of the wagon bay is?

3   A.   Normally, it's to pull your vehicle in there to take out

4   prisoners and take prisoners into the station.

5   Q.   And is that something that's done at B-3?

6   A.   No.

7   Q.   Why not?

8   A.   They put a cage inside the wagon bay that, like, has all

9   kinds of property so you can't pull in there.

10   Q.   So is it standard procedure at B-3 at this time to park

11   and remove arrestees from the vehicle outside the station?

12   A.   Yes.

13   Q.   To the left of the freeze-frame here, what is that white

14   vehicle with the blue stripe?

15   A.   That's the B-3 wagon.

16   Q.   And what's the building that we see beyond what looks like

17   an SUV parked in front of your camera?

18   A.   That's District 3.

19   Q.   And to the -- the big door to the right, what is that?

20   A.   That's the mechanics bay.

21   Q.   And what's the door to the left?

22   A.   That's the entrance to the wagon bay.

23   Q.   And is the wagon bay how you bring arrestees into the

24   station at B-3 at this time?

25   A.   Yes.

1   Q.   And why do you bring arrestees through the wagon bay?

2   A.   For safety, so you can secure them in a secure area.

3   Q.   Is the booking area connected to the wagon bay?

4   A.   Yes.

5        MR. WHITESELL:  Go ahead and play the video.

6        (The video was played.)

7  BY MR. WHITESELL:

8   Q.   Did Mr. McCullough do anything when you got him out of the

9  cruiser?

10  A.   Yes, he tried to push his head forward into me.

11  Q.   And what did Mr. McCullough do after you pulled him out of

12  the vehicle?

13  A.   He grabbed his cell phone off the seat.

14  Q.   And what happened next?

15  A.   I was holding his sleeve and his arm to escort him and he

16  lunged forward and tried to take off towards the ambulance bay.

17  Q.   Did he say anything while he was lunging forward?

18  A.   "Help me, help me, they're trying to kill me."

19  Q.   And just prior to saying that, he said, "Why are you

20  grabbing my shit like that?"  Do you know what he was referring

21  to?

22  A.   His camera.

23  Q.   Did you try to pick up the camera and bring it out of the

24  vehicle?

25  A.   Yes.

1    Q.    And did he take it from you?

2    A.    Yes.

3              MR. WHITESELL:  Go ahead.

4              (The video was played.)

5    BY MR. WHITESELL:

6    Q.    At this point in time, where are your hands at,

7    Mr. McCullough?

8    A.    On his upper body, his right shoulder and the back of his

9    jacket.

10   Q.    And you hear a beeping noise and you say something.  What

11   was going on there?

12   A.    I was calling to let them know that I needed assistance in

13   the back.

14             MR. WHITESELL:  Go ahead.

15             (The video was played.)

16   BY MR. WHITESELL:

17   Q.    The brick wall here, what is that?

18   A.    That's the ambulance bay office window.

19   Q.    Did other officers arrive to help you escort him into the

20   station?

21   A.    Yes.

22   Q.    How quickly did they arrive?

23   A.    Couple of seconds.

24   Q.    Were there any EMTs present?

25   A.    Yes.

```
 1   Q.   Who was present?

 2   A.   I believe it was Saintfort.  He was standing, actually, to

 3   the left of this, right in the ambulance bay.

 4   Q.   And were there any supervisors outside in the B-3 parking

 5   lot at this time?

 6   A.   Yes.

 7   Q.   Who?

 8   A.   Sergeant McGoldrick.

 9   Q.   Did you see Officer Woods there at this time?

10   A.   Yes.

11   Q.   And what did he do?

12   A.   He proceeded to -- I believe I gave him my weapon and --

13   so he would go around and open up the door.

14   Q.   And why did you give him your weapon?

15   A.   Because you don't bring your weapon into the booking area.

16   Q.   So you gave him your weapon because you were going into

17   the booking area?

18   A.   Yes.

19   Q.   Do you know why you don't bring your weapon in the booking

20   area?

21   A.   Just in case.  There was an officer that was killed years

22   ago in the booking area with his own weapon.

23   Q.   Somebody grabbed his gun?

24   A.   Yes.

25   Q.   So Officer Woods checked your weapon for you?
```

1    A.    Yes.

2    Q.    And did Officer Woods enter the booking area?

3    A.    I don't believe he did.  I believe he just opened up the

4    door for me.

5          MR. WHITESELL:  Go ahead.

6          (The video was played.)

7    BY MR. WHITESELL:

8    Q.    You saw the door, the green-and-white door there?

9    A.    Yes.

10   Q.    Is that the wagon bay door?

11   A.    Yes.

12   Q.    Did you ever slam Mr. McCullough into the wagon bay door?

13   A.    No, I did not.

14   Q.    Did you ever punch McCullough at this time?

15   A.    No, I did not.

16   Q.    You say, "Stop spitting," at this point.  Do you remember

17   what that means?

18   A.    He turned back and as he was yelling, he was spitting in

19   my face.

20   Q.    Was there any particular reason you were concerned about

21   that?

22   A.    Yes.

23   Q.    And what was that?

24   A.    Because the COVID.

25   Q.    Did Mr. McCullough ever hit the wagon bay door?

1    A.    I don't believe so.  He lunged himself forward into the

2    wall in an attempt to try to pull away from me because he

3    was -- he wanted his property, he wanted his cell phone.

4    Q.    At this point in time, did you have the phone in your

5    hand?

6    A.    Yes.

7    Q.    Did you push him into the wall?

8    A.    No, I did not.

9    Q.    But he hit the wall?

10   A.    Yes.

11   Q.    And that was because he was lunging away from you?

12   A.    Yes, he was pulling away.

13   Q.    Did you do anything about the spitting?

14   A.    I pulled his hood up over his head and over the front of

15   his face.

16   Q.    Does BPD have any sort of device to prevent arrestees from

17   spitting if that becomes a problem?

18   A.    They may have one now.  I don't believe they had one back

19   then.

20   Q.    And at that point in time, did you have any opportunity to

21   do anything else?

22   A.    I just wipe my face off and continued to bring him in

23   through the wagon bay.

24         MR. WHITESELL:  Go ahead and play it.

25         (The video was played.)

1   BY MR. WHITESELL:

2   Q.   So at this stage, there's a large section of the video

3   where you can hear rustling, but you can't see what's going on.

4   What was happening at this time?

5   A.   We were just standing there waiting for the bay door to

6   open.

7   Q.   And is there a reason why you can't see what's happening

8   on the camera?

9   A.   I guess because I was up close to his -- his body was up

10  close to my body as well.

11  Q.   At this point you can see concrete.  Are you inside the

12  wagon bay at this time?

13  A.   Yes.

14          MR. WHITESELL:  Go ahead.

15          (The video was played.)

16  BY MR. WHITESELL:

17  Q.   What is the door we're looking at here?

18  A.   That's the inside cage door to the wagon bay.

19  Q.   Is that's what's called a sally port door?

20  A.   Yes.

21  Q.   Can you explain what a sally port is?

22  A.   The sally port is where we -- normally, we would drive in,

23  into the sally port, and the door would close, and that's how

24  we would take prisoners out.  But because of the confinement of

25  the B-3 sally port, they have a big caged-off area inside there

1    that you can't fit a vehicle in there.

2    Q.    Can the wagon bay door and the door to this area be open

3    at the same time?

4    A.    No.

5    Q.    Why is that?

6    A.    You have to wait until the bay door closes.

7    Q.    And is that why you were waiting in this area?

8    A.    Yes.

9    Q.    Were you taking Mr. McCullough in for booking at this

10   point?

11   A.    Yes.

12   Q.    And the arm you see in that picture, do you know who that

13   is?

14   A.    I believe that's me.

15   Q.    The arm on the door?

16   A.    Yes.

17   Q.    And you testified a minute ago you thought Officer Woods

18   opened the door.  You didn't open the door, did you?

19   A.    He opened the -- got the bay door open, the outside bay

20   door where we was waiting.

21   Q.    Is there a policy that states you're supposed to turn your

22   cameras off in the booking area?

23   A.    Yes.

24   Q.    Why did you keep yours on?

25   A.    Because of what was going on and I didn't have time to

1   deactivate it.

2   Q.   Any other reason?

3   A.   No.  That was pretty much it.

4        MR. WHITESELL:  Go ahead and play.

5        (The video was played.)

6   BY MR. WHITESELL:

7   Q.   See the hand reaching.  Do you know whose hand that is?

8   A.   Yes, I believe that's Officer Woods.

9   Q.   So you were originally trying to open the door, but

10  Officer Woods came in and assisted.

11  A.   Yes, or somebody did, I'm not sure.

12        (The video was played.)

13  BY MR. WHITESELL:

14  Q.   You hear Mr. McCullough scream at that point and we see at

15  that point he's down towards the ground, correct?

16  A.   Yes.

17  Q.   Describe how that happened.

18  A.   As we were walking in, he dropped his weight like he

19  testified to earlier, to make dead weight.

20  Q.   And that's not you in the picture, is it -- the hands?

21  A.   No.

22  Q.   It's someone holding the cuffs, though, correct?

23  A.   Yes.

24  Q.   At some point did Mr. McCullough fall all the way to the

25  floor?

1  A.   Yes.

2  Q.   Did you push him to the ground?

3  A.   No, I did not.

4  Q.   And you weren't holding onto the cuffs at this time, were

5  you?

6  A.   No.

7         MR. WHITESELL:  Play the video.

8         (The video was played.)

9  BY MR. WHITESELL:

10  Q.   So we see Mr. McCullough's foot in this picture, right?

11  A.   Yes.

12  Q.   Can you describe what he was doing with his foot?

13  A.   Kicking against the evidence cage.

14  Q.   And you say -- we hear your voice say, "You need to stop."

15  Right?

16  A.   Yes.

17  Q.   What were you telling him to stop?

18  A.   Just the way he was acting and kicking at the screen and

19  flailing on the floor.

20         MR. WHITESELL:  Go ahead.

21         (The video was played.)

22  BY MR. WHITESELL:

23  Q.   You just saw another officer in the video there.  Do you

24  know what his name was?

25  A.   Actually, I couldn't really tell.

1          (The video was played.)

2     BY MR. WHITESELL:

3     Q.   Do you know who that is?

4     A.   Yes, I believe it's Sparks-Clancy.

5          (The video was played.)

6     BY MR. WHITESELL:

7     Q.   You hear Mr. McCullough say he can't breathe, he can't

8     breathe, take the hood off.  Did you hear that at the time?

9     A.   Yes, I looked down to see if it was constricting him.

10    Q.   And is that why it was captured on the camera?

11    A.   Yes.

12    Q.   And you saw someone remove it?

13    A.   Yes.

14    Q.   Who was that?

15    A.   I believe it was Sparks-Clancy.

16    Q.   And that happened right away, right?

17    A.   Yes.

18    Q.   And you hear someone tell Mr. McCullough to calm down and

19    that they would get his eyes washed out.  Who was that?

20    A.   Sergeant McGoldrick.

21    Q.   And do you know what Sergeant McGoldrick's duty was that

22    night?

23    A.   I believe he was the staggered patrol supervisor, or he

24    might have been the duty supervisor, I'm not sure.

25    Q.   When you say "staggered patrol supervisor," what are you

1   describing there?

2   A.   There would be a supervisor that came in on the

3   alternative shift, as well, because of the pandemic.

4   Q.   So were there two patrol supervisors on at times during

5   the pandemic?

6   A.   Yes.

7   Q.   You also mentioned that he could have been the duty

8   supervisor.  What's that role?

9   A.   That consists of being responsible for prisoners in the

10  station and staying in the station and the station duties.

11  Q.   Is that usually filled by a sergeant?

12  A.   Not usually.  It's usually filled by a lieutenant but when

13  there's no lieutenant, the sergeant becomes the acting

14  lieutenant and takes that position.

15  Q.   And we hear you saying, again, that it was not

16  Mr. McCullough that got sprayed, it was you, correct?

17  A.   Yes.

18  Q.   Did you arrest Mr. McCullough because he was videotaping

19  you?

20  A.   No.

21  Q.   What did you do after you turned off the body-worn camera?

22  A.   I went to the bathroom and washed my eye out.

23  Q.   Did you get checked by the EMTs?

24  A.   Yes.

25  Q.   Did they treat you in any way?

1  A.   He gave me, I believe, an ice pack.

2  Q.   Do you know whether Mr. McCullough was seen by the EMTs?

3  A.   Yes.

4  Q.   You heard him here yesterday.  He said he refused

5  treatment.  Were you there when that happened?

6  A.   I was outside of the booking area, but the same EMT that

7  gave me the ice pack was the one that was in there talking with

8  him.

9  Q.   And was that Saintfort?

10  A.   Yes.

11  Q.   And he was the guy that was outside in the parking lot

12  when you came in?

13  A.   Yes.

14  Q.   What did you do after you were seen by the EMTs?

15  A.   I believe I went and printed out his BOP and his Q5

16  suicide watch list.

17  Q.   Is BOP an abbreviation?

18  A.   Yes.

19  Q.   What does it stand for?

20  A.   Board of Probation check.

21  Q.   And what kind of information is in Board of Probation

22  check?

23          MR. O'NEILL:  Objection, Judge.

24          THE COURT:  Sustained.

25  BY MR. WHITESELL:

1   Q.   Did you check anything else besides his BOP?

2   A.   Yes.  If he had still an active warrant.

3   Q.   Did he have an active warrant?

4        MR. O'NEILL:  Objection.

5        THE COURT:  That question is overruled.

6  BY MR. WHITESELL:

7   Q.   And I think you said you checked the Q5 report?

8   A.   Yes.

9   Q.   What's a Q5 report?

10  A.   It's a suicide watch list.

11  Q.   He wasn't on the suicide watch, though, was he?

12  A.   I don't believe so.

13  Q.   What did you do with this information that you collected?

14  A.   I left it at the booking area with two officers.

15  Q.   And what happened next?

16  A.   I proceeded to do the report in the report room area.

17  Q.   Was there a period of time when Sergeant Brooks took

18  photographs of you?

19  A.   Yes.

20  Q.   Did that happen before or after your report?

21  A.   Before.

22  Q.   So you wrote a report on this incident?

23  A.   Yes.

24  Q.   Did you book Mr. McCullough?

25  A.   No, I did not.

1  Q.   Do you know who, other than the booking officer, booked

2  Mr. McCullough?

3  A.   Not offhand, no.

4  Q.   And after you finished up your report, what did you do?

5  A.   I went -- I believe I went back out on patrol a little

6  while after.

7  Q.   And I understand that charges were brought against

8  Mr. McCullough.  How did that come about?

9  A.   I did that while I was doing my report.  I went on the

10 CJIS and typed up the application for criminal complaint.

11 Q.   And what is CJIS?

12 A.   Criminal Justice Information System.  It's a database held

13 by the state.

14 Q.   And you type up criminal complaints in there?

15 A.   Yes.

16 Q.   And what do you do when you're done typing up a criminal

17 complaint?

18 A.   You save it to a draft and it goes up to Dorchester Court.

19 Q.   Is this a normal routine for an arrestee?

20 A.   Yes.

21 Q.   Did you see him again that night?

22 A.   I did not.

23 Q.   Who arrested Mr. McCullough that night?

24 A.   I did.

25 Q.   That night, did you use any more force than was necessary

1   to effectuate his arrest?

2           MR. O'NEILL:  Objection.

3           THE COURT:  Overruled.

4           THE WITNESS:  No, I did not.

5   Q.   Did you hit Mr. McCullough at any point?

6   A.   No, I did not.

7   Q.   Did you punch him?

8   A.   No, I did not.

9   Q.   Did you push him into the clothing bin?

10  A.   No, I did not.

11  Q.   Did you push him into the side of a vehicle?

12  A.   No, I did not.

13  Q.   Did you spray your OC spray at him intentionally?

14  A.   No, I did not.

15  Q.   And did you push him to the ground at any point?

16  A.   No I did not.

17  Q.   From your perspective, what was Mr. McCullough's primary

18  concern that evening?

19          MR. O'NEILL:  Objection.

20          THE COURT:  Overruled.

21          THE WITNESS:  His phone.

22  BY MR. WHITESELL:

23  Q.   And what was your reason for arresting him?

24  A.   For disorderly conduct for being in the street.

25  Q.   Did you arrest him because he was recording your traffic

1   stop?

2   A.   No, I did not.

3   Q.   Had Mr. McCullough not stepped into the street, would you

4   have arrested him?

5   A.   No.

6        MR. WHITESELL:  No further questions.

7        THE COURT:  Why don't we take the morning recess now,

8   Mr. O'Neill, give you a chance to prepare the

9   cross-examination.  Let's take our morning recess, 25 minutes.

10       (A recess was taken from 10:40-11:05.)

11

12                    CROSS-EXAMINATION

13  BY MR. O'NEILL:

14  Q.   Good morning, Officer Robey.

15  A.   Good morning.

16  Q.   You discussed with Mr. Whitesell that you ran

17  Mr. McCullough's information at some point during the encounter

18  we see on Exhibit 2, correct?

19  A.   Yes.

20  Q.   So that was the video where you're initially in your

21  vehicle, he comes out of the vehicle at some point, right?

22  A.   Yes.

23  Q.   You told Mr. Whitesell that you ran Mr. McCullough's

24  information?

25  A.   Yes, I believe it shows on the video that we were running

1   his information.

2   Q.   Was that before you got out of the vehicle or after you

3   got out of the vehicle?

4   A.   I believe it was after.  Before we drove off.  It didn't

5   come back right away.  It didn't come back until a little while

6   later.

7   Q.   So you're saying you ran his information after you got

8   back in the vehicle and then before you drove away?

9   A.   Yes.

10   Q.   So you're recorded in the video in Exhibit 2, which we

11   just discussed, right?

12   A.   Yes.

13   Q.   And then you were -- and that's on video, right?

14   A.   Shawmut Ave.

15   Q.   Right?

16   A.   Yes.

17   Q.   And then you're also in the video or multiple videos that

18   were recorded on April 25, 2020, right?

19   A.   Yes, yes.

20   Q.   And one of those videos is a video that Mr. McCullough

21   recorded, right?

22   A.   Yes.

23   Q.   Were you in any other videos that Mr. McCullough recorded?

24   A.   I believe so.  He recorded around the station a couple of

25   times as well as -- well, I wasn't sure if he was recording the

1   incident in JP where I had the road blocked or if he was

2   recording -- I didn't know if he was recording -- because he

3   was at a distance away from me so I wasn't too sure if he

4   recorded it or not.  But I have been recorded on his videos

5   before.

6   Q.   How do you know you've been recorded on videos other than

7   the two that have been admitted into evidence here?

8   A.   Other officers showed me videos that he had recorded.

9   Q.   You purposely haven't watched any of Mr. McCullough's

10   videos on YouTube using any of your own personal devices so he

11   wouldn't get the views, correct?

12   A.   Yes.

13   Q.   You spoke with Mr. Whitesell about this.  When you parked

14   your vehicle during the traffic stop on April 25, 2020, you

15   parked it at -- partially out into one of the driving lanes,

16   right?

17   A.   Yes.  At an angle.

18   Q.   And I think you talked to Mr. Whitesell about this, but

19   you did that to protect yourself, the car you had stopped, and

20   the people in that car, right?

21   A.   As well as to use for -- as a barricade in case something

22   transpires out of the traffic stop.

23   Q.   You testified on -- you spoke with Mr. Whitesell about

24   using a pressure point on Mr. McCullough's arm while you were

25   attempting to put the handcuffs on him, correct?

1   A.   Yes.

2   Q.   And you said that was a pain compliance method, right?

3   A.   Yes.

4   Q.   You mentioned also or you spoke about how Mr. McCullough

5   spit on you and you believe that wasn't intentional, correct?

6   A.   I don't know if it was intentional or not.

7         MR. O'NEILL:  Just one moment, Your Honor.

8         If I could have this just displayed to the witness.

9         THE CLERK:  HD 1?

10        MR. O'NEILL:  Yes.

11  BY MR. O'NEILL:

12  Q.   Officer Robey, you participated in a deposition in this

13  matter --

14        THE CLERK:  Is this just for --

15        MR. O'NEILL:  Yes, just for him.

16  BY MR. O'NEILL:

17  Q.   You participated in a deposition in this matter, correct?

18  A.   Yes.

19  Q.   And you and I, Mr. Whitesell, I believe Ms. Davidson, as

20  well, all went to an office, correct?

21  A.   Yes.

22  Q.   And you were put under oath, correct?

23  A.   Yes.

24  Q.   It's the same oath that you took here today, correct?

25  A.   Yes.

1  Q.   And this was on December 8 of 2023, correct?

2  A.   Yes.

3  Q.   I'm going to direct you to page -- everything that you

4  said during that deposition was transcribed, correct?

5  A.   Yes.

6  Q.   Put to a transcript?

7  A.   Uh-huh.

8  Q.   Is that a yes?

9  A.   Yes.

10  Q.   So I'm going to direct your attention to page 110, lines

11  12 through 15.  Were you asked the following question and did

12  you give the following answer:

13       "Okay, but if your -- it's your opinion that he didn't

14  intentionally spit on you, right?"

15       "Not intentionally, no, but during the COVID it was

16  kind of one of those situations."

17       You were asked that question and you gave that answer,

18  correct?

19  A.   Yes.

20  Q.   While you were transporting Mr. McCullough from your

21  vehicle into the booking area at B-3, there was a point in time

22  where he hit the wagon bay door, correct?

23  A.   Not the door.  The wall right beside the door.

24  Q.   That is the brick wall, right?

25  A.   Yes.

1   Q.   You saw Exhibit 6 where -- the part of Exhibit 6, the

2   video, your body-worn camera, where Mr. McCullough is lying on

3   the ground in the booking area, correct?

4   A.   Yes.

5   Q.   Typically when arrestees are taken into the booking area,

6   they're searched while they're standing up, correct?

7   A.   Yes.

8   Q.   When you arrested Mr. McCullough on April 25, 2020, you

9   arrested him for disorderly conduct, and as a part of it, the

10  fact that he was out past curfew, correct?

11  A.   It was for disorderly conduct, and that's part of the

12  curfew violation.  The charge would be disorderly conduct.

13  Q.   When you're engaged with someone, you're obligated to

14  provide your name and badge number, correct?

15  A.   Yes.

16  Q.   In your 29 years as an officer, and during your time

17  traveling around and residing in Boston, you see people in the

18  street while cars are also nearby in the street, correct?

19  A.   Yes.

20  Q.   It's not typical for those people to be arrested for doing

21  that, correct?

22  A.   No.

23  Q.   While you were arresting Mr. McCullough -- let me

24  rephrase.  In the time that you approached Mr. McCullough, and

25  then between that time and the time you actually put the

1    handcuffs on him, he didn't kick you at any point, right?

2    A.    No.

3    Q.    He didn't punch you at any point, right?

4    A.    No.

5    Q.    He didn't try to break your hold on him at any point,

6    right?

7    A.    Yes, he did.

8    Q.    Did he -- he didn't use his arms to try and break your

9    hold on him at any point, right?

10   A.    He pulled his arms, stiffened his arm, and pulled it back

11   away from him.

12   Q.    He never used, like, a chopping motion to try and break

13   your hold on him, correct?

14   A.    No.

15   Q.    The force you were using to push Mr. McCullough backwards

16   after you grabbed onto him initially, on a scale of one to ten,

17   that was a six or a seven, correct?

18   A.    To push him?

19   Q.    Right.

20   A.    No.  He was pulling away from me as I was holding onto

21   him.  He was backing himself up going towards the wall.

22   Q.    You testified at Mr. McCullough's trial for the underlying

23   criminal charges, correct?

24   A.    Yes.

25   Q.    And that trial lasted two days, correct?

1   A.   I believe so, yes.

2   Q.   If you recall, the first day was on October 6, 2020?

3   A.   I don't recall.

4   Q.   When you testified, you testified over two days, correct?

5   A.   I don't recall how long it was.

6   Q.   So you have a page in front of you -- the first page of a

7   transcript, correct?

8   A.   There's nothing in front of me.  Now it is.

9   Q.   So this is the first page of a transcript, correct?

10  A.   Yes.

11  Q.   And you see, towards the bottom right-hand side, there's a

12  date there.  It says Friday October 7, 2022, right?

13  A.   Yes.

14  Q.   And the title of the case is *Commonwealth of Massachusetts*

15  *v. John McCullough*, correct?

16  A.   Yes.

17  Q.   Do you recall testifying on this day of the trial, October

18  7, 2022?

19  A.   I don't recall the date.  I recall testifying in the case

20  but I don't know what date it was.

21  Q.   Look on page 2 and you see where it says -- spelled

22  incorrectly, but it says Scott Robey, correct?

23  A.   Yes.

24  Q.   I'm going to turn your attention to page 38 and lines 9

25  through 17.  Were you asked the following questions and did you

1   give the following answers --

2          MR. WHITESELL:  Your Honor, just before this, I would

3   object that this is not being used specifically for impeachment

4   purposes given the Court's order.

5          THE COURT:  I don't know as yet so I'm not sure what

6   you're asking him to comment on.

7          MR. O'NEILL:  I am using it for impeachment, Your

8   Honor.

9          THE COURT:  All right, let's see how we go.

10         MR. O'NEILL:  Thank you.

11  BY MR. O'NEILL:

12  Q.  Officer Robey, were you asked the following questions and

13  did you give the following answers:

14         "Officer Robey, you had an opportunity to see the

15  video, body-worn camera, of Officer Woods, and in that video

16  you had your left hand on Mr. McCullough's chest pushing him

17  back; is that correct?

18         "I believe so, yeah."

19         And on a scale of one to ten, that force that you were

20  using him to push him back, what would you say on that scale of

21  one to ten that force you used to.

22         -- Probably six, maybe seven."

23         You were asked those questions; you gave those

24  answers, correct?

25  A.  This is from the court transcript or the deposition?

1   Q.   From the trial.

2   A.   Yes.

3   Q.   And then the force you used on his arm -- as well, on a

4   scale of one to ten -- that was a six or seven as well,

5   correct?

6   A.   Yes.

7           MR. O'NEILL:  If I could have just one moment, Your

8   Honor.

9           THE COURT:  You may.

10          MR. O'NEILL:  Nothing further from me, Judge.

11          MR. WHITESELL:  Just one brief question.

12                      REDIRECT EXAMINATION

13   BY MR. WHITESELL:

14   Q.   You were asked about the level of force that you used.

15   That force was to put a non-compliant resisting arrestee into

16   handcuffs, correct?

17   A.   Yes.

18          MR. WHITESELL:  No further questions, Your Honor.

19          THE COURT:  Mr. O'Neill?

20          MR. O'NEILL:  Nothing for me, Judge.  Thank you.

21          THE COURT:  You're excused.

22          MR. WHITESELL:  Your Honor, at this time, the defense

23   would call Lieutenant Brooks to the stand.

24          (The witness was sworn.)

25          THE CLERK:  Could you please introduce yourself to the

1   jury, spelling your last name for the record.

2          THE WITNESS:  My name is Thomas Brooks, my last name

3   is B-R-O-O-K-S.

4                          THOMAS BROOKS,

5   having been duly sworn by the Clerk, was questioned and

6   testified as follows:

7                      DIRECT EXAMINATION

8   BY MS. DAVIDSON:

9   Q.   Good morning.

10  A.   Good morning.

11  Q.   Mr. Brooks, do you go by any other names?

12  A.   As a nickname, Tommy.

13  Q.   And are you married?

14  A.   Yes.

15  Q.   Do you have children?

16  A.   I have three of them.

17  Q.   And did you go to college?

18  A.   I did.

19  Q.   Where?

20  A.   I did my undergraduate at UMass Amherst and I got a

21  master's degree at Western New England University.

22  Q.   And what is your master's degree in?

23  A.   Criminal Justice.

24  Q.   And what degree did you get from UMass Amherst?

25  A.   Sociology with a minor in philosophy.

1    Q.    Did you serve in the military?

2    A.    I did.

3    Q.    What branch?

4    A.    I was in the Marine Corps.

5    Q.    When?

6    A.    '95 to -- I got out at the end of '98.

7    Q.    And where are you currently employed?

8    A.    For the City of Boston.

9    Q.    And what department do you work for for the city?

10   A.    Boston Police.

11   Q.    Were you employed before you were employed at the Boston

12   Police Department?

13   A.    I was employed at the MBTA police.

14   Q.    And what did you do at the MBTA?

15   A.    I was a police officer.

16   Q.    When did you start there?

17   A.    I got hired at the end of '98; I started in '99.

18   Q.    And what was your rank at the MBTA?

19   A.    I was a patrol officer.

20   Q.    And did you receive training before you started working as

21   an MBTA police officer?

22   A.    Yes, ma'am.

23   Q.    And what was that training?

24   A.    It was an approximately six-month police academy.  It

25   wasn't entirely dissimilar to college.  There's classes

1   everyday, sometimes it might be for three-hour blocks,

2   four-hour blocks or eight-hour blocks.  So if you imagine five

3   days a week for almost six months and it varied from law

4   classes -- criminal law, constitutional law, municipal,

5   domestic violence -- investigative classes, sexual assault

6   cases, introduction to scene responsibilities, to homicides,

7   rules and regs and other things, and personal skills --

8   one-on-one communication, things like that.

9   Q.   And how long have you been employed by the Boston Police

10  Department?

11  A.   I got on the Boston Police Department in 2002.

12  Q.   What is your current rank?

13  A.   I'm a lieutenant.

14  Q.   And what district do you work out of?

15  A.   District B-3.

16  Q.   What does the B-3 district cover?

17  A.   It covers Mattapan and a portion of Dorchester.

18  Q.   Can you please go through your background at the BPD for

19  the jury?

20  A.   Sure.  I got on 2002.  I went to the police academy.

21  Similar experience -- it's six months long.  Years later, in

22  2007, I made detective.  I should have mentioned, I did all my

23  patrolman years at B-2.  Area B is Roxbury, Dorchester,

24  Mattapan, so I worked in B-2 and the Roxbury/Dorchester

25  section.  In 2007, I got promoted to detective.  I went to the

1  gang unit.  I was detective in the gang unit for a number of

2  years.

3          In 2010 I promoted to sergeant.  I went back to

4  District B-2, this time as a sergeant.  I was there for not too

5  long before I got transferred back to the gang unit.  I was

6  then a sergeant in the gang unit for a while.  I then went to

7  District B-3 where I was the supervisor on the night shift

8  there for probably a little over a decade, and then I made

9  sergeant detective a few years back.  And probably shortly

10 after this incident, in 2020, actually, I was a sergeant

11 detective for only, I think, a year and four months before I

12 made lieutenant, and I've been in B-3 through all of those

13 final ranks:  -- B-3 as a sergeant -- B-3 after the gang unit,

14 being a sergeant of the gang unit, B-3 as a sergeant; B-3 as a

15 sergeant detective; and I'm B-3 still as a lieutenant.

16 Q.   At the time of this case, what was your rank?

17 A.   I was a sergeant at this time.

18 Q.   And were you the patrol supervisor the night of the events

19 in this case?

20 A.   Yes.

21 Q.   What is a patrol supervisor?

22 A.   When you're a sergeant, there's basically two possible

23 responsibilities.  There's patrol sergeant -- I should say

24 patrol supervisor, and then the duty supervisor.  The patrol

25 supervisor handles everything outside of the police station.

1    Everything on the street, 911 calls, assisting officers,

2    anything on the street.  The duty supervisor handles everything

3    inside the building, handling roll calls, employee issues,

4    assignments; things like that.  On that evening, I was the

5    patrol supervisor, so I would have been responsible for

6    anything on the street outside the building.

7    Q.    When you joined the Boston Police Department, did you

8    receive training?

9    A.    Yes, ma'am.

10   Q.    And what was that training?

11   A.    I had again gone to that six-month police academy.

12   Q.    And at the BPD Academy were you trained regarding OC

13   spray?

14   A.    Yes.

15   Q.    What is OC spray?

16   A.    OC stands for "oleoresin capsicum." Some people refer to

17   it as pepper spray, but it's technically a different chemical.

18   It's an irritant.

19   Q.    Is it considered a non-lethal use of force?

20   A.    Yes.

21   Q.    What does OC spray come in?

22   A.    Sort of a canister about four inches tall and about as

23   thick as, maybe, a half dollar.

24   Q.    Is it department issued?

25   A.    It is.

1  Q.   What affects can OC spray have on someone?

2  A.   It's an irritant.  It's irritating.  It can cause people

3  to cough.  It causes people's eyes to get runny, bloodshot.  It

4  can be itchy and uncomfortable on the skin.

5  Q.   At the BPD academy, were you yourself sprayed with OC

6  spray?

7  A.   Actually yes, both academies.

8  Q.   Are officers allowed to use OC spray if someone is

9  resisting an arrest?

10  A.   Yes.

11  Q.   Have you heard of officers accidentally spraying their OC

12  spray?

13  A.   Like an accidental discharge?

14  Q.   Yes?

15  A.   Yes.

16  Q.   And at the BPD academy, were you trained in defensive

17  tactics?

18  A.   Yes, ma'am.

19  Q.   And did that include training on the use of force?

20  A.   Yes.

21  Q.   As you have moved up the ranks in BPD, have you received

22  any additional training?

23  A.   Yes.

24  Q.   What additional trainings have you received?

25  A.   By the department I've been to a four-week investigative

1    school when I made detective.  When I made sergeant, there was

2    a four-week supervisor school, and I've probably been to well

3    over 30 individual trainings not sponsored by the department

4    but offered.

5    Q.   And have you had any trainings regarding investigations?

6    A.   Yes.

7    Q.   And does that include the use-of-force investigations?

8    A.   Specifically it wasn't based on that, but, yes, it was

9    covered.  It was a month-long training so that was one of the

10   things they would discuss, but it wasn't a four-week training

11   on that.

12   Q.   What are some of the scenarios that a patrol supervisor is

13   called into the field?

14   A.   Really, anything on the street where an officer may have

15   questions or something, they have the ability to call a

16   supervisor at anytime.  But there's really four times that it's

17   mandated that they request a supervisor.

18   Q.   And what are those mandated times?

19   A.   I'm sure there could be other examples where someone

20   with -- common sense would dictate where it should be done, but

21   there's four where a patrol sergeant would be responsible for

22   an investigation.  That would be:  a use of force, an injured

23   officer, a department motor vehicle accident, and/or a motor

24   vehicle pursuit.

25   Q.   And did Officer Robey call you on the night of the

1   incident in this case?

2   A.   He did.

3   Q.   And why did he call you?

4   A.   Because he had been involved with an incident where he had

5   his OC spray discharged.

6   Q.   Before the incident that occurred on April 25, 2020, were

7   you familiar with Mr. John McCullough?

8   A.   Loosely.

9   Q.   And how were you familiar with him?

10  A.   I knew he had a YouTube channel, and I knew he would go

11  to -- I'm not even sure if it was just police but -- and I

12  don't want to be disrespectful of the terms he used; I would

13  use whatever term he wants.  I would refer to them as auditors,

14  like an audit, so I don't mean any disrespect if that's not a

15  term he uses, but he's one of the individuals we knew was an

16  auditor.  So he'd go into government buildings and government

17  employees and make YouTube videos of the interactions he'd get.

18  Q.   Did you yourself have any interactions with

19  Mr. McCullough?

20  A.   Yes.

21  Q.   What were they like?

22  A.   I would describe my previous interactions with him as

23  friendly, cordial.  I never had any problems with him.

24  Q.   And I believe you just testified -- are you familiar with

25  his YouTube page?

1  A.   Yes.

2  Q.   Do you know what it's called?

3  A.   "Familiar" is an odd term.  At that time I knew he had

4  one.  I wouldn't claim any familiarity with it.

5  Q.   Do you know what his YouTube page is called?

6  A.   Yes.

7  Q.   What is it called?

8  A.   The Resistance.

9  Q.   Prior to the incident in this case -- while we're here

10  today -- have you watched any of the videos on his YouTube

11  page?

12  A.   Prior to the incident, no.  I think I had been, like,

13  aware of, like, videos he'd done of people, and someone would

14  have sent me a link or something and I might have watched a

15  second of it, but some of the videos were long.  I never

16  watched any of them through, but I'm certain I've, maybe, seen

17  a clip that someone I might have known had been in it and

18  someone may have told me about it.  But no, I never watched his

19  videos or had any familiarity with his overall product, I

20  guess.

21  Q.   What about since this case?  Have you watched any videos

22  on his YouTube page?

23  A.   Yes.

24  Q.   On April 25, 2020, what shift were you working?

25  A.   We call it a last half.  For a supervisor, that's from

1    10:45 p.m. to 6:30 a.m. at that time.  That shift has changed

2    since, but at that time it was 10:45 p.m. to 6:30 a.m.

3    Q.    And you were the patrol supervisor that night, correct?

4    A.    Yes, ma'am.

5    Q.    And did you receive a call -- a request to respond to Blue

6    Hill Ave. and Ansel Street?

7    A.    Yes, ma'am.

8    Q.    And who was that from?

9    A.    Officer Scott Robey.

10   Q.    How did you receive that request?

11   A.    He came on the radio, he said his call sign and he just

12   said, Can I get a supervisor to my location.  Something like

13   that.

14   Q.    Do you know why Officer Robey called you?

15   A.    At that time, I did not know.  He just asked for a

16   supervisor.

17   Q.    How long did it take you to respond to the scene?

18   A.    I only know this because I've since had the opportunity to

19   watch the body cams, but it was like -- I want to say, like,

20   under 30 seconds.

21   Q.    And the location of where Officer Robey was, was it far

22   from the B-3 station?

23   A.    No; in fact, it would be, like, within 30 seconds.

24   Q.    And how did you get to the scene?

25   A.    At the time, I wasn't really certain if I'd walked or

1    driven because it's almost kind of diagonally across the

2    street.  I'm familiar now -- having reviewed the cameras, I'm

3    confident I drove.

4    Q.   And what did you have on that night?

5    A.   Police uniform.

6    Q.   About what time did you arrive?

7    A.   I don't know the exact time I arrived.  Whenever he called

8    on the radio, I was on scene.  Like I said, in under 30 seconds

9    I was already on scene and asking him what he had.

10   Q.   Were there a lot of people out that night?

11   A.   No.

12   Q.   Why not?

13   A.   This was right in the sweet spot of COVID and a lot of the

14   social fears regarding it, so regardless of one person or

15   another's opinions on it, April, 2020, was a time when

16   everything was really shut down.  It was actually so much so

17   that we weren't even allowing officers in the building.  Like,

18   officers were doing roll call in the parking lot, and only the

19   mandatory inside personnel were even going inside the building,

20   washing cruisers.  The outside was the exact same thing.

21        There was no community.  A few homeless people might

22   come through and we'd try to find options for them, but the

23   streets were very, very quiet.

24   Q.   Was there also a curfew at that time?

25   A.   There was a curfew.

1  Q.   What time was it?  What time was the curfew?

2  A.   9:00 p.m.

3  Q.   So when you arrived on scene, what was the first thing

4  that you did?

5  A.   I went directly to Officer Robey, and I basically said,

6  you know, What have you got?

7  Q.   And what did Officer Robey say to you?

8  A.   He said that he had made an arrest and that he'd said that

9  the individual had resisted, and he said that his OC spray had

10  gone off and then he made a reference that he kind of got

11  himself in the eye.  So I didn't know if he'd sprayed himself

12  in the eye or touched the OC stuff and rubbed his eye or what,

13  but he seemed to have visibly, to me, an OC reaction in his

14  eyes.

15  Q.   Before you had got to the scene, had you known that

16  Officer Robey's OC spray has been deployed?

17  A.   I had no idea what I was called for.

18  Q.   Is it normal to receive a request from a police officer

19  without any specific details?

20  A.   It's probably most common.  They're given details if

21  there's a need.  Sometimes people call supervisors to ask a

22  question:  Hey, I got these people arguing, what's your

23  opinion?  Because you're a supervisor, you have some

24  experience.  People call us to the scene.  It's the four that I

25  mentioned at the times that they're mandated to request us

1    immediately, but he could call for anything anytime.  It's very

2    normal.

3          MS. DAVIDSON:  I would like to pull up Exhibit 3,

4    please, and that can be played for the jury.

5          (The video was played.)

6    BY MS. DAVIDSON:

7    Q.   Lieutenant Brooks, is that you on the left-hand side of

8    the frame?

9    A.   Yes, ma'am.

10   Q.   And is this you when you were first responding to the

11   scene?

12   A.   Yes, I just walked up.

13   Q.   And I believe you testified you checked in with Officer

14   Robey, correct?

15   A.   Yes.

16   Q.   After you checked with him and he mentioned he deployed

17   his OC spray, what did you do?

18   A.   He didn't state that he deployed his OC spray; he stated

19   that his OC spray had gone off and he got some in his eye.  He

20   didn't state that he had, like, deployed it.

21   Q.   So after you talked to him, what did you do?

22   A.   Well, it sounded like he got some OC in his eye.  The

23   first response to that is EMS, so I asked him if he was okay

24   and if he needed anything, and I wanted to make sure he was

25   okay to go back across the street.

1    Q.    And did you call EMS at that point?

2    A.    No.  EMS was right across the street.  That's why I was

3    asking him, "Do you want to walk across the street or do you

4    need a ride?"  And he says, "I'm fine, I can see, no worries."

5    Q.    And what happened after that?

6    A.    Then he had also mentioned that the individual that had

7    been arrested was -- I think he called him John the video guy

8    or something to that effect.  So I saw, like, a phone or maybe

9    something sitting on the cruiser, so I asked him, "Is this all

10   still recording?"  Because I know that people can be very

11   protective of their recording stuff and I had no intention of

12   disturbing that.  I just wanted to make sure I knew that was

13   going on.  I think he said Mr. McCullough had the phone in the

14   car.

15         Then he stated that he had only sprayed himself or

16   only got it on himself, and he said that Mr. McCullough -- and

17   I think the words he used was "I don't think he got hit with

18   any."  So just to confirm, I then walked away from Officer

19   Robey and I went directly to the car that Mr. McCullough was

20   in.  I didn't know he was on scene at the time; he could have

21   already been transported.

22         I couldn't see him.  That's when he said,

23   "Mr. McCullough is in the car."  And he said, "I don't think

24   anything got on him."  So then I went over to the car and

25   opened the car door and I had asked him if he had been sprayed

1    and needed EMS and at that time he said, "Yes, I want EMS."

2    Q.   And after Mr. McCullough told you that he wanted EMS, what

3    did you do?

4    A.   I immediate keyed my mic and I called EMS.

5    Q.   And just go back a couple steps.  When Officer Robey

6    referred to Mr. McCollough --

7    A.   Can I clarify a statement?  Keyed the mic right away and I

8    stepped on the radio.  I've since watched the video.  It was 15

9    seconds later that I requested EMS.  So when I say

10   "immediately," 15 seconds or so.

11   Q.   When Officer Robey referred to him as "John the video

12   guy," did you know what he was talking about?

13   A.   I did.

14   Q.   How did you know what he was talking about?

15   A.   When I had come to work, officers just inside the building

16   said, "Heads up, one of the video guys is outside filming,

17   making a YouTube video."  And somebody -- I think somebody

18   said, It's the guy John.  So I was loosely familiar so I knew

19   it was The Resistance, so I was aware of that.  So a short

20   while later -- I want to say this happened, I don't know, maybe

21   after that roll call, 45 minutes after that roll call, whatever

22   it was.  It wasn't put out at roll call.  I'm saying someone

23   told me during the changeover of shifts and that was -- when he

24   said, "John the video guy," it was easy math.

25   Q.   So after you requested EMS after you checked on

1  Mr. McCullough, what did you do next?

2  A.    That was it.  He was transported to EMS directly across

3  the street.  He was taken there immediately to the station,

4  which is also an EMS station.

5  Q.    And did -- did you go back to the B-3 station?

6  A.    I did.

7  Q.    When you arrived back at B-3, what did you do?

8  A.    I went back to B-3, and I was heading in, and I went in

9  back to the supervisor's office.

10  Q.    Did you hear anything when you got back to the station?

11  A.    Yes.

12  Q.    What did you hear?

13  A.    I heard Mr. McCullough back by the entrance bay where you

14  enter the police station.  And just to be clear, the same

15  building is EMS and the police, so when you come in, EMS is to

16  the left, police is to the right.  I went around the building

17  to where there's a second entrance to where the supervisor's

18  office is, and from there I could hear -- coming back from

19  where EMS and the entrance bay is -- him yelling.

20  Q.    Did you go over to assist with Mr. McCullough at that

21  time?

22  A.    No, because I knew there was a bunch of officers already

23  there and sometimes less is more when people are having a

24  moment of expression.

25  Q.    Were you involved in booking Mr. McCullough that night?

1    A.    No.

2    Q.    Did you have any other interactions with Mr. McCullough

3    that night?

4    A.    Yes.

5    Q.    And what was that interaction?

6    A.    Probably 30 minutes or maybe even less after he'd been

7    offered EMS, I came in just to, kind of, follow up with him and

8    just to confirm if he'd had any injuries.  I wanted to ask him

9    directly rather than hear from other officers and to get any

10   pictures of those injuries if he had them.

11   Q.    Where was Mr. McCullough when you checked in with him?

12   A.    He was still in the booking area.  He was still right

13   where the booking desk is.

14   Q.    And did you take pictures of him?

15   A.    I did.

16   Q.    Did you have a conversation with him?

17   A.    I did.

18   Q.    How was Mr. McCullough acting at this point?

19   A.    I found him to be friendly and cordial, sort of on-brand

20   with my past interactions with him.  I've never had any

21   disagreements with him.

22   Q.    Was he screaming anymore?

23   A.    No, he was quiet.  When I came in, it was all very quiet

24   when I got there.

25   Q.    And what was the conversation you had with him?

1    A.   I sort of already intimated that.  I had just asked him, I
2    want to make sure if you have any injuries, I want to ask you
3    directly.  He said no.  I said -- I was aware he had declined
4    EMS and I said, "So were you sprayed?"  And he said, "No, it
5    didn't hit me."  He was aware of it, so I don't know if he
6    smelled it or what.  He was definitely aware of the spray, but
7    he said it didn't seem to have gotten on him.  I looked at him.
8    His eyes had natural white.  To juxtapose it, like, Robey's
9    eyes were all red and swollen -- his eye, one of them.

10         So I said, "I'll take some pictures of the absence of
11   injuries or, if something changes later, I can document your
12   current condition."  So I just took pictures, just, sort of, a
13   satellite round around him and he didn't report any other
14   injuries.  I would have taken them, but he didn't suggest any.

15         I then did the same for Officer Robey.  I found him --
16   he was somewhere in the roll call area -- and I said, "Are you
17   okay?"  He said, "Yeah."  I said, "You got any injuries or
18   anything?"  And I offered to photograph or do anything he
19   needed as well.

20         MS. DAVIDSON:  Can you please pull up Exhibit 4 for
21   me, please?

22   BY MS. DAVIDSON:

23   Q.   Lieutenant Brooks, can you see that picture on your
24   screen?

25   A.   Yes, ma'am.

1    Q.   Do these look like the pictures that you took of

2    Mr. McCullough that night?

3    A.   Yes, ma'am.

4    Q.   And did Mr. McCullough show any signs that he was affected

5    by OC spray?

6    A.   No.  In fact, he stated he was not, and his eyes did not

7    give any indication --

8         MR. O'NEILL:  I object to that, Judge.  Just the

9    answer.

10        THE COURT:  Overruled.

11   BY MS. DAVIDSON:

12   Q.   And looking at Exhibit -- this last one which, I believe,

13   would be 4-I, where Mr. McCullough's eyes weren't red, correct?

14   A.   That's correct.

15   Q.   Why did you still take pictures of Mr. McCullough if he

16   reported he didn't have any injuries?

17   A.   It's just -- it seemed like a normal thing to do -- like,

18   take a picture of the absence of injury.  Like any scene, you

19   want to capture photos of the scene and preserve the scene.  It

20   was a way of preserving this scene in whatever form.

21   Q.   And was it at this point when you were taking pictures of

22   Mr. McCullough that he reported he wasn't sprayed?

23   A.   Yes, ma'am.  He had already declined EMS as well, so he

24   confirmed he wasn't sprayed.

25        MS. DAVIDSON:  Can you pull up Exhibit 5 for me,

1  please?

2  BY MS. DAVIDSON:

3  Q.   Lieutenant Brooks, I'm referring to what's been pre-marked

4  as Exhibit 5.  Is this a picture you took of Officer Robey to

5  document that he had OC spray, was affected by it?

6  A.   Yes, ma'am.

7  Q.   And Officer Robey's eye is red in this picture, correct?

8  A.   Yes.

9  Q.   Did you have any other interactions with Mr. McCullough

10 that night?

11 A.   No.  It should be noted on that photo of his eye:  It's

12 not that the eye was red, it's that even in taking the photo he

13 was trying to get his eye open.  It was very different -- I

14 know that's a photo of a red eye, but even getting that picture

15 of his eye open was -- he was very clearly affected by it.

16 Q.   So did you do an investigation related to this incident?

17 A.   Yes, I'm mandated to do when OC spray is deployed.

18 Q.   Was it for Officer Robey's use of force?

19 A.   Specifically for the use -- it was specifically for the

20 deployment of the OC spray of Officer Robey?

21 Q.   If Officer Robey had not deployed his OC spray during this

22 incident, would a use-of-force investigation have been done?

23 A.   No, no.

24 Q.   Who completes use-of-force investigations?

25 A.   I initiate them.  They are completed above my rank.

1    Q.    So you start the process?

2    A.    Yes.

3    Q.    And is height and weight of a person a factor that you

4    take into consideration?

5    A.    Height and weight is a factor that the officer involved in

6    determining whether or not to use force -- that they would take

7    into consideration.

8    Q.    Are there any other factors that would be taken into

9    consideration?

10   A.    Many, yes.

11   Q.    And what are some of those?

12   A.    It's come up before.  One of the examples that comes to

13   mind again:  If you've had a history with an individual who's

14   been known to fight with you in the past, obviously that would

15   be something you would have to be aware of at this time.  If

16   you know an individual has a history of unique violence in

17   general, that's worth knowing.  If an individual has fighting

18   history -- they're a boxer or UFC cage fighter or something.

19   All of this can be taken in.  Age, health, fitness,

20   athleticism, anger issues, emotional issues, psychological

21   problems; anything like that can all be a factor.

22   Q.    So in this incident specifically, would Mr. McCullough's

23   YouTube page be a factor to consider in the investigation?

24   A.    For use of force?

25   Q.    Yes.  Was it considered?

1    A.    I thought it was noteworthy, yes.

2    Q.    Why?

3    A.    He has a YouTube page called The Resistance and he seeks

4    out police to film in order to get YouTube likes for those

5    interactions.  I imagine if you call your web page The

6    Resistance, it would be less popular if you were super cordial

7    and polite with the police.  So I think that I would have had a

8    concern that any interaction with Mr. McCullough, he would

9    benefit on his YouTube page by showing resistance, and so, yes,

10   if I was about to arrest him, that would be a factor in my mind

11   that I'd be looking for that to not happen, hopefully.

12   Q.    What did you do to prepare this report for the incident,

13   this incident?

14   A.    I reached out to all the officers that I could identify

15   that were on scene and I asked them to prepare reports.  I read

16   those reports and I spoke to those officers.  I had Officer

17   Robey write a report about what took place in supplement to the

18   arrest report that he had to write as part of just any arrest.

19   I had -- I had taken the photos, as we discussed.  I had also

20   looked up Rule 304 -- it's the rule and reg on use of force --

21   to just make sure that -- just the verbal breakdown of what I

22   got of what had taken place, I had a good understanding of

23   where that fit in for my district level investigation

24   initiation.

25             I had also reviewed some body-worn camera from any of

1   the cameras that were available to me at that time.  It should

2   be noted they're not available immediately so I had to wait for

3   that.  And I had spoken to the EMTs.  Mostly a question of just

4   talking to everybody who was involved and then reviewing

5   whatever video and stuff and taking my own photos.

6   Q.   When did you finish that report?

7   A.   One shift later because, at the time of this shift, those

8   videos weren't available to me.

9   Q.   So, fair to say April 26?

10  A.   It was April 26.

11  Q.   And what did you determine happened in your report?

12  A.   I determined that Officer Robey had made a decision to

13  place an individual under arrest.  I determined that Officer

14  Robey, when making an arrest, is allowed to put someone's hands

15  behind their back and handcuff them; that, in this case here,

16  when he made an effort to do so, the individual did not comply

17  with the arrest, and that he was initially sort of passive and

18  increasingly active and pulling away.

19       And in doing so, Officer Robey had opted to use the OC

20  spray to be on the ready and, in doing so, Officer Robey had --

21  I don't know if it was an accidental discharge or it squirted

22  it on his finger and later touch his eye.  I can't say if --

23  Officer Robey can speak better to that than me.  And I

24  determined that, in doing so, they placed him under arrest and

25  the rest of it is all in the video.  There's a lot of yelling

1  from Mr. McCullough.

2          MS. DAVIDSON:  Can I just have one minute, Your Honor?

3          THE COURT:  You may.

4  BY MS. DAVIDSON:

5  Q.   In your opinion, did Officer Robey use excessive force?

6          MR. O'NEILL:  Objection.

7          THE COURT:  Jurors, this is only an opinion.  This is

8  not to take the issue away from you.

9          THE WITNESS:  I do not believe he used excessive

10 force, no.

11         MS. DAVIDSON:  I have nothing further.

12         THE COURT:  Mr. O'Neill?

13         MR. O'NEILL:  Thank you, Your Honor.

14                          CROSS-EXAMINATION

15 BY MR. O'NEILL:

16 Q.   Just still in the morning, Lieutenant Brooks, so good

17 morning.

18 A.   Good morning, sir.

19 Q.   I want to start with some of the testimony you just ended

20 with.  So you just spoke with Ms. Davidson about a report that

21 you authored about the interaction between Officer Robey and

22 Mr. McCullough, correct?

23 A.   Yes.

24 Q.   And you just said that Officer Robey had -- based on what

25 you reviewed, Officer Robey had the canister of OC spray in his

1   hand as he was attempting to handcuff Mr. McCullough, correct?

2   A.   I can't say exactly what he had in his hand.  He had it in

3   his hand at one point during the interaction because it

4   sprayed.  It has a cap, they don't go off in pockets, generally

5   speaking.  So it was in his hand.  He stated it was in his hand

6   at one point.  I can't say for certain at what point it came

7   up.

8   Q.   But it was in his hand at some point as he was at one

9   point attempting to put the handcuffs on Mr. McCullough,

10   correct?

11   A.   During the interaction, I would say yes.  I don't know if

12   it came out during that.  I can't say from the body cam.

13   Q.   And based on everything you reviewed, you determined that

14   how Officer Robey handled the OC spray was an unsafe handling

15   of the OC spray, correct?

16   A.   I did in that it was an accidental discharge.

17   Q.   But even if it hadn't sprayed, the way he handled it was

18   unsafe, correct?

19   A.   Yes.

20   Q.   And a safe handling of the OC spray would have been if he

21   had the opportunity to put the canister back in the holder?

22   A.   And that's what I want to clarify.  It's not that it was

23   unsafe in the fact of him having it out.  I'm perfectly fine

24   with him having the OC spray in his hand the entire time.  What

25   I'm saying is I don't know it was an accidental spray from an

1   unsafe handling specifically or if, during the struggle, it got

2   grabbed.  That's something I would have no way of determining.

3         So I'm saying that, yes, it's possible that it was

4   unsafe handling, or it's possible it got squeezed in the

5   struggle with Mr. McCollough.  That's something I can't

6   determine that with certainty.  I initiate the report; I don't

7   finalize it.

8   Q.   But in the report, you determined that it was -- the way

9   Officer Robey handled the OC spray was unsafe handling of the

10   OC spray, correct?

11   A.   It could be unsafe, yes.

12   Q.   You talked to Ms. Davidson about reviewing body-worn

13   camera video before you -- as part of your use-of-force

14   investigation, correct?

15   A.   Yes, sir.

16   Q.   And you reviewed Officer Robey's body-worn camera footage

17   before -- as part of your investigation, correct?

18   A.   Yes.

19   Q.   You didn't have the opportunity to view Officer Woods'

20   body-worn camera video before completed your report, correct?

21   A.   We talked about this previously and I said I wasn't

22   certain at what point I had done it, I had reviewed his.

23   Q.   You don't recall doing it before you completed your

24   report, correct?

25   A.   I don't recall one way or another right now.

1  Q.    You also, in your report, mentioned that Mr. McCullough

2  didn't comply with any of Officer Robey's orders in the lead-up

3  to their arrest, correct?

4  A.    Can you repeat that?

5  Q.    In your report, you noted that Mr. McCullough didn't

6  comply with any of the orders given by Officer Robey in the

7  lead-up to him being handcuffed, correct?

8  A.    Is that my exact wording?  I would -- you're saying that's

9  what my report says?  I don't think that's my exact wording.

10  Q.    Let me ask you this then:  You determined that

11  Mr. McCullough didn't comply with Officer Robey's orders in the

12  lead-up to Mr. McCullough being handcuffed, correct?

13  A.    You're saying that's a determination I made?  Specifically

14  that sentence?

15  Q.    Correct.

16  A.    I don't believe that's what I said in the report, sir.

17  But yes, I'm of the opinion he was not following Officer

18  Robey's orders.

19  Q.    At any time, right?

20  A.    See, you keep adding the "at any time."  That's not what

21  the report says.  It was up to that point, I believe, was the

22  sentence I had written.

23  Q.    Okay.  So when you say "up to that point," what do you

24  mean?

25  A.    The point of arrest.

1   Q.   So up to the point of Mr. McCullough being handcuffed, he

2   had not followed Officer Robey's orders, correct?

3   A.   That's correct.

4   Q.   You spoke a little bit about the effects that OC spray can

5   have on individuals with Ms. Davidson, correct?

6   A.   Yes.

7   Q.   You described it as an irritant, right?

8   A.   Yes.

9   Q.   And it can affect different people differently, correct?

10   A.   Yes, sir.

11   Q.   So, for example, some people can have extreme difficulty

12   breathing if the OC spray is deployed on them, correct?

13   A.   That's correct.

14   Q.   And then some people can have limited or minimal affect on

15   their breathing if it's deployed on them, correct?

16   A.   I would agree.

17   Q.   And then everything in between there, correct?

18   A.   That's true.

19   Q.   One of the effects that OC spray has is pain, correct?

20   A.   Yes.  Irritant, yes.

21   Q.   It's extremely uncomfortable or can be, correct?

22   A.   I would agree.

23   Q.   When OC spray is deployed, it affects -- it can affect

24   anybody who is nearby where the air gets deployed, correct?

25   A.   They could be very aware of it, yes.

1    Q.   And it can cause some level of the irritation we've
2    described even if --
3    A.   The breathing stuff, yes.
4    Q.   And it can cause burning as well, correct?
5    A.   Depending on how close you were.  If someone sprayed near
6    here I wouldn't hurt my eyes, but the irritant, the breathing,
7    I think would have a wider berth.
8    Q.   You spoke with Ms. Davidson about Mr. McCullough's YouTube
9    videos being a factor in whether someone can use force against
10   him in effectuating an arrest, correct?
11   A.   I absolutely did not say that.
12   Q.   Okay, I apologize.  You did describe, though, that the
13   fact that his YouTube channel was entitled The Resistance could
14   be a factor, correct?
15   A.   Right, but we were talking about my report.  It's a factor
16   in me determining what I have to -- I have to determine of --
17   like you referenced before:  Up to this point, is someone going
18   to comply?
19        I'm saying, in my opinion -- and I can't guess the
20   opinion of Officer Robey, but, in my opinion, in that scenario,
21   I would presume my efforts for saying, "Comply.  Put your hands
22   behind your back," and he's not following those things, he's
23   not going to suddenly stop and comply.  I believe this is a
24   factor that would go on for a long time.  His videos would get
25   longer, he would get more subscribed views.  If the guy says,

1    "Fair enough," sorry, no.

2          So in my opinion, his website is a factor in that his

3    failing to follow orders was not going to suddenly just turn

4    off.  That's a personal opinion of mine, sir.

5    Q.   And you were aware that Officer Robey, at the time he

6    arrested Mr. McCullough on April 25, 2020, he was aware of

7    Mr. McCullough's videos, correct?

8    A.   I would definitely guess yes, but I have no place to speak

9    for what Officer Robey knows.

10   Q.   Well, if he didn't know about those videos, then he would

11   have no ability to use it as a factor in his -- in determining

12   his use of force, correct?

13   A.   Again, I'm aware.  I don't know if I can testify in front

14   of the jury -- I'm very comfortable that I believe Officer

15   Robey knew about it.

16   Q.   I want to go back to OC spray.  So you explained that OC

17   spray comes in a canister, correct?

18   A.   Yes.

19   Q.   And there's a button on the top of the canister that a

20   person has to depress in order to deploy the OC spray, correct?

21   A.   Correct.

22   Q.   And that button has a flap over the top of it, correct?

23   A.   Like a -- it's like a three-quarter flap.  Like one

24   quarter is open and three quarters are covered so when the flap

25   lifts, it's one quarter sort of exposed.

1    Q.    And in order for -- that flap has to be flipped upward in

2    order to depress the button to deploy the spray, correct?

3    A.    You can slide your thumb between the two but, yes, there's

4    a cap to lift the two.  But yes, you can put your thumb right

5    in between.  The cap is to protect it if something comes on top

6    of it.

7    Q.    Well, if you slide your thumb in between them, you're

8    sliding your thumb under the flap, correct?

9    A.    Correct.

10   Q.    You don't recall -- let me back up.  On any event in which

11   you were a primary, you don't recall hearing about OC spray

12   being accidentally deployed, correct?

13   A.    While I was right there on scene I don't know off the top

14   of my head.  I don't think so.

15   Q.    So just to be clear, you don't recall any event you were a

16   primary on, any event you were directly involved in, you don't

17   recall hearing about or viewing OC spray being accidentally

18   deployed, correct?

19   A.    I have definitely heard about incidents where there was an

20   accidental OC spray.  I definitely heard of that.  I have

21   personally never had one.

22   Q.    And you've never seen it in person, correct?

23   A.    Like, directly in front of me an accidental OC spray?

24   Q.    Correct.

25   A.    That's correct.  I've never had one directly in front of

1   me.

2   Q.   Generally speaking, officers should only use OC spray when

3   they're defending themselves or another person or when they're

4   met with active resistance, correct?

5   A.   That's a general description of it, yes.

6   Q.   And that's a correct description of it as well?

7   A.   It's a general description of it, yes.  The rule of reg is

8   longer than a sentence but yes.

9   Q.   But do you agree with that description?

10  A.   That that is a portion of it, yes.

11  Q.   If tactically safe and feasible, officers are required to

12  give verbal warnings or commands when force is going to be

13  used, correct?

14  A.   Correct.

15  Q.   From your perspective, Mr. McCullough is not a danger to

16  the community, correct?

17  A.   I don't know Mr. McCullough's danger level.

18  Q.   So you do or do not believe he's a danger to the

19  community?

20  A.   I don't have an opinion on it; I don't know.  It could be,

21  I don't know.

22  Q.   So you're --

23  A.   I have no information that says he is or no long-term

24  knowledge of him to know that he isn't.

25  Q.   Let me ask you this:  In the lead-up to April 25, 2020,

1    from your perspective, Mr. McCullough is not considered a

2    danger to the community, correct?

3    A.   I don't know how to answer that.  He wasn't not

4    considered -- I've never met him and feared him attacking me or

5    anything.  I already testified:  I've had interactions with

6    him, I thought they were cordial, I would have told you that he

7    and I got along pretty well.

8         That would have been my personal perception.  But I

9    admit there's a lot about Mr. McCullough I don't know.

10   Q.   You participated in a deposition in this matter, correct?

11   A.   That's correct.

12   Q.   You and I spoke?

13   A.   We did.

14   Q.   And you took an oath identical to the one you took here

15   today, correct?

16   A.   That's correct.

17        MR. O'NEILL:  Can you make this available just to the

18   witness, please?

19   BY MR. O'NEILL:

20   Q.   You see a transcript in front of you, correct?

21   A.   Not yet.

22   Q.   Are you able to see it now?

23   A.   I can, sir.

24   Q.   This is on page 45.  I'm going to direct your attention to

25   lines 10 through 16.  Were you asked the following questions

1  and did you give the following answers:  "Okay, so he's not

2  considered for example, like, a danger to the community,

3  correct?

4          "Not that I know of.

5          "And he wasn't considered that before April 25, 2020?

6          "Not to me.  I can only speak for myself.  Not to me."

7          You were asked those questions and gave those answers,

8  correct?

9  A.   Correct.

10  Q.   And those are -- when you're talking about "he," we're

11  talking about Mr. McCullough, correct?

12  A.   As I testify here today, I have never had a problem with

13  him, not to me, speaking personally, but not that I know of.

14  There's things I cannot know about a person, sir, and I can't

15  fill in those gaps.

16  Q.   When the COVID-19 curfew was in place, as far as you know,

17  no one was arrested for violating that curfew, correct?

18  A.   Not anytime that I saw.

19  Q.   You respect the fact that Mr. McCullough films police

20  officers and Government officials, correct?

21  A.   Yes, I have no issue with it.

22          MR. O'NEILL:  If I could have just one moment, Your

23  Honor.

24          THE COURT:  You may.

25          MR. O'NEILL:  Nothing further for me, Your Honor.

1          THE COURT:  Ms. Davidson, any further.

2          MS. DAVIDSON:  I have no redirect, Your Honor.

3          THE COURT:  Thank you very much, Lieutenant.

4          THE WITNESS:  Thank you.  Good afternoon.

5          MR. WHITESELL:  Your Honor, the defendants would call

6  officer Saequan Sparks-Clancy.

7          (The witness was sworn.)

8          THE CLERK:  Could you please introduce yourself,

9  spelling your last name for the record.  My name is Saequan

10  Sparks-Clancy.  S-P-A-R-K-S C-L-A-N-C-Y.

11                    SAEQUAN SPARKS-CLANCY,

12  having been duly sworn by the Clerk, was questioned and

13  testified as follows:

14                    DIRECT EXAMINATION

15  BY MR. WHITESELL:

16  Q.  Officer Sparks-Clancy, how old are you.

17  A.  I am 32 tomorrow, sir.

18  Q.  Congratulations, my birthday is today.  What do you do for

19  a living?

20  A.  I'm a Boston police officer.

21  Q.  And how long have you been a Boston police officer?

22  A.  A little over five years now.

23  Q.  Do you have a college degree?

24  A.  Yes, sir.

25  Q.  Is that an associate's or a bachelor?

1   A.   Associate's.

2   Q.   And what is that in?

3   A.   Criminal justice.

4   Q.   Where did you get that from?

5   A.   Quincy College, sir.

6   Q.   Did you get that on the job?

7   A.   Yes.

8   Q.   Were you ever in the military?

9   A.   Yes.

10   Q.   And what branch?

11   A.   The Army.

12   Q.   What year did you join?

13   A.   I joined in July of 2012.

14   Q.   Is that active duty?

15   A.   Yes, sir.

16   Q.   When did you leave active duty?

17   A.   February of 2017.

18   Q.   Is that an honorable discharge?

19   A.   Yes, sir.

20   Q.   And did you join the Reserves?

21   A.   Yes, I did.

22   Q.   How long were you in the Reserves?

23   A.   February of 2023, when I was up.

24   Q.   Are you still in the Reserves?

25   A.   No, sir.

```
 1   Q.   And were you in the Reserves while you were serving as a
 2   Boston police officer?
 3   A.   Yes.
 4   Q.   Do you have any children, sir?
 5   A.   Yes, sir.
 6   Q.   How many?
 7   A.   I have two.
 8   Q.   When did you attend the Boston Police Academy?
 9   A.   December of 2018.
10   Q.   And did you take an exam for attending the academy?
11   A.   Yes.
12   Q.   What kind of exam was that?
13   A.   Civil Service Exam.
14   Q.   And did your training at the academy include defensive
15   tactics?
16   A.   Yes.
17   Q.   Does that include BPD rules on the use of force?
18   A.   Yes.
19   Q.   And when did you graduate from the academy?
20   A.   Six months after 2018, so I'd say about July.
21   Q.   And what was your rank upon graduation?
22   A.   Police officer.
23   Q.   Has that always been your rank?
24   A.   Yes.
25   Q.   Where were you first stationed?
```

1    A.    I was first stationed in D-4 which is the South End.

2    Q.    And was that part of a probationary tour?

3    A.    Yes, sir.

4    Q.    And then where did you go after that?

5    A.    After that I went to B-3.

6    Q.    Was B-3 a permanent assignment?

7    A.    No, that was also part of my probation.

8    Q.    And were you on probation at the time of the incident in

9    this case?

10   A.    I believe I was, sir.

11   Q.    And when you say "probation,"  can you explain to the jury

12   what that means?

13   A.    So after you graduate from the Boston Police Academy,

14   you're placed on a probationary period for a year where, if you

15   follow all the rules and stuff like that, you then gain your

16   permanent status with the union.

17   Q.    So at this time you hadn't gained permanent status,

18   correct?

19   A.    No, I hadn't.

20   Q.    And how long total were you at B-3?

21   A.    Say about six months.

22   Q.    Are you there now?

23   A.    No.

24   Q.    Where are you stationed now?

25   A.    Now I'm in West Roxbury, District 5.

1   Q.   And how long have you been at D-5?

2   A.   I'd say two to three years.

3   Q.   But on the night of the arrest, you were assigned to B-3?

4   A.   Yes.

5   Q.   Prior to the events of the evening of the arrest of

6   Mr. McCullough that we're here for, did you know

7   Mr. McCullough?

8   A.   No.

9   Q.   Were you familiar with his YouTube channel?

10  A.   I've heard about it from other officers but I've -- wasn't

11  familiar with it.

12  Q.   Did you know what it was called?

13  A.   I believe it was called The Resistance.

14  Q.   Had you ever viewed it?

15  A.   No.

16  Q.   Have you ever viewed any of his videos?

17  A.   No.

18  Q.   Have you ever personally encountered Mr. McCullough prior

19  to the night of his arrest?

20  A.   No.

21  Q.   The night of the events in this case, what shift were you

22  working?

23  A.   I believe I was working the last half.

24  Q.   And what hours are last half normally?

25  A.   11:45 p.m. to 7:45 a.m.

1  Q.  And do you remember what your assignment was that night?

2  A.  I do not.

3  Q.  Did you recall having a partner that night?

4  A.  I don't remember.

5  Q.  When you first encountered Mr. McCullough and Officer

6  Robey that evening, had you left the station yet?

7  A.  No.

8  Q.  And do you remember what you were wearing that night?

9  A.  My department-issued uniform.

10  Q.  At approximately 2:22 a.m. that night, had you just

11  started your shift?

12  A.  12:22.

13  Q.  12:22, I'm sorry, I misspoke.

14  A.  Yes.

15  Q.  And you were at the B-3 station at that time?

16  A.  Yes.

17  Q.  And do you remember responding to a call?

18  A.  I remember responding to a scream.

19  Q.  So can you explain how that came about?

20  A.  Yes.  With the refresher of my Form 26, I heard a

21  screaming saying, "He's trying to kill me" in the rear parking

22  lot of B-3.

23  Q.  And did you go to the back of the parking lot in B-3?

24  A.  Yes.

25  Q.  And you said -- I think you said just a minute ago with

1    the refresher of your Form 26.  What's a Form 26?

2    A.   A Form 26 is an internal department report that you give

3    to your captain.

4    Q.   And you did one in this case?

5    A.   Yes.

6    Q.   Was it at the request of then-Sergeant Brooks?

7    A.   Yes.

8    Q.   And was he the patrol supervisor that night?

9    A.   Yes.

10   Q.   Did you know why he was asking for a Form 26?

11   A.   Just for the details of the event.  I believe the entire

12   event that happened that night.

13   Q.   And you did do a Form 26?

14   A.   Yes, I did.

15   Q.   In the course of this case you had opportunities to review

16   that Form 26?

17   A.   Yes.

18   Q.   Prior to reviewing the Form 26, did you remember this

19   incident?

20   A.   I did not.

21   Q.   Was there any reason you didn't remember it?

22   A.   It happened almost five years ago.

23   Q.   Did anything abnormal happen that night when you were

24   involved with Mr. McCullough?

25   A.   Can you clarify.

1    Q.    Did anything stand out about that night in your

2    involvement with Mr. McCullough?

3    A.    No.

4    Q.    And when you reviewed your Form 26 you were able to recall

5    the details of what occurred that night?

6    A.    Yes, some of it.

7    Q.    So where specifically were you located when you heard the

8    man screaming?

9    A.    I don't remember.  I just know I was in the parking lot of

10   B-3.

11   Q.    This was early on in the global pandemic, correct?

12   A.    Yes.

13   Q.    Were there any BPD procedures or things that were -- the

14   way things were done that changed because of the pandemic?

15   A.    I believe we had roll call outside only because of the

16   pandemic and we were working, like, split shifts.

17   Q.    So what did you do when you heard the individual yell?

18   A.    I believe I went towards Officer Robey at the time just to

19   see what was going on because I heard screaming.

20   Q.    And what did you observe?

21   A.    I observed, again, with my 26 Mr. McCullough screaming,

22   "He's trying to kill me."  He was placed under arrest, he had

23   handcuffs on, he was violently pulling away from the officers,

24   his body going towards the direction of Blue Hill Ave.

25   Q.    Were there other officers there besides Officer Robey at

1  that time?

2  A.  I don't recall.

3  Q.  You said Mr. McCullough, and I think you said you knew

4  that because of your Form 26.  When you were there that night,

5  did you know it was Mr. McCullough?

6  A.  No.

7  Q.  And were you and the other officers that were present

8  there able to get Mr. McCullough under control?

9  A.  Yes.

10  Q.  And where did you take him at that point?

11  A.  After he was under control, I believe he went to the

12  booking area to be processed.

13  Q.  At some point did you enter the booking area?

14  A.  Yes.

15  Q.  And did you recall noting that OC spray might have been

16  discharged that evening?

17  A.  Yes.

18  Q.  Did you smell it?  How did you know that it had been

19  discharged?

20  A.  I believe my eyes were irritated, I wrote on my Form 26.

21  Q.  Do you have any idea where the OC spray was discharged?

22  A.  No.

23  Q.  Did you ever see Mr. McCullough with a hood pulled over

24  his face?

25  A.  Yes.

1   Q.   Did Mr. McCullough ever indicate that he was having

2   trouble breathing because of the hood?

3   A.   Yes.

4   Q.   What did you do when you heard that?

5   A.   As soon as I heard it, I immediately took off his hoodie.

6        MR. O'NEILL:  No further questions, Your Honor.

7        THE COURT:  Mr. O'Neill.

8        MR. O'NEILL:  Thank you, Your Honor.

9                          CROSS-EXAMINATION

10  BY MR. O'NEILL:

11  Q.   Good afternoon, Officer Sparks-Clancy.

12  A.   Good afternoon, sir.

13  Q.   Happy early birthday.

14  A.   Thank you.

15  Q.   You just spoke with Mr. Whitesell about your eyes being

16  irritated because of OC spray, correct?

17  A.   Yes.

18  Q.   And that happened -- you were experiencing that when you

19  were in the caged area near the booking area, correct?

20  A.   Yes.

21  Q.   And you were experiencing that when you were standing --

22  when you were standing near Mr. McCullough's upper body,

23  correct.

24  A.   I believe so.

25  Q.   You've never accidentally sprayed anyone with OC spray or

1    pepper spray, correct?

2    A.    I have not.

3    Q.    You've never heard of other people, other officers

4    accidentally spraying people with OC spray or pepper spray,

5    correct?

6    A.    I have not.

7    Q.    You don't recall Mr. McCullough spitting on anyone,

8    correct?

9    A.    I don't recall.

10   Q.    So you don't recall him spitting on anybody, correct?

11   A.    No.

12   Q.    You never saw Mr. McCullough hit anybody, correct?

13   A.    No.

14   Q.    Do you recall seeing -- do you recall seeing

15   Mr. McCullough, a part of his body, hit the brick wall next to

16   the wagon bay door, correct?

17   A.    No.

18   Q.    And you don't recall Mr. McCullough breaking control --

19   the control that Officer Robey had on him, correct?

20   A.    During which part?

21   Q.    At any point.

22   A.    I'd say towards before going into the booking area, as I

23   stated, he was violently pulling away from officers, so we

24   needed more officers to get him under control.

25   Q.    But he didn't break control at that point, correct?

1  A.   I don't recall.

2  Q.   You don't recall if he did, correct?

3  A.   I don't recall if he did during the booking area but

4  before that, yes.

5  Q.   So in the -- in transporting him from -- or outside the

6  wagon bay door there was a point in time where --

7  A.   There was a point in time where more officers needed to

8  come.  It wasn't enough for one officer to keep Mr. McCullough

9  under control.

10 Q.   But Officer Robey had at least one hand on Mr. McCullough

11 or his handcuffs at all times, correct?

12 A.   I don't recall.

13 Q.   You were told about Mc -- let me back up.  During roll

14 call on -- in the early morning of April 25, 2020, you were

15 told about Mr. McCullough for officer awareness, correct?

16 A.   During roll call.  I don't know if it was that specific

17 day.

18 Q.   But you don't --

19 A.   It was said during roll call but I don't know if it was

20 that specific day.

21 Q.   You don't recall if it was on April 25, 2020?

22 A.   Correct.

23 Q.   But there had been previous times during roll call where

24 Mr. McCullough was mentioned?

25 A.   Yes.

1          MR. O'NEILL:  Nothing further from me, Judge.

2          THE COURT:  Anything?

3          MR. WHITESELL:  No, Your Honor.

4          THE COURT:  Thank you very much, Officer

5     Sparks-Clancy.

6          THE WITNESS:  Thank you, Your Honor.

7          THE COURT:  Jurors, we have one more witness as I

8     understand it.  Let's hear from that witness for the next few

9     minutes.  We have lunch coming at 12:45.  I think we'll then

10    finish up.  As I suggested yesterday, shortly after lunch we

11    should be done with the evidence in the trial.

12         MR. WHITESELL:  Your Honor, the defense would call

13    Officer Frank Woods to the stands.

14         (The witness was sworn.)

15         THE CLERK:  Could you please introduce yourself to the

16    jury, spelling your last name for the record.

17         THE WITNESS:  Good afternoon, my name is Frank Woods,

18    real name is Francis Woods.  Last name is W-O-O-D-S.

19         MS. DAVIDSON:  May I proceed Your Honor?

20         THE COURT:  You may.

21                         FRANCIS WOODS,

22    having been duly sworn by the Clerk, was questioned and

23    testified as follows:

24                      DIRECT EXAMINATION

25    BY MS. DAVIDSON:

1  Q.  Good afternoon, Officer Woods.

2  A.  Good afternoon.

3  Q.  How old are you?

4  A.  I'm 40 years old.

5  Q.  Where were you born?

6  A.  Malden, Massachusetts.

7  Q.  Do you go by any other names?

8  A.  My real name is Francis but I usually go by Frank.

9  Q.  Are you married?

10  A.  I am.

11  Q.  Do you have children?

12  A.  I do.  Two.

13  Q.  What are their ages?

14  A.  Seven and four.

15  Q.  Where did you attend high school?

16  A.  Stoneham high school.

17  Q.  Did you go to college?

18  A.  I did.

19  Q.  Where did you go to college?

20  A.  For undergrad I went to Assumption College which is now

21  assumption university out in Worcester, Mass. And for my

22  master's, I went to Lasell University.

23  Q.  And do you have a bachelor's degree?

24  A.  I have a bachelor's degree in history from assumption.

25  Q.  And what do you have your master's degree in?

1    A.    Criminal justice.

2    Q.    Do you have any other degrees?

3    A.    No.

4    Q.    What do you do for a living?

5    A.    I'm a police officer for the City of Boston, Boston

6    police.

7    Q.    When did you join the Boston Police Department?

8    A.    I joined the Boston Police Department in September of

9    2017.

10   Q.    Since 2017, have you held the rank of police officer?

11   A.    I officially hit the streets in April of 2018.  Before

12   that I was a recruit in the academy.

13   Q.    So about how long have you been a police officer?

14   A.    Approximately six years.

15   Q.    What districts have you worked in?

16   A.    My first rotation was district D-4 which was Back Bay,

17   South End, Fenway.  After that, I went to District 18 which is

18   Hyde Park and a part of Mattapan.  After that I went to

19   District B-2 which is Roxbury and part of Dorchester, and then

20   my permanent assignment was then District B-3 which is Mattapan

21   and parts of Dorchester.

22   Q.    What district are you currently assigned to?

23   A.    District B-3.

24   Q.    And are you in a specialized unit currently?

25   A.    I'm a patrol officer in District B-3 but my assignment is

1    in the auto investigations room.

2    Q.   How long have you been assigned to district B-3?

3    A.   Since April of 2019.

4    Q.   Where were you assigned on the night of the events in this

5    case?

6    A.   I was assigned as a patrol officer to the first half shift

7    in B-3.

8    Q.   Before you became a police officer, what did you do for a

9    living?

10    A.   I had a career in human resources with my final HR

11    experience being for the City of Boston's IT department in City

12    Hall.

13    Q.   And when you became a police officer, did you receive

14    training?

15    A.   I did.

16    Q.   Was that through the BPD academy?

17    A.   Them.

18    Q.   Can you please explain to the jury what type of training

19    you receive at the Boston Police Academy?

20    A.   My academy was a little over six months.  We went through

21    constitutional law, criminal law, City of Boston municipal law,

22    motor vehicle, domestic violence, scenario-based training,

23    physical training; things of that nature.

24    Q.   Did you receive training at the academy include defensive

25    tactics?

1   A.   Yes.

2   Q.   And did that include the Boston police rules on the use of

3   force?

4   A.   Yes.

5   Q.   Do you receive any in-service training now as a police

6   officer?

7   A.   Yes, annually.

8   Q.   And can you explain to the jury what in-service training

9   is?

10   A.   In-service will cover any updates to the law, any updates

11   to BPD-specific rules and regs that we need to know.  CPR

12   training, really just anything that needs to be updated.

13   Q.   When you were at the Boston Police Academy, did you

14   receive training specifically related to OC spray?

15   A.   I did in the police academy.

16   Q.   And what is OC spray?

17   A.   OC spray is -- it's like an aerosol-type spray.  It can be

18   an irritant or, you know, it's -- yeah, it comes in a canister

19   about this big and there's a plastic top where there's, like, a

20   flip top on the top.

21   Q.   What training did you receive about OC spray?

22   A.   We learned about it in the classroom, and then we were

23   actually physically sprayed and put through, like, a

24   scenario-based training after you're pepper sprayed -- OC

25   sprayed.

1    Q.   I was just going ask you, is OC spray commonly referred to

2    as pepper spray?

3    A.   Yeah, commonly referred to.  People will call it pepper

4    spray.

5    Q.   And what does pepper spray smell like?

6    A.   It's pretty distinct.  I think it kind of has, like, a hot

7    peppery smell.

8    Q.   And when it's sprayed, does it have a specific color?

9    A.   Yeah, it's like a reddish/brownish-like orange type.  So,

10   like, if -- typically if it's on someone's skin or on their

11   clothes, you'll be able to see it.

12   Q.   Does the department issue OC spray?

13   A.   They do.

14   Q.   And do you carry it on your duty belt?

15   A.   I do.

16   Q.   How do you discharge your OC spray?

17   A.   You're supposed to take it out of your belt, flip the top

18   up and then press down on it.

19   Q.   Have you ever accidentally sprayed your OC spray?

20   A.   I have not.

21   Q.   Before the night of the incident that happened in this

22   case, did you know John McCullough?

23   A.   I was familiar with him.

24   Q.   How so?

25   A.   Just familiar that he had been videotaping police

1    stations, police stops, some other buildings and areas in

2    public.

3    Q.    Has Mr. McCullough videotaped you before?

4    A.    I'm not -- as far as if he had taped me, his typical

5    interaction is, name and badge, name and badge.  But I can't

6    recollect if he had said name and badge to me prior to that or

7    after that, but I know that I've been on Mr. McCullough's

8    films.

9    Q.    Do you know about Mr. McCullough's YouTube channel?

10   A.    I do.

11   Q.    Do you know what his YouTube channel is called?

12   A.    The Resistance.

13   Q.    And how do you know about his YouTube channel?

14   A.    It had been brought to my attention.

15   Q.    Have you seen any of the videos?

16   A.    I have.

17   Q.    I'm now going to draw your attention to the incident of

18   why we're here that occurred on April 25, 2020.  Were you

19   working that night?

20   A.    Yes.

21   Q.    What shift were you working?

22   A.    I was working a first half shift which under normal

23   circumstances would be from 4:00 p.m. to 11:45 p.m.  Due to the

24   global pandemic, the department had, kind of, done a split

25   shift.  Based on my seniority, my shift was then moved from

1   5:00 p.m. to 12:45.  So I had done a day tour, and then I had,

2   like, an hour break between 4:00 and 5:00 and then a did a

3   second shift.

4   Q.   Did you have a partner assigned to you that evening?

5   A.   I did.  He had finished his tour at 11:45 so I was riding

6   as, like, one half of the Charlie 111 Frank, which is a rapid

7   response car.

8   Q.   And is the Charlie 111 Frank a call sign?

9   A.   Yeah, it's a call sign for a rapid response car in

10  District B-3.

11  Q.   And can you explain to the jury what a rapid response car

12  is?

13  A.   Rapid response car is a two-officer assignment.  They'll

14  go to things that require an immediate response whether it's a

15  robbery, person with a gun, breaking and entering, even a

16  building alarm.  So that's what a rapid response is, primarily

17  their responsibilities.

18  Q.   Was your partner Officer Robey that night?

19  A.   No.

20  Q.   Did you assist Officer Robey with a traffic stop that

21  night?

22  A.   I did.

23  Q.   And why did you assist him?

24  A.   It's common to assist an officer who's conducting a

25  traffic stop.  I can't with 100% certainty say that if I saw it

1  on our CAD or if I had just driven past, but, either way, I saw

2  a traffic stop and I got out to assist.

3  Q.  Where was this traffic stop?

4  A.  On Blue Hill Ave. near Ansel Street, and that's a section

5  of Dorchester.

6  Q.  And around what time did you assist him with this traffic

7  stop?

8  A.  This was around 12:30.

9  Q.  What were you wearing?

10  A.  Boston police uniform.

11  Q.  What type of car were you in?

12  A.  I was in a marked Boston police cruiser, a Ford Explorer.

13  Q.  Where did you park your cruiser when you arrived?

14  A.  Behind Officer Robey's.

15  Q.  How did you park your cruiser?

16  A.  I parked behind his -- I think it was actually a little

17  bit offset, but I didn't want to take up the other lane so --

18  but it would have been behind his cruiser.

19  Q.  And why did you park like that?

20  A.  That's how we're trained to park to provide safety for

21  both the stop, the officer, the other car that's involved, too,

22  and the other occupants.

23  Q.  Which lights did you have activated on your cruiser?

24  A.  Overhead lights and headlights.

25  Q.  After you parked your cruiser, can you tell the jury what

1   happened?

2   A.   After I parked my cruiser I went up to observe the traffic

3   stop on the passenger side of the vehicle.

4   Q.   Why did you do that?

5   A.   Just for officer safety.  If there's multiple people in

6   the car and the first officer is on the driver's side, they

7   won't really be able to see what's going on on the other side

8   of the car, so it's commonplace for another officer to go on

9   the other end.

10  Q.   So it's normal practice to go on passenger side when

11  you're assisting a traffic stop?

12  A.   Yeah, if the first officer goes to the driver's side, it's

13  normal for the other person to go on the other side.

14  Q.   In this instance, where were you positioned?

15  A.   I was near the -- I was on the passenger side of the car.

16  Yeah, I was on the passenger side of the car.

17  Q.   Were you on the sidewalk?

18  A.   I don't recall.  I think I had made my way on the sidewalk

19  at some point, but I'm not 100% sure.

20  Q.   At this point, did you have your body-worn camera on?

21  A.   I did not.  I wasn't engaged in the traffic stop, my

22  body-worn camera wasn't on.

23  Q.   As the traffic stop was going on, where was Mr. McCullough

24  when you noticed him the first time?

25  A.   I don't recall where, but I do know that at a certain

1  point I saw him.  We were sharing the same sidewalk.

2  Q.    How did you know that it was Mr. McCullough?

3  A.    I had recognized him. As I stated earlier, I was familiar

4  with him.

5  Q.    And where were you when you noticed him?

6  A.    I think, at that point, I was on the sidewalk.

7  Q.    Were there a lot of people out on this night?

8  A.    There weren't many people out.  This was during the global

9  pandemic and the governor had issued a curfew, I believe, it

10  was 9:00 p.m.

11  Q.    After you had noticed Mr. McCullough, can you please tell

12  the jury what happened next?

13  A.    After I noticed Mr. McCullough, Officer Robey I thought

14  had concluded his traffic stop.

15  Q.    So what did you do when you thought he concluded his

16  traffic stop?

17  A.    When I thought the traffic stop concluded, I went back to

18  my cruiser.

19  Q.    Did you get in your cruiser?

20  A.    I think I did either get in or at least partially got in.

21  Q.    Did you end up driving away?

22  A.    No.

23  Q.    Why not?

24  A.    I noticed that Officer Robey and Mr. McCullough were now

25  engaging and dealing with each other.

1    MS. DAVIDSON:  I'm going to pull up Exhibit 3.

2  BY MS. DAVIDSON:

3  Q.    Officer Woods, from this small portion of Exhibit 3, is

4  this your body worn camera?

5  A.    It.

6  Q.    And there -- the small portion we just saw -- is this the

7  point where you're going to assist Officer Robey because you

8  see him engaging with Mr. McCullough?

9  A.    It is.

10  Q.    Can you explain to the jury what is happening in this

11  scene, the portion that was just played?

12  A.    I'm now going back to my cruiser again because I thought

13  that that interaction had ended.

14  Q.    And why did you think the engagement between the two of

15  them was over?

16  A.    I saw Mr. McCullough on the sidewalk and I saw Officer

17  Robey turning and I believed that he was going back to his

18  cruiser as well.

19  Q.    What is that beep noise that we hear at 30 seconds?

20  A.    That beep is the sound of my camera as it begins to record

21  including audio.

22  Q.    Why is there no sound in the first 30 seconds of your

23  body-worn camera?

24  A.    Because the way that the body camera works is that it will

25  go back -- as long as it's actively buffering -- which is, when

1    it has the green light it's actively buffering, when you

2    activate it, it goes back the previous 30 seconds, so it's

3    going to get all that visually, but it's not going to get the

4    audio.  The audio turns on when it's officially activated.

5    Q.   And why did you decide to activate your body-worn camera

6    at this time?

7    A.   I thought it was clear now that Officer Robey was engaging

8    with him and it looked like he was going to effect an arrest.

9    Q.   And why did you turn back around?

10   A.   Well, I had turned back around because I heard something

11   which told me that there was something else I needed to

12   investigate.

13              (The video was played.)

14   BY MS. DAVIS:

15   Q.   At this point, had the car from the traffic stop left the

16   scene?

17   A.   I believe so.

18   Q.   And in this portion, who is saying, "Put your hands behind

19   your back"?

20   A.   That's Officer Robey.

21   Q.   And who is Officer Robey saying this to?

22   A.   Mr. McCullough.

23   Q.   And at this point, is Mr. McCullough complying with

24   Officer Robey's request?

25   A.   No.

1          (The video was played.)

2     BY MS. DAVIDSON:

3     Q.   Who was saying, "Put them behind your back"?

4     A.   I was saying, "Put them behind your back."

5     Q.   And who was saying "Stop resisting"?

6     A.   I was also saying "Stop resisting."

7     Q.   Who has handcuffs out?

8     A.   Officer Robey.

9     Q.   Did you?

10    A.   No.

11    Q.   Did you grab one of Mr. McCullough's arms?

12    A.   I did.

13    Q.   And at the beginning of this portion of the video, is that

14    the first time that you touched Mr. McCullough?

15    A.   Sorry, repeat that?

16    Q.   At the beginning of this, is that the first time you made

17    contact with Mr. McCullough?

18    A.   In this moment right here?

19    Q.   Yup?

20    A.   Yes.

21    Q.   And did Mr. McCullough have anything in his hand?

22    A.   Yeah.  He had, like, a dark, like, black object.

23    Q.   Looking at the screen right here on the left side, is that

24    the object that you just described?

25    A.   Yes.

1   Q.   That's the object that was in Mr. McCullough's hand?

2   A.   Yes.  I just took it from his hand.

3        THE COURT:  Ms. Davidson, if you're going to move on,

4   why don't we break for lunch.  I think lunch just arrived

5   upstairs.  Jurors, as yesterday, 45 minutes and then, I think,

6   45 minutes and we'll be finished for the day.  The jury will be

7   excused for lunch and we'll be back in 45 minutes.

8        (A recess was taken from 12:45-1:32 p.m.)

9        THE COURT:  Ms. Davidson?

10       MS. DAVIDSON:  Thank you Your Honor.

11  BY MS. DAVIDSON:

12  Q.   Officer Woods, before the break I believe, you testified

13  about the object in the left-hand corner, correct?

14  A.   Yes, ma'am.

15  Q.   And what is that red object on the ground?

16  A.    That's a canister of OC spray.

17  Q.   And the black object on the left screen, did

18  Mr. McCullough let go of that object?

19  A.   I had to pull it from Mr. McCullough.

20  Q.   What did you do to get the object out of his hand?

21  A.   I continued to pull and, eventually, I was able to get it

22  loose.

23  Q.   Are police officers allowed to pry an object out of the

24  hands of someone who's under arrest?

25  A.   Yes.  They should haven't any objects in their hand.

1  Q.   And why is that?

2  A.   For safety.

3  Q.   Once you got the video holder out of Mr. McCullough's

4  hands, what did you do with it?

5  A.   I placed it on the ground.

6  Q.   And why did you drop it to the ground?

7  A.   I just wanted it away from Mr. McCullough, who we were

8  still effecting an arrest.

9        MS. DAVIDSON:  Can you please play Exhibit 3?

10        (The video was played.)

11  BY MS. DAVIDSON:

12  Q.   At this point, could you smell anything?

13  A.   Yeah, I could smell the faint pepper spray in the air

14  during the interaction here.

15  Q.   Did you spray the pepper spray?

16  A.   I did not.

17  Q.   Who was saying in this portion of the video, "What did you

18  spray me with?"

19  A.   That's Mr. McCullough.

20  Q.   And who says, "I didn't spray you with nothing"?

21  A.   That was Officer Robey.

22  Q.   Were you affected by the pepper spray?

23  A.   I was not.

24  Q.   Do you know if Mr. McCullough was affected by the pepper

25  spray?

1   A.   He said he was in this part of the video.  He said,

2   "What'd you spray me with?" so it sounds like he was affected.

3   Q.   And is this the point where Mr. McCullough is officially

4   handcuffed?

5   A.   Yes, at this point he's officially in handcuffs with his

6   hands behind his back.

7   Q.   Who cuffed Mr. McCullough?

8   A.   Officer Robey and myself.

9          MS. DAVIDSON:  One minute, Your Honor.

10         (The attorneys confer.)

11  BY MS. DAVIDSON:

12  Q.   Would you have considered this a compliant arrest?

13  A.   No.

14  Q.   When someone is under arrest and they ask what they are

15  being arrested for, do you have to tell them?

16  A.   No, they'll eventually be transported back and they'll go

17  over their charges at the booking desk.

18         MS. DAVIDSON:  Can you please play Exhibit 3 to 2:04,

19  please?

20         (The video was played.)

21  BY MS. DAVIDSON:

22  Q.   Can you tell us what's happening in this portion of the

23  video?

24  A.   We're placing Mr. McCullough in Officer Robey's cruiser so

25  he can be transported back to B-3 for booking.

1   Q.   Did you know where Mr. McCullough's phone was when he was

2   asking for it?

3   A.   I didn't.

4   Q.   During Mr. McCullough's arrest, did you know if he was

5   recording?

6   A.   I didn't -- he didn't announce he was recording, but

7   Mr. McCullough records, so it's safe to assume that he was

8   recording.

9   Q.   Whose cruiser is Mr. McCullough being put in?

10  A.   Officer Robey's.

11  Q.   And are you the one that opens the back door to the

12  cruiser?

13  A.   That was my hand on the back handle.

14  Q.   Why are you assisting Officer Robey to get Mr. McCullough

15  into the cruiser?

16  A.   It's commonplace to have two officers put someone safely

17  into a cruiser.

18  Q.   So, fair to say it's normal to assist the arresting

19  officer when placing someone in the back of a cruiser when

20  they're under arrest?

21  A.   Yes.

22       MS. DAVIDSON:  Can you please play Exhibit 3 to 2:30,

23  please?

24       (The video was played.)

25  BY MS. DAVIDSON:

1   Q.   After Mr. McCullough was in the cruiser, what are you

2   doing?

3   A.   Standing at the -- waiting to figure out what's next.

4   Q.   What is Officer Robey doing?

5   A.   He's radioing for his supervisor.

6   Q.   And why does Officer Robey radio for a supervisor?

7   A.   His OC spray went off.

8   Q.   And is that procedure, to call a supervisor when OC spray

9   is deployed or it goes off?

10   A.   Yes.

11       MR. WHITESELL:  Can you please play Exhibit 3 to 3:06.

12       (The video was played.)

13   BY MS. DAVIDSON:

14   Q.   In this portion of the video, why does Officer Robey

15   apologize to you?

16   A.   I think he thought he got spray on me.

17   Q.   And did he?

18   A.   No.

19   Q.   Who says, "I'm going to power down"?

20   A.   That was me.

21   Q.   And what does "power down" mean?

22   A.   Deactivate my body camera.  Mr. McCullough was already in

23   the back of the cruiser.

24   Q.   And I believe someone says, "staying on."  What does that

25   mean?

1    A.    Just keeping your body camera rolling.

2    Q.    And why did you ask Officer Robey if he was staying on?

3    A.    Well, if Officer Robey's camera is staying on and I was

4    going to be on scene, I was going to do the same as him.

5    Q.    And is that normal practice?

6    A.    Yeah.

7    Q.    And who says, "Half the 111 is here"?

8    A.    That's me.

9    Q.    And can you explain to the jury what "half the 111" means?

10   A.    I had started the shift as a two-man rapid response car as

11   a Charlie 111 Frank, so, in order to tell the dispatch that I

12   was there, and so they could understand the number of officers

13   there and the other officers, I said "half the 111."  So that

14   means I'm one member of the 111 so that way they would have me

15   there at the location and they could update the CAD.

16   Q.    What did Officer Robey get in his eye?

17   A.    OC spray.

18         MR. WHITESELL:  Can you please play Exhibit 3 to the

19   end for me, please.

20         (The video was played.)

21   BY MS. DAVIDSON:

22   Q.    Who shows up on scene?

23   A.    At the time, it was Sergeant Brooks; he's now Lieutenant

24   Brooks.

25   Q.    And when Sergeant Brooks arrives on scene, why do you warn

1   him that you are live?

2   A.   Sergeant Brooks isn't wearing a body camera.  Supervisors

3   and detectives aren't issued them.  It's my common practice

4   that anyone's walking into a scene, whether they're patrolmen,

5   supervisor, detective, I'm going to say, "Hey, I'm live, I'm

6   recording."

7   Q.   And can you please tell the jury what happens during this

8   portion of the video?

9   A.   That's Officer Robey talking to Sergeant Brooks about, you

10   know, what had transpired, why he called for him.

11   Q.   And at the end of this portion of the video is that you

12   who says "I'm going to power down"?

13   A.   Yes.

14   Q.   And what does that mean?

15   A.   That I was shutting down my body camera.  I was heading

16   back to my cruiser.

17   Q.   Did you turn your body-worn camera on at any other point

18   that night?

19   A.   No.

20   Q.   Where did you go when you left the scene?

21   A.   Went back to District B-3.

22   Q.   And about how far is B-3 stationed from the scene?

23   A.   Only a couple blocks.  Probably under a half mile.

24   Q.   And what happened when you got back to the station?

25   A.   When I got back to the station, I had parked my cruiser in

1    the lot, and then I heard yelling, and I went towards the

2    yelling.

3    Q.    What happened when you went towards the yelling?

4    A.    I realized that the yelling was Mr. McCullough and Officer

5    Robey was trying to transport him through the bay back to the

6    booking area.

7    Q.    Did you assist Officer Robey at that point?

8    A.    Yeah.

9    Q.    And how did you assist Officer Robey?

10   A.    I joined up with him at some point and then I assisted by

11   opening the back door which goes to the booking area.  There's

12   a punch code.

13   Q.    Did you help book Mr. McCullough?

14   A.    I did not.

15   Q.    Where did you go after you opened that door?

16   A.    I went back around.  There's a -- so I went back out of

17   the bay out to the outside of the building, and then I went

18   around to the back door of the station.

19   Q.    Did you go back into the station?

20   A.    I went back into the station.

21   Q.    And what did you do when you went back into the station?

22   A.    I don't 100 percent recall.  It had been the end of my

23   tour.  I had done a double plus a one-hour break and additional

24   time at the end.

25   Q.    So this was the last incident of your night during your

1  shift?

2  A.   Yes.

3  Q.   Did you write a report about this incident?

4  A.   I did.  I wrote a Form 26.

5  Q.   Can you explain to the jury what a Form 26 is?

6  A.   A Form 26 is like an internal report.  It goes to your

7  captain.

8  Q.   And how did you -- who did you submit that Form 26 to?

9  A.   I submitted it via e-mail this again was during COVID.

10  They were trying to limit the number of people that were in the

11  station and also, my shift had finished, so I sent it via

12  e-mail to Sergeant Brooks.

13  Q.   Did you submit any other reports regarding this incident?

14  A.   No.

15  Q.   When was your last interaction with Mr. McCullough that

16  night?

17  A.   Right before the booking area.

18  Q.   Why did you not participate in booking Mr. McCullough?

19  A.   It wasn't my arrest.

20       MS. DAVIDSON:  Can I have one minute, Your Honor?

21  BY MS. DAVIDSON:

22  Q.   I just have one more question for you.  Do you believe

23  that Officer Robey had probable cause to arrest Mr. McCullough?

24       MR. O'NEILL:  Objection.

25       THE COURT:  I don't mind the individual officer's

1  opinion about what he did, but as a second hand opinion, he

2  won't know.

3  BY MS. DAVIS:

4  Q.   Do you believe that there was probable cause to arrest

5  Mr. McCollough?

6          THE COURT:  At that form you can ask it.

7          THE WITNESS:  I do.

8          MS. DAVIDSON:  I have no further questions, Your

9  Honor.

10         THE COURT:  Mr. O'Neill.

11         MR. O'NEILL:  Thank you, Your Honor.

12                       CROSS-EXAMINATION

13  BY MR. O'NEILL:

14  Q.   Good afternoon, Officer Woods.

15  A.   Good afternoon, Attorney O'Neill.

16  Q.   You've never had pepper spray or OC spray canister in your

17  hand and had it deploy without you intending it to, correct?

18  A.   That's correct.

19  Q.   And other than the events of April 25, 2020, you don't

20  recall an officer having a canister of OC spray or pepper spray

21  accidentally deploy, correct?

22  A.   Correct, I don't recall.

23  Q.   During the course of Mr. McCullough's arrest on April 25,

24  2020, he never struck you, correct?

25  A.   He did not strike me.

1    Q.   You weren't injured as a result of the interaction with

2    Mr. McCullough on that night, correct?

3    A.   I was not injured.

4         MR. O'NEILL:  Nothing further, Your Honor.

5         MS. DAVIDSON:  I have nothing further, Your Honor.

6         THE COURT:  Thank you very much, Officer Woods.  That

7    concludes your testimony.

8         MR. WHITESELL:  At this time, Your Honor, with obvious

9    things to discuss with Your Honor, the defense rests.

10        MR. O'NEILL:  Nothing further from me, Judge.

11        THE COURT:  All right, jurors, that concludes the

12   evidence in the case, just about the time we predicted.

13   Tomorrow morning we start at the usual time.  There may be just

14   a few minutes delay.  I've written out the jury instructions.

15   I do want to give the lawyers a chance to go over them.  If

16   they have any improvements they want to make, we may spend a

17   few minutes processing that.  We'll try to be ready at 9:00, in

18   any event.  We'll look forward to seeing you at the usual time

19   tomorrow morning.

20        (Whereupon the jury was excused.)

21        THE COURT:  I haven't finished proofreading, but I

22   basically have the jury instructions together and I think, in

23   going through them, I'll answer the question I know defense is

24   posing, which is:  What would I do if the motion of

25   acquittal -- no, not acquittal, a judgment not withstanding the

1    evidence in the case.

2         So here is my sense, and this is what I'm going to put

3    to the jury.  I took very careful note of Mr. O'Neill's

4    descriptions which is very useful of the actual claim that

5    we're going forward with -- at least the plaintiff was going

6    forward with in the case.  Some are duplicative and I tend to

7    compress them into one description.

8         But what -- I propose to do this:  Of the substance of

9    the claims themselves, the one that I'm going to, basically,

10   take out of the case now is the state malicious prosecution

11   claim.  The state malicious prosecution common, law claim

12   requires showing of malice which means evil intent, and I just

13   don't think there's evidence in the case that will support a

14   finding of malice so it is with punitive damages.  I don't

15   think those are warranted in terms of the instructions.

16        Federal law is different.  I don't know why we call it

17   malicious prosecution because malice is not an element of the

18   federal malicious prosecution claim.  I think the more correct

19   term should probably be wrongful prosecution, but those claims,

20   I think, all basically lodge against Officer Robey exclusively.

21   I just don't really -- I think having Officer Woods in the

22   case, that's really hanging on by the skin of our teeth, here,

23   in that his involvement is pretty minimal.

24        The only argument that I see you might make is the --

25   and I'll give the instruction on the failure to intervene the

1   request that the plaintiff makes in his instructions, but I

2   think I'll most likely direct that out, even if the jury

3   disagrees with me on that claim.  I just did not hear evidence

4   beyond one hand being placed on the plaintiff during the course

5   of the arrest.  I think that pretty much is controlled by

6   Supreme Court cases which say that is simply not enough.  I'm

7   thinking of the case involving Vice President Gore, where the

8   Court said not every touching, push, or shove amounts to

9   excessive force under the Fourth Amendment.  So the question, I

10  think, in terms of what remains of that instruction, is whether

11  the jury would find that Officer Woods had a realistic

12  opportunity to intervene or even if that intervention was

13  required.

14          Under the circumstances, the jury can very well take

15  the view that there was nothing extraordinary about the arrest.

16  It is the case, as I will explain to the jury, that under state

17  law an arrestee has no right to resist arrest even if he

18  sincerely believes the arrest is illegal.  It's only when

19  excessive force is applied is any kind of resistance by an

20  arrestee is permitted, but that is a jury issue, not one for me

21  to make at this point.

22          So when we get to the damages issue, the only damage

23  claim that I can see, Mr. O'Neill, is the emotional distress

24  claim.  I don't think there was any suggestion of medical bills

25  or lost wages, so I think it's really just the usual emotional

1   distress measure of humiliation, upset, this, that and so on,

2   which is what I will explain to the jury.  I'll then ask them

3   if they do return damages to designate damages separately, in

4   terms of the total verdict, as between two officer defendants

5   because, as I said, I may take one of them entirely out of the

6   case, and I will just simplify things if I don't have to make a

7   damage assessment myself.  I'll let the jury do that work for

8   me.

9           What I'm going do now, as soon as I finish

10  proofreading, is I'll e-mail a copy of the instructions to you

11  and I'll ask if -- I know it's a little bit hard, but, at the

12  end of business today, if you can get back any suggestions to

13  me, because I like to make any recollections that I think are

14  warranted.

15          Tomorrow morning, let's plan to meet at say 8:45 to go

16  over any outstanding differences, but it would be nice to start

17  on time with the jury in the morning, and if we do this in

18  advance -- plus, I think you'll feel better prepared for your

19  closing arguments if you know what I'm going to be saying to

20  the jury, as you will, because you'll be seeing the

21  instructions.  Of course they may change a little bit depending

22  on whatever suggestions you give.

23          So what I'm going to do is, with respect to the Mass

24  Civil Rights Act, I'm going to explain to the jury that with

25  respect to all of the claims except the malicious prosecution

1    claim which is solely a federal, that the Massachusetts Act,

2    although it has one differing element that I'll explain, but it

3    has no bearing on the case.  The law is the same and the

4    verdict slip I will explain that, if you are finding excessive

5    force, you're finding it both as a matter of federal and state

6    law under the act.  I don't think there's any reason to make

7    the jury answer the same question twice.

8         So -- but you'll see that, because I'm going to send

9    you the verdict slip, as well, so you can see how I've

10   instructed on the verdict slip.  So that you should have, I

11   hope, within the next hour and a half, and good work on it.

12   I've lined it out by line number so, when you send back

13   suggestions, we'll know exactly where your suggestion is

14   targeted because you'll have line numbers to refer to.

15        Closing arguments, that will be tomorrow morning, I

16   think I said 45 minutes which would seem to be adequate.  I'm

17   not going to cut anybody off if you wander over 45 minutes, but

18   I would suggest 45 minutes seems like a reasonable amount of

19   time for the closing.

20        For reasons that no one can explain, the defendant in

21   federal court goes first followed by the plaintiff.  The reason

22   may be that the plaintiff has the burden of proof so the

23   plaintiff gets the last word, for that reason.  But this is not

24   actually written down as a rule anywhere, unlike the federal

25   closing statements.  We've always done it that way and, of

1  course, we'll always go on doing it that way until somebody

2  tells us differently, and they haven't as yet.  So unless

3  there's something else pressing today, I think we probably

4  better spend our time tomorrow morning with all of the

5  documents in hand.

6          MR. WHITESELL:  Your Honor, just so I'm clear, Your

7  Honor's ruling is there's not going to be a punitive damages

8  instruction?

9          THE COURT:  No punitive damages instruction.

10  Malicious prosecution only on the federal side of the case and

11  as I said, the only count that I think really implicates --

12  potentially in the jury's mind -- Officer Woods is the failure

13  to intervene claim which I will describe to the jury.

14          MR. WHITESELL:  Does Your Honor on the jury slip

15  intend to have only that claim be Officer Woods and the

16  remainder of the claims be Officer Robey?

17          THE COURT:  The questions will be very specific.  Do

18  you find that, x did this on that date in violation of federal

19  and state law or in one case in violation of federal law

20  solely.

21          MR. WHITESELL:  Thank you, Your Honor.

22          MR. O'NEILL:  I just want to note my objection as to

23  the exclusion of the punitive damages instruction, but I have

24  nothing further.

25          THE COURT:  I would -- formally, you probably want to

1   do that.  I do have to have a sidebar conference after I finish

2   the instructions to preserve the defendant's right to reserve.

3   I'll certainly note yours is preserved as well but, again, I

4   think both sides should renew any request after I give the

5   instructions to the jury and before they begin, obviously, the

6   deliberations.

7             MR. O'NEILL:  Very well.

8             THE COURT:  See everyone tomorrow morning.

9             (Whereupon the hearing was adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Jessica Leonard, Certified Shorthand Reporter

4    and Federal Certified Realtime Reporter for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter, to the best of my skill and ability.

9              Dated this 8th day of April, 2024.

10

11

12              /s/ Jessica M. Leonard
                _____

13              Jessica M. Leonard, CSR, FCRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25